**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ELM HAVEN CONSTRUCTION, L.P., | : | CIVIL NO. 3:01-CV-01307 (WIG) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NERI CONSTRUCTION, LLC, | : | FEBRUARY 27, 2006 |
| Defendant. | : | |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW AND RESPONSES TO DEFENDANT'S EXTRA WORK CLAIMS

## TABLE OF CONTENTS

I.  PROPOSED FINDINGS OF FACT ................................................................. 1

   A.  Background ............................................................................................. 1

   B.  Subcontract and the Contract Documents ...................................................... 3

   C.  Neri's Scope of Work ........................................................................... 10

   D.  Unsuitable Materials ............................................................................. 27

   E.  Block B Acceleration Period and Neri's "Confirmations of Change" .................... 41

   F.  Payment Procedures .............................................................................. 54

   G.  Status of Project, March 2000 ................................................................. 54

   H.  Progress of Work, March - October 2000 .................................................... 55

   I.  Elm Haven's Takeover of Neri's Work Related to the Fine Grading and
      Paving of Foote Street, New Street 3, New Street 4, and Parking Lots and
      Driveways in Blocks E, F, and G, in October 2000 ......................................... 65

   J.  Progress of Work, November - December 2000 .............................................. 74

   K.  Change Order No. 204-55 ....................................................................... 79

        $515.00 for the repair of damaged water meter pits ...................................... 79

        $794.00 for two lawn pedestal boxes ...................................................... 80

        $14,742.00 for the replacement of two light poles ....................................... 80

        $35,000.00 for site work surveying services ............................................... 80

        $5,072.50 for the removal of unsuitable materials ....................................... 81

        $6,280.50 for the excavation for sonotube installations and corrective work ....... 81

        $290.00 for the application of an additional two inches of topsoil ................... 81

        $2,045.00 for video inspections of sewer laterals ....................................... 82

        $33,823, $6,264, $5,931, and $1,680 for the installation of concrete stairs and
            railings ....................................................................................... 83

        $768.50 for street cleaning .................................................................. 84

        $4,136.91 for various erosion and sedimentation control systems ................... 84

        $182,283 for fine grading and paving performed by Waters Construction .......... 84

$30,011, $11,675, and $65,800, for (*i*) repairs to sanitary sewers; (*ii*) resetting of manhole frames and covers; and (*iii*) the removal and replacement of incorrectly installed concrete sidewalks and handicapped ramps .................................... 85

$1,467 for radius curbing and bullnose granite ............................................... 93

$572.40 to repair one aluminum fence panel and one aluminum post ................... 94

L.   Progress of Work, January 2001 - June 2001 ................................................. 94

Remaining Site Work within Block G-2 ...................................................... 95

Remaining Road Work ............................................................................. 99

M.   Elm Haven's Completion of Neri's Work Under the Subcontract ....................... 107

N.   Elm Haven's Claim Against Neri.................................................................. 119

II.   PROPOSED CONCLUSIONS OF LAW ....................................................... 122

A.   General ................................................................................................ 122

B.   Contract Interpretation............................................................................. 122

C.   Conclusions of Law ................................................................................ 124

The Reconstruction of Ashmun Street South............................................. 124

The Installation of Utility Laterals Beneath Ashmun Street North ................. 125

Excavation, Removal and Disposal of Unsuitable Materials .......................... 125

Site Concrete and Concrete Stairs.......................................................... 127

Excavations for Foundations ................................................................. 127

Survey Control on the Project ............................................................... 128

Cleaning Streets and Areas around the Project ......................................... 128

Items Damaged by Neri's Forces on the Project ....................................... 128

Erosion and Sedimentation Control on the Project..................................... 129

Rough and Fine Grading on the Project, and Application of Topsoil .............. 129

Inspections ....................................................................................... 129

D.   *Contra Proferentem* .............................................................................. 129

E.   Prejudgment Interest ............................................................................... 130

III.   RESPONSES TO NERI'S EXTRA WORK CLAIMS........................................ 132

Exhibit 594 - Neri Extra Work Claim No. NC-013-204-1 ..................................... 132

RJT/29497/3/761609v1
02/27/06-HRT/

Exhibit 593 - Neri Extra Work Claim No. NC-010-204 ......................................... 137
Exhibit 598 - Neri Extra Work Claim No. NC-017 ............................................... 139
Exhibit 599 - Neri Extra Work Claim No. NC-019 ............................................... 141
Exhibit 602 - Neri Extra Work Claim No. NC-023-207-1 ..................................... 141
Exhibit 560 - Neri Extra Work Claim No. NC-051-207 ......................................... 143
Exhibit 561 - Neri Extra Work Claim No. NC-052 ............................................... 145
Exhibit 562 - Neri Extra Work Claim No. NC-055-207 ......................................... 145
Exhibit 563 - Neri Extra Work Claim No. NC-056-207-1 ..................................... 145
Exhibit 564 - Neri Extra Work Claim No. NC-056-207-4 ..................................... 148
Exhibit 565 - Neri Extra Work Claim No. NC-058-207-1 ..................................... 151
Exhibit 566 - Neri Extra Work Claim No. NC-059-207-1 ..................................... 156
Exhibit 567 - Neri Extra Work Claim No. NC-060-207-1 ..................................... 158
Exhibit 568 - Neri Extra Work Claim No. NC-061-207-1 ..................................... 160
Exhibit 569 - Neri Extra Work Claim No. NC-062-207-1 ..................................... 163
Exhibit 570 - Neri Extra Work Claim No. NC-063-207 ......................................... 170
Exhibit 572 - Neri Extra Work Claim No. NC-064-207 ......................................... 171
Exhibit 573 - Neri Extra Work Claim No. NC-064-207-1 ..................................... 172
Exhibit 574 - Neri Extra Work Claim No. NC-065-207-2 ..................................... 173
Exhibit 575 - Neri Extra Work Claim No. NC-065-207-4  ..................................... 173
Exhibit 576 - Neri Extra Work Claim No. NC-067-207-1 ..................................... 175
Exhibit 577 - Neri Extra Work Claim No. NC-067-207-2 ..................................... 181
Exhibit 578 - Neri Extra Work Claim No. NC-068-207-1 ..................................... 183
Exhibit 580 - Neri Extra Work Claim No. NC-069-207-1 ..................................... 187
Exhibit 581 - Neri Extra Work Claim No. NC-070-207 ......................................... 190
Exhibit 582 - Neri Extra Work Claim No. NC-070-207-1 ..................................... 194
Exhibit 555 - Neri Extra Work Claim No. NC-022-207 ......................................... 195
Exhibit 556 - Neri Extra Work Claim No. NC-022-207-1-C ................................. 195
Exhibit 557 - Neri Extra Work Claim No. NC-039-207-2-B ................................. 196
Exhibit 583 - Neri Extra Work Claim No. NC-074-207-2-B ................................. 198

RJT/29497/3/761609v1
02/27/06-HRT/

Exhibit 584 - Neri Extra Work Claim No. NC-076-207-3-C ................................. 200

Exhibit 585 - Neri Extra Work Claim No. NC-076-207-6-B ................................. 201

Exhibit 586 - Neri Extra Work Claim No. NC-207-115 ...................................... 202

Exhibit 587 - Neri Extra Work Claim No. NC-207-126 ...................................... 203

Exhibit 588 - Neri Extra Work Claim No. NC-207-129 ...................................... 204

Exhibit 590 - Neri Extra Work Claim No. NC-207-138 ...................................... 206

Exhibit 592 - Neri Extra Work Claim No. NC-207-146 ...................................... 209

Exhibit 595 - Neri Extra Work Claim No. NC-015-204 ...................................... 211

Exhibit 597 - Neri Extra Work Claim No. NC-015-204-G..................................... 212

Exhibit 600 - Neri Extra Work Claim No. NC-019-204-1-G ................................. 213

Exhibit 601 - Neri Extra Work Claim No. NC-019-204-2-G ................................. 215

Exhibit 605 - Neri Extra Work Claim No. NC-045-204-1 ................................... 215

Exhibit 607 - Neri Extra Work Claim No. NC-075-204-1-E ................................. 217

Exhibit 608 - Neri Extra Work Claim No. NC-204-56 ...................................... 218

Exhibit 609 - Neri Extra Work Claim No. NC-204-57 ...................................... 219

Exhibit 610 - Neri Extra Work Claim No. NC-204-78 ...................................... 220

Exhibit 611 - Neri Extra Work Claim No. NC-204-87 ...................................... 222

Exhibit 613 - Neri Extra Work Claim No. NC-204-131 ..................................... 223

Exhibit 614 - Neri Extra Work Claim No. NC-204-134...................................... 226

Exhibit 615 - Neri Extra Work Claim No. NC-204-135...................................... 228

Exhibit 616 - Neri Extra Work Claim No. NC-204-139...................................... 229

Exhibit 603 - Neri Extra Work Claim No. NC-028-204-1-G ................................. 229

Exhibit 612 - Neri Extra Work Claim No. NC-204-130...................................... 232

**IV.  SUMMARY OF ELM HAVEN'S CLAIM FOR RELIEF** ................................. 235

RJT/29497/3/761609v1
02/27/06-HRT/

The Plaintiff, Elm Haven Construction Limited Partnership ("Elm Haven"), hereby submits its Proposed Findings of Fact and Conclusions of Law, in support of its claim for monetary damages against the Defendant Neri Construction, LLC ("Neri"), and its Responses ("Responses") to Neri's Extra Work Claims. In summary, Elm Haven claims monetary damages in the amount of **$268,360.00**, exclusive of interest and costs.

## I.    PROPOSED FINDINGS OF FACT

### A.    Background

1.    Elm Haven was the General Contractor for the construction of a public housing project in New Haven, Connecticut, known as Elm Haven Hope VI Urban Revitalization Housing ("the Project"). Joint Trial Memorandum, ¶ 5A.a.

2.    Neri is an experienced site work subcontractor with over forty years' experience in the business of performing site work. Joint Trial Memorandum, ¶ 5A.c; *see also* Vincent Neri Direct Testimony, June 13, 2005, at 215:23-216:14; Carl Neri Direct Testimony, September 13, 2005, at 02:23-03:02.

3.    Loureiro Engineering Associates, Inc. ("LEA"), is a Connecticut engineering and environmental services company, and was, at all times material hereto, contracted with Elm Haven Rental Limited Partnership I and II (the "Owner") to provide inspection services for the Owner and the City of New Haven, with respect to the construction of public utilities, roadways, and rights-of-way on the Project. Joint Trial Memorandum, ¶ 5A.e; John Ford Direct Testimony, June 6, 2005, at 84:25-85:16.

4.    Fletcher Thompson, Inc. ("Fletcher Thompson") was, at all times material hereto, engaged in the business of architecture, engineering, and interior design. Pursuant to an architectural services contract with the Owner, Fletcher Thompson was the Architect of record on the Project. Joint Trial Memorandum, ¶ 5A.f; John Ford Direct Testimony, June 6, 2005, at 94:25.

1

5.      On or about January 26, 1999, Elm Haven and the Owner entered into a guaranteed maximum price contract for the construction of the Project. Joint Trial Memorandum, ¶¶ 4A, 5A.g.

6.      On or about March 5, 1999, Elm Haven entered into a Subcontract (the "Subcontract") with Neri, pursuant to which Neri agreed to provide materials, tools, equipment, and labor necessary to complete the site work on the Project, for the lump sum of $3,642,500.00, all as is more particularly set forth in the Subcontract Documents. Joint Trial Memorandum, ¶ 5A.h.

7.      For contract administration purposes, the work under the Subcontract was separated into two parts, Project No. 204 (also known as Phase 1B) and Project No. 207 (also known as Phase 1C). The work associated with Project No. 204 (Phase 1B) involved all of the general site work for Blocks D, E, F, and G, and the reconstruction of all or portions of Admiral Street, Canal Street, Dixwell Avenue, Foote Street, Gregory Street, Henry Street, and New Streets 1, 2, 3, and 4, as well as Ashmun Street South. *See* **Exhibit 5**, Subcontract Drawings. The price for this phase of the work was $2,470,258.00. The work associated with Project No. 207 (Phase 1C) included all of the general site work for Blocks B and C, as well as the reconstruction of Ashmun Street North, along with Ashmun Street from Gregory Street to Webster Street. The price for this phase of the work was $1,172,242.00 of the Subcontract price. *Id.*; John Ford Direct Testimony, June 6, 2005, at 59:02-59:15.

8.      Throughout the course of the Project, Elm Haven issued payments to Neri totaling $2,822,034.26. Joint Trial Memorandum, ¶ 5A.n.

9.      Throughout the Project, Elm Haven issued fifty-four Change Orders for Phase 1B (Project No. 204) to Neri, totaling $499,527. Joint Trial Memorandum, ¶ 5A.k.

10.      Elm Haven also issued Change Order No. 204-55, a backcharge change order in the amount of $409,153.71, to Neri on March 27, 2001, for costs incurred by Elm Haven through 2000, to perform various portions of Neri's scope of work. *See* **Change Order No. 204-55**, *infra*.

11.      Throughout the Project, Elm Haven issued thirty-nine Change Orders to Phase 1C (Project No. 207) to Neri, totaling $286,035. Joint Trial Memorandum, ¶ 5A.*l*.

RJT/29497/3/761609v1
02/27/06-HRT/

12. John Ford was hired by Elm Haven on March 20, 2000, and relieved Lorraine Beckwith as Project Manager shortly thereafter. John Ford Direct Testimony, June 6, 2005, at 49:14-49:15, 51:07-51:11. In that capacity, he was responsible for ensuring that the Project was built in accordance with the Subcontract and the Contract Documents. *See id.* at 50:23-50:25.

**B.      Subcontract and the Contract Documents**

13. Neri was obligated to perform the Subcontract work in strict accordance with the Contract Documents (which included certain specifications and drawings), including any work reasonably inferable therefrom. Specifically, the Subcontract provided:

> The Subcontractor agrees to perform the Work in strict accordance with the Contract Documents. All work covered by this Agreement shall be performed in a skillful and workmanlike manner according to good construction industry or trade practice.

**Exhibit 1**, Article 2.2 of the Subcontract (emphasis added). The Subcontract further provided:

> The Subcontractor hereby agrees to furnish all labor, materials, equipment, facilities, supervision and/or administration required, and perform all services and work necessary, to complete the following portion of the Work and any work reasonably inferable therefrom:
>
> **SITEWORK, UTILITIES, SITE CONCRETE, PAVING**
>
> The Subcontract Work shall be performed in accordance with the following documents (the "Contract Documents"), which are incorporated herein and made a part hereof:
>
> > Attachment "A" - Rider Page 1-10
> > Attachment "B" - Contract Documents; Phase 1B pages 1-8; Phase 1C pages 1-7; Senior Building pages 1-3

3

Attachment "C" - Schedule of Insurance Requirements

Attachment "D" - Safety Requirements for Subcontractors

Attachment "E" - Contract Provisions Required by Federal Law or The Amended and Restated Subgrant Agreement by and Between the Housing Authority of the City of New Haven and Elm Haven Homes Partnership

Attachment "F" - Wage Rates; U.S. Department of Housing & Urban Development, General Decision Number CT970002, Modification Number 0, Dated 2/14/97.

**Exhibit 1**, Article 1.1 of the Subcontract (emphasis added).

14.      Attachment "B" to the Subcontract (**Exhibit 1**) lists the project specifications, drawings, and other associated documents. *See also* **Exhibit 2**, Addenda 1 through 4; **Exhibit 3**, Project Specifications Vols. I and II; **Exhibit 4**, Geotechnical Engineering Report dated January 14, 1997; and **Exhibit 5**, Subcontract Drawings.

15.      The Contract Documents include, but are not limited to, the drawings specified in Attachment "B." *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 1.

16.      Drawing SS-26, "Phase 2 Streets, Sewers & Utilities - Ashmun Street, Sta. 14+68 to 21+15," dated October 9, 1998, is listed in Attachment "B," as one of the Contract Documents, and is included in Neri's scope of work. *See* **Exhibit 1**, Attachment "B" to the Subcontract, List of Drawings and Specifications; *see also* **Exhibit 5**, Drawing SS-26; **Exhibit 437**, Letter of Transmittal dated October 19, 1998.

17.      In executing the Subcontract on March 5, 1999, Vincent Neri acknowledged that Neri reviewed and examined the Subcontract and all of the Contract Documents, and all documents relating to the Subcontract. Vincent Neri also acknowledged that Neri fully examined and analyzed all conditions that could have affected the performance of its scope of work. **Exhibit 1**, Article 11.4 of the Subcontract.

4

18.    Time was of the essence of the Subcontract.  **Exhibit 1**, Article 2.1 of the Subcontract.

19.    As part of the Subcontract, Neri provided an add Alternate in the event that it was requested by Elm Haven to perform site work in Blocks A-1, A-2 and K-1.

> This Subcontractor Agreement includes an Alternate for the work (same scope as base contract) associated with Blocks A1, A2, and K1, in the amount of $620,000.00.  This dollar amount will be added to the Subcontract price if accepted by the Owner no later than June 30, 1999.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 5 (emphasis added).

20.    As John Ford testified, the Alternate was intended to allow Elm Haven to rapidly move ahead with the development of those blocks, if it chose to do so:

> The idea behind the Alternate was that, as I pointed out before, the future blocks of A-1, A-2 and K-1, if the owner chose to proceed with those blocks, the development of those blocks, along with Phase 1B and 1C, we would have the prices already established and be able to move quickly to include them in Phase 1B and 1C.

John Ford Direct Testimony, June 6, 2005, at 83:08-83:14.

21.    Neri agreed to perform its obligations in accordance with all applicable laws, regulations and requirements, and to the approval of Elm Haven, the Architect, and the Owner:

> The Subcontractor agrees that its performance of the Subcontract Work will be conducted in accordance with all applicable governmental laws, regulations and requirements, including but not limited to, building, fire, safety and similar laws, codes and ordinances, and shall be subject to the approval of the Contractor and, to the extent provided in the Contract Documents, to the

5

supervision and approval of the Architect or any other person
authorized therein to act on behalf of the Owner. . . . There shall
not be increases in the Subcontract Price for Amendments during
construction necessary to comply with building, fire, safety and
similar laws, codes and ordinances.

**Exhibit 1**, Article 2.4 of the Subcontract (emphasis added).

22.     The only forms capable of altering, adding to or deviating from the Subcontract
are Change Orders or Construction Change Directives.

The Subcontractor acknowledges that the Contractor may issue to
the Subcontractor, without notice to any surety, written
instructions (Amendments, which term as used herein shall
include Change Orders and Construction Change Directives)
requiring alterations or additions to or deviations from the
Subcontract Work. The Subcontractor agrees that it will accept
such Amendments and that it will make no alterations or additions
to or deviations from the Subcontract Work, except in accordance
with an Amendment. The amount of any addition to or deduction
from the Subcontract Price and any extension of time shall be
determined in accordance with the Contract Documents and shall
be specifically stated in such Amendment, except that in no case
shall the Subcontractor be paid on account of overhead and profit
at a rate in excess of ten percent (10%) of the cost of the work.
The Subcontractor shall in no event be entitled to any
compensation in an amount greater than that which the Contractor
receives from the Owner with respect to such Amendment.

**Exhibit 1**, Article 2.6 of the Subcontract (emphasis added).

23.     Neri was obligated to provide information to substantiate its claims for extra
work costs, and any other information, certificates and reports required for payment of any
portion of the Subcontract price. *See* **Exhibit 1**, Articles 2.6 and 4.5 of the Subcontract.

RJT/29497/3/761609v1
02/27/06-HRT/

24.     John Ford's insistence on the use of Change Orders to memorialize changes to the Subcontract and extra work performed by Neri was in accordance with the Subcontract.

> Q.: [W]hat was Mr. Ford's policy with regard to the performance of extra work?
>
> A.: He wanted everything to be in a lump sum type of change order. He wanted it to be in a change order.

Vincent Neri Direct Testimony, June 15, 2005, at 142:10-142:13.

> Q.: What I'm focusing on is Mr. Ford's procedure [for issuing change orders], was something that was in the bounds of the contract, correct?
>
> A.: Yeah, I believe there was.

Vincent Neri Testimony on Cross-Examination, June 17, 2005, at 82:24-83:02.

25.     As the Contractor, Elm Haven controlled all matters relative to the timely and orderly performance and completion of the Subcontract Work.

> The Contractor shall have the right to decide the time, order and priority in which the various portions of the Work shall be performed and all other matters relative to the timely and orderly performance and completion of the Subcontractor's Work.

**Exhibit 1**, Article 3.4 of the Subcontract (emphasis added).

26.     Neri was required to attend all project coordination meetings, and its failure to do so constituted a material breach of the Subcontract.

> The Contractor will schedule job meetings on a regular basis.
> The Subcontractor shall attend all job meetings on a regular basis.
> The Subcontractor shall attend all job meetings as scheduled; failure to attend a job meeting shall be considered a material

RJT/29497/3/761609v1
02/27/06-HRT/

<u>breach</u> of this Agreement.

**Exhibit 1**, Article 3.4 of the Subcontract (emphasis added).

27.     Neri was required to promptly notify Elm Haven, in writing, whenever it encountered any ambiguities or discrepancies in the Subcontract, and its failure to timely do so rendered it liable for the costs and/or consequences of its actions thereafter.

> In case of any ambiguity or discrepancy in this Contract, the Subcontractor <u>shall promptly submit the matter to the Contractor, in writing, otherwise the Subcontractor will be held solely liable to make any change necessary to correct same</u>. Any decision or adjustment by the Subcontractor without a written determination by the Contractor <u>shall be at the Subcontractor's sole risk and expense</u>.

**Exhibit 1**, Article 11.4 of the Subcontract (emphasis added).

28.     Neri was obligated to provide and supply a sufficient number of properly trained and skilled workmen required to complete the Subcontract Work. *See* **Exhibit 1**, Article 6.1.1 of the Subcontract.

29.     Neri was obligated to provide sufficient, safe and proper facilities at all times for the protection of the Subcontract Work. *See* **Exhibit 1**, Article 6.1.3 of the Subcontract; *see also* **Exhibit 3**, Project Specifications Vols. I and II, § 01500 ¶ 2.03.

30.     Neri was obligated to provide a full-time, competent and experienced superintendent on the Project site at all times. *See* **Exhibit 1**, Article 6.1.10 of the Subcontract.

31.     Neri's failure to perform in strict accordance with the Subcontract, its failure to diligently prosecute and perform all or any part of its work, and its failure or refusal to supply sufficient and proper quality labor, equipment and materials to Elm Haven's satisfaction rendered it in default.

> The <u>Subcontractor shall be in default</u> hereunder if . . . [t]he

RJT/29497/3/761609v1
02/27/06-HRT/

>Subcontractor shall <u>fail to perform in strict accordance with this Subcontract or the Contract Documents</u>, shall be in breach of any term or condition of this Subcontract Agreement, or shall <u>fail to diligently prosecute and perform all or any part of the Subcontract Work</u> or shall <u>fail or refuse to supply sufficient and proper quality workmen, equipment, and materials</u>, to the satisfaction of the Contractor.

**Exhibit 1**, Article 9.1.2 of the Subcontract (emphasis added).

32.     In the event of a default by Neri, Elm Haven was entitled under the Subcontract to:

>Provide any labor, materials or equipment necessary to perform the Work subject to [the Subcontract] and to deduct the cost thereof, including an amount equal to 5% thereof, representing the Contractor's overhead, from any payments then or thereafter due to the Subcontractor.

**Exhibit 1**, Article 9.2.1 of the Subcontract.

33.     In addition to its Subcontract work on the Project, Neri had a contract with the City of New Haven known as the Combined Sewer Overflow (CSO) separation contract ("the CSO Contract"), whereby Neri would separate the city's storm water runoff and domestic wastewater systems in the vicinity of the Project. The CSO Contract included the installation of new storm drains on Ashmun, Canal, Foote and Webster Streets. *See* John Ford Direct Testimony, June 6, 2005, at 59:17-60:04.

34.     Under the Subcontract, Neri was required to ensure that its performance of the Subcontract work would not be hindered or prevented in any way by its contractual obligations to the City of New Haven:

>This Subcontractor agrees to complete all work in this Subcontract in a timely manner based on originally designed CSO work per agreed upon schedules and <u>in no way will allow any Contracts received from the City of New Haven to effect</u> [*sic*]

this work included in Subcontract, either by schedule or any
problems with payment.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.V (emphasis added); *see also* John
Ford Direct Testimony, June 6, 2005, at 77:16-77:20.

**C.    Neri's Scope of Work**

35.    The work inside Block D was eventually eliminated from Neri's scope of work,
and a credit in the amount of $254,417.00 was applied to the balance of the Subcontract.  John
Ford Direct Testimony, June 9, 2005, at 24:12; *see* **Exhibit 376**, Elm Haven Cost-to-
Complete Summary.  Neri accepts this credit.  *See, e.g.,* **Exhibit 660**, Claim/Contract
Summary.

36.    Neri's scope of work included drawings labeled as "Phase 2" which described
work in the Phase 1B/1C Subcontract.  These drawings are listed in Attachment "B," as part
of the drawings included in Neri's Subcontract.  **Exhibit 1**, Attachment "B" to the
Subcontract; *see also* John Ford Direct Testimony, June 6, 2005, at 70:03-70:19, 71:05-71:22;
John Ford Direct Testimony, June 7, 2005, at 151:23-152:02; 157:25-158:04; **Exhibit 5**,
Subcontract Drawings.

37.    Neri received several drawings and other documents including, *inter alia*,
Drawings SS-25 through SS-38, on or about October 19, 1998.  These drawings included
"Phase 2" drawings, and Neri was directed to include these Phase 2 drawings and their scope-
of-work items in its bid on the Phase 1B/1C Subcontract.  As stated in Lorraine Beckwith's
letter of transmittal to Stephen Simoncini, on October 19, 1998:

Phase 1 revisions by Addendum and Drawing revision.  Phase 2
Blocks D & E are new and added to Phase 1 Bid Package.

Note: Your Phase 1 Bid To Be Revised As Follows:
1. Add blocks D & E.
2. Deduct Blocks A1, A2, K1 - Price these as alternates
3. All sitework on Ashmun St. adjacent to Blocks A1, A2, K1 to
be included in Phase 1 base bid
4. Revisions to remainder of Phase 1.

10

**Exhibit 437**, Letter of Transmittal dated October 19, 1998 (emphasis added); *see also* **Exhibit 5**, Subcontract Drawings.

38.     Drawing SS-26 includes paving, roadwork and utilities along Ashmun Street South, from the intersection of Ashmun Street and Webster Street to Station 21+15, where the drawing indicates "End of New Pavement & Curbs (Sta. 21+15) Match Existing Grade." *See* **Exhibit 5**, Drawing SS-26. Drawing SS-26 is specifically listed as a Contract Document, and is therefore included in Neri's scope of work. *See* **Exhibit 1**, Attachment "B" to the Subcontract.

39.     Lorraine Beckwith and Stephen Simoncini negotiated the Subcontract over several months, exchanging proposals back and forth, with each party making annotations, line-outs, and corrections to what would eventually become the Subcontract. As Lorraine Beckwith testified:

> Q.: . . . [C]an you describe that process, generally, the process of your actual contract negotiations with Mr. Simoncini?
>
> A.: I prepared a contract, a blank -- you know, a contract made out by me, prepared by me, sent it up to Steve for his review, and got it back marked up.
>
> Q.: From Mr. Simoncini?
>
> A.: From Mr. Simoncini.
>
> Q.: Marked up.
>
> Do you know who marked it up? Did he tell you?
>
> A.: I assume it was him.
>
> Q.: Now, what happens next, after you receive the marked up copy?
>
> A.: We went back and forth on quite a few issues in the contract,

11

and finally agreed on the contract terms, and he had someone, it turns out it wasn't him that signed the contract, sign the contract to send it back to me.

Q.: And after it was sent back to you, what did you do?

A.: I signed the contract.

Q.: . . . . [G]oing through [the Subcontract], ma'am, I notice, you know, how -- the way it's set up, there's various scratchouts and some handwritten edits at various locations, and then people initialing off on those handwritten edits.

Do you see that in the document, ma'am?

A.: Yes.

Q.: . . . . [T]hese handwritten edits that we see here, whose edits are these?

A.: There might be one or two of mine, and the rest, I assume, are Steve Simoncini's.

Q.: Are these -- You talked about he made some edits -- you understood he made some edits to the document, and then you had some discussions, some back and forth on it.

A.: Yes.

Q.: Are these some of the -- are these edits that are reflected in the final version of the document, things that you discussed back and forth with Mr. Simoncini?

A.: Yes.

Lorraine Beckwith Direct Testimony, September 23, 2005, at 80:18-82:12 (emphasis added).

RJT/29497/3/761609v1
02/27/06-HRT/

40.    Based on the instruction to include Phase 2 drawings and their scope-of-work items into its bid on the Phase 1B/1C Subcontract, Neri responded with three separate proposals, none of which excluded Phase 2 drawings. *See* **Exhibit 438**, Letter from Stephen Simoncini to Lorraine Beckwith, "Scope of Work, Items Bid by Neri Construction LLC," dated November 16, 1998; **Exhibit 439**, Letter from Stephen Simoncini to Lorraine Beckwith, "Scope of Work, Items Bid by Neri Construction LLC," dated November 17, 1998; **Exhibit 440**, Letter from Stephen Simoncini to Lorraine Beckwith, "Adjustment to Proposal," dated December 19, 1998.

41.    Neri's chief estimator and original project manager, Stephen Simoncini, testified at trial that Neri's various proposals to Elm Haven in the fall of 1998 never indicated that they did not include Drawing SS-26.

> Q.:  Sir, putting **Exhibit 438** in front of you, this is a proposal that you submitted in response to the information that Ms. Beckwith forwarded to you on October 19, 1998, correct?  This proposal, dated November 16, 1998?
>
> A.:  Yes.
>
> Q.:  All right, and nowhere in this proposal do you exclude any work or make any reference to the exclusion of any work shown on drawing SS-26, the Ashmun Street South portion of the overall project?
>
> A.:  Could you repeat that?
>
> Q.:  Nowhere in this proposal do you make any specific exclusion . . . of road work for Ashmun Street South, as shown on drawing SS-26?
>
> A.:  No.
>
> Q.:  So I'm clear, "No" meaning there is no exclusion, correct?
>
> A.:  There is no exclusion.

RJT/29497/3/761609v1
02/27/06-HRT/

Stephen Simoncini Testimony on Cross-Examination, June 13, 2005, at 139:09-140:01 (emphasis added).

> Q.: Sir, showing you **Exhibit 439**, that's your revised proposal to Elm Haven Construction for the Project, revising your November 16, 1998, proposal, the prior exhibit, correct?
>
> A.: Yes.
>
> Q.: All right, and you prepared these -- both of these proposals, correct, in your capacity as the estimator for Neri Construction?
>
> A.: Yes.
>
> Q.: All right, and nowhere on this proposal is there any exclusion for Ashmun Street road work as depicted on Drawing SS-26, correct?
>
> A.: <u>Correct</u>.
>
> Q.: All right. Nowhere in here, in either of these proposals, the November 16 or the November 17, do you say, "Notwithstanding the fact that you sent us Drawing SS-26, we are not bidding or submitting any pricing based on any of the work shown in Drawing SS-26," correct?
>
> A.: (No audible response.)
>
> Q.: Nowhere in these proposals, the November 16 and November 17, do you say, Mr. -- to Ms. Beckwith or Elm Haven, do you say, "We received SS-26 in your prior package from October, but we want you to know that we are not bidding or submitting or -- any pricing concerning SS-26." In other words, "We're excluding SS-26 work from these two proposals"?
>
> A.: <u>No, it doesn't indicate that on here</u>.

14

> Q.: Doesn't say that anywhere, but you had received the SS-26 drawing nearly a month earlier, in October 1998?
>
> A.: Yes.

Stephen Simoncini Testimony on Cross-Examination, June 13, 2005, at 140:25-142:06 (emphasis added).

> Q.: Showing you **Exhibit 440**, sir, that's your proposal of December 19, 1998 to Elm Haven, making further modifications to your subcontract price?
>
> A.: Yes.
>
> Q.: All right, and this is the proposal where we finally see the $620,000 alternate for A-1, A-2, and K-1, correct?
>
> A.: Yes.
>
> Q.: All right, and this price stuck or maintained, in effect, right up to the signing of the contract in [March] 2000, correct?
>
> A.: Yes.
>
> Q.: Didn't change, and nowhere in this proposal of December 19, 1998, do you take any exception or do you exclude road work that was shown on [Drawing] SS-26, correct?
>
> A.: No.
>
> Q.: There's no exclusion on this proposal?
>
> A.: No.
>
> Q.: Okay. Sir, in these three proposals we just went through, **Exhibit 438**, the November 16 proposal; the **Exhibit 439**, the November 17 proposal; or **Exhibit 440**, the December 19

15

proposal, do you specifically call out that you are excluding from your base subcontract price, the laterals under Ashmun Street North that service A-1, A-2 and K-1, correct?  Just the laterals under the street.

A.:  <u>That I'm excluding that work</u>?

Q.:  Right.

A.:  <u>No</u>.

Q.:  Okay, and we know, sir, that eventually the contract was signed . . . in March 1999 and in that contract on the drawings page, the list of drawings, Attachment "B," . . . all of the subcontract drawings are listed.  You're familiar with Attachment "B" of the **Exhibit 1**, correct?

A.:  Yes.

Q.:  All right, and under Attachment "B," under "New Construction, Phase 1-B," the first page of Attachment "B," it lists all the drawings that are part of what's now being called Phase 1-B, correct?

A.:  Yes.

Q.:  All right, and nowhere in the subcontract do you say, or is there language to the effect that, "Although SS-26 is listed as a contract drawing," we're obligated to perform -- or "Neri is not obligated to perform the road work associated with Ashmun Street South as depicted on SS-26"?

A.:  <u>No</u>.

Stephen Simoncini Testimony on Cross-Examination, June 13, 2005, at 142:24-145:04 (emphasis added).

RJT/29497/3/761609v1
02/27/06-HRT/

42.    In deciding not to develop Blocks A-1, A-2 and K-1, Elm Haven specifically reminded Neri that its scope of work included all of the work relating to Ashmun Street North:

> The work in Blocks A1, A2 and K1 will not be proceeding at this time.  Accordingly, we will not be accepting the Alternate costs included in your Subcontract Agreement for these Blocks.
>
> Your subcontract does include all work associated with Ashmun Street from Henry Streets [sic] to Block B.

**Exhibit 465**, Elm Haven letter to Neri, dated March 27, 2000 (emphasis added).

43.    Lorraine Beckwith testified that Neri's scope of work included the laterals beneath Ashmun Street North, as these were shown on the Contract Documents:

> Q.:  When you say there, "Your subcontract does include all work associated with Ashmun Street," what did you mean by that term, "All work associated with Ashmun Street"?
>
> A.:  All work shown on the drawings relating to Ashmun Street was included in their contract.
>
> Q.:  Okay.
>
> What about -- How do the laterals relate to that statement there, where you say "work associated with Ashmun Street"?
>
> A.:  The laterals were shown on the drawings within Ashmun Street, and so that was part of their contract, to run the laterals from the main to the inside of the sidewalk in the block.

Lorraine Beckwith Direct Testimony, September 23, 2005, at 96:07-96:20.

44.    Prior to commencing any work, Neri was obligated to examine the quality of all previous work performed by others, and notify Elm Haven of any discrepancies or non-conformities in writing before proceeding further.  Its failure to do so rendered it liable for the

RJT/29497/3/761609v1
02/27/06-HRT/

repair costs associated with the non-conforming work.

> Before proceeding with any work within the scope of this Subcontract, accurately check and verify to the best of ability all previous work done by others and notify the Contractor in writing if any such work is not acceptable or not in conformance with the Contract Documents. If the Subcontractor proceeds without such notification, any defects which subsequently appear are the Subcontractor's responsibility as to repairs, replacements and costs in connection with any non-acceptable or non-conforming work which should have been discovered by the Subcontractor.

**Exhibit 1**, Article 6.1.11 of the Subcontract (emphasis added).

45.    Neri was obligated to provide all instrumentalities and field measurements required for the proper performance and completion of the Subcontract Work, and perform layout, engineering and elevation control required to complete all site development work described in the Subcontract. **Exhibit 1**, Article 6.1.14 of the Subcontract; Attachment "A" to the Subcontract, Paragraph 6.A.

46.    As John Ford testified, Elm Haven was obligated to provide Control Points, including a baseline and benchmarks for Neri's use:

> As the Contractor, Elm Haven Construction, we needed to provide . . . the baseline and benchmark.
>
> Baseline is used for horizontal control. It would be two coordinated points that the Subcontractor could use to begin to lay out the Project. The benchmark is for vertical control, and we've got to establish that benchmark for them and then they [Neri] take that original, we'll call it our benchmark, and they [Neri] would establish different benchmarks throughout the project that could all tie into our original benchmark.
>
> . . . [F]rom the baseline and the benchmark, they [Neri] have to provide survey layout engineering to lay out the project and

RJT/29497/3/761609v1
02/27/06-HRT/

anything that's included in their [Neri's] scope of work.

John Ford Direct Testimony, June 6, 2005, at 84:05-84:19.

    47.    Neri was required to maintain erosion and sedimentation control throughout its time of performance under the Subcontract:

> Provide all Erosion & Sedimentation Control work required by
> Contract Drawings including the maintenance of all [Erosion &
> Sedimentation Control] measures during the time [Neri] is on the
> job.  [Neri] shall remove these [Erosion & Sedimentation
> Control] measures at the end of the Project after all landscaping is
> complete and the grass has taken hold.  Non-construction areas
> with [Erosion & Sedimentation Control] measures shall be
> returned as much as possible to their original condition, as
> indicated on the plans, unless disturbed by Neri.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.C.

    48.    Neri was required to remove all existing utilities, streets and underground structures, and dispose of them offsite.  Neri's obligation in this regard extended to the areas covered by the Phase 1B and 1C Subcontract:

> <u>Demolish and remove from within limits of Phase 1B and 1C site</u>
> <u>all existing utilities and streets</u> including but not limited to asphalt
> paving, concrete sidewalks, bluestone curb, granite curb,
> concrete curb, underground water lines and hydrants,
> underground storm lines and sanitary lines and all associated
> structures, electric poles and lines, and guard rails, as shown on
> Contract Documents, including removal and disposal offsite.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.D (emphasis added)

    49.    Neri was obligated to perform general site and building cuts and fills, mass excavations and rough grading to the new grades specified in the Contract Drawings.  Neri was further obligated to excavate all unsuitable material within the cut lines of the Project, as

19

specified in the Contract Drawings or in the Geotechnical Report, and remove and dispose of such unsuitable material offsite.

> Perform general site and building cut and fill, mass excavation and rough grading to new grades established by Contract Drawings. Site fill with onsite materials (if deemed suitable) or borrow materials. Building fill with onsite materials (if deemed suitable) or borrow materials. Subcontract includes hauling and disposal of all unsuitable and/or surplus material offsite. All excavation shall be performed on an unclassified basis. All unsuitable material within cut material and as noted in Geotechnical Report to be removed from site and legally disposed of. Any unsuitable material not included in contract requirements that is required to be removed shall be done per Unit Prices included in this Subcontract.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G (emphasis added); *see also* John Ford Direct Testimony, June 6, 2005, at 78:10-80:07.

50.     As used in the Subcontract and Contract Documents, the term "excavation" explicitly includes the removal and reuse or disposal of materials.

> Excavation consists of the removal of material encountered to subgrade elevations and the reuse or disposal of materials removed.

**Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 1.4A (emphasis added).

51.     As used in the Subcontract and Contract Documents, "borrow" is defined as "soil material obtained off-site when sufficient approved soil material is not available from excavations." **Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 1.4.C.

52.     As used in the Subcontract and Contract Documents, "soil material" includes satisfactory structural soil material, unsatisfactory structural soil material, backfill, fill materials, bedding materials, broken stone bedding, select material, and topsoil. **Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 2.1.

20

53.    Further, "satisfactory structural soil materials" are strictly defined in the Contract Documents:

> Satisfactory Structural Soil Materials:  ASTM D 2487 soil classification groups GW, GP, GM, SW, SP and SM; free of rock or gravel larger than 2 inches (50 mm) in any dimension, debris, waste, frozen materials, vegetation and other deleterious matter.

**Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 2.1.B.

54.    As used in the Subcontract, all excavations on the Project were "unclassified," meaning that Neri was to excavate to the required subgrade elevations regardless of the character of materials and obstructions encountered.  **Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 3.3B.

55.    Neri was obligated to install all sewer, storm sewer, roof drainage and water supply systems, including water and sewer laterals as described in the Subcontract, the Contract Documents, and applicable drawings.

> Furnish and install complete all sanitary sewer lines and appurtenances including but not limited to trenching, backfilling, fill material, compaction, sheeting and shoring, pipe, manholes w/covers, laterals to within 5'-0" of buildings, construction of inverts, cutting of existing sanitary manholes, cleaning of existing catch basins as noted, adjustments to existing structures to grade as noted on plans, testing and taps into existing sanitary sewer systems, and complete installation of new sewer system as shown.  This subcontractor responsible for all coordination with City, other utilities, other work proceeding on site, other contractors, and related work by the City of New Haven for separation of sewer/storm systems.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.I (emphasis added).

> Furnish and install complete all storm sewer lines and

RJT/29497/3/761609v1
02/27/06-HRT/

appurtenances including but not limited to trenching, backfilling, fill material, compaction, sheeting and shoring, pipe, manholes w/covers, inlets w/grates, <u>lateral stubs from inlets/manholes for roof collection system</u>, perimeter wall drainage system and under pavement drainage system and taps into existing storm sewer systems, RCP pipe as shown if value engineering not chosen, PVC pipe as shown, lawn inlets, construction of inverts, adjustments to existing structures as noted to grade, testing and taps into existing storm system, cleaning existing basins as noted, inspections, and complete installation of new storm drainage system as shown.  <u>This subcontractor responsible for all coordination with City, other utilities, other work proceeding on site, other contractors, and related work by the City of New Haven for separation of sewer/storm systems</u>.  Abandon, remove, modify all existing drainage structures as indicated.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.J (emphasis added).

<u>Furnish and install</u> an <u>underground roof collection system</u> as detailed per contract drawings including but not limited to trenching, backfilling, fill material, compaction, pipe, pipe accessories, <u>connection to stubs provided under storm sewer system</u> with appropriate connections to allow tie-ins by others. <u>This subcontractor responsible for all coordination with City, other utilities, other work proceeding on site, other contractors, and related work by the City of New Haven for separation of sewer/storm system</u>.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.K (emphasis added).

<u>Furnish and install complete</u> all <u>on-site water lines</u> and appurtenances, including but not limited to trenching, backfilling, fill materials, compaction, pipe, <u>laterals to and including curb box to within 5'-0" of buildings</u>, coordination w/City water dept., testing, chlorination, thrust blocks, etc.  Scope includes sand at

22

pipe bed, water meter pits as required for all units/structures, <u>inspections</u>, adjustment to existing structures as noted to grade. This subcontractor responsible for all coordination with City, other utilities, other work proceeding on site, other contractors, and related work by the City of New Haven for separation of sewer/storm system.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.L (emphasis added).

56.    Neri was obligated to furnish all trenching, backfilling and conduits for primary and secondary electrical, telephone, and cable television conductors.  *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.N.

57.    Neri was obligated to furnish all trenching and backfilling for site and street lighting, per the Contract Drawings.  *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.O.

58.    Neri was obligated to furnish and install all curbing and sidewalk materials.

<u>Furnish and install all concrete curb, granite curb, concrete sidewalks</u> (both city and residential) <u>and all handicap ramp depressions</u> where indicated on plans.  <u>Work shall include but not limited to establishment of line and grade</u> (baseline and benchmark by other) excavation and backfill for curbs and sidewalks, subbase material and installation, forming, rebar/WWM including installation, expansion joint material, concrete and placement of, finishing as required, curing/sealing, stripping of forms, etc.  Remove and salvage granite curb as shown, if alternate is selected.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.P (emphasis added); *see also* John Ford Direct Testimony, June 6, 2005, at 76:22-76:24.

59.    Neri was obligated to furnish and install all asphalt paving on the Project, including all sub-base materials as required by the Contract Documents.  *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.Q.

23

60.    Neri was obligated to provide all materials and equipment necessary to install the following site concrete material and all associated items on the Project:

> This subcontractor responsible to provide all materials and equipment required to install the following <u>site concrete</u> items of work, including concrete material and all associated items: <u>Concrete sidewalks</u> both City and Residential, concrete dumpster pads, generator pads, <u>handicap ramps</u>, concrete patios, <u>concrete stoops, concrete driveway aprons, concrete staircases with handrails</u>, concrete retaining walls, concrete foundations for benches, concrete unit pavers, precast concrete stepping stones.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.S (emphasis added).

61.    John Ford testified that the term "site concrete" includes all concrete outside of the building foundation walls:

> Outside of [the] foundations, <u>anything outside the wall line of that foundation is site concrete, and that includes the stairs</u>.  It includes the walks that were [made] of concrete.  Some were bituminous pavement, but much of it was concrete.  It includes dumpster pads, handicap ramps, concrete stairs.  Common stairs, we'll call them, [and] the railings.

John Ford Direct Testimony, June 6, 2005, at 81:25-82:06 (emphasis added).

62.    Neri was obligated to perform all excavation and backfill for building footings and foundations, including all subgrade preparation for footings.  *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.H.

63.    Sonotubes are round, concrete footings or foundations to be installed below the frost-line, which were depicted in the contract drawings.  *See* **Exhibit 5**, Drawing A103.  John Ford testified that sonotubes are included in Neri's Subcontract:

> [T]his is a sonatube.  This is -- It's a foundation for a small column for a shed roof, for simple construction that's done in

24

people's backyards.

I don't believe this is one of the -- These are some of the details that they just leave for -- it's pretty simple detail, so when you see "sonatube" you know what it is, and it's to go below the frost line. They do give you the varying dimension, which is eight-inch. [The] key is to get it below the frost line so when the frost comes, it doesn't move the roof up . . .

John Ford Testimony on Cross-Examination, June 9, 2005, at 167:03-167:13.

. . . [On Drawing A103], there was a foundation plan, and this calls for performing all rough grade and finish grading on the building. [Attachment "A" to the Subcontract, Paragraph 6.H] says:

"Perform all excavation and backfill for building footings and foundations."

A sonatube is a footing or foundation for that building, that portion of the building, which just happens to be the roof over the stairs.

"To include all subgrade preparation for footings."

. . . That's a good indicator of where that work was included. He's our excavator. He's excavating our footings. That's the detail I showed you. [Drawing A103] was a foundation drawing.

John Ford Testimony on Cross-Examination, June 9, 2005, at 169:17-170:08.

64.    Neri was obligated to perform work in all blocks simultaneously. **Exhibit 1,** Attachment "A" to the Subcontract, Paragraph 6.Y; *see also* John Ford Direct Testimony, June 6, 2005, at 76:22-76:24.

65.    Under the Subcontract, Neri was obligated to provide topsoil, and ready the site

RJT/29497/3/761609v1
02/27/06-HRT/