for landscaping:

> This subcontractor to respread topsoil, supplement and screen as
> required.  Rough and fine grade site per Contract Documents,
> ready for landscaping.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.CC.

      66.     Neri was obligated to clean the streets and areas around the Project under the
Subcontract.

> The Subcontractor agrees that in performance of the Subcontract
> Work it will:
>
> Clean and remove all stains, marks, splatters and dirt resulting
> from the performance of the Subcontract Work; clean up and
> remove from the Project site all rubbish and debris resulting from
> the performance of the Subcontract Work; in the event of
> controversy as to whether the Subcontractor is required to remove
> specific rubbish or debris, the determination of the Contractor as
> to the liability for removal of such rubbish or debris shall be
> final.  If the Subcontractor fails or refuses to remove within
> twenty-four (24) business hours after notice any rubbish or debris
> directed for removal by the Contractor, the Contractor may
> remove same and charge any costs resulting therefrom to the
> account of the Subcontractor.

**Exhibit 1**, Article 6.1.7 of the Subcontract.

> This subcontractor shall be responsible for . . . <u>street cleaning</u>
> during activities by Neri Construction.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.W(e) (emphasis added).

> This subcontractor is responsible for <u>clean up and removal of all</u>
> <u>debris and material</u> caused by this operation from the site and the

legal disposal thereof.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.GG (emphasis added).

> All hoisting, staging, rigging, offloading, material storage, clean-up, rubbish removal, final cleaning is by this subcontractor in order to perform the requirements of this subcontractor. Trash/debris generated from work in this subcontract including removal and disposal is the subcontractor's responsibility. Clean-up is required on a daily basis. Failure by the subcontractor to clean-up as directed by the General Contractor will result in backcharges for all costs incurred by the General Contractor to clean-up as required, providing Subcontractor [has] a reasonable amount of time to comply.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 15 (emphasis added).

67.    Neri was obligated to prevent any disputes between itself and Elm Haven from interfering with its diligent performance of the Subcontract Work. **Exhibit 1**, Article 11.1 of the Subcontract.

68.    Neri was further obligated to coordinate its work with all other contractors, subcontractors and suppliers, so as not to delay, interfere or damage such work or performance of other contractors, subcontractors, or suppliers. **Exhibit 1**, Article 3.5 of the Subcontract.

69.    Neri was required to provide facilities at all times for the inspection or testing of its work by Elm Haven, the Architect, or the Owner, or any authorized representative of Elm Haven or the Owner. **Exhibit 1**, Articles 2.9 and 6.1.3 of the Subcontract.

**D.    Unsuitable Materials**

70.    Neri was required to excavate and remove from the site any unsuitable material from within the cut lines of the Project, and backfill the area with suitable materials, as noted in Geotechnical Report and Project Specifications.

> Perform general site and building cut and fill, mass excavation

RJT/29497/3/761609v1
02/27/06-HRT/

and rough grading to new grades established by Contract Drawings. <u>Site fill</u> with <u>onsite</u> materials (if deemed suitable) or <u>borrow</u> materials. <u>Building fill</u> with <u>onsite</u> materials (if deemed suitable) or <u>borrow</u> materials. <u>Subcontract includes hauling and disposal of all unsuitable and/or surplus material offsite. All excavation shall be performed on an unclassified basis. All unsuitable material within cut material and as noted in Geotechnical Report to be removed from site and legally disposed of</u>. Any unsuitable material not included in contract requirements that is required to be removed shall be done per Unit Prices in this Subcontract.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G (emphasis added); *see also* **Findings of Fact 48-54**, *supra*.

71.    John Ford testified as to the requirements of this provision and the clear meaning of Paragraph 6.G:

> [W]hat this paragraph is saying is that <u>all unsuitable material within the cut</u> and [as] noted in [the] Geotechnical Report [is] to be removed from site and legally disposed of.

> And what that means is within the excavation lines of this Project from existing grade to the bottom of where the plans call for footings or the plans call for a bottom of the pipe because the <u>unsuitable[s] were so well-defined in the Geotechnical Reports any unsuitable material within that cut material was to be included in this Subcontract.</u> . . .

> Everybody knew [there] were unsuitable[s] on the project based on the Geotechnical Report.

> So you either had to screen -- unsuitable means there's a -- there's brick in it or there's something that's preventing it from being constructional fill or some type of useful fill. So you'd

28

> have to screen it or supplement in some way to make sure.

John Ford Direct Testimony, June 6, 2005, at 78:15-79:09.

72.    Neri did, in fact, employ a screening operation on the Project site, with which it screened the very materials that it claimed were "unsuitable," and used these materials for backfill elsewhere on the Project. John Ford testified that the screening operation enabled Neri to make much of the unsuitable material suitable for use in various capacities elsewhere on the Project:

> [Neri] reused a lot of this material that they're talking about.
> They had a screener there. Most of it -- the material that is
> deemed unsuitable simply needed to be screened, and it said that.
> It [alluded] to that in the geotechnical report. A lot of it is just
> because you have the concrete, brick. Screen it, you can make it
> suitable material for certain applications, and they did that.

John Ford Direct Testimony, October 4, 2005, at 119:24-125:07.

73.    The Subcontract further emphasized that the excavation and disposal of unsuitable materials within the contract limit lines was part of Neri's scope of work. Specifically, the Subcontract stated at Page 10 of Attachment "A" that:

> This contract <u>excludes</u> the following:
>
> 2. Excavation and disposal of unsuitable materials (including
> urban debris) <u>beyond the limits</u> indicated in the Contract
> Documents.

**Exhibit 1**, Attachment "A" to the Subcontract, Page 10 of 10 (emphasis added); *see also* John Ford Direct Testimony, June 6, 2005, at 81:03-81:10.

74.    Vincent Neri testified at trial that, on the basis of the Exclusion above, the excavation of unsuitable materials from within the contract limit lines was within Neri's scope of work.

29

Q.: [Y]ou understand what's being set forth here [are] things that are excluded from your contract, not part of [your] scope of work, correct?

A.: Yes.

Q.: Very important provision, correct?

A.: I would say.

Q.: Okay. Item number two, you have that? You see that? It says:

"Excavation and disposal of unsuitable materials (including urban debris) beyond the beyond the limits indicated in the Contract Documents." You read that provision, sir, right?

A.: Yes.

Q.: So, if you're dealing with the excavation and the disposal of unsuitable materials, including urban debris, <u>within the limits . . . indicated in the Contract Documents, then it's part of your scope of work</u>?

A.: <u>Yes.</u>

Vincent Neri Testimony on Cross-Examination, June 28, 2005, at 13:17-14:10 (emphasis added).

75.    Vincent Neri testified at trial that if unsuitable material was excavated outside the limit lines in the Contract Documents, then the Subcontract's unit prices would be applied to the amount excavated, and that the only unsuitable material excavation to be excluded under the Subcontract was that from beyond the contract limit lines.

Q.: . . . <u>[I]f it's outside the contract limit lines, then you apply the contract unit prices, correct</u>? That's what [Lorraine

Beckwith's] letter says?

A.: <u>Yes</u>.

Q.: All right.

A.: But when you say limit lines, --

Q.: Contract limit lines, sir.

A.: For unsuitable excavation. <u>If it's outside the limit lines as defined in the report and the contract documents, then it would be -- refer to the unit prices.</u>

Q.: <u>Right</u>. Contract documents for this project, the contract documents include <u>more than just a geo-technical report</u>.

They include the specifications, drawings and the addenda and your Subcontract as well. Those are the contract documents, sir?

A.: Yes.

Q.: Geo-technical report is one of many contract documents, correct?

A.: Yes, sir, it is.

Q.: And again, going back to your exclusion, the exclusion page of your contract, Attachment "A," rider page 10 of 10, <u>where that says what's excluded is excavation and disposal of unsuitable materials, including urban debris beyond the limits indicated in the contract documents.</u>

That's what it says, sir, and <u>that's what you read before you signed off on this page, correct</u>?

A.: <u>Yes</u>.

31

Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 62:20-63:24 (emphasis added).

76.    John Ford consistently informed Neri of its contractual obligations as to unsuitable materials encountered on the Project.

> Your contract reads very clear[ly] that that material is unsuitable material from [within] the cut lines of the Project that was included in the Geotechnical Report. If you can't reuse it, if you can't screen it, supplement it, do whatever you want to either make it subbase or topsoil or whatever you want to make it, then you got to get rid of it.

John Ford Direct Testimony, June 6, 2005, at 143:23-144:04.

77.    Neri was obligated to provide approved borrow soil materials from off-site when sufficient soil materials were not available from excavations, or if the excavated material was deemed by the engineer to be unsuitable for backfill purposes. **Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 2.1A.

78.    The use of "borrow" as backfill for utility trenches is not prohibited by the Subcontract or the Contract Documents. *See* **Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 3.13.

79.    On June 22, 1999, Lorraine Beckwith emphasized the role of the Project Superintendent and the procedure for determining whether materials were suitable for use as backfill. This procedure included the professional determination by LEA as to the suitability and the quantity of the materials, but did not constitute a guarantee or promise of payment thereof. In this capacity, LEA was not empowered to obligate Elm Haven to pay extracontractual sums for the excavation and removal of unsuitable materials.

> As discussed many times, the Project Superintendent has the authority to sign tickets to <u>verify time</u> for additional work. <u>In no case is the Project Superintendent authorizing dollars.</u> This is standard in the industry and <u>will be the way all additional work is handled on this project</u>, except for approvals of lump sum extras

32

which will not require any signed tickets.

*See* **Exhibit 13**, Letter from Lorraine Beckwith to Stephen Simoncini, dated June 22, 1999 (emphasis added).

80.    Lorraine Beckwith consistently applied this procedure for determining the status and quantity of soil materials throughout her time on the Project:

> For the record, the procedure which I have stated numerous times, both in writing and verbally, for determining and quantifying unsuitables is as follows:
>
> 1. Neri Construction is to immediately notify the Elm Haven Project Superintendent, Ivan Carlsen, if possible unsuitable material has been encountered. EHC will respond and view the conditions, verify the material is unsuitable and quantify same.
>
> 2. If Neri Construction and EHC are unable to reach an agreement on whether the material is unsuitable or the quantity of same, then the Site Engineer will be contacted. The Site Engineer, LEA, as the interpreter of their contract documents, will make the final determination.

**Exhibit 662**, Lorraine Beckwith letter to Stephen Simoncini, dated Aug. 19, 1999.

81.    The procedure highlighted by Lorraine Beckwith for the determination of the existence and quantity of unsuitable materials was consistent with both the Project Specifications and the Geotechnical Report, which also limited the engineer's role to observing excavations, verifying the removal of unsuitable materials, and reporting any deviations in the subsurface conditions:

> Owner will employ a qualified independent geotechnical testing agency to classify proposed on-site and borrow soils to verify that soils comply with specified requirements and to perform required field and laboratory testing.

RJT/29497/3/761609v1
02/27/06-HRT/

**Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 1.6C (emphasis added).

> A geotechnical engineer, or material testing laboratory under the direct supervision of a geotechnical engineer, should <u>observe</u> and document excavations, <u>verify removal</u> of unsuitable bearing materials, as defined herein, and <u>report any subsurface conditions which differ from those reported herein</u>.

**Exhibit 4**, Geotechnical Engineering Report dated January 14, 1997, § 6.10 (emphasis added).

    82.    Vincent Neri testified at trial that the engineers on the Project did not decide whether compensation for unsuitable materials was due; rather, he testified, that the engineers' only role was to determine whether material is suitable or unsuitable for use on the Project.

> Q: [The engineers are] not a party to your contract. Obviously, they're not parties to the Elm Haven-Neri contract. It's not -- They're not a party to it. That's just between Elm Haven and Neri, correct?
>
> A.: Yes.
>
> Q.: That's obvious. And when they're deciding whether something is unsuitable or not, okay, <u>they are not deciding whether or not Neri is entitled to compensation under its contract</u> for having to do something with that material.
>
> <u>They're just deciding, is it unsuitable or not, correct?</u> You understand that to be the case?
>
> A.: <u>Yes.</u>

Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 25:07-25:19 (emphasis added).

    83.    Both LEA and Ivan Carlsen followed the aforementioned procedure throughout the construction on the Project. For example, LEA reported on November 12, 1999, as

RJT/29497/3/761609v1
02/27/06-HRT/

follows:

> Met with I. Carlsen.  He <u>asked me to confirm the quantities and the locations</u> of the unsuitable materials that Neri claims were encountered during the installation of the water services on Ashmun Street.
>
> I took <u>measurements of the trenches and the location</u> of the unsuitable materials.  Determination of the <u>quantities</u> and the <u>location</u> where the unsuitable material was encountered were based on my visual observation of the sidewalls of the trenches. The excavated material was stockpiled alongside the trenches. Much of the material contained building debris, concrete rubble and large rocks.  In general, it appeared that most of the material that was excavated from within the street right of way and <u>only 30%-40% of the material excavated from outside the street right-of-way was suitable</u> for reuse as backfill.  After completing my investigation I <u>reviewed the quantities with V. Neri</u>.  V. Neri and I went through each trench and developed detailed as-builts indicating the <u>location</u> and the <u>quantities</u> of unsuitable materials. I gave a copy of these as-built sketches to I. Carlsen.

**Exhibit 561**, Project Site Report Prepared by Mark J. Budnick, November 12, 1999 (emphasis added).

84.    The fact that excavated materials would contain building debris or concrete rubble was clearly anticipated, given the prior use of the Project site as a public housing project.  The Contract Documents specifically described the prior use of the site, including the condition and proposed uses of the materials therein.

> . . . The site is abutted to the north by Admiral and Henry Streets; to the [west] by Dixwell Avenue and Ashmun Streets; to the south by a residential housing development located on Bristol Street; and to the [east] by Canal Street. . . .

35

> The area between Ashmun and Canal Streets is a vacant parcel which at one time contained six 10-story apartment buildings with basements and currently contains an unoccupied masonry building, formerly the Saint Martin's School. . . .
>
> . . . [T]he razing of the former 10-story residential buildings circa 1988 included removing the structure and foundation elements, crushing the building debris and placing the crushed debris, with some form of compaction, in the open excavations. . . .
>
> . . . [D]emolition of the existing 31 buildings and the former Saint Martin's School building will be performed in a similar manner as the former 10-story buildings, and will begin with the three "dogbone" buildings fronting Dixwell Avenue. The foundation elements will be removed, and transported offsite. The open excavations will be backfilled with compacted clean sand and gravel backfill.

**Exhibit 4**, Geotechnical Engineering Report dated January 14, 1997, § 1.30 (emphasis added).

85. The Contract Documents accurately described the nature of the soils on the Project site, and the soils described therein were actually encountered by Neri during construction:

> Fill materials were encountered in the forty test borings and seven test pits to depths of $1\pm$ to $22.5\pm$ feet. The fill materials consisted of pavement materials, granular fill, buried construction or demolition debris, buried incinerator waste, and solid waste.
>
> **Pavements** generally consisted of $1\pm$ $4\pm$ inches of bituminous concrete pavement and walks overlying $0\pm$ $16\pm$ inches of processed gravel. Test borings were not performed through the concrete walks and dumpster pads.
>
> **Organic materials** are defined herein as topsoil, vegetation,

36

roots, peat and organic silt, and any soil matrix containing visually observable organic material. Organic materials were encountered in roughly ½ of the test borings, and were encountered at multiple depths in roughly $^1/_3$ of the test borings. Organic materials were not observed in the test pits. The organic materials were encountered as deep as $12.5\pm$ feet, and in thickness ranging from $3\pm$ inches to $3\pm$ feet. Organic materials are described in the test boring logs as topsoil, however this description may suggest subsoil, root mat or other organic-containing soil.

**Granular fill** materials are defined herein as soil consisting of sand, gravel cobbles and silt, devoid of solid waste and any deleterious materials such as topsoil and roots, and containing less than approximately 15% combined construction debris and incinerator waste. Granular fill was encountered in roughly ¾ of the test borings in thicknesses ranging from $0.5\pm$ to $10.5\pm$ feet. The top of the granular fill was encountered at depths ranging from $0\pm$ to $9\pm$ feet and the bottom of the granular fill at $0.5\pm$ to $11\pm$ feet. The granular fill consisted generally of very loose to medium dense sand, trace to little gravel, trace silt. Granular fill was observed in one test pit, TP-3, at a depth interval of $6\pm$ to $9\pm$ feet.

**Demolition debris** is defined herein as broken concrete brick, masonry, rock and asphalt which is devoid of solid waste and deleterious materials (i.e., wood, asphalt shingles, insulation, plaster, plastic and other bulky waste) and includes any soil matrix containing more than approximately 15% demolition debris. Individual pieces of demolition debris larger than ½-cubic yard will be defined herein as **foundation elements**. Demolition debris was encountered in roughly ½ of the test borings, ranging in thickness of $1.5\pm$ to $9\pm$ feet. The top of the demolition debris was encountered at depths ranging from 0 to $10\pm$ feet, and the bottom of the demolition debris between $2\pm$

37

and 14± feet.  Demolition debris was observed in the 7 test pits in two general forms; exclusive demolition debris, and demolition debris in a silty sand matrix.  The exclusive demolition debris is likely the crushed demolition debris placed in open excavations left from the razed six 10-story buildings, and other former structures.  The demolition debris encountered in the area of the former 10-story building basements was too dense to readily excavate with the rubber-tired Case excavator.  Accordingly, test pits were advanced around the demolition debris to assess the edges and approximate lateral limits of the demolition debris.  The demolition debris observed in the test pits contained appreciable amounts of steel reinforcing bars (i.e., rebar) suggesting that the steel was not separated out as part of the demolition operations.  The rebar would not be observed in the test boring split spoon samples.

. . .

**Solid waste** is defined herein as bulky waste and any artificial material not specifically defined as fill, construction debris or incinerator waste, including any matrix containing more than 1% solid waste by volume.  Solid waste was encountered in test boring B-22, located at the south end of the site, between existing buildings #26 and #27.  The solid waste was encountered between 14± and 22.5± feet, and consisted generally of very loose matrix consisting of fabric, glass, ceramic and brick.  Due to the nature of the waste, split spoon sample recovery was 0 to 25%, suggesting that the samples recovered may not necessarily be representative, and possibly voids exist within this depth interval.

**Exhibit 4**, Geotechnical Engineering Report dated January 14, 1997, § 3.10.

86.    The Contract Documents explicitly contemplated the processing and reuse of materials, including unsuitable materials.

RJT/29497/3/761609v1
02/27/06-HRT/

Reuse of excavated materials will be an important factor in determining site grading, and designing a balanced site.

Excavated bituminous and concrete pavements, walks, pads and slabs, demolition debris, abandoned utilities, and foundation elements may be used as raise-in-grade fill, provided it is processed to meet the material, placement and compaction requirements for rubble fill given subsequently. Primary crushing of foundation elements and concrete structures may be necessary using a hoe-ram or other method. Secondary crushing with mechanical and possibly manual screening will be necessary to achieve gradation requirements and to remove injurious amounts of steel, and any deleterious, soft and elongated objects.

Excavated granular fill should be stockpiled, sampled and tested to meet gradation requirements for "structural fill" defined later herein. Excavated fill of questionable quality should be stockpiled separately. Representative samples should be obtained by the engineer or testing laboratory for gradation testing using wet sieve methods per ASTM D 1140 and mechanical sieve methods per ASTM D 422. The excavated fill should not be re-used as structural fill without approval of the engineer after review of gradation test results.

**Exhibit 4**, Geotechnical Engineering Report dated January 14, 1997, § 6.20 (emphasis added).

87.    Vincent Neri testified that Neri did, in fact, reprocess and reuse unsuitable materials it excavated from the Project, and that it priced the Subcontract to include the reuse of screened material as backfill:

Q.: That material that you had over there at the intersection of Canal and Locke Street, what you also had over there was a, forgive me if I don't use the right term, you had a screening operation set up, where you would take the material that was stockpiled there, put it through a screening process to screen out

39

material that wouldn't pass through this screen, so you would then have a residual material that would fall through the screens, correct?

A.: We had a screening operation and we also crushed, as well.

. . . .

Q.: Now, and then you would do that because you could then reuse that -- after you screened it, you could then reuse it on this Elm Haven Project --

A.: If it passes specification you could.

Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 108:14-109:13.

Q.: So the contract for this geotechnical report, the contract documents contemplates that the reusing of excavated material that's initially found to be unacceptable, it can be reused if it's subsequently -- if steps are taken to upgrade that material to a structural fill quality that the engineer is satisfied with, and that can be reused on this site, correct?

A.: That's exactly what we did on the foundations.

Q.: Okay.

A.: We excavated it, we screened it, and we put it back in on the areas defined in the Heynen Teale report.

. . . .

Q.: So you knew this going into this contract, or your -- someone in your organization reviewed this geotechnical report and knew that when it priced this contract, right?

RJT/29497/3/761609v1
02/27/06-HRT/

A.:  <u>That is exactly how we priced it</u>.

Q.:  Okay.

A.:  <u>We priced it to screen it and put it back in where the foundations were</u>.

Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 112:12-113:20 (emphasis added).

**E.    Block B Acceleration Period and Neri's "Confirmations of Change"**

88.    In November of 1999, Elm Haven initiated discussions with Neri concerning the progress of work in Block B.  Pursuant to these discussions, Elm Haven offered Neri an "acceleration bonus" of $10,000, if Neri's work in Block B was substantially complete on or before December 17, 1999.  *See, e.g.*, James Canning Direct Testimony, September 22, 2005, at 185:20-191:11; Lorraine Beckwith Direct Testimony, September 23, 2005, at 150:20-156:18.

89.    Although the parties originally disagreed as to whether Neri met the necessary conditions for receiving the bonus, Elm Haven stipulated to the bonus at the outset of the trial. *See* Elm Haven Opening Statement, June 6, 2005, at 13:06-13:17.

90.    At trial, Neri presented thirteen exhibits which included self-styled documents called "Confirmations of Change."  Twelve of the thirteen Confirmations of Change presented at trial were signed by Ivan Carlsen, and nine were signed during the Block B acceleration period in December 1999, on either December 11, 1999, or December 17, 1999.  *See id.*  The thirteen Confirmations of Change presented at trial are as follows:

| Exhibit | NC Number | Description |
|---|---|---|
| **Exhibit 562** | NC-055-207-1 | Acceleration of Site Work at Block B |
| **Exhibit 563** | NC-056-207-1 | Acceleration of Granite Curbing Installation |
| **Exhibit 564** | NC-056-207-4 | Concrete with Winter Additives |
| **Exhibit 565** | NC-058-207-1 | Removal and Reinstallation of Granite Curbing |
| **Exhibit 566** | NC-059-207-1 | Removal and Reinstallation of Catch Basins |
| **Exhibit 567** | NC-060-207-1 | Excavation and Construction of Concrete Pads |

41

| Exhibit 568 | NC-061-207-1 | Removal of Underground Concrete Structures |
|---|---|---|
| Exhibit 569 | NC-062-207-1 | Removal of Brick Pavement beneath Ashmun Street |
| Exhibit 574 | NC-065-207-2 | Replacement of Ashmun Street Brick Pavement with Offsite Process |
| Exhibit 576 | NC-067-207-1 | Concrete Aprons at City Sidewalks |
| Exhibit 578 | NC-068-207-1 | Concrete Ramps at City Sidewalks |
| Exhibit 580 | NC-069-207-1 | Screened Offsite Topsoil |
| Exhibit 581 | NC-070-207 | Temporary Paving at Intersections of Ashmun Street & Webster Street and Ashmun Street & New Street 1 |

91.     The purpose of Ivan Carlsen's signature on the Confirmations of Change was simply to confirm that Neri was directed to perform that work at issue and that Neri should keep track of the labor time, equipment and material costs.  It would then be determined at a later point whether the work at issue constituted a valid extra work claim.  The relevant portions of Mr. Carlsen's testimony were as follows:

> Q.:  [W]hat was the purpose of your signing this confirmation of change [**Exhibit 580**]?
>
> A.:  Crunch time, Block B.  Had to be done.
>
> Q.:  Okay.
>
> What was your purpose?  Were you instructing Neri to proceed with the work which is the subject of the confirmation of change?
>
> A.:  Correct.

Ivan Carlsen Direct Testimony, September 22, 2005, at 44:24-45:06 (emphasis added).

> We felt that during the time, we need to finish and I use it before, the wrong language, by saying somebody put gun to my head.
>
> I felt that we have to proceed as Neri was asking us to proceed. We, you know, that's why I put all this note, saying "Verify time material.  Proceed with the work."

42

> At that time Neri was standing still.  We need to proceed.  We need to move forward.

Ivan Carlsen Direct Testimony, September 22, 2005, at 68:11-68:19 (emphasis added).

> Q.:  So you were saying, Mr. Carlsen, that when you made that comment ["gun to my head" and "crunch time"], you were referring to Neri coming in, in December 1999, with a stack of confirmations of change during the crunch time, and presenting those to you.
>
> That's what you were referring to, correct?
>
> A.:  Yes.
>
> Q.:  And that was Carl Neri or Vincent Neri or both?
>
> A.:  Both.
>
> Q.:  They walked in to what, your office in the field, the field office?
>
> A.:  Correct.
>
> Q.:  Correct?
>
> A.:  Yes.
>
> Q.:  And approached you and presented you with these confirmations of change that they wanted you to address immediately, correct?
>
> A.:  Correct.
>
> Q.:  And it was during that period of time where there was -- a major effort was going on, as you say, the crunch time, to complete Block B by the end of 1999, correct?

43

A.: <u>Correct</u>.

Ivan Carlsen Testimony on Cross-Examination, September 22, 2005, at 74:09-75:06 (emphasis added).

Q.: And the Neris, Carl Neri and Vincent Neri, wanted you to address those confirmations of change <u>before they would proceed with that work</u>, correct?

A.: <u>Yes</u>.

Q.: And you were <u>very concerned</u> about that whole situation, weren't you?

A.: <u>Yes</u>.

Q.: Because <u>you were in a difficult spot</u>, correct?

A.: <u>Absolutely</u>.

Q.: You had -- You were undertaking an effort to get work done that you felt had to be done by the end of the year, --

A.: Yes.

Q.: -- in December of 1999, and you had a subcontractor saying, "<u>I'm not going to proceed with the work in the confirmation of change unless the subject is addressed by you</u>," correct? . . .

THE WITNESS: <u>Yes</u>.

Ivan Carlsen Testimony on Cross-Examination, September 22, 2005, at 75:22-76:22 (emphasis added).

Q.: [B]ased on your experience in construction, and experience in this job, there are occasions on a job where work has to get done and you don't have time to argue back and forth about, "Is

44

this outside the scope of my contract?", or "Is it inside the scope of my contract?", correct?

A.: Yes.

Q.: And you don't always have time to call up the -- either the project architect or the project engineer, present the issue to them, give them an opportunity to analyze the documents and make a decision?

A.: Yes, especially on December 17 [1999].

Ivan Carlsen Testimony on Cross-Examination, September 22, 2005, at 77:14-77:25 (emphasis added).

92.    James Canning's testimony as to the Confirmations of Change was as follows:

Q.: Carl Neri testified . . . that there was a point in time, I think in December of 1999, when he spoke directly to you on the phone about the confirmation of change documents that were being presented at that time, and you told him on the phone that Ivan Carlsen was authorized to sign those documents.

Did you ever have such conversations --

A.: No.

Q.: -- with Mr. Neri?

A.: No.

Ivan would call me and read me the scope of the work, what they were doing, and if it was legitimately true, we told him to sign it, not a problem. If there was something that needed some interpretation, that neither one of us or someone wasn't clear on, then go ahead, let's get this job built and we'll iron these things

45

out afterwards, and in my career that has happened a lot, and I
never had much of a beef stew, as we call it back in Boston, over
that afterwards, but it's a way to get the job done.

James Canning Direct Testimony, September 22, 2005, at 194:03-194:23 (emphasis added).

Q.: What did you tell Mr. Carlsen during that -- those
conversations with him on December 11, 1999, concerning the
[confirmation of change documents] that he was discussing with
you?

A.: Go ahead and sign the verification of time and material. We
had to get it done. I just can't remember which ones he was
reading to me right now. I think the ones he was reading to me
were -- it was pertinent that they got done so we could hit the
[December] thirty-first [deadline].

So it was a Saturday you're saying. I can't remember what the
contents were, but just to keep the job progressing, and I thought
that it -- when it was all over with, we could sit down at the
table, go through them one-on-one, and give them a yea or a nay,
but we had to get the job done.

James Canning Direct Testimony, September 22, 2005, at 196:05-196:19 (emphasis added).

In the heat of the battle, lots of times, and when I ran it myself,
sometimes you sign a slip, and it was actually contract work. So
you can always press these things out after the fact.

So [Ivan Carlsen] was instructed to go ahead and push forward.
If it needed an engineer's judgment call, or myself or Lorraine,
then we'll press it out afterwards.

James Canning Direct Testimony, September 22, 2005, at 218:20-219:01 (emphasis added).

93.    Confirmations of Change are not listed as potential Amendments under the

46

contract, *see* **Finding of Fact 22**, *supra*, *citing* **Exhibit 1**, Article 2.6 of the Subcontract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation.

> Q.: [W]ho is it that came up with this concept of this document confirmation of change?
>
> A.: I came up with using it for this particular project.

Carl Neri Direct Testimony, September 13, 2005, at 44:12-44:14 (emphasis added).

94.    Ivan Carlsen testified that Elm Haven's Project Superintendents never possessed the authority to unilaterally approve requests for change orders or additional compensation.

> Q.: [Y]ou understood that decisions concerning whether or not change orders should be issued to a subcontractor on this project were not decisions that you were authorized to make exclusively; isn't that correct?
>
> A.: No.
>
> Q.: Meaning correct, that was not your decision?
>
> A.: Yeah.  I did not -- I just follow what the instructions were.

Ivan Carlsen Testimony on Cross-Examination, September 22, 2005, at 85:03-85:11 (emphasis added).

> Q.: [S]o you would -- on decisions of whether or not those items of work are -- would constitute a change order to a contract, those decisions as to whether or not a change order would be issued, have to be made by your superiors.
>
> That was not something that you unilaterally would make?
>
> A.: I don't know how to answer that question.

47

Q.: Okay.

If a subcontractor comes to you in the field on this job, --

A.: Uh-huh.

Q.: -- and says, "I want a change order issued because I feel I'm doing extra work," and requests a certain amount of money, you would not make that decision unilaterally on your own, correct?

A.: No.

Q.: You would take that request and have to discuss it and review it with your superiors?

A.: Correct.

Q.: Correct, and based on -- and they would make a decision whether or not that request is legitimate, and then give you instructions based on that discussion, correct?

A.: Yes.

Q.: Okay.

Now, sir, you talked about -- And you made that known, and that procedure we just talked about, for extra work claims, there are occasions on the job where you made that known to either Carl Neri or Vincent Neri, correct? . . . You made known that request for change orders, okay, for what they felt was additional work, you made it known to them that you would have to review those kinds of issues with Lorraine Beckwith or Jim Canning or John Ford before any authorization can be given that a change order would, in fact, be issued?

A.: Yeah.  It's well known in the industry, yes.

48

Ivan Carlsen Testimony on Cross-Examination, September 22, 2005, at 85:03-87:04 (emphasis added).

95.    Ivan Carlsen testified that Elm Haven's Project Superintendents were specifically instructed to deal only with time and material, not money, and were not authorized to issue Change Orders.

> Q.:  What did you understand the $32.50 per cubic yard to represent?
>
> A.:  I didn't understand anything.
>
> Q.:  You didn't have any understanding of it at all?
>
> A.:  I -- <u>My instruction was not deal with dollars</u> [*sic*].

Ivan Carlsen Direct Testimony, September 22, 2005, at 24:19-24:23 (emphasis added).

> Q.:  Did you ever <u>instruct Mr. Carlsen to authorize the issuance of a change order</u> for this work that's described in this document **[Exhibit 576]**?
>
> A.:  <u>No</u>.  Anytime there was a question, okay, he was given the authority to sign a slip to verify time of material.

James Canning Direct Testimony, September 22, 2005, at 218:14-218:19 (emphasis added).

96.    No one at Elm Haven ever represented to Neri that Neri's Confirmations of Change acted in substitution of -- or would eventually become -- formal Change Orders.

> Q.:  [Y]our purpose in signing the Neri receiving tickets on this project, was to confirm [time worked by men and equipment]?
>
> A.:  Yes.
>
> Q.:  You were not making any independent judgments on that receiving ticket, that this receiving ticket will constitute a change

49

order between Neri Construction and Elm Haven Construction, right?

A.: Yes, <u>I did not</u> --

Q.: Right.

A.: -- <u>assume</u> that it was going to be -- <u>there's gonna be change ordered, no</u>.

Ivan Carlsen Testimony on Cross-Examination, September 22, 2005, at 87:22-88:09 (emphasis added).

97.    James Canning testified that he never saw Confirmations of Change, approved their use, or discussed such documents with Neri representatives.

Q.: This time period now, in October/November time period, 1999, into December 1999, did you have any discussions with Carl Neri or any other Neri person about a document entitled, "Confirmation of Change"?

A.: <u>No</u>.

Q.: You're sure of that?

A.: <u>Positive</u>.

Q.: Absolutely?

A.: <u>Absolutely positive</u>. I don't know why I would have a conversation with him on that.

James Canning Direct Testimony, September 22, 2005, at 191:13-191:23 (emphasis added).

Q.: Now, were you ever told by Mr. Neri -- I'm sorry, <u>did you ever agree to the use of a confirmation of change document with Carl Neri</u>? Did you ever have --

50

A.:  <u>No</u>, --

Q.:  -- reached that agreement with him?

A.:  -- and the reason I wouldn't get into that because that's Lorraine Beckwith's project.  I wouldn't change anything.  If there's a flow of paper that -- the way she wants it, it's coming through her desk, I wouldn't go in there and look at something else --

Q.:  Uh-huh.

A.:  -- that someone would want.  That would have to go to her.

If they were going to change the format of anything, it would have to go through her because I never got any of that paper on my desk.

James Canning Direct Testimony, September 22, 2005, at 192:06-192:21.

Q.:  Carl Neri testified in these proceedings that Neri Construction filled out this confirmation of change document based on an agreement it had with you, Jim Canning, and that form -- that form document was presented to you for review.

Did that happen, sir?

A.:  Until just recently, <u>I never saw that piece of paper</u>.

Q.:  Never saw what?

A.:  That what you just mentioned.

Q.:  The confirmation of change document?

A.:  Confirmation (inaudible), right.

RJT/29497/3/761609v1
02/27/06-HRT/

James Canning Direct Testimony, September 22, 2005, at 193:09-193:20 (emphasis added).

> Q.: [S]o you heard the testimony about a series of confirmation
> of changes that [Ivan Carlsen] received on December 11th, 1999,
> and then phone calls that same day that he had with you on
> December 11, 1999.
>
> On that date, sir, did you receive any documents from --
>
> A.: No.
>
> Q.: -- anyone that you, in turn, -- that you had in front of you
> that you were discussing with Mr. Carlsen?
>
> A.: No, I never ever.

James Canning Direct Testimony, September 22, 2005, at 195:08-195:17 (emphasis added).

> THE COURT: If you had that document or a similar document
> using the same form there, confirmation of change, --
>
> THE WITNESS: Uh-huh.
>
> THE COURT: -- back in late 1999, would it have caused you
> any concern?
>
> THE WITNESS: I wouldn't have accepted this only because I
> don't have to deal with this. This has to be blessed by my project
> manager, so I wouldn't get involved. Not that I'm John Wayne
> of the industry, okay, but she has to deal with the subcontractors,
> and she's got her plan on how things are going to be submitted.
>
> I wouldn't get into her sandbox and say, "Let's accept this."
>
> THE COURT: Okay.

James Canning Direct Testimony, September 22, 2005, at 204:10-204:24 (emphasis added).

52

RJT/29497/3/761609v1
02/27/06-HRT/

Q.: Do you recall receiving faxed confirmation of change documents to you, from anyone from Neri Construction?

A.: <u>No</u>.

Q.: Do you recall discussing your receipt of faxed confirmations of change with anyone at Neri Construction?

A.: <u>No</u>.

James Canning Re-Direct Testimony, September 23, 2005, at 47:05-47:12.

98.    **Exhibit 664** was admitted for the limited purpose of demonstrating that a twelve-page facsimile transmission was sent to (617) 822-7202, and the parties have not presented any evidence that these documents were reviewed by James Canning or anyone else at Elm Haven following their transmittal.  As James Canning testified, he did not recall receiving **Exhibit 664**:

Q.: Do you recall receiving this document [**Exhibit 664**]?

A.: Never.

Q.: Do you recall having a conversation with Mr. Neri on December 10th of 1999?

A.: Did I have a phone call with him?  I could have.  I might have, but not in reference to this.

I mean, he called me a lot, okay?  I was getting sometimes three or four phone calls a day from him.  So can I remember a phone call from him?  No.  Be specific?  No.  Do I remember anything of this?  No, absolutely not.  I don't remember one thing about this, that's clear.

. . . .

53

THE COURT: I'm going to allow it for that limited purpose [to demonstrate that the document was faxed to Cor-Jen Construction on Friday, December 10, 1999, at 7:39 p.m.], but I do note that, I guess at this point we don't -- Mr. Canning is saying that he doesn't recall personally receiving it, or reviewing it, but I think enough [foundation] has been laid to indicate that at least this cover sheet and some other pages were faxed to Cor-Jen.

James Canning Testimony on Cross-Examination, September 23, 2005, at 39:25-41:06.

## F.    Payment Procedures

99.    Neri was required to submit draft requisitions for payment to Elm Haven, not later than the eighteenth day of each month. On these draft requisitions, the subcontractor would set forth what it believed the percentage of completion for each pay line item on the requisition. Elm Haven would then review Neri's proposed completion percentages versus the work performed and adjust them if necessary, and incorporate those percentages into its requisitions to the Owner. The Owner would send Elm Haven's requisitions to the bank and, at least once monthly, representatives from the bank, the Owner, the Architect, and the Housing Authority of New Haven would tour the Project site to confirm the proposed completion percentages. Once the percentage of completion was determined, the Owner would issue payment to Elm Haven, and Elm Haven in turn issued final requisitions and payments therefor to each individual subcontractor. **Exhibit 1**, Article 4.3 of the Subcontract; *see also* John Ford Direct Testimony, June 6, 2005, at 93:12-97:20.

100.    The same payment procedures were used both before and after John Ford became Elm Haven's Project Manager in late March 2000. *See* John Ford Direct Testimony, June 6, 2005, at 100:04-100:07.

## G.    Status of Project, March 2000

101.    As testified to by John Ford, the status of the Project upon his arrival in March 2000, was that the foundations for all of the buildings (except the townhouses in Block G) were completed, and the buildings were in various stages of completion. Block B was deemed substantially complete. *See* John Ford Direct Testimony, June 6, 2005, at 86:11-87:09.

RJT/29497/3/761609v1
02/27/06-HRT/

102.    In March 2000, the Owner had obtained a Temporary Certificate of Occupancy for Block B, which included the surrounding roads and sidewalks, *i.e.*, the surrounding portions of Ashmun Street, New Street 1, New Street 2, and Canal Street.  However, in Block B, only four inches of topsoil had been installed versus the required six inches; fencing was not yet erected, as it awaited the full installation of six inches of topsoil; and various sidewalks, handicap ramps, and bituminous pavement remained unfinished.  *See* John Ford Direct Testimony, June 6, 2005, at 92:21-93:03, 101:02-101:14.

103.    In March 2000, Canal Street from New Street 1 to New Street 2 had only a binder course of pavement, with its structures, manholes, and catch basins raised to accommodate the two remaining final courses of pavement.  *See* John Ford Direct Testimony, June 6, 2005, at 87:11-88:06.

104.    In March 2000, New Street 1 was also paved to the binder course, but without granite curbing on its northern side.  *See* John Ford Direct Testimony, June 6, 2005, at 88:07-89:17.

105.    In March 2000, New Street 2, from Canal Street to Ashmun Street, was paved only to the binder course, but with granite curbing on both sides.  *See* John Ford Direct Testimony, June 6, 2005, at 88:07-89:17.

106.    In March 2000, Ashmun Street was paved to the binder course from New Street 1 to Webster Street.  There had been no progress on either Ashmun Street North or Ashmun Street South, and a dirt road existed where the road is currently severed and replaced by the cul-de-sac as a part of Ashmun Street North.  *See* John Ford Direct Testimony, June 6, 2005, at 89:18-90:20.

107.    In March 2000, there was no substantive progress on Foote Street, New Street 3 or New Street 4.  *See* John Ford Direct Testimony, June 6, 2005, at 90:21-91:08.

108.    In March 2000, the pre-existing pavement remained on Webster Street, and no work had commenced there.  *See* John Ford Direct Testimony, June 6, 2005, at 91:09-91:22.

**H.    Progress of Work, March - October 2000**

109.    Block B was eventually completed in April 2000, when Elm Haven hired

RJT/29497/3/761609v1
02/27/06-HRT/