Executive Landscaping ("Executive") to apply the remaining two inches of topsoil. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 7.

110.    Shortly after his arrival, John Ford bifurcated Block G into Block G-1 (the senior center, duplexes and surrounding areas) and Block G-2 (townhouses and surrounding areas), in an effort to maintain construction progress despite the design revisions to the townhouses in Block G-2. The original design was for two townhouse buildings, comprised of six and ten units, respectively. The revisions split the ten-unit townhouse building into two smaller buildings, and added one townhouse unit to each of the smaller buildings, increasing the total number of townhouse units from sixteen to eighteen. *See* John Ford Direct Testimony, June 6, 2005, 101:25-104:12.

111.    Elm Haven issued Change Order No. 204-13 to Neri on April 12, 2000, for the cost of the extra work associated with the Block G-2 revisions, in the amount of $188,766. *See* **Exhibit 246**, Change Order No. 204-13.

112.    Change Order No. 204-13 also specifically incorporated a schedule dated March 8, 2000, for the completion of Block C before the end of April, 2000; the roads surrounding Block C by the end of April 2000; and Block E before April 27, 2000. *See* **Exhibit 18** (original form of schedule); **Exhibit 20** (graphical form of schedule); *see also* John Ford Direct Testimony, June 6, 2005, at 105:09-110:07. Specifically, the change order provided:

> This Change Order [No. 204-13] is being issued with the mutual agreement that the work required to complete Block G . . . must be completed by no later than 5/15/00. In addition, [Neri] accepts this Change Order [No. 204-13] with the condition that the scheduled completion dates for Blocks C, E, and F indicated on the [Elm Haven] project schedule dated 4/12/00 will be met at no additional cost or time to the [Subcontract] . . .

**Exhibit 246**, Change Order No. 204-13 (emphasis added).

113.    Neri did not meet the schedule dates set forth in Change Order No. 204-13. *See* John Ford Direct Testimony, June 6, 2005, at 110:09-110:23.

114.    Unsatisfied by Neri's failure to complete Block C, Elm Haven notified Neri that

56

it was in default of the Subcontract on May 18, 2000.  Specifically, Elm Haven's default notice stated:

> This letter is to inform you that your firm has failed to prosecute the work in Block C in accordance with the project schedule. [Elm Haven] has repeatedly directed your firm to proceed with the roadwork required at Canal Street and Webster Street, and [Neri] has failed to perform.  In addition to the remaining roadwork, no work has been performed by [Neri] in the Parking Lot of Block C, residential drives, bituminous walks, topsoil subgrading, topsoil placement, or concrete sidewalks for several weeks.
>
> [Elm Haven] will not tolerate delays to this project, as a result of your firm's failure to prosecute the work included in your Subcontract.
>
> Due to your firm's failure to prosecute the work, directed to be performed by our letter dated 5/16/00, we herewith provide notice, under Article 9.1 of the [Subcontract], that your firm will be considered in default of your contract as of the end of business Friday, May 19, 2000, if the following work does not commence immediately:
>
> - Roadwork Canal & Webster Street, Block C
> - Topsoil, Block C
> - Parking Lot, residential drives, and bit. walks
> - Concrete Sidewalks and ramps, curbing, Block C
> - Bituminous paving, Block C
>
> Should your firm fail to provide this project with the adequate labor, equipment, and materials, required to complete the work in Block C, and provide this office with assurance that all work remaining in Block C will be complete on or before 5/25/00, [Elm Haven] will perform the work with others.  All costs and

57

damages resulting from this action will be the responsibility of [Neri].

**Exhibit 30**, Elm Haven letter to Neri dated May 18, 2000; *see also* John Ford Direct Testimony, June 6, 2005, at 111:05-113:06; **Exhibit 31**, Elm Haven letter to Neri dated May 19, 2000; John Ford Direct Testimony, June 6, 2005, at 117:09-120:02.

115.    Neri eventually completed most of the remaining work in Block C, with the exception of two water meter pits that had been crushed because Neri failed to properly protect its work prior to its acceptance by Elm Haven. *See* John Ford Direct Testimony, June 6, 2005, at 113:15-114:14; *see also* **Finding of Fact 29**, *supra, citing* **Exhibit 1**, Article 6.1.3 of the Subcontract; *see also* **Exhibit 3**, Project Specifications Vols. I and II, § 01500 ¶ 2.03. The water meter pits in Block C were eventually repaired by Page Excavation on May 8, 2000, and the costs of these repairs -- which totaled $515.00 -- were backcharged to Neri as a part of Change Order No. 204-55, on March 27, 2001. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 1.

116.    In view of its difficulties in meeting the schedule established on April 12, 2000, by Change Order No. 204-13, Neri submitted an amended schedule on June 6, 2000. *See* **Exhibit 43**, Mark Rossetti letter to Elm Haven dated June 6, 2000; *see also* John Ford Direct Testimony, June 6, 2005, at 121:18-124:04.

117.    Per Neri's schedule, Block C was to be completed on or before June 14, 2000; Block G was to be completed on or before July 21, 2000; Block E was to be completed on or before August 31, 2000; and Block F was to be completed on or before September 1, 2000. *Id.*

118.    With its schedule of June 6, 2000, Neri acknowledged that it had no outstanding scope of work issues. *See* **Exhibit 43**, Mark Rossetti letter to Elm Haven dated June 6, 2000.

119.    John Ford testified that Block C was deemed substantially complete in late June 2000, two months after the completion date specified in Change Order No. 204-13, and two weeks after the completion date specified in Neri's amended schedule of June 6, 2000. *See* John Ford Direct Testimony, June 6, 2005, at 114:22-115:04; *see also* **Exhibit 43**, Mark Rossetti letter to Elm Haven dated June 6, 2000.

RJT/29497/3/761609v1
02/27/06-HRT/

120.    Also with its schedule of June 6, 2000, Neri listed several items which it claimed were hindering its progress in Blocks C and G specifically, and all blocks generally. *See* **Exhibit 43**, Mark Rossetti letter to Elm Haven dated June 6, 2000.

121.    Subsequently, Elm Haven issued several change orders to address Neri's claimed hindrances and facilitate Neri's timely completion of the Project.

| Exhibit | Change Order | Date | Amount | Description |
|---------|-------------|------|--------|-------------|
| **Exhibit 256** | No. 204-23 | July 20, 2000 | $104,000 | Reducing Roadway Widths on Foote and Webster Streets; Removing Existing Trees; Design Changes to the Base Material Requirements |
| **Exhibit 257** | No. 204-24 | July 20, 2000 | $7,587 | Block E Grade Changes |
| **Exhibit 258** | No. 204-25 | July 20, 2000 | $1,472 | Revised Drainage at Block F Townhouses |
| **Exhibit 259** | No. 204-26 | July 20, 2000 | $5,100 | Revised Roof Leader Drainage at Block E Townhouses |
| **Exhibit 260** | No. 204-27 | July 24, 2000 | $7,500 | Temporary Block G Drainage Connection at Webster Street |
| **Exhibit 261** | No. 204-28 | July 24, 2000 | $2,000 | Additional Site Stairs at Block F |
| **Exhibit 262** | No. 204-29 | July 24, 2000 | $1,100 | Additional Handicapped Ramp at Block F Parking Lot |
| **Exhibit 263** | No. 204-30 | July 24, 2000 | $1,130 | Revisions to the Block F Parking Area |
| **Exhibit 264** | No. 204-31A | July 24, 2000 | $1,200 | Additional Haunch Detail for Block F Concrete Patio |
| **Exhibit 265** | No. 204-31B | July 24, 2000 | $1,700 | Temporary Bituminous Walk at Block G |
| **Exhibit 266** | No. 204-32 | July 24, 2000 | $182.07 | Relocate Site Stairs at Block F |
| **Exhibit 267** | No. 204-33 | July 24, 2000 | $1,200 | Excavate for Sonotube Supports at Block E and F Townhouse Units |
| **Exhibit 268** | No. 204-34 | Aug. 03, 2000 | $13,000 | Drainage Revisions at Block E and F Townhouses |
| **Exhibit 269** | No. 204-35 | Aug. 03, 2000 | $1,900 | Modification to Rear Handicapped Patios and Bituminous Walks at Block F Unit 1 |
| **Exhibit 270** | No. 204-36 | Aug. 03, 2000 | $16,064 | Additional Excavation and Grading at Foote Street |
| **Exhibit 271** | No. 204-37 | Aug. 22, 2000 | ($104,000) | Voiding Change Order No. 204-23 ; to be Replaced with Change Order Nos. 204-38 and 204-39 |
| **Exhibit 272** | No. 204-38 | Aug. 22, 2000 | $46,600 | Reduction in Widths of Foote Street and Webster Street; and Removal of 25 Trees |

RJT/29497/3/761609v1
02/27/06-HRT/

| Exhibit 274 | No. 204-39 | Aug. 22, 2000 | $51,153 | Grade C Base Material |
|---|---|---|---|---|
| Exhibit 275 | No. 204-40 | Sep. 11, 2000 | $13,515 | Additional Handicapped Ramps Following Design Change |
| Exhibit 276 | No. 204-41 | Sep. 11, 2000 | $6,000 | Bituminous Walkway Revisions at Block E |
| Exhibit 278 | No. 204-43 | Sep. 11, 2000 | $3,114 | Video Inspection of all Sewer Mains and Laterals |
| Exhibit 279 | No. 204-44 | Sep. 11, 2000 | $25,856 | Drainage Revisions to Block G |
| Exhibit 280 | No. 204-45 | Sep. 11, 2000 | $2,848 | Patio Revisions at Block E |
| Exhibit 281 | No. 204-46 | Sep. 11, 2000 | $735 | Backfilling Foundation at Block E Unit 23 |
| Exhibit 282 | No. 204-47 | Sep. 11, 2000 | $6,311 | Additional Sidewalks at New Street 3 and New Street 4 |
| Exhibit 283 | No. 204-48 | Sep. 11, 2000 | $2,400 | Bituminous Shims for Driveways and Handicapped Ramps at Block C |

122.    John Ford testified that Elm Haven removed every obstacle that could have potentially prevented Neri from completing the Blocks before the date specified in its amended schedule of June 6, 2000, but Neri still failed to complete the Project.  *See* John Ford Direct Testimony, June 6, 2005, at 131:19-132:18.

123.    On September 14, 2000, a meeting was held between Dave Rosen and John Ford of Elm Haven and Carl Neri and Vincent Neri of Neri.  At this meeting, Elm Haven and Neri discussed the work required to finish Neri's scope of work on the Project, and Elm Haven directed Neri to submit a schedule for completing all work prior to the onset of winter weather. *See* John Ford Direct Testimony, June 6, 2005, at 139:21-140:11.

124.    At this meeting, Neri agreed to complete Block E not later than September 22, 2000; Block F not later than September 29, 2000; Block G not later than October 6, 2000; roadway preparatory work not later than October 16, 2000; fine grading and paving of roadways not later than October 20, 2000; and remaining topsoil and other finishing work in the Blocks not later than October 27, 2000.  *See* **Exhibit 67**, Elm Haven letter to Neri, dated September 22, 2000.

125.    After the meeting, however, Neri submitted a new amended schedule for the completion of the Project.  *See* **Exhibit 61**, Neri Schedule as of September 14, 2000; *see also* **Exhibit 62**, Bar Chart of Neri Schedule as of September 14, 2000.  Under this schedule, Neri was to complete Blocks E, F, and G, and their surrounding roadways, no later than October 27, 2000.  *See* John Ford Direct Testimony, June 6, 2005, at 134:15-136:08.

60

126.    Elm Haven informed Neri that this schedule was inconsistent with the discussions between the parties at their September 14, 2000, meeting.  Specifically, Elm Haven wrote Neri to state:

> The subject schedule is not consistent with statements made by your firm at our meeting in our Branford office on 9/14/00.  In fact [Neri] at this meeting made the following statements.
>
> - Block E to be done by 9/22/00
> - Block F to be done by 9/29/00
> - Block G to be done by 10/6/00
> - Roadway prep work to be done by 10/16/00
> - Fine grade and pave to start 10/16/00 and be done by 10/20/00
> - Remaining topsoil and finishes complete, Blocks E, F, and G1 100% complete by 10/27/00
>
> The attached schedule is far from this agreed schedule.  In fact between 9/29/00 and 10/12/00 Neri has scheduled only handicapped ramp construction, and placement of subbase.  In addition to this change [in] plan, Neri is indicating the topsoil operations to start 10/18/00, and complete by 10/27/00.  This is inconsistent with our discussions on 9/14/00 in which it was understood that the topsoil would be placed in all blocks by 10/6/00 to allow [other] trades to perform their work.
>
> It appears that [Neri] is not willing to adhere to any schedules presented for this project.  [Neri] is seriously [affecting] the work of other trades, and [Elm Haven's] ability to insure a timely completion of the work.
>
> [Neri] is directed to modify the attached schedule to conform to the agreed completion dates discussed at our meeting on 9/14/00.  [Elm Haven] will not accept any completion dates which impact 100% completion of Blocks E, F, and G1 by 10/27/00.  The

61

subject schedule is to be submitted to this office by no later than
9/25/00.

**Exhibit 67**, Elm Haven letter to Neri, dated September 22, 2000; *see also* John Ford Direct
Testimony, June 6, 2005, at 139:09-140:11.

    127.    At no point did Neri ever perform its work in accordance with the new amended
schedule.  As John Ford testified:

> [F]rom 9/15, I'd say Neri Construction never followed this
> schedule.
>
> [Neri] worked out of sequence.  [Neri] was behind on several
> items, not all of them.  [Neri] just refused to adhere to a schedule
> and wouldn't hear -- wouldn't hear it if we had a problem with
> that.
>
> The problem was that there was no [schedule] -- we had a
> schedule now.  This is, what, the fourth one?  And still, even
> after we removed all the obstacles that were in issue at that time,
> [Neri] still refused to perform the work in accordance with the
> schedule or any schedule.

John Ford Direct Testimony, June 6, 2005, at 138:11-138:22.

    128.    Notwithstanding the problems that Elm Haven had with Neri's September 14,
2000, schedule as being wholly inconsistent with the meeting between the parties, at this point
Elm Haven had reconciled itself to accepting any schedule from Neri that would assure the
Project completion by the end of 2000.  As John Ford testified:

> We hadn't gotten a lot of schedules from Neri Construction at
> this point, and the schedule actually showed them finishing by the
> end of the year.  So if that's the sequence they wanted to use and
> they could still finish and not affect the other trades that followed
> them, fine.

62

John Ford Direct Testimony, June 6, 2005, at 140:13-140:18.

129.    Shortly thereafter, Neri missed many of the milestone dates set forth in its September 14, 2000, schedule, which prompted Elm Haven to again notify Neri of these delays and the unsatisfactory manner in which Neri was progressing its work. Elm Haven informed Neri on September 25, 2000, that:

> In accordance with the Neri schedule dated 9/14/00, the following items of work are behind schedule.
>
> - Concrete encasement of Ductbank Block E, and F - Not started
> - Drainage Block E - Not started
> - Drainage Block F - Not started
> - Drainage Block G1 - Not started
> - Granite Curb NS 3 - Not Complete
> - Granite Curb NS 4 - Not Complete
> - Concrete Curb E&F - Not Complete
> - HC Ramps Foote St - Not started
> - F of SG Parking Lot E & F - Not started
> - Paving Top course Drives - Not started
>
> [Elm Haven] is extremely concerned with the current progress of your firm's work. Neri does not seem to be following the submitted schedule. [Elm Haven] has observed only two crews on site on this date performing work on Webster Street Sidewalks, and Formation of Subgrade in the Block G Parking Area. These work activities are out of your proposed sequence. Neri must immediately provide adequate manpower to perform the work required to complete Blocks E, F, and G1. If there are any sequence modification [sic] that your firm wants to make to your submitted schedule, you are directed to submit the same to this office.

**Exhibit 63**, Elm Haven letter to Neri, dated September 25, 2000; *see also* John Ford Direct

RJT/29497/3/761609v1
02/27/06-HRT/

Testimony, June 6, 2005, at 147:18-149:02.

130.    Neri complicated the completion of Blocks E and G by storing unsuitable materials in the center of those blocks and not disposing them offsite, although Elm Haven had previously directed Neri to remove those materials on August 14, 2000.  *See* **Exhibit 58**, Elm Haven letter to Neri, dated August 14, 2000; *see also* Articles 6.1.5-6.1.7 of the Subcontract.

131.    When Neri rejected Elm Haven's direction to remove the subject materials, Elm Haven hired Executive Landscaping to remove the unsuitable materials in those blocks.  John Ford testified as to Neri's opposition to Elm Haven's direction:

> They wanted to be paid.  Pay me.  It's unsuitable.  Pay me for the unsuitable material.
>
> They felt that anything they couldn't just touch on the site that they couldn't reuse was unsuitable and, therefore, they should be paid for it.
>
> Well, I pushed and pushed and finally we couldn't wait anymore, and I had -- Executive Landscaping was the landscaper on our project who had the equipment to load and haul material.  I instructed him to remove that material.

John Ford Direct Testimony, June 6, 2005, at 144:13-145:02.

132.    On September 22, 2000, Elm Haven notified Neri by letter that it hired Executive to remove the unsuitable materials that it previously directed Neri to remove from those blocks, and would backcharge Neri for the costs of their removal:

> It has now been over 1 month since [Elm Haven] directed your firm to remove the Unsuitable material currently stored in Blocks E, and G.  Neri has not made any effort to comply with this directive, and the project continues to be impacted as a result of this inactivity.
>
> Many trades have been impacted as a result of your firm's failure

64

> to proceed with this contracted work as directed. The overall contract completion date also continues to be impacted as a result of your firm's refusal to proceed with the work.
>
> [Neri] is hereby informed that [Elm Haven] will proceed to remove the subject unsuitable material by others. All costs resulting from this effort, as well as all damages resulting from your firm's failure to proceed as previously directed will be charged against [Neri's] existing contract amount.

**Exhibit 68**, Elm Haven letter to Neri, dated September 22, 2000.

133.    Neri was again notified of Elm Haven's intentions in this regard, three days later:

> [Neri] has been directed on several occasions to remove the subject stockpiles. Neri has made no effort to perform this work. The subject stockpiles have significantly impacted the progress of others' trades. Due to [Neri's] refusal to remove the subject stockpiles, [Elm Haven] has proceeded with this work by others in accordance with Article 6 of the [Subcontract].
>
> . . . [Elm Haven] has been very clear in identifying this work as included in your original contract scope.

**Exhibit 69**, Elm Haven letter to Neri, dated September 25, 2000.

**I.    Elm Haven's Takeover of Neri's Work Related to the Fine Grading and Paving of Foote Street, New Street 3, New Street 4, and Parking Lots and Driveways in Blocks E, F, and G, in October 2000**

134.    As the winter of 2000-2001 approached, and with no indication that Neri had a paving subcontractor lined up and ready to perform work in Blocks E, F, and G1 just twelve days before Neri was scheduled to begin paving, John Ford issued a request to Neri that it provide, by October 6, 2000: the name of Neri's paving subcontractor; confirmation that it would begin paving on October 16, 2000, and complete paving on October 20, 2000; and a

RJT/29497/3/761609v1
02/27/06-HRT/

copy of Neri's paving subcontract.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 16, Elm Haven letter to Neri, dated October 4, 2000.  John Ford testified that he:

> . . . wanted to see confirmation in writing from the paving subcontractor that they're going to start on the 16th [of October] because that's what the schedule 9/14 showed. . . .

> I wanted a copy of the agreement between [Neri] and the paving subcontractor.

John Ford Direct Testimony, June 6, 2005, at 152:04-152:11.

135.    Based on the normal, cyclic nature of the paving business, and Neri's failure to adhere to its amended schedule of September 14, 2000, John Ford testified that it was critical to ensure that the paving would be timely completed, due to the onset of winter and its associated impact on the industry:

> We're coming up to another winter. . . If you don't have your ducks in a row by September or October, forget it.  You're never going to get done before the winter comes up.  The [paving] plants close like November 15th.  You can sometimes keep them open until December 15th, but certainly after that, it's not worth paving it.

John Ford Direct Testimony, June 6, 2005, at 132:11-132:18.

136.    Elm Haven's request was authorized under the Subcontract because it pertained to the timely and orderly performance and completion of Neri's work.  *See* **Finding of Fact 25**, *supra, citing* **Exhibit 1**, Article 3.4 of the Subcontract.  John Ford explained that a prudent contractor would have the information he requested readily available:

> I wanted to know that there was a contract set up, that this thing was scheduled, that these dates weren't just dates that were thrown up -- you know, thrown on a piece of paper that no one intended to meet.  I wanted to know that they were reality. . . .

RJT/29497/3/761609v1
02/27/06-HRT/

> I didn't think it was a lot to ask to have [Neri] give me, you know, confirmation a week-and-a-half before this paving subcontractor was supposed to come out and do work. They should have had it right at the tips of their fingers. I gave them two days to give me the answer. I needed an answer. I needed to be assured that this is not just a date that someone threw on a piece of paper, not going to get stuck in November and December scratching my head, figuring out who's going to pave these roads.

John Ford Direct Testimony, June 6, 2005, at 152:25-153:04, 153:23-154:07.

137.    John Ford testified that Neri's failure to meet the dates in its own schedule concerned him, given the cyclic nature of the paving industry.

> It's 10/4 and I'm getting concerned. It's 10/4. They haven't met any of the dates that were in the 9/14 schedule.

> Now we're -- it's another month closer to winter, and I want to make sure they have a paver lined up. Typically, in the fall, the season, if you don't have a paver set up, your chances are tough to get a paver set up. That's their busiest time of the year. . . .

> Right before they close. Everybody rushes to pave. It's just the nature of the business, that's what they all do. . . .

> So, I wanted to make sure that we had a paver lined up, that [Neri] had somebody who they had a contract with, that were prepared to come out when [Neri] was telling us they were going to come out.

John Ford Direct Testimony, June 6, 2005, at 151:08-151:24.

138.    John Ford testified that Neri's previous difficulties in completing paving work also concerned him:

RJT/29497/3/761609v1
02/27/06-HRT/

[I]n Block C, we had this same issue where Empire Paving, if you remember, Block C, we had a big default issue and there was a big paving issue and we can't get the paver and he's busy.

. . . [G]o back to Block B. We had the same issues in Block B with paving, and then we ended up actually paying Tilcon a premium to come and do the work.

Now we get to E, F, and G, I'm not going to do that again. I'm not going to play that game. So, I asked, look, I want a subcontractor to tell me, not Neri, because I know Neri doesn't pave. He has to hire somebody to pave. So I want to hear from the guys who do the work. I'm going to be there on 10/16 and I'm going to finish on this date. That's what I want to hear, and he never gave that to me. He gave me a quote of unit prices.

John Ford Testimony on Cross-Examination, June 10, 2005, at 20:04-20:20.

139.    On October 6, 2000, Neri forwarded to Elm Haven a copy of a two-month old quotation from Empire Paving, purportedly executed on October 6, 2000. *See* **Exhibit 76-A**, Quotation/Contract dated August 7, 2000. Elm Haven immediately notified Neri by letter on that day that this "quotation/contract" did not satisfy its request:

EHC has received a fax copy of a Quotation/Contract from Empire Paving dated 8/7/00, executed today 10/06/00. This contract is between Hammonasset Construction, LLC, and Empire Paving. Neri has not provided any agreements between Hammonasset Construction and Neri Construction. Neri has also not complied with item 1 of our letter dated 10/4/00, which requires confirmation that the paving will start on 10/16/00 and be complete, by 10/20/00.

**Exhibit 76**, Elm Haven letter to Neri, dated October 6, 2000.

140.    The Quotation/Contract did not meet Elm Haven's requirements in its October 4, 2000, letter. The Quotation/Contract clearly states that it is a "quote" which was valid for

RJT/29497/3/761609v1
02/27/06-HRT/

only thirty days from the date of its issuance. *See* **Exhibit 76-A**, Quotation/Contract dated October 6, 2000. John Ford further testified why this "quotation/contract" was insufficient:

> [The Quotation/Contract] is a list of unit prices. It's a list of square yards, unit prices for paving work, for different grades of paving and different thicknesses of paving. . . .
>
> It had no schedule, didn't say when the work was going to start, none of that.
>
> It was simply a list of prices that were agreed to or whatever between Hammonasset and Empire on unit price -- unit prices.

John Ford Direct Testimony, June 6, 2005, at 157:05-157:14.

141.    Because the quotation did not meet Elm Haven's requirements, Elm Haven notified Neri on October 6, 2000, that it would perform the fine grading and paving with other subcontractors, and backcharge Neri for the cost of this work. *See* John Ford Testimony on Cross-Examination, June 10, 2005, at 23:03-23:05.

> [Elm Haven] will no longer tolerate Neri's continued effort to delay the project. Be advised, that as of this date October 6, 2000, [Elm Haven] will perform all Fine Grade work, and Paving on Foote Street, New Street 3, New Street 4, and the Parking Lots and Drives included in Blocks E, F, and G, by others.

**Exhibit 76**, Elm Haven letter to Neri, dated October 6, 2000.

142.    At approximately 5 o'clock in the evening on October 6, 2000, Neri forwarded to Elm Haven a "Subcontract Agreement" between Empire Paving and Hammonasset Construction, in the amount of $148,080.85. *See* **Exhibit 635**, Subcontract Agreement dated October 6, 2000. John Ford testified that he was "absolutely positive" that he did not have the Subcontract Agreement when he made the decision to remove the fine grading and paving work from Neri's scope of work on October 6, 2000:

> Q.:  . . . Did you have **Exhibit 635** available to you or did you

RJT/29497/3/761609v1
02/27/06-HRT/

see this exhibit, this document, [when] you wrote your October
6th letter taking the action you took in that letter?

A.: I didn't see that at that time, no.

Q.: Are you absolutely positive, Mr. Ford?

A.: Yes. Absolutely positive.

John Ford Re-Direct Testimony, June 10, 2005, at 135:11-135:17 (emphasis added); *see also*
John Ford Testimony on Cross-Examination, June 10, 2005, at 17:24-18:21.

  143. Shortly after Elm Haven informed Neri that the fine grading and paving would
be performed by others, it also informed Neri on October 11, 2000, that it would supplement
Neri's forces in certain areas in an attempt to achieve the October 27, 2000, completion date in
Neri's September 14, 2000, schedule.

As a follow up to [Elm Haven's letter of October 6, 2000], this
letter is to advise your firm that the work described below will be
performed by others.

Finegrade and paving (adequate supply of Grade C Base Material
must be supplied by Neri).

All Bituminous Paving remaining on the above referenced
Project.

[Elm Haven] is removing the above listed work from Neri's
existing Contract Scope as a result of your firm's failure to
provide adequate assurances to [Elm Haven] that the subject work
will be completed by 10/27/00 as previously committed to by
Neri.

In addition, [Elm Haven] will be supplementing [Neri's] efforts
in completing all other work items in Neri's contract, to facilitate
the 10/27/00-completion date.  These items include, but are not

limited to the following:

- Concrete Sidewalks/HC Ramps/Patios (including base)
- Stair Railings
- Granite Curbing
- Concrete Curbing
- Drainage
- Utility Lateral repairs
- Grading/Topsoil Site Light Conduit and Bases
- Bituminous walks (including base)
- Maintenance and Protection of Traffic

[Elm Haven] will compile a listing of all work performed by others, along with the associated costs, and negotiate a fair value of the work with Neri for reduction of [Neri's] Contract amount.

**Exhibit 84**, Elm Haven letter to Neri, dated October 11, 2000.

144.    When Neri protested Elm Haven's decision to remove the fine grading and paving from its scope of work, Elm Haven further explained to Neri the reasons why it decided to perform this work with another contractor.

[Elm Haven] must maintain our previous determination to proceed with the Finegrade and paving remaining on the project by others. This decision is based on the following facts.

The durations included in [Neri's] original schedule date 9/14/00, to date have not been met. [Elm Haven] has issued many letters advising Neri of this slippage. However, Neri has yet to respond with any recovery schedules. In fact, [Neri's] original schedule indicated that the Subbase work on Foote Street would take 2 days to complete, New Street 3 Subbase, 1 day, and New Street 3, 1 day. All together the Subbase operation originally was purported by Neri to take 4 days if worked consecutively. As of this date, Neri has been working on these items for over 2 weeks,

RJT/29497/3/761609v1
02/27/06-HRT/

and it is still not complete. . . .

Furthermore, the outstanding items which remain behind schedule (reference Neri schedule dated 9/14/00, and discussions on the same) for completion of Blocks E, F, and G1, include but are not limited to the following:

- Bituminous walks
- Concrete sidewalks
- Block G Drainage
- Concrete Aprons
- Granite Curbing
- Concrete HC Ramps
- Setting of MH Frames & Covers
- Preparation and placement of Topsoil
- Sanitary repairs, and inspection reports

This work is significantly behind the Neri 9/14/00 schedule, and no attempt by Neri has been made to regain the time lost to date. [Neri's] above referenced letter does not mention the balance of work to be complete as agreed on 9/14/00. Neri has proven to be unreliable in their scheduling of work and meeting any deadlines, even those which Neri sets on their own.

**Exhibit 88**, Elm Haven letter to Neri, dated October 13, 2000.

145.    On October 11, 2000, Elm Haven contracted with Waters Construction Company, Inc. ("Waters"), to complete the fine grading and paving portions of Neri's scope of work. *See* **Exhibit 80**, Waters Construction Subcontract, dated October 11, 2000; *see also* John Ford Direct Testimony, June 6, 2005, at 173:04-179:16.

146.    Although the Waters bid was the only one considered by Elm Haven to complete Neri's fine grading and paving work, John Ford testified that it was a reasonable bid, given the time constraints and other circumstances. John Ford sent drawings and other information to Waters in advance, and showed the paving areas to Waters representatives. *See* John Ford

72

Direct Testimony, June 6, 2005, at 167:06-172:19.

147.    Furthermore, a comparison of the unit prices in the Waters subcontract and the Empire-Hammonasset Subcontract Agreement offered by Neri proves that the Waters prices were fair and reasonable. For example, Neri's agreement purportedly included the fine grading and paving of streets for a total of $11.08 per square yard, while the Waters Subcontract included fine grading and paving of streets at a rate of $11.45 per square yard. *See* **Exhibit 80**, Waters Construction Subcontract (Invoice No. 8956, Bates stamp no. EH04234, dated Nov. 28, 2000, adding binder course at $5.30, top course at $5.30, and fine grading at $0.85 per square yard in streets, respectively); **Exhibit 635**, Empire-Hammonasset Subcontract Agreement (S.C. no. HC-003, dated Sep. 21, 2000, no Bates stamp, adding fine grading and compacting at $6.08 and finish course at $5.00 per square yard in streets, respectively). Neri's agreement also purportedly offered to fine grade and pave the parking lots for a total of $10.53 per square yard, while the Waters Subcontract included parking lots at a total rate of $8.85 per yard. *See* **Exhibit 80**, Waters Construction Subcontract (Invoice No. 8956, Bates stamp no. EH04234, dated Nov. 28, 2000, adding binder course at $4.00, top course at $4.00, and fine grading at $0.85 per square yard in parking lots, respectively); **Exhibit 635**, Empire-Hammonasset Subcontract Agreement (S.C. no. HC-003, dated Sep. 21, 2000, no Bates stamp, listing fine grading, compacting and finish course in parking lots at $10.53 per square yard).

148.    Elm Haven informed Neri that its decision as to the fine grading and paving work was final, and instructed Neri not to interfere with Elm Haven's attempts to complete this work with Waters:

> All Finegrading and Paving remaining on the above referenced project will be performed by others. Should Neri interfere with [Elm Haven's] ability to proceed with the finegrade and paving work, [Elm Haven] will terminate your firm's Subcontract and Neri will be immediately removed from the Project.

**Exhibit 88**, Elm Haven letter to Neri, dated October 13, 2000.

149.    Despite Elm Haven's instructions, Neri attempted to interfere with Elm Haven's contractual relationship with Waters:

73

[Elm Haven] has been advised that you have personally contacted the President of [Elm Haven]'s new Paving Subcontractor, hired to perform the finegrade and paving remaining on the Project. This office was advised that you informed the subject contractor that Neri will be performing the work, and not to waste their time mobilizing this Project. This is a serious violation of the [Subcontract]. This action by Neri reinforces the fact that Neri is a disruption to the Project. Neri has taken these actions to undermine [Elm Haven's] ability to perform the work by others. [Elm Haven] will advise your office of all added costs resulting from this action. [Elm Haven] reserves our rights to claim all damages against Neri as a result of this action.

Should Neri continue to undermine [Elm Haven's] ability to prosecute the work [Neri] will be immediately removed from this Project, and the [Subcontract] will be terminated.

**Exhibit 89**, Elm Haven letter to Neri, dated October 13, 2000.

150.    Waters installed concrete sidewalks, handicap ramps, patios, granite curbing, concrete curbing, drainage, and bituminous walks; the company also conducted utility lateral repairs, grading and topsoil applications, maintained the site and provided for traffic protection on the Project. *See* **Exhibit 80**; *see also* John Ford Direct Testimony, June 6, 2005, 174:14-206:25.

**J.    Progress of Work, November - December 2000**

151.    On October 30, 2000, Elm Haven and Neri held a project meeting that was attended by John Ford and John Woods of Elm Haven, and Vincent Neri, Carl Neri, and Mark Rossetti of Neri. *See* **Exhibit 101**, Meeting Minutes, dated November 6, 2000.

152.    At this meeting, Neri maintained that it was not required to install water and sewer laterals beneath the Ashmun Street North section of roadway, as depicted on the Contract Drawings, and argued that the cost of these laterals was included in the Alternate price for developing the interior of those blocks under the Subcontract. *See* **Exhibit 101**,

RJT/29497/3/761609v1
02/27/06-HRT/

Meeting Minutes, dated November 6, 2000; *see also* **Exhibit 5**, Drawings SS-5 and SS-6.

153.    Under the Subcontract, Neri was required to install water and sewer laterals beneath the streets and extend them into blocks, to within five feet of the buildings in Blocks which were to be fully developed as a part of the Project. For Blocks that were not scheduled for development as a part of the Project, the laterals were to be installed up to the end of the City of New Haven right-of-way, *i.e.*, the inside edge of the sidewalks, and then "stubbed" at that location. *See, e.g.*, **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraphs 6.I through 6.L; **Exhibit 5**, Drawings SS-1 and SS-25.

154.    If the laterals from the main utility line to the edge of the right-of-way for undeveloped blocks were not installed, John Ford testified that future development would require cutting into the newly installed roadway to install the water and sewer lateral connections:

> THE WITNESS: There are other drawings where you'll see in a future block where you have a future connection, you cap it at the right of way. It's pretty -- it's very evident in -- if you look at those drawings in a way that it was shown as being phased on those drawings, where it has, say, a Phase 2 area noted on the drawings, you'll see it says, "Cap for future phases."
>
> Standard operating procedures as part of those drawings, if you have a future connection, you cap it at the right of way so you don't have to rip the road up to get it when you build the next phase, which was planned, made sense. So, that's what the plan was.
>
> THE COURT: And -- Do you refer to those as what? Is that stubs or --
>
> THE WITNESS: Stubs.
>
> THE COURT: Right, okay.
>
> THE WITNESS: Stub-ups.

RJT/29497/3/761609v1
02/27/06-HRT/

THE COURT:  And basically they'll be in place and if there are future units, you don't have to tear up everything that -- they're already in place and then when the unit goes up you can connect out to the larger lines.

THE WITNESS:  Yes.  Ultimately . . . [y]ou provide an as-built that tells you exactly where that stub-up is --

THE COURT:  Yes.

THE WITNESS:  -- the next contractor comes in, has the benefit of the as-built drawing and he could find it without a problem.

THE COURT:  Okay.

John Ford Direct Testimony, June 7, 2005, at 135:25-137:05.

155.    Water and sewer laterals into Blocks A-1, A-2 and K-1 are clearly designated on Drawings SS-5 and SS-6.  *See* **Exhibit 5**, Drawings SS-5 and SS-6; *see also* **Finding of Fact 55**, *supra, citing* **Exhibit 1**, Paragraphs 6.I through 6.L of Attachment "A" to the Subcontract.  *See also* Stephen Simoncini Direct Testimony, June 13, 2005, at 19:11-20:10.

156.    Drawings SS-5 and SS-6 also include sidewalks, curbing, paving and other items. *See* **Exhibit 5**, Drawings SS-5 and SS-6.

157.    Neri was obligated to perform work in strict accordance with the Contract Documents, including Drawings SS-5 and SS-6, and any work "reasonably inferable therefrom." *See* **Finding of Fact 13**, *supra, citing* **Exhibit 1**, Articles 1.1 and 2.1 of the Subcontract.

158.    Water and sewer laterals into Blocks A-1, A-2, and K-1 are included on drawings designated "Streets, Sewers and Utilities," which explicitly incorporated the following items into Neri's scope of work:

A.    SCOPE AND GENERAL NOTES:

76

1.  The work shown on Streets, Sewers & Utilities Drawings (numbered SS-xx) <u>includes the following</u>:

    a.  New Curbs and pavement for public streets; Removal of existing curbs and pavement.

    b.  <u>Sanitary and storm sewer systems</u> to be constructed by Contractor in public streets.

    c.  <u>Sanitary sewer building connections in public streets and on private property</u>.

    d.  <u>Storm sewer systems on private property and in public streets</u> (coordinated with storm sewer work in public streets by the City of New Haven).

    e.  Removal and modification of existing drains, sewers, manholes and catch basins.

    f.  <u>Water and gas utility services</u>.

**Exhibit 5**, Drawing SS-1, Notes (emphasis added); *see also* **Exhibit 1**, Drawing SS-25.

159.  Lorraine Beckwith testified that the laterals beneath Ashmun Street North were included in the Subcontract scope of work because they were identified on the "Streets, Sewers & Utilities" drawings:

> Q.: . . . Why do you feel it's part of the scope of work for the street, those laterals?
>
> A.: Well, first of all, it's underneath the road, so if you're going to construct the road, you need to do everything underneath the road before you, obviously, pave the road.
>
> So they were shown on the drawings --
>
> Q.: What was shown on the drawings?
>
> A.: The laterals were shown on the drawings, in the street.

Lorraine Beckwith Direct Testimony, September 23, 2005, at 92:22-93:06.

RJT/29497/3/761609v1
02/27/06-HRT/

160.   Elm Haven had directed Neri to price these laterals within its Phase 1 base bid.

All sitework on Ashmun St. adjacent to Blocks A1, A2, K1 to be included in Phase 1 base bid.

**Exhibit 437**, Letter of Transmittal dated October 19, 1998 (emphasis added).

161.   At the October 30, 2000, meeting, when Elm Haven requested a schedule for the performance of work on Ashmun Street South, Neri maintained that this work was not included in the Subcontract.

The next topic of discussion was the work on Ashmun Street from Webster to Bristol. [John Ford] requested Neri schedule to perform this work. Neri stated that this roadwork is not included in their current contract. [John Ford] stated that Drawing SS26 clearly details this work as being part of the current EHC-Neri Contract. The subject drawing is also listed as a contract drawing in the EHC-Neri Contract. [Carl Neri] stated that they never included this work in their price. [John Ford] questioned if Neri had included the laterals to service Block D in their price. [Carl Neri] stated that Neri will review which laterals were included in their price for Block D.

**Exhibit 101**, Meeting Minutes, dated November 6, 2000; *see also* **Exhibit 5**, Drawing SS-26; **Exhibit 1**, Attachment "B" to the Subcontract.

162.   John Ford testified that Neri's perspective at this meeting suggested to him that Neri did not have sufficient resources to complete the remaining portions of its scope of work on the Project.

So, [I am] not only getting worried about schedule, I'm getting worried about the fact that, does Neri have enough money to finish this project if he doesn't even think a good portion of Ashmun Street is even in his contract, or any of these laterals are even in his contract. That's what I'm thinking at this point.

78

John Ford Direct Testimony, June 7, 2005, at 170:06-170:11.

**K.    Change Order No. 204-55**

163.    On January 18, 2001, Elm Haven informed Neri that it was assembling a deduct Change Order for the work in Neri's Subcontract that was performed by other contractors.

> [Elm Haven] will also be generating a deduct Change Order under separate cover which will include all backcharges to be issued against [Neri] to date. All items of work included with this Change Order will be substantiated by sufficient documentation for your firm's review. [Elm Haven] is proceeding with this action under Article 6.1.6 of the [Subcontract], and provisions contained within the Contract Documents.

**Exhibit 114**, John Ford letter to Carl Neri, dated January 18, 2001.

164.    On March 27, 2001, Elm Haven submitted Change Order No. 204-55 in the deduct amount of $483,097.40, in order to deduct from Neri's Subcontract price the costs incurred by Elm Haven in completing or performing portions of Neri's scope of work with other subcontractors through 2000. *See* **Exhibit 290**, Change Order No. 204-55, dated March 27, 2001; *see also* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, dated March 27, 2001.

165.    At trial, Elm Haven reduced the backcharge amount to $409,153.71. *See* John Ford Direct Testimony, June 6, 2005, at 215:04-225:17; June 7, 2005, at 03:15-128:08. The breakdown of the charges and supporting documentation that comprise Change Order No. 204-55 were testified to and described by John Ford, all of which is summarized as follows:

- **$515.00 for the repair of damaged water meter pits**

166.    These repairs were performed by Page Excavation, Inc. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 1; *see also* **Finding of Fact 115**, *supra*. Neri was responsible for these repair costs because it failed to provide adequate protection for the damaged water meter pits, prior to their acceptance by Elm Haven. *See* **Finding of Fact**

RJT/29497/3/761609v1
02/27/06-HRT/

**29**, *supra, citing* **Exhibit 1**, Article 6.1.3 of the Subcontract; *see also* **Exhibit 3**, Project Specifications Vols. I and II, § 01500 ¶ 2.03.  The amount of the backcharge for this work was determined by subtracting amounts for Owner's extras from Page Excavation, Inc.'s invoices.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 1; *see also* John Ford Direct Testimony, June 6, 2005, at 221:24-223:06.

- **$794.00 for two lawn pedestal boxes**

167.    These boxes had been furnished and installed by Neri in Blocks E and F, but were subsequently damaged in May 2000.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 2.  Elm Haven directed Semac Electrical to purchase the boxes, and Elm Haven's superintendents installed them.  *See* John Ford Direct Testimony, June 7, 2005, at 08:02-08:15.  As with the damaged water meter pits, Neri was responsible for these repair costs because it failed to provide adequate protection for the damaged lawn pedestal boxes, prior to their acceptance by Elm Haven.  *See* **Finding of Fact 29**, *supra, citing* **Exhibit 1**, Article 6.1.3 of the Subcontract; *see also* **Exhibit 3**, Project Specifications Vols. I and II, § 01500 ¶ 2.03; John Ford Direct Testimony, June 7, 2005, at 06:17-07:14.

- **$14,742.00 for the replacement of two light poles**

168.    Two New Haven-style "Century Poles" were damaged by Neri's dump trucks.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 3; *see also* John Ford Direct Testimony, June 7, 2005, at 09:02-13:13.

169.    Neri was obligated not to damage work performed by others.  *See* **Finding of Fact 68**, *supra, citing* **Exhibit 1**, Article 3.5 of the Subcontract.

170.    Semac Electric replaced these poles, at a cost of $14,742.00.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 3.  This amount is $4,000.00 less than the charge included in the original Backcharge Change Order No. 204-55, which included an estimate for potential damages to the underground electrical conduit.  As the conduit was undamaged, John Ford testified that he removed this estimate from the final amount of the backcharge change order.  *See* John Ford Direct Testimony, June 7, 2005, at 13:14-14:05.

- **$35,000.00 for site work surveying services**

80

171.    Neri was responsible for the survey layout, and Elm Haven was responsible for providing a baseline and benchmark. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 4; *see also* **Findings of Fact 45-46**, *supra*, *citing* **Exhibit 1**, Article 6.1.14 of the Subcontract; Attachment "A" to the Subcontract, Paragraph 6.A.

172.    Since both Neri and Elm Haven used DTC's services on the Project, yet only Elm Haven was billed for them, John Ford estimated that Neri should pay approximately half of the $71,918.00 bill, or $35,000.00. *See also* John Ford Direct Testimony, June 7, 2005, at 14:13-15:13.

- **$5,072.50 for the removal of unsuitable materials**

173.    These materials, which were stockpiled in Blocks E and G, were removed by Executive after Neri ignored Elm Haven's direction to do so. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 5; *see also* **Findings of Fact 48-54, 70-87, 130-133**, *supra*; John Ford Direct Testimony, June 7, 2005, at 21:01-25:22.

- **$6,280.50 for the excavation for sonotube installations and corrective work**

174.    These items were included in Neri's scope of work under the Subcontract, but were performed by Executive. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 6; *see also* **Findings of Fact 62-63**, *supra*; John Ford Direct Testimony, June 7, 2005, at 25:06-35:19.

- **$290.00 for the application of an additional two inches of topsoil**

175.    The additional topsoil was applied in Block B, and was necessary to enable Elm Haven to obtain a permanent Certificate of Occupancy in Block B no later than April 30, 2000. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 7; *see also* **Finding of Fact 65**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.CC; **Findings of Fact 102, 109**, *supra*.

176.    Elm Haven had previously issued Change Order No. 207-17 to Neri, in the amount of $8,890.00, for the two inches of topsoil to be applied in Block B. *See* **Exhibit 309**, Change Order No. 207-17, dated April 10, 2000; *see also* John Ford Direct Testimony, June 7, 2005, at 36:07-37:06.

81

177.    John Ford testified that Neri refused to install the topsoil even after receiving Change Order No. 207-17.  Therefore, John Ford contacted Executive Landscaping, which offered a price of $9,180.00 for the labor, materials and equipment to install the additional two inches of topsoil.  *See* John Ford Direct Testimony, June 7, 2005, at 37:07:37:23.

178.    Elm Haven subsequently issued a deduct change order which voided Change Order No. 207-17, for Neri's failure to install the topsoil.  *See* **Exhibit 328**, Change Order No. 207-37, dated October 3, 2000.  The $290 backcharge for Block B topsoil in Change Order No. 204-55 represents the difference between the amount Elm Haven expected to pay Neri for the topsoil ($8,890) and the amount that it ultimately paid Executive for the topsoil ($9,180).

179.    John Ford testified that the price for labor, materials and equipment offered by Executive was reasonable when compared to Change Order No. 207-17, which was for materials only, given the time constraints associated with obtaining the Certificate of Occupancy in Block B.  *See* John Ford Direct Testimony, June 7, 2005, at 37:24-38:17.

- **$2,045.00 for video inspections of sewer laterals**

180.    Neri was required to perform these inspections per the Subcontract.  *See* **Finding of Fact 69**, *supra*, *citing* **Exhibit 1**, Articles 2.9 and 6.1.3 of the Subcontract; *see also* **Exhibit 3**, Project Specifications Vols. I and II, § 01500 ¶ 2.03.  Elm Haven hired Mr. Rooter, doing business as Connecticut Sewer, to perform the inspections.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 8.

181.    John Ford also testified that Neri failed to provide the supporting documentation and video recording of the inspection upon request.

> Carl Neri said he didn't get a video.  He'll call Connecticut Sewer, but he didn't get a video and he doesn't have any drawing.  As far as he knows, everything's okay.  That's what Carl told me in general, in summary, that's what he told me.

> The standard procedure for Connecticut Sewer, or any other sewer inspection people, they have no use for the video.  When they're done videoing your line, they give you the tape as soon as

82

they're done.

John Ford Direct Testimony, June 7, 2005, at 41:23-42:06.

182.    After Neri had claimed that it performed the inspections, LEA discovered faulty construction and/or debris in the laterals.

> During the flushing, testing and television inspection of the new sanitary sewers, it was found that the laterals and main sewer contained soil and debris.  During the televising of the laterals on New Street 4 it was found that some of the laterals had offset connections, possibly at the fernco couplings and the lateral for unit #15 was completely offset.  Based on the observations made during the testing and inspection and discussions with the City of New Haven Water Pollution Control Authority, LEA was directed to require the contractor to televise all of the new sanitary sewer lines and laterals.  LEA has made the contractor aware of this requirement.  The contractor has not yet responded to LEA about this matter.  LEA has not yet received copies of the completed sanitary sewer testing/inspection reports.

**Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 8, LEA Report, dated June 21, 2000 (emphasis added).

- **$33,823, $6,264, $5,931, and $1,680 for the installation of concrete stairs and railings**

183.    These work items, which included excavation, forming, pouring, finishing and backfilling for concrete stairs and railings in Blocks B, C, E, and F, were performed by Santos Foundations, Inc. ("Santos"), Shawnlee Construction, Lengyel Construction, LLC, and Paul P's Welding.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 9-12.

184.    The installation of these stairs and railings was included in the Subcontract.  *See* **Findings of Fact 60-61**, *supra, citing* **Exhibit 1**, Paragraph 6.S of Attachment "A" to the Subcontract; *see also* John Ford Direct Testimony, June 7, 2005, at 50:06-70:22.

83

- **$768.50 for street cleaning**

185.    This work was performed by High Tech Mobile Services, despite the fact that street cleaning was included in Neri's scope of work.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 13; *see also* **Finding of Fact 66**, *supra*, *citing* **Exhibit 1**, Article 6.1.7 of the Subcontract; Attachment "A" to the Subcontract, Paragraphs 6.W(e), 6.GG, and 15.  John Ford testified that he directed Neri to clean up the streets but Neri refused, arguing that cleaning the streets with anything other than a broom was not in its scope of work.  *See* John Ford Direct Testimony, June 7, 2005, at 73:06-75:20.

186.    Therefore, John Ford testified that Elm Haven contracted with High Tech Mobile to clean Ashmun Street and the area around Block B, on two occasions.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 13; John Ford Direct Testimony, June 7, 2005, at 75:21-78:07.

- **$4,136.91 for various erosion and sedimentation control systems**

187.    Elm Haven notified Neri on numerous occasions that its efforts to control the erosion and sedimentation on the project were inefficient or nonexistent, and not in compliance with the Subcontract.  *See, e.g.,* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 15, Letters dated December 30, 1999, January 11, 2000, January 18, 2000, February 24, 2000; and March 8, 2000.  *See also* **Finding of Fact 47**, *supra, citing* **Exhibit 1**, Paragraph 6.C of Attachment "A" to the Subcontract.

188.    John Ford testified that because Neri failed to provide for erosion and sedimentation control systems as required by the Subcontract, Elm Haven contracted with various suppliers and vendors to provide hay bales, silt fences, and other measures on the Project site, in the amount of $4,136.91.  *See* John Ford Direct Testimony, June 7, 2005, at 79:15-88:15; *see also* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 15.

- **$182,283 for fine grading and paving performed by Waters Construction**

189.    This backcharge is for the fine grading and paving work on Foote Street, New Street 3, New Street 4, and the parking lots and driveways in Blocks E, F, and G that was removed from Neri's scope of work and performed by Waters Construction in October 2000.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 16.  *See also* **Findings**

RJT/29497/3/761609v1
02/27/06-HRT/

**of Fact 134-150**, *supra, citing, e.g.,* **Exhibit 80**, Waters Construction Subcontract, dated October 11, 2000.

190.    The backcharge includes an invoice in the amount of $121,919.82, for driveways, fine grading and parking lots (binder course and top course) in Blocks E, F, and G; as well as the binder course, top course, and tack coat for Foote Street, New Street 1 and New Street 2; plus sales tax. *See* **Exhibit 80**, Waters Construction Subcontract, Invoice No. 8956 dated November 28, 2000; *see also* John Ford Direct Testimony, June 7, 2005, at 91:25-93:20.

191.    The backcharge also includes an invoice in the amount of $60,362.39, for the driveway to the Block G Senior Building; top course, leveling course, and tack coat on Canal Street, Gregory Street, Foote Street, Webster Street, and Ashmun Street; plus sales tax. *See* **Exhibit 80**, Waters Construction Subcontract, Invoice No. 8967 dated December 6, 2000; see also John Ford Direct Testimony, June 7, 2005, at 90:08-91:22.

192.    John Ford testified that the price charged by Waters was reasonable, given the scope of work and the quantities performed. *See* John Ford Direct Testimony, June 7, 2005, at 91:15-91:18; 93:25-94:03. John Ford also testified that Waters did not charge Elm Haven a premium for the performance of this work, despite the fact that it was completed on such short notice. *See* John Ford Direct Testimony, June 7, 2005, at 94:11-95:21.

- **$30,011, $11,675, and $65,800, for (*i*) repairs to sanitary sewers; (*ii*) resetting of manhole frames and covers; and (*iii*) the removal and replacement of incorrectly installed concrete sidewalks and handicapped ramps**

193.    In addition to its fine grading and paving work on Foote Street, New Street 3, New Street 4, and the parking lots and driveways in Blocks E, F, and G, Waters also completed a number of other items on the Project, pursuant to an original Purchase Order issued by Elm Haven, in an amount not to exceed $30,000. *See* **Exhibit 80**, Purchase Order No. 0087, dated October 11, 2000.

194.    The repairs of sanitary sewers, the resetting of manhole frames and covers, and the removal and replacement of incorrectly installed sidewalks and handicapped ramps were included in Neri's scope of work. This work was eventually performed by Waters and/or its

RJT/29497/3/761609v1
02/27/06-HRT/