subcontractor, PDF Construction Company, Inc. ("PDF"), pursuant to Elm Haven's notice to Neri of October 11, 2000, that Elm Haven would supplement Neri's work force with others in an attempt to keep the project on schedule. *See* **Exhibit 84**, Elm Haven letter to Neri dated October 11, 2000; *see also* **Exhibit 1**, Article 3.5 of the Subcontract; *see also* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19.

195.    Elm Haven notified Neri of various broken, separated, or blocked sanitary sewer laterals at least four months before it contracted with Waters to perform the needed repairs. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19, Elm Haven letter to Neri, dated September 22, 2000; *see* John Ford Direct Testimony, June 6, 2005, at 178:16-180:17. Elm Haven directed Neri to repair the sanitary sewer laterals not later than September 27, 2000. *Id.*

196.    Because Neri failed to produce the testing report and video recording from the testing that it performed on the site, Elm Haven contracted for the performance of video inspections of sanitary laterals. *See* **Findings of Fact 69, 180-182**, *supra.* As noted by LEA, the reinspection of the sanitary sewer laterals revealed sagging, depressed joints, dropped and/or separated pipes, and various blockages:

> Repairs of the sanitary sewer laterals are required at:
>
> 229 Ashmun Street: Remove the sagging at 40'-50'.
> 233 Ashmun Street: Remove the sagging at 10'-17' and at 40'-50'.
> 239 Ashmun Street: Remove the brick from the clean out then retelevise the lateral.
> 154 Canal Street: Remove the sagging at 25'-30', also eliminating the depressed joint at 30'.
> 126 Canal Street: Repair the dropped pipe at the fernco at 18' and at 25'.
> 104 Canal Street: Repair the dropped pipe at the joint at 30'.
> 217 Ashmun Street: Repair the separated pipe at 32' then retelevise the lateral.
> 219 Ashmun Street: Locate cleanout and televise the lateral.
> 221 Ashmun Street: Repair the offset pipe at the fernco at 3' and

at 32'.  Replace the compressed pipe at 40'.

10 Foote Street: Remove the sagging 17'-25'.

15 New Street 4: Remove the blockage and complete the inspection of the lateral.

10 New Street 4: Replace the crushed section of lateral starting at 36'.  This repair was done on 11/7/00.  Retelevise the lateral after completion of the repair.

Sagging of the pipe was also noted in the laterals for 11 Webster Street and 215 Webster Street.  The sagging appears to be minor and should not be of concern.

**Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19, LEA letter to Elm Haven, dated November 14, 2000 (originally sent on November 8, 2000).

197.    When Neri failed to repair the sanitary sewer laterals, Elm Haven contracted with Waters to complete the work.  Not until Waters began to fix problems with the laterals did Neri finally volunteer to perform the necessary corrections.  As was stated in Elm Haven's letter to Neri of November 6, 2000:

Following the testing review, EHC proceed [*sic*] to procure a contract with an alternate contractor to perform the repair work expeditiously, to avoid further delay to the Project.  It was <u>not until the day that EHC started the subject repair work that Neri volunteered to perform the work</u>.  Elm Haven's alternate subcontractor had already mobilized men and equipment at that time, and it would not have been feasible to stop the work, based on Neri Construction's history with these repairs.  EHC did however offer Neri the opportunity to correct the Sanitary Sewer Lateral identified as non-conforming on New Street 2, Block B.  However, Neri <u>did not take any action on this item of work, again, until EHC mobilized others to perform the work</u>.

**Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19, Elm Haven letter to Neri, dated November 6, 2000 (emphasis added).

RJT/29497/3/761609v1
02/27/06-HRT/

198.    The sanitary sewer lateral backcharges included charges for labor and materials to repair the laterals, including the costs of excavating through pavement or concrete and repairing the disruptions, as well as necessary permits, in the amount of $30,011.00.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19, Waters Extra Work Authorization Nos. 1 through 6 and 10 through 12.

199.    Similarly, Elm Haven notified Neri on October 3, 2000, that the manhole frames and covers on Ashmun Street, Canal Street, New Street 1, New Street 2, and Webster Street around Blocks B and C required adjustment.  The frames were set too high and would stick out of finished pavement, and therefore, required resetting to the proper grade prior to applying the binder course.  *See* John Ford Direct Testimony, June 6, 2005, at 191:18-192:11. Specifically, Elm Haven informed Neri that:

> The subject Manholes were to be reset as a part of Change Order # 207-19 [dated April 14, 2000].  Neri did not reset the subject MH Frames.  Therefore, Neri is directed to perform this work immediately.  Should Neri continue to delay the resetting of these structures, [Elm Haven] will perform the work by others.  All costs associated will be backcharged against Neri.
>
> **The work must be complete by the end of business October 4, 2000**.

**Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19, Elm Haven letter to Neri, dated October 3, 2000 (emphasis in original).

200.    John Ford testified that the streets listed above in the vicinity of Blocks B and C, as well as Foote Street, New Street 3 and New Street 4 in the blue-marked areas of **Exhibit 7** contained several manholes which required repair.

> Q.: . . . Just explain to the Court the various areas where Waters worked to adjust manholes and frames that are included in [Tabs 17-19 of **Exhibit 291**] -- these charges.
>
> A.: . . . [T]he original contract I had with Waters was simply to walk on the job, fine grade the [sub-base] there, and pave it on a

RJT/29497/3/761609v1
02/27/06-HRT/

unit price, square foot basis.

The work he had to do above and beyond that, is in here.  There were certain manholes on Foot[e] Street and the New Streets [3 and 4] in the blue area [on **Exhibit 7**] as well as there was a lot in the [yellow-and-blue] cross-hatched area [on **Exhibit 7**].  Anything, as I said, outside of the square foot numbers that we agreed to, are on those sheets [listed in Tabs 17-19 of **Exhibit 291**].

John Ford Direct Testimony, June 7, 2005, at 104:20-105:09.

201.  With no response, Elm Haven contracted with Waters to reset the manhole frames and covers.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19, Elm Haven letter to Neri, dated November 6, 2000.

202.  The repair charges for the manholes included labor and materials for raising or resetting the manhole frames and covers, as well as necessary permits, in the amount of $11,675.00.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19, Waters Extra Work Authorization Nos. 1 and 8 through 11.

203.  Waters hired PDF to perform various concrete work and repairs throughout Blocks E, F, and G.  PDF's final charges for this work totaled $65,800.00.  These repairs included the removal of existing sidewalks and ramps which were not built according to plans, and the formation of new ramps; the formation, finishing, and pouring of concrete driveway aprons and handicapped ramps at Foote Street and Ashmun Street; the removal and resetting of granite curbing at Foote Street, New Street 3 and New Street 4; two new handicapped ramps at New Street 3 and New Street 4; concrete stairs along New Street 3; and setting and installing granite curbing at New Street 3 and New Street 4.  *See* John Ford Direct Testimony, June 7, 2005, at 107:16-107:19; *see also* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19, Waters Invoice Nos. A-1 through A-12, dated December 13, 2000.

204.  Initially, PDF's requests for payment were only supported by a summary of the hours and rates for labor and equipment, and material costs for the performance of its work.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19, PDF letter to

89

Waters, dated December 13, 2000.  When he received this summary, John Ford testified that he requested a more detailed breakdown of PDF's charges:

> I told them, you got to get me something.  You have to get me -- Go back to PDF Construction, have him go back to whatever he has to look at as far as his daily logs or what have you.  I need you to establish what you did, where and when. . . .
>
> At this point, I mean, I know he had the people there.  I know these rates seemed fair and reasonable.  I know the work was done, but again, I wanted something to be able to put into a package so that I could substantiate it; I could substantiate the daily events, and although this spelled out the cost and the work that was done and the costs associate with that work, it wasn't on a daily basis type of ticket.  So, I wanted more information.

John Ford Direct Testimony, June 7, 2005, at 109:03-109:07; 110:16-110:24.

205.    In response, Waters provided additional back-up summaries which approximated PDF's performance of work on the Project.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tabs 17-19, Waters letter to Elm Haven dated March 22, 2001.  Although these summaries did not fully satisfy his request, John Ford testified that he paid Waters for PDF Construction's work on the Project because the rates were fair and reasonable, and because he actually observed PDF performing the work:

> Well, at this point, I received this from Mike Volpe, who works for Waters Construction.  He's trying to comply with my request to show the backup, but when I look at it, although the dates that they were there are accurate, what it appeared is they took the total sum and spread it out amongst all the different days, which is accurate to the point, 'cause he had the same amount of people there for those days, but you'll see in terms [of] like, the concrete or the materials presented, it's the same number every day and I know he didn't have the same amount [of] concrete every day.

RJT/29497/3/761609v1
02/27/06-HRT/

So, it was apparent to me at that point that he had spread the cost amongst the days he was there and at that point, I had to make a decision.

John Ford Direct Testimony, June 7, 2005, at 111:18-112:06.

Q.: What decision did you have to make?

A.: I pay him for the work he's done without it knowing that the work is done, he did the work. It seemed like a reasonable rate, amount. So, I authorized to pay it.

Q.: You authorized a payment of $65,800 that's behind Tab 19 [of **Exhibit 291**]?

A.: Yes.

Q.: Did you think it would be appropriate not to pay for that work, notwithstanding the fact that you didn't get quite all the information you wanted in terms of backup?

A.: No, in this particular case, I didn't think that would be a fair thing to do.

Q.: Why did you feel that way?

A.: Well, they came out, you know, dropped what they were doing to come perform work. I know they did the work and 'cause of the maybe a communication problem between Waters and his subcontractor, I didn't think anyone should have to not get paid for all that work.

John Ford Direct Testimony, June 7, 2005, at 114:08-115:03.

206.    The cost of the repairs to sanitary sewer laterals, manhole frames and covers, and concrete sidewalks, ramps and aprons listed above totaled $107,485.90. *See* **Exhibit 291**,

RJT/29497/3/761609v1
02/27/06-HRT/

Backcharge Change Order No. 204-55 Backup, Tabs 17-19, Waters Invoice dated December 1, 2000. Although this amount is more than the original "not to exceed" price of $30,000, set forth in Purchase Order No. 0087, Elm Haven paid Waters for all of its work. John Ford testified that he directed Waters to exceed $30,000 because the original estimate on the Purchase Order did not include some work that Elm Haven expected Neri to finish; and that when Neri failed to do so, the work needed to be finished with other contractors:

> Q.:  . . . [D]id you, in turn, make payment for those sums?
>
> A.:  Yes.
>
> Q.:  But they exceed $30,000 that you had a not to exceed price on the October 11 contract.
>
> A.:  That's correct.
>
> Q.:  Why did you still approve, even though it exceeded $30,000?
>
> A.:  'Cause the work needed to get done.  That was an estimate that I had at the time.  I had thought Neri was going to do certain items [of] work that he eventually ended up not doing.  So, it just added to our burden to have to put people on the job.
>
> As a matter of fact, Waters, one of the reasons why Waters needed to hire PDF.  We just really thought that Neri was going to perform some of the work that he ended up not performing.  So, we exceeded my original estimated amount.
>
> Q.:  Did you authorize Waters to exceed that original sum of $30,000 and to proceed forward with work?
>
> A.:  Yes.

John Ford Direct Testimony, June 7, 2005, at 106:04-106:23 (emphasis added).

RJT/29497/3/761609v1
02/27/06-HRT/

- **$1,467 for radius curbing and bullnose granite**

207.    Elm Haven purchased these items from North Carolina Granite Corporation. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 21.  The Subcontract required the installation of radius granite curbing on New Street 3 and New Street 4, at the neckdown areas where these streets intersect with Foote Street and Webster Street.  *See* **Exhibit 5**, Drawings SS-15 and SS-16.

> Although the original design of the curb returns did not specify a radius for the transition piece of curb, it was shown with a radius.  The design of the curb returns was subsequently revised, initially on November 18, 1998 and again on August 8, 2000, to reflect the final configuration and the proper materials of construction per the City of New Haven requirements.

**Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 21, Request for Information No. 60, dated September 25, 2000; *see also* **Finding of Fact 58**, *supra*, *citing* **Exhibit 1**, Paragraph 6.P of Attachment "A" to the Subcontract.

208.    John Ford testified that Neri misrepresented to Elm Haven that the required radius granite had been ordered from North Carolina Granite Corporation by Neri, when this was clearly not the case.

> Vincent Neri, Neri Construction, had told me they had ordered that bullnose granite and it was coming shortly.  Their supplier is the same guy that I'm calling, Doug Norman, North Carolina Granite.  When I called Doug Norman, he had no idea what I was talking about.
>
> So, it appeared to me, it was pretty obvious at that point, no one had ordered, not only the eight radius curbs that were a subject of this [Request for Information], but also the four ends of those islands.

John Ford Direct Testimony, June 7, 2005, at 124:21-125:05.

93

As a follow-up to our verbal conversation today regarding the
Granite Curbing required by the Contract Documents at the ends
of each island on New Street 3 and New Street 4, [Elm Haven]
contacted North Carolina Granite to confirm your statement that
Neri had ordered the Granite Material for this work and expected
delivery by . . . early next week.

In fact, North Carolina Granite does NOT have any orders
currently in place for the Granite Radius curb needed to complete
the work outlined in Neri schedule 9/14/00. This type of
misinformation is seriously impacting the schedule to complete
this project. Had this office not followed up on your statements,
this material would have again been a last minute crisis.

**Exhibit 77**, Elm Haven letter to Neri, dated October 6, 2000.

- **$572.40 to repair one aluminum fence panel and one aluminum post**

209.    This charge is for the replacement costs for fencing which was damaged by Neri
in Block C. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 22; *see also*
**Finding of Fact 29**, *supra*, *citing* **Exhibit 1**, Article 6.1.3 of the Subcontract; *see also* **Exhibit
3**, Project Specifications Vols. I and II, § 01500 ¶ 2.03.

210.    John Ford testified that in the process of cutting down a tree, portions of the tree
fell onto the fence in Block C, damaging the fence panel and post. The panel and post were
replaced by Frankson Fence, for the cost of $572.40. *See* John Ford Direct Testimony, June
7, 2005, at 127:06-128:08.

**L.    Progress of Work, January 2001 - June 2001**

211.    In January 2001, the parties were analyzing the possibility of a mutually
acceptable arrangement whereby Neri would not perform any more work on the Project, in
exchange for an appropriate credit to Elm Haven for the value of incomplete work. John
Ford, therefore, analyzed the site work that remained on the Project as of January 2001, along
with Neri's then-pending extra work claims, to determine the cost of completing Neri's scope
of work.

94

> I took all the numbers off the requisition, I researched our files.
> I called Neri Construction for NC [extra work claim] backup
> information I didn't have.  I asked for it and I assembled [the]
> package in January that summarized not only the completion cost
> for the balance of work to finish Phase 1-B, 1-C, but my analysis
> of the tickets that were outstanding and at least the latest Neri
> requisition that I was looking at at the time. . .

> Obviously, the best thing that could have happened to us was, I
> look at the cost to complete the work, I look at what Neri's
> tickets are and come up with a value for that and there's some
> type of an agreement and we could just walk away from each
> other and that's it.

John Ford Direct Testimony, June 7, 2005, at 172:14-173:07.

212.    John Ford completed his analysis after Neri submitted $1,554,774.30 in
unsubstantiated extra work claims.  *See* John Ford Direct Testimony, June 7, 2005, at 175:08-
175:10

213.    Thereafter, Elm Haven rejected Neri's extra work claims on January 18, 2001,
but afforded Neri the opportunity to substantiate its claims with supporting information within
seven days.  *See* **Exhibit 114**, Elm Haven letter to Neri dated January 18, 2001; *see also* John
Ford Direct Testimony, June 7, 2005, at 175:14-176:09, 178:21-179:20.

214.    Neri did not provide Elm Haven with any substantiation of its claims within that
seven-day period, and Elm Haven subsequently insisted that Neri complete its scope of work
under the Subcontract.  John Ford Direct Testimony, June 7, 2005, at 179-21-180:06.

> As with other Neri requests, no substantiating documentation was
> included with your firm's claim.  Therefore, it is [Elm Haven's]
> intention at this time to demand that Neri complete all remaining
> contract work included in the [Subcontract].

**Exhibit 114**, Elm Haven letter to Neri dated January 18, 2001; *see also* John Ford Direct
Testimony, June 7, 2005, at 181:11-181:19.

95

215.    By mid-March 2001, John Ford expressed concern as to whether the amounts remaining in the Subcontract would be sufficient to complete the work remaining, and requested a copy of Neri's revised schedule of values, which Neri never provided.  *See* **Exhibit 131**, Elm Haven letter to Neri dated March 16, 2001; John Ford Direct Testimony, June 7, 2005, at 205:05.

- **Remaining Site Work within Block G-2**

216.    On or about February 7, 2001, Elm Haven generated a schedule for the completion of the remaining townhouse units in Block G-2, and demanded that Neri respond with any questions or comments about the schedule.  *See* John Ford Direct Testimony, June 7, 2005, at 187:08-188:09.

217.    Neri never responded to Elm Haven's schedule, and Carl Neri claimed that Neri never received it.  *See* John Ford Direct Testimony, June 7, 2005, 188:10-188:24.  In response, John Ford forwarded a second copy to Neri, and demanded that they inform Elm Haven of any issues that could prevent Neri from performing work pursuant to the schedule. *See* **Exhibit 127**, Elm Haven letter to Neri dated March 12, 2001.

218.    Elm Haven subsequently demanded that Neri commence work in accordance with the February 2001 schedule.  *See* **Exhibit 130**, Elm Haven letter to Neri dated March 15, 2001.  As of March 2001, the only work that Neri had performed in Block G-2 was the foundation excavations for the three townhouse buildings that Neri excavated in November 2000.  Although the foundations were excavated, there were still corrective measures that Neri had to undertake because of an improperly excavated section of the Townhouse No. 3 foundation wall.  *See* **Exhibit 135**, Elm Haven letter to Neri dated March 26, 2001.  John Ford testified that these corrective measures caused unneeded disruptions to the normal construction schedule:

> THE WITNESS:  The fourth page in [**Exhibit 135**] . . . is a foundation drawing.
>
> THE COURT:  Uh-huh.
>
> THE WITNESS:  And it shows the area that the footing wasn't properly excavated in this area, and that's the spot they had to --

RJT/29497/3/761609v1
02/27/06-HRT/

we had to dig in and dig it four feet undercut underneath the footing and it presented a problem with the concrete subcontractor.

BY MR. LIBRIZZI:

Q.: Why [did] that present a problem?

A.: And the overall schedule. We don't plan on having a concrete subcontractor have to stop for excavators now to come back and dig out. We don't have provisions like that in our schedule. So, [it] throws a monkey wrench in something that we had been planning since February.

John Ford Direct Testimony, June 7, 2005, at 209:16-209:06.

219.    John Ford testified that the schedule for the three Block G-2 townhouses and all associated site work called for overall completion by mid-October 2001. *See* John Ford Direct Testimony, June 7, 2005, at 211:20:211:23. John Ford also explained how Neri's site work activities in Block G-2 were generally performed during the early stages leading up to the backfilling of the concrete foundations, so as to allow the building framers and other follow-on trades to actually build the three townhouse buildings. The early site work activities typically include the foundation excavations, underground utilities, underground drainage for roof leaders and backfilling of foundations. Once the townhouse buildings were sufficiently completed, the remaining site work must be performed, such as the site work amenities, sidewalks, stairs, finish grading, utilities, and the spreading of topsoil. *See* John Ford Direct Testimony, June 7, 2005, at 212:04-212:19.

220.    On April 2, 2001, Elm Haven sent Neri an updated version of the Block G-2 townhouse schedule, *see* **Exhibit 143**, Block G Townhouses Schedule, dated April 2, 2001, which Neri accepted, as stated in Neri's letter of April 6, 2001. *See* **Exhibit 146**, Neri letter to Elm Haven, dated April 6, 2001.

221.    Except for sending two workers back to the Project on March 29, 2001, to correct the improperly excavated portions of the Townhouse No. 3 foundation, *see* **Exhibit 475**, Elm Haven Daily Report dated March 29, 2001, Neri did not return to the site until mid-

97

April 2001 to resume site work activities inside Block G-2.

222.    As testified to by John Ford, Neri had very few people on the Project and its work was being performed very sporadically and with a lack of supervision, despite Neri's obligation under the Subcontract to provide a sufficient number of properly trained and skilled workmen on the Project. *See* **Exhibit 156**, Elm Haven letter to Neri, dated April 25, 2001; *see also* John Ford Direct Testimony, June 8, 2005, at 16:07-19:13; *see also* **Finding of Fact 28**, *supra*, *citing* **Exhibit 1**, Article 6.1.1 of the Subcontract.

223.    Neri's lack of supervision resulted in an improperly excavated underslab utility trench that Elm Haven had to re-excavate in order to avoid delays to other underground work that was scheduled to start; and the re-scheduling of compaction testing due to delays by Neri with interior backfilling of Townhouse No. 3. *See* **Exhibit 156**, Elm Haven letter to Neri, dated April 25, 2001.

224.    Neri did not have a full-time superintendent assigned to the Project in April 2001 despite its contractual obligation to provide one, and Vincent Neri was seldom, if ever, on the Project site. John Ford Direct Testimony, June 8, 2005, at 18:19-19:13; *see also* **Finding of Fact 30**, *supra*, *citing* **Exhibit 1**, Article 6.1.10 of the Subcontract.

225.    Neri's very slow and unsupervised progress with the site work in Block G-2 continued into the first week of May 2001. The lack of skilled manpower and supervision also resulted in Neri's machinery causing damage to the newly constructed foundations for the townhouses and an existing light pole base. *See* **Exhibit 164**, Elm Haven letter to Neri, dated May 1, 2001; **Exhibit 165**, Elm Haven letter to Neri, dated May 2, 2001; *see also* John Ford Direct Testimony, June 8, 2005, at 30:01-39:01.

226.    Due to Neri's failure to maintain adequate progress and Elm Haven's need to ensure that work schedules were met so as not to impact other trades in the performance of their work on the three townhouses in Block G-2, Elm Haven notified Neri on May 2, 2001, that Elm Haven would supplement Neri's workforce with other workers as necessary. *See* **Exhibit 165**, Elm Haven letter and photographs to Neri, dated May 2, 2001. As John Ford testified, Neri's lack of progress was holding up other trades:

If there was an item of work that had to be done in accordance

RJT/29497/3/761609v1
02/27/06-HRT/

with the -- with our schedule, that Neri Construction was not
getting done, it didn't appear that he was gonna get it done, or
was prepared to get it done, I had other people do that work.

I have other people coming after Neri Construction is done, like
the framer that actually built the houses, that, you know, he relies
on us to tell him when we're gonna be done, right?

I can't wait for a subcontractor to finish work when he wants to.
There's a schedule.  We have to adhere to it.  There's a lot of
people that fall behind the site contractor in the early stages of a
project . . . .

John Ford Direct Testimony, June 8, 2005, at 34:08-34:20.

227.    Notwithstanding Elm Haven's clear notice to Neri on May 2, 2001, of its
intention to supplement Neri's workforce as necessary to maintain the Project schedule, Neri's
progress failed to improve.  Instead, the situation worsened in that there continued to be a lack
of supervision and fewer workers were on site.  *See* John Ford Direct Testimony, June 8,
2001, at 39:02-40:05.

228.    May 9, 2001, was the last day that Neri supplied any manpower to the Project.
*See* **Exhibit 475**, Elm Haven Daily Reports.  Elm Haven, therefore, notified Neri again on
May 10, 2001, that Neri's lack of manpower was unacceptable, and that Elm Haven intended
to continue to supplement Neri's workforce with other workers, in order to complete Neri's
outstanding work.  *See* **Exhibit 166**, Elm Haven letter to Neri, dated May 10, 2001; **Exhibit
169**, Elm Haven letter to Neri, dated May 11, 2001.  Neri also failed to attend a mandatory
job meeting that was scheduled for May 10, 2001.  *See* **Exhibit 170**, Elm Haven letter to Neri,
dated May 11, 2001; *see* John Ford Direct Testimony, June 8, 2005, at 40:07-46:06.

- **Remaining Road Work**

229.    With respect to the roads, the work that remained in Neri's scope heading into
the spring of 2001 included the installation of service laterals and the reconstruction of Ashmun
Street North, including sidewalks and curbing; Ashmun Street South reconstruction, including
sidewalks, laterals and curbing; repairs to Canal Street near its intersection with Webster

RJT/29497/3/761609v1
02/27/06-HRT/

Street; Dixwell Avenue shoulder reconstruction and sidewalks; Webster Street reconstruction, including utility laterals, curbing and sidewalks, from Ashmun Street to Dixwell Avenue; and Foote Street sidewalks, curbing and roadway tie-in with Dixwell Avenue. *See* **Exhibit 143**, Street and Sewer Work Schedule; *see also* John Ford Direct Testimony, June 7, 2005, at 209:19-210:01, 212:25-216:11; *see* **Exhibit 5**, Subcontract Drawings.

230.    On April 2, 2001, Elm Haven issued a road work schedule to Neri that established milestone dates for commencing and completing work on the various roadways. *See* **Exhibit 143**, Street and Sewer Work Schedule; *see also* John Ford Direct Testimony, June 7, 2005, at 212:25-216:11. The road work schedule was as follows:

| Road | Start | Finish |
|------|-------|--------|
| Ashmun Street North | Apr. 16, 2001 | June 22, 2001 |
| Ashmun Street South | May 28, 2001 | July 13, 2001 |
| Canal Street | June 11, 2001 | Sep. 21, 2001 |
| Webster Street | June 18, 2001 | Aug. 10, 2001 |
| Dixwell Avenue | July 30, 2001 | Aug. 31, 2001 |
| Foote Street | Sep. 03, 2001 | Sep. 14, 2001 |

231.    The roadway work on Webster Street required coordination with the CSO work for the City of New Haven, which involved the installation of the main drainage line. As John Ford testified, the CSO work on Webster Street did not have to be completely finished before Neri could commence its utility lateral installation and roadway reconstruction. Rather, the two activities needed to be sequenced and coordinated in a manner such that the CSO work could start ahead of Neri's Subcontract work, which would begin a week later and fall in behind the CSO work, with the two activities moving sequentially down Webster Street. John Ford Direct Testimony, June 7, 2005, at 215:22-216:11.

232.    At the time the parties entered into the Subcontract, Neri was the City of New Haven's CSO contractor and had the contractual responsibility to coordinate the CSO work with its work under the Subcontract. *See* **Findings of Fact 33-34**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.V.

233.    As of the spring of 2001, however, Neri was no longer the City of New Haven's CSO contractor, that relationship having been terminated by the end of 2000 for reasons involving neither Elm Haven nor the Project. Nevertheless, Neri's CSO coordination

100

RJT/29497/3/761609v1
02/27/06-HRT/

obligations remained under the Subcontract such that it was incumbent upon Neri to inform the City as to when Neri intended to start its Webster Street roadway work so that the City could line up one of its two approved CSO contractors at that time in order to start the CSO work at least one week ahead of Neri's work.  *See* John Ford Direct Testimony, June 7, 2005, at 217:05-220:15.

234.    In response to Elm Haven's schedule for the completion of Block G and the roadways, Neri stated that the Block G schedule was acceptable.  With respect to the roadways, however, Neri issued a proposed completion schedule for Ashmun Street North (from Henry Street to the cul-de-sac), Ashmun Street South (from Webster Street to Bristol Street), Webster Street (from Ashmun Street to Dixwell Avenue), and Foote Street.  *See* **Exhibit 146**, Neri letter to Elm Haven and Proposed Schedule, dated April 6, 2001.  Pursuant to this schedule, Neri proposed to start work on April 16, 2001, and complete all roadway work by November 16, 2001.  *See id.*

235.    In its letter of April 6, 2001, Neri reserved its rights concerning scope of work issues relating to:

- Ashmun Street North Service Laterals to Blocks A-1, A-2, and K-1
- Ashmun Street South Service Laterals to Blocks H and D
- Webster Street Service Laterals to Blocks H and I
- The reconstruction of Ashmun Street from Webster Street to Bristol Street
- Associated Sidewalks in Blocks D, H and I

*See* **Exhibit 146**, Neri letter to Elm Haven and Proposed Schedule, dated April 6, 2001.

236.    With respect to Webster Street, although Neri stated in its letter of April 11, 2001, that Webster street laterals to Blocks H and I were not part of its scope of work under the Subcontract, Neri's estimator and original project manager, Stephen Simoncini, testified at trial that this work was indeed, covered by the Subcontract:

> Q.:  . . . It made sense to you, "Hey, let's put the stubs in along Block H and I," so when you develop H and I in the future, you would just pick up from that stub point and do the actual lateral work that's actually in the physical geographic area of the block

RJT/29497/3/761609v1
02/27/06-HRT/

from the right of way into the block, correct?

A.: <u>Yes</u>.

Q.: And that made a lot of sense to you, correct?

A.: That's what it showed on the drawings, yes.

Q.: All right, and, sir, that was clear to you that was shown on the drawings from the get go, doing that lateral stub-up work on Webster Street?

A.: Yes.

. . . .

Q.: . . . [Y]ou heard Mr. Ford testify and he put an exhibit into evidence that were meeting minutes. The exhibits are dated November of 2000 concerning a meeting with Carl Neri and Vincent Neri at the end of October 2000, where they're questioning whether or not they have to do this stub-up work on Webster Street into H and I.

You remember that testimony, don't you?

A.: No, I don't.

Q.: Okay. We'll get back to that, sir, but if you were at such a meeting, you would have told Carl Neri, "Don't worry, that is part of our scope of work. There's no need to question Elm Haven on the fact that we had the stub-up work into Blocks H and I."

You would have told them that, right?

A.: Yeah, more than likely.

102

Stephen Simoncini Testimony on Cross-Examination, June 13, 2005, at 109:15-111:21.

237.    Commencing in April 2001, Douglas King was the Neri representative who was communicating with John Ford concerning the scheduling and performance of the remaining work on the Project. John Ford first learned at the beginning of April 2001 that Douglas King had been working as a claims consultant for Neri since November 2000. John Ford Direct Testimony, June 7, 2005, at 221:16-223:13; *see also* **Exhibit 145**, John Ford Note to File, dated April 4, 2001.

238.    On April 10, 2001, John Ford responded to Neri's April 6, 2001 schedule and acknowledged Neri's proposed start date of April 16, 2001 for the Ashmun Street North work, and requested Neri's proposed traffic mitigation plan, copies of Neri's permits from the City of New Haven to perform this work -- given that its earlier street and excavation permits had since expired -- and a more detailed sequence of operations in order to allow proper coordination with utility companies. *See* **Exhibit 147**, Elm Haven letter to Neri dated April 10, 2001. For Webster Street, Neri's schedule depicted completion of all CSO work before Neri would ever begin its Subcontract work. Elm Haven, therefore, instructed Neri "that this work must be properly scheduled to allow all work to proceed concurrently in a coordinated manner, to limit the impact to the city streets." *Id.*; *see also* John Ford Direct Testimony, June 7, 2005, at 224:21-226:01; John Ford Direct Testimony, June 8, 2005, at 05:13-09:08.

239.    On April 12, 2001, Elm Haven again notified Neri that its traffic mitigation plan for the Ashmun Street North roadwork had not been approved by the City of New Haven, and that the permits Neri provided in response to Elm Haven's request had expired three months earlier. Elm Haven, therefore, once again informed Neri that an approved traffic mitigation plan and current building permits were needed before work could commence on Ashmun Street North. *See* **Exhibit 148**, Elm Haven letter to Neri, dated April 12, 2001, at 2; *see also* John Ford Direct Testimony, June 8, 2005, at 12:21-13:23.

240.    Elm Haven's letters to Neri of April 2 and 10, 2001 (**Exhibits 143** and **147**) also made it clear that Elm Haven was prepared to proceed with the Ashmun Street North work with others if Neri was not prepared to start its work on April 16, 2001. *See* **Exhibit 143**, Elm Haven letter to Neri dated April 2, 2001; **Exhibit 147**, Elm Haven letter to Neri dated April 10, 2001; *see also* John Ford Direct Testimony, June 8, 2005, at 09:06-09:16.

RJT/29497/3/761609v1
02/27/06-HRT/

241.    With respect to Ashmun Street South, although Neri unequivocally stated on April 6, 2001, that it was "not refusing to complete any of the items in dispute," *see* **Exhibit 146**, Neri letter to Elm Haven and Proposed Schedule, dated April 6, 2001, this position changed on April 11, 2001, when Neri stated that it would <u>not</u> proceed with work on that street unless it was issued a change order to the Subcontract for the cost of that work. *See* **Exhibit 148**, Elm Haven letter to Neri, dated April 12, 2001; **Exhibit 152**, Elm Haven letter to Neri, dated April 19, 2001; *see also* John Ford Direct Testimony, June 8, 2005, at 10:06-10:25.

242.    In response to Neri's refusal to perform work on Ashmun Street South, Elm Haven notified Neri on April 12, 2001, and again on April 19, 2001, that Elm Haven, in accordance with Article 9.2.1 of the Subcontract, would complete the work on Ashmun Street South with others, and assess all costs against Neri. *See* John Ford Direct Testimony, June 8, 2005, at 11:13-12:15, 14:25-15:07; *see also* **Exhibit 148**, Elm Haven letter to Neri, dated April 12, 2001; **Exhibit 152**, Elm Haven letter to Neri, dated April 19, 2001.

243.    As for Ashmun Street North, although Neri's schedule provided that Neri would start work on Ashmun Street North on April 16, 2001, no work had started as of April 25, 2001. Nor had Neri provided copies of current building permits. Instead, Neri was informing Elm Haven that it would supposedly start work on April 30, 2001. *See* **Exhibit 157**, Elm Haven letter to Neri, dated April 25, 2001; *see also* John Ford Direct Testimony, June 8, 2001, at 19:15-24:16.

244.    Neri failed to start work by April 25, 2001, despite a meeting held on April 23, 2001, at which Douglas King insisted that Neri would begin its roadway work and provide all required permits by April 25, 2001. *See* John Ford Direct Testimony, June 8, 2005, at 20:07-20:18; *see also* **Exhibit 157**, Elm Haven letter to Neri, dated April 25, 2001. However, Neri did not begin its roadway work as promised, and neither obtained the needed permits nor installed appropriate detour signage by that date. *See id.*

245.    In its notice letter to Neri dated April 25, 2001, concerning Neri's failure to start work on Ashmun Street North, Elm Haven informed Neri that Elm Haven would exercise its rights under Article 9 of the Subcontract, and complete this portion of the Project by others if Neri continued to delay its work. *See* **Exhibit 157**, Elm Haven letter to Neri, dated April 25, 2001.

RJT/29497/3/761609v1
02/27/06-HRT/

246.    As of April 30, 2001, Neri had still not commenced its work on Ashmun Street North. Based on Neri's failure to obtain proper permits, start work in accordance with any schedule, or provide adequate coordination, Elm Haven removed the work on Ashmun Street North from Neri's scope of work on April 30, 2001, and arranged to perform that work with others. *See* John Ford Direct Testimony, June 8, 2005, at 22:20-24:16; *see also* **Exhibit 158**, Elm Haven letter to Neri, dated April 30, 2001. Included as part of the Ashmun Street North scope of work was also a relatively small section of Admiral Street. *See* **Exhibit 7**, White-Shaded Area on Admiral Street.

247.    With respect to Webster Street, Neri's road work schedule of April 6, 2001 (**Exhibit 146**), stated that this work would commence on August 24, 2001, and be completed by November 13, 2001. These dates were contrary to the schedule issued by Elm Haven on April 2, 2001 (**Exhibit 143**), which indicated that the work should start during the week of June 18, 2001, and be completed by August 10, 2001. Neri's schedule of April 6, 2001, also did not indicate that Neri's Webster Street utility lateral and roadway reconstruction work would proceed concurrently with the CSO work in a coordinated manner, as Elm Haven had requested. *See* **Exhibit 146**, Neri letter to Elm Haven and Proposed Schedule, dated April 6, 2001.

248.    Because Neri was making no effort in April 2001 to coordinate the road work on Webster Street with the City's CSO work, John Ford took it upon himself to meet with City representatives to arrange for the CSO work to start by June 11, 2001, by one of the City's approved CSO contractors. *See* John Ford Direct Testimony, June 8, 2005, at 25:01-26:16.

249.    John Ford thereafter notified Neri on May 1, 2001, of the schedule for the CSO work and the timing and manner in which Neri's Webster Street work was to proceed. *See* **Exhibit 159**, Elm Haven letter to Neri, dated May 1, 2001; *see also* **Finding of Fact 25**, *supra*, *citing* **Exhibit 1**, Article 3.4 of the Subcontract. Specifically, Neri was informed that the CSO work would begin on June 11, 2001, and that Neri's utility work on the water and sewer laterals was to start immediately behind the CSO work, with a lag of one week. John Ford also requested confirmation from Neri by May 4, 2001, that it would start its work in accordance with this schedule. *See* **Exhibit 159**, Elm Haven letter to Neri, dated May 1, 2001; *see also* John Ford Direct Testimony, June 8, 2005, at 26:12-28:25.

250.    Given the involvement of the City CSO contractor, prompt confirmation of this

RJT/29497/3/761609v1
02/27/06-HRT/

schedule was necessary in order to conduct all necessary coordination activities so as to ensure the timely start of work on June 11, 2001, and to ensure that the work proceeded promptly and efficiently.  *See* **Findings of Fact 55, 68**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraphs 6.I through 6.L; Article 3.5 of the Subcontract.

251.    That confirmation was not, however, forthcoming from Neri as of May 14, 2001.  *See* John Ford Direct Testimony, June 8, 2001, at 46:21-48:14.  Accordingly, Elm Haven notified Neri on May 14, 2001, that:

> Due to Neri Construction's failure to respond to our request for confirmation of your firm's proposed start date for the Webster St. work in an effort to coordinate the work of this contract with the City CSO work, EHC will proceed with others to coordinate and perform this work.

**Exhibit 172**, Elm Haven letter to Neri, dated May 14, 2001.

252.    As was the case with the Ashmun Street North and Ashmun Street South, Elm Haven exercised its rights under Article 9 of the Subcontract.  Specifically, Articles 9.1.2 and 9.2.1 provide that:

> 9.1.    The Subcontractor shall be in default hereunder if:
>
> . . . .
>
> 9.1.2.  The Subcontractor shall fail to perform in strict accordance with this Subcontract or the Contract Documents, shall be in breach of any term or condition of this Subcontract Agreement, or shall fail to diligently prosecute and perform all or any part of the Subcontract Work or shall fail or refuse to supply sufficient and proper quality workmen, equipment and materials, to the satisfaction of the Contractor.
>
> 9.2     In the event the Subcontractor shall be in default pursuant to Section 9.1 hereof, the Contractor shall give seventy-two (72) hour written notice to the Subcontractor and on the expiration of

106

such period and the failure of the Subcontractor to cure such default, the Contractor may elect any or all of the following remedies without prejudice to any other rights or remedies it may have:

9.2.1. Provide any labor, materials or equipment necessary to perform the Work subject to this agreement and to deduct the cost thereof, including an amount equal to 5% thereof, representing the Contractor's overhead, from any payments then or thereafter due to the Subcontractor.

**Exhibit 1**, Article 9 of the Subcontract.

253.    In summary, as of May 14, 2001, Elm Haven had removed from Neri's scope of work under the Subcontract the performance of roadway work on Ashmun Street South, Ashmun Street North (including work on Admiral Street), and Webster Street. Also as of May 14, 2001, Elm Haven had notified Neri that Elm Haven would supplement Neri's workforce as necessary for the Block G-2 site work, in order to maintain the Project schedule.

**M.    Elm Haven's Completion of Neri's Work Under the Subcontract**

254.    In the spring of 2001, Elm Haven forwarded drawings and bid packages to three subcontractors -- Waters, Executive, and Sweeney Excavation ("Sweeney") -- to solicit bids for the completion of Neri's scope of work. John Ford Direct Testimony, June 8, 2005, at 50:23-52:21.

255.    Specifically, Elm Haven sought proposals to complete roadwork and utility work in Block G-2 and on Ashmun Street North, including portions of both Admiral and Henry Street; Webster Street, from Ashmun Street to Dixwell Avenue; and Ashmun Street South, along with Canal Street, from New Street 1 to Henry Street, as a new contract. *See* **Exhibit 434**, Proposal Packages.

256.    Elm Haven received two proposals to perform the road and utility work -- a combined proposal from Waters and Executive, in which Waters would perform the road work and Executive would install the utilities; and a single proposal from Sweeney. *See* **Exhibit 434**, Proposal Packages; *see also* John Ford Direct Testimony, June 8, 2005, at 53:08-53:10.

RJT/29497/3/761609v1
02/27/06-HRT/

257.    John Ford reviewed both proposals, and selected Sweeney's bid.

I analyzed the pricing that I have.  I weigh the cost between Sweeney versus the combination between Executive Landscaping and Waters Construction.

I -- After my analysis of that, I felt not only was Sweeney qualified to do the work, between the two packages, and I felt it was a fair number, so I issued Sweeney a contract to perform the work that we had defaulted Neri on.

John Ford Direct Testimony, June 8, 2005, at 65:16-65:24.

258.    Sweeney's price was reasonable and did not include a premium, despite the short notice and rapid mobilization required.  *See* John Ford Direct Testimony, June 8, 2005, at 68:05-68:20.

259.    On or about May 17, 2001, Sweeney and Elm Haven executed a subcontract agreement in the amount of $841,406.00, for the completion of Neri's scope of work.  *See* **Exhibit 377**, Sweeney Subcontract; **Exhibit 392**, Sweeney Excavation Phase 1B Schedule of Values Breakdown; **Exhibit 403**, Sweeney Excavation Phase 1C Schedule of Values Breakdown; *see also* John Ford Direct Testimony, June 8, 2005, at 71:14-72:24.

260.    John Ford testified that the scope of work in Sweeney's subcontract was the same as that in Neri's Subcontract.  *See* John Ford Direct Testimony, June 8, 2005, at 75:17-93:15.

261.    In reality, the scope of work under Sweeney's subcontract was less than Neri's scope under the Subcontract, in that the length of Ashmun Street South was shortened by approximately 195 feet.  Additionally, the future development contemplated in Block H facing that street was reduced, thereby reducing the number of laterals required to be installed into Block H from Ashmun Street South.  *See* John Ford Direct Testimony, June 8, 2005, at 76:09-77:18.

262.    The Sweeney Subcontract included site demolition, earthwork, bituminous concrete pavement, and site concrete work on Admiral Street, in the amount of $46,527.00.

108

*See* **Exhibit 377**, Sweeney Subcontract; **Exhibit 392**, Sweeney Excavation Phase 1B Schedule of Values Breakdown; John Ford Direct Testimony, June 8, 2005, at 72:02; John Ford Re-Direct Testimony, June 10, 2005, at 129:06-129:11.

263.    The Sweeney Subcontract also included site demolition, earthwork, bituminous concrete pavement, and site concrete work on Dixwell Avenue, in the amount of $73,400.00. *See* **Exhibit 377**, Sweeney Subcontract; **Exhibit 392**, Sweeney Excavation Phase 1B Schedule of Values Breakdown; John Ford Direct Testimony, June 8, 2005, at 72:01; John Ford Re-Direct Testimony, June 10, 2005, at 129:14-129:17.

264.    The Sweeney Subcontract also included site demolition, earthwork, bituminous concrete pavement, and site concrete work on Henry Street, in the amount of $32,570.00. *See* **Exhibit 377**, Sweeney Subcontract; **Exhibit 392**, Sweeney Excavation Phase 1B Schedule of Values Breakdown; John Ford Direct Testimony, June 8, 2005, at 72:02-72:03; John Ford Re-Direct Testimony, June 10, 2005, at 127:21-129:05.

265.    The Sweeney Subcontract also included site demolition, earthwork, bituminous concrete pavement, and site concrete work on Webster Street, in the amount of $302,736.00. *See* **Exhibit 377**, Sweeney Subcontract; **Exhibit 392**, Sweeney Excavation Phase 1B Schedule of Values Breakdown; John Ford Direct Testimony, June 8, 2005, at 71:25-72:01; John Ford Re-Direct Testimony, June 10, 2005, at 129:20-130:01.

266.    The Sweeney Subcontract also included site demolition, earthwork, bituminous concrete pavement, and site concrete work on Ashmun Street, in the amount of $386,173.00. *See* **Exhibit 377**, Sweeney Subcontract; **Exhibit 403**, Sweeney Excavation Phase 1C Schedule of Values Breakdown; John Ford Direct Testimony, June 8, 2005, at 71:23-72:02; John Ford Re-Direct Testimony, June 10, 2005, at 130:16-132:25.

267.    During the course of Sweeney's performance of work on the Project, Elm Haven issued several change orders to Sweeney, totaling $271,337.20, and backcharged these against Neri because they involved other work covered by Neri's Subcontract that Neri did not perform, but was not included in Sweeney's Subcontract. These change orders were as follows:

| Exhibit | Sweeney CO | Date | Amount | Description |
|---------|-----------|------|--------|-------------|

RJT/29497/3/761609v1
02/27/06-HRT/

| Exhibit 381 | No. 204-3 | Sep. 25, 2001 | $25,742.00 | Underground Utility Piping; Subgrading; Conduit and Bases along Dixwell Avenue; Realigning Drainage at the Intersection of Webster Street and Ashmun Street; Concrete Sidewalks; Handicap Ramps; and Water Services Materials |
|---|---|---|---|---|
| Exhibit 382 | No. 204-4 | Oct. 22, 2001 | $189,159.20 | Block G Site Work and Foote Street |
| Exhibit 383 | No. 204-5 | Jan. 21, 2002 | $1,630.00 | Cleanup of Debris at Block K-1 |
| Exhibit 384 | No. 204-6 | Mar. 1, 2002 | $10,482.00 | Water and Sanitary Laterals to Block A-1 |
| Exhibit 385 | No. 204-7 | Apr. 23, 2002 | $9,260.00 | Removal of Stockpiled Soil and Debris along Canal Street, north of Block A-1 |
| Exhibit 386 | No. 204-8 | May 22, 2002 | $590.00 | Traffic Control in Connection with Repairing or Locating Sewer Laterals |
| Exhibit 388 | No. 204-10 | Sep. 17, 2002 | $9,396.00 | Re-setting of Water Meter Vaults and Curb Boxes; Removal and Replacement of Damaged Sidewalks |
| Exhibit 389 | No. 204-11 | Nov. 6, 2002 | $19,118.00 | Paving Ashmun Street and New Street 1; Replacing Manhole Frames on Ashmun Street and Canal Street; Removing and Replacing Damaged Sidewalks; and Excavation to Bring Canal Street to Grade |
| Exhibit 390 | No. 204-12 | Dec. 19, 2002 | $5,960.00 | Extending Canal Street and Installing Sidewalk |

268.   **Exhibit 381**, Sweeney Change Order No. 204-3, dated Sep. 25, 2001, in the amount of $25,742.00, was backcharged against Neri because it includes items which were in Neri's scope of work under the Subcontract.  *See* John Ford Direct Testimony, June 8, 2005, at 101:10-110:13.

269.   The change order in **Exhibit 381** includes site work in the amount of $11,022.00.  This amount includes $1,260.00 to replace subbase that had been improperly laid by Neri at the intersection of Ashmun Street and Webster Street, causing poor drainage at that intersection.  The amount also includes $8,703.00 for concrete sidewalks, ramps and aprons, and $1,059.00 for water services materials, which were in Neri's scope of work under the Subcontract but were not included in the Sweeney Subcontract.  *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraphs 6.S and 6.L.

270.   The change order in **Exhibit 381** also includes underground conduit work in

RJT/29497/3/761609v1
02/27/06-HRT/

Block G, in the amount of $14,720.00. Neri damaged underground utility piping in Block G, which required repair and subsequent regrading. As John Ford testified, Neri had originally installed the utility piping, but Elm Haven learned that the pipes were damaged when its electrical subcontractor attempted to install wires through the pipes. *See* John Ford Direct Testimony, June 8, 2005, at 102:17-103:22; *see* **Finding of Fact 68**, *supra*, *citing* **Exhibit 1**, Article 3.5 of the Subcontract. This amount also includes materials to install light poles as well as trenching and backfill for a conduit along Dixwell Avenue, which were in Neri's scope of work under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 104:03-106:14; *see also* **Exhibit 5**, Drawings SS-8 and SS-10; **Exhibit 1**, Attachment "A" to the Subcontract, Paragraphs 6.N and 6.O.

271.    **Exhibit 382**, Sweeney Change Order No. 204-4, dated Oct. 22, 2001, in the amount of $189,159.20, was backcharged against Neri because it included work on Foote Street which was a part of Neri's Subcontract, as well as work in Block G-2 which was a part of Neri's Change Order No. 204-13. *See* John Ford Direct Testimony, June 8, 2005, at 111:02-117:10; *see also* **Exhibit 5**, Drawing SS-8; **Exhibit 246**; Change Order No. 204-13.

272.    The Block G-2 work in **Exhibit 382**, which was a part of Neri's scope of work in Change Order No. 204-13, included earthwork, sonotubes, storm drainage, sanitary sewers, water meter vaults, electrical conduit work, and concrete paving in the Block, in the amount of $149,000.00. *See* **Exhibit 382**, Sweeney Change Order No. 204-4, dated Oct. 22, 2001; *see also* John Ford Direct Testimony, June 8, 2005, at 115:02-117:04.

273.    The Foote Street work in **Exhibit 382**, which was a part of Neri's scope of work under the Subcontract, included the installation and/or repair of granite curbing, as well as the final overlay coating of pavement from New Street 4 to Dixwell Avenue, in the amount of $40,159.20. *See* **Exhibit 382**, Sweeney Change Order No. 204-4, dated Oct. 22, 2001; *see also* John Ford Direct Testimony, June 8, 2005, at 111:02-114:08.

274.    **Exhibit 383**, Sweeney Change Order No. 204-5, dated Jan. 21, 2002, in the amount of $1,630.00, was for the removal of debris left behind by Neri in the area of Block K-1. This change order was backcharged against Neri because the materials removed from Block K-1 were left strewn about by Neri from its prior operations on the Project. *See* John Ford Direct Testimony, June 8, 2005, at 118:17-121:12; *see also* **Finding of Fact 66**, *supra*, *citing* Article 6.1.7 of the Subcontract; Attachment "A" to the Subcontract, Paragraphs 6.GG and 15.

RJT/29497/3/761609v1
02/27/06-HRT/

275.  **Exhibit 384**, Sweeney Change Order No. 204-6, dated Mar. 1, 2002, in the amount of $10,482.00, is for the installation of water and sanitary sewer laterals and a pre-cast chimney for building no. 3 in Block A-1.  This change order was backcharged against Neri because the work described therein was included in Neri Change Order Nos. 207-4 and 207-8, but never performed by Neri.  *See* **Exhibit 296**, Change Order No. 207-4, dated September 28, 1999; **Exhibit 300**, Change Order No. 207-8, dated November 3, 1999.  John Ford testified that Elm Haven searched for the laterals that Neri should have installed, and could not find them:

> The reason why I'm charging it is because the laterals that were actually to go to this unit were never put in.  We went.  We looked.  We dug it up.  We dug up everywhere within the possible range of where the drawings showed the sanitary lateral to be, and it was not there, so we had to install a sanitary.

> Now, that was a change order that was paid for to Neri and the work was not done, so we performed it through Sweeney Excavation, both the water and the sanitary in that block.

John Ford Direct Testimony, June 8, 2005, at 121:16-124:13.

276.  **Exhibit 385**, Sweeney Change Order No. 204-7, dated Apr. 23, 2002, in the amount of $9,260.00 is for the labor and equipment required to remove a material stockpile of nearly 1,200 cubic yards of soil and debris along Canal Street in Block A-1.  This change order was backcharged against Neri because Neri left the material there and failed to remove it.  John Ford testified that the pile affected Elm Haven's ability to move into Phase 2 of the Project, and that the City of New Haven was requiring Elm Haven to have the pile removed.  *See* John Ford Direct Testimony, June 8, 2005, at 124:17-127:18; *see also* **Finding of Fact 66**, *supra*, *citing* Article 6.1.7 of the Subcontract; Attachment "A" to the Subcontract, Paragraphs 6.GG and 15.

277.  **Exhibit 386**, Sweeney Change Order No. 204-8, dated May 22, 2002, in the amount of $590.00, was backcharged against Neri in connection with Sweeney Change Order No. 204-6, *see* **Exhibit 384**.  When Sweeney installed the laterals on Ashmun Street North and stubbed them up to Block A-1, it required police protection, which was included in Neri's

112

scope of work under the Subcontract.  *See* John Ford Direct Testimony, June 8, 2005, at 127:19-129:20; *see also* **Exhibit 1**, Paragraphs 6.W and 6.X of Attachment "A" to the Subcontract.

278.    **Exhibit 388**, Sweeney Change Order No. 204-10, dated Sep. 17, 2002, in the amount of $9,396.00, is for the resetting of water meter vaults and curb boxes, and for the removal and replacement of damaged sidewalks.  This change order was backcharged against Neri because it includes expenses for resolving non-conformities in Neri's work, which were discovered during a walkthrough with the City of New Haven and LEA.  John Ford testified that both Elm Haven and LEA had informed Neri on several occasions that the water meter vaults and curb boxes were set too high, but that Neri failed to correct their heights.  He also testified that the damaged sidewalks were installed by Neri, but were not sufficiently protected prior to the turnover of the blocks to the residents.  Elm Haven paid Sweeney $2,176.00 to reset the vaults and curb boxes, and $7,220.00 to remove and replace damaged sidewalks.  *See* John Ford Direct Testimony, June 8, 2005, at 129:21-138:24.

279.    **Exhibit 389**, Sweeney Change Order No. 204-11, dated Nov. 6, 2002, in the amount of $19,118.00, was backcharged against Neri because it included items in Neri's scope of work.  *See* John Ford Direct Testimony, June 8, 2005, at 139:06-145:19.

280.    The change order in **Exhibit 389** includes the costs for paving at the intersection of Ashmun Street and New Street 1, to tie the intersection in with the finished pavement there, including necessary adjustments to manhole frames and the saw-cutting of pavement.  *See* John Ford Direct Testimony, June 8, 2005, at 139:09-139:17; *see also* **Exhibit 5**, Drawings SS-6 and SS-13.

281.    The change order in **Exhibit 389** also includes the replacement costs for manhole frames and covers on Ashmun Street and Canal Street.  Neri installed frames which did not meet the City's specifications; therefore, Sweeney jackhammered the area around the manholes, removed and replaced the frames and covers, and patched the surrounding pavement.  *See* John Ford Direct Testimony, June 8, 2005, at 139:18-141:22; *see also* **Exhibit 1**, Article 10.2 of the Subcontract.

282.    The change order in **Exhibit 389** also includes the costs for removing and replacing damaged sidewalks.  *See* John Ford Direct Testimony, June 8, 2005, at 141:23-

113

144:07; *see also* **Finding of Fact 68**, *supra*, *citing* **Exhibit 1**, Article 3.5 of the Subcontract.

283.    The change order in **Exhibit 389** also includes excavation costs for completion of the south end of Canal Street, beyond Webster Street. *See* John Ford Direct Testimony, June 8, 2005, at 144:08-145:19. Neri was required to develop Canal Street until Station 15+30, but stopped its work at the intersection of Canal Street and Webster Street. *See* **Exhibit 5**, Drawing SS-4.

284.    **Exhibit 390**, Sweeney Change Order No. 204-12, dated Dec. 19, 2002, in the amount of $5,960.00, was backcharged against Neri because it covers paving and sidewalks along Canal Street, which were included in Neri's scope of work under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 145:21-149:01; *see also* **Exhibit 5**, Drawings SS-2, SS-3 and SS-4.

285.    In addition to the aforementioned change orders, Elm Haven also backcharged invoices in the amount of $6,700.00 against Neri, for milling and patching performed by Sweeney on Foote Street in the vicinity of Dixwell Avenue, an area of paving included in Neri's scope of work. *See* **Exhibit 411**, Sweeney Invoice dated Dec. 4, 2003; *see also* John Ford Direct Testimony, June 8, 2005, at 149:10-153:05; **Exhibit 5**, Drawing SS-8.

286.    Elm Haven also processed several invoices for portions of Neri's scope of work performed by Executive and others on the Project, totaling $24,149.05, and backcharged the invoices against Neri. These invoices are as follows:

| Exhibit | Date | Amount | Description |
| --- | --- | --- | --- |
| **Exhibit 413** | May 3, 2001 | $1,428.00 | Executive Landscaping Invoice for Sewer Line and Backfilling at Block G-2, Townhouse No. 2 |
| **Exhibit 414** | July 3, 2001 | $3,291.95 | Executive Landscaping Invoice for Storm Drains in Block G |
| **Exhibit 415** | May 4, 2001 | $183.36 | Executive Landscaping Invoice for Electricity Main Hookup at Block G-2, Townhouse No. 3 |
| **Exhibit 416** | May 4, 2001 | $1,541.50 | Executive Landscaping Invoice for Storm Drains at Block G-2, Townhouse No. 3, Front and Rear |
| **Exhibit 417** | May 4, 2001 | $80.00 | Executive Landscaping Invoice for Four Cubic Yards of Bedding Sand at Block G-2, Townhouse No. 3 Sanitary Line |

RJT/29497/3/761609v1
02/27/06-HRT/

| Exhibit 418 | May 2, 2001 | $80.00 | Executive Landscaping Invoice for Four Cubic Yards of Bedding Sand at Block G-2, Townhouse Nos. 2 and 3 Sanitary Line |
| Exhibit 419 | May 10, 2001 | $1,692.13 | Executive Landscaping Invoice for Hauling Unsuitable Material from Storm Drainage excavation at Block G-2, Townhouse Nos. 2 and 3 |
| Exhibit 420 | May 8, 2001 | $1,388.00 | Executive Landscaping Invoice for Backfilling Electric Lines at Block G-2 |
| Exhibit 421 | May 9, 2001 | $2,162.36 | Executive Landscaping Invoice for Materials for ADS Site Drainage pipe |
| Exhibit 422 | May 7, 2001 | $276.27 | Executive Landscaping Invoice for Materials for Storm Piping at Block G-2, Townhouse Nos. 2 and 3 |
| Exhibit 423 | May 14, 2001 | $1,708.00 | Executive Landscaping Invoice for Labor and Equipment Costs for Storm Piping and Grading at Block G, Townhouse No. 3 |
| Exhibit 424 | May 15, 2001 | $795.60 | Executive Landscaping Invoice for Materials for ADS Site Drainage Pipe |
| Exhibit 425 | date unclear | $452.00 | Blue Diamond Quarry Invoice for Tracking Pad Material at Block G |
| Exhibit 426 | May 7, 2001 | $420.00 | Semac Electrical Invoice for Site Light Conduit at Block G-2, Townhouse No. 2 |
| Exhibit 427 | Mar. 12, 2001 | $445.20 | Paul P's Invoice for Site Handrails |
| Exhibit 428 | Apr. 26, 2001 | $962.64 | Merritt & Company Invoice for Copying Services |
| Exhibit 429 | May 10, 2001 | $2,852.05 | Arrow Concrete Products Invoice for Yard Drains and Grates Conforming to Project Drawings |
| Exhibit 412 | various dates | $4,392.00 | National Rent-a-Fence Invoices for Supply and Relocation of Chain Link Fences |

287.    **Exhibit 413**, Executive Landscaping Invoice No. 3794, dated May 3, 2001, in the amount of $1,428.00, was backcharged against Neri because it covers the installation of the sewer line to Townhouse No. 2 in Block G, which was included in Neri's scope of work under the Subcontract.  *See* John Ford Direct Testimony, June 8, 2005, at 161:01-163:03; *see also* **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.I.

288.    **Exhibit 414**, Executive Landscaping Invoice No. 3803, dated May 4, 2001, in the amount of $3,291.95, was backcharged against Neri because it covers the installation of

RJT/29497/3/761609v1
02/27/06-HRT/