storm drains in Block G, which were included in Neri's scope of work under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 163:04-164:18; *see also* **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.J.

289.    **Exhibit 415**, Executive Landscaping Invoice No. 3804, dated May 4, 2001, in the amount of $183.36, was backcharged against Neri because it covers the installation of portions of the electrical conduit in Block G, which were included in Neri's scope of work under the Subcontract.  *See* John Ford Direct Testimony, June 8, 2005, at 164:19-165:22; *see also* **Finding of Fact 56**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.N.

290.    **Exhibit 416**, Executive Landscaping Invoice No. 3805, dated May 4, 2001, in the amount of $1,541.50, was backcharged against Neri because it covers the installation of portions of the storm drain system to Townhouse No. 3 in Block G, which were included in Neri's scope of work under the Subcontract.  *See* John Ford Direct Testimony, June 8, 2005, at 165:23-167:05; *see also* **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.J.

291.    **Exhibit 417**, Executive Landscaping Invoice No. 3806, dated May 4, 2001, in the amount of $80.00, was backcharged against Neri because it covers the cost of four cubic yards of bedding material for the sanitary line to Townhouse No. 3 in Block G, which was included in Neri's scope of work under the Subcontract.  *See* John Ford Direct Testimony, June 8, 2005, at 167:06-168:06; *see also* **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.I.

292.    **Exhibit 418**, Executive Landscaping Invoice No. 3807, dated May 4, 2001, in the amount of $80.00, was backcharged against Neri because it covers the cost of four cubic yards of bedding material for the sanitary lines to Townhouse Nos. 2 and 3 in Block G, which was included in Neri's scope of work under the Subcontract.  *See* John Ford Direct Testimony, June 8, 2005, at 168:07-169:07; *see also* **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.I.

293.    **Exhibit 419**, Executive Landscaping Invoice No. 3812, dated May 10, 2001, in the amount of $1,692.13, was backcharged against Neri because it covers the removal of unsuitable materials encountered in the excavation for the storm drainage lines to Townhouse

Nos. 2 and 3 in Block G, which was included in Neri's scope of work under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 169:08-171:05; *see also* **Findings of Fact 48-54 and 70-87**, *supra*, *citing*, *e.g.*, **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G.

294. **Exhibit 420**, Executive Landscaping Invoice No. 3813, dated May 8, 2001, in the amount of $1,388.00, was backcharged against Neri because it covers the backfilling of electrical conduit lines and the installation of storm drain piping to Townhouse No. 2 in Block G. *See* John Ford Direct Testimony, June 8, 2005, at 171:06-172:13; *see also* **Finding of Fact 56**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.N; **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.J.

295. **Exhibit 421**, Executive Landscaping Invoice No. 3818, dated May 9, 2001, in the amount of $2,162.36, was backcharged against Neri because it includes material costs for the storm drainage piping to Townhouse Nos. 2 and 3 in Block G, which was included in Neri's scope of work under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 172:15-173:17; *see also* **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.J.

296. **Exhibit 422**, Executive Landscaping Invoice No. 3819, dated May 9, 2001, in the amount of $276.27, was backcharged against Neri because it includes other material costs for the storm drainage piping to Townhouse Nos. 2 and 3 in Block G, which was included in Neri's scope of work under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 173:18-174:17; *see also* **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.J.

297. **Exhibit 423**, Executive Landscaping Invoice No. 3820, dated May 14, 2001, in the amount of $1,708.00, was backcharged against Neri because it includes labor and equipment costs to install storm drainage and roof leader piping to Townhouse No. 3 in Block G, which was included in Neri's scope of work under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 174:19-175:17; *see also* **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.J.

298. **Exhibit 424**, Executive Landscaping Invoice No. 3821, dated May 15, 2001, in the amount of $795.60, was backcharged against Neri because it includes material costs for the

storm drainage piping to Townhouse No. 2 and the Senior Building in Block G, which was included in Neri's scope of work under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 175:18-176:20; *see also* **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraphs 6.J and 6.K.

299. **Exhibit 425**, Blue Diamond Quarry Ticket No. 20588, in the amount of $452.00, was backcharged against Neri because it included the costs for 34.77 tons of 2" stone tracking pad material in Block G. *See* John Ford Direct Testimony, June 8, 2005, at 182:14-183:19; *see also* **Finding of Fact 47**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.C; **Finding of Fact 66**, *supra*, *citing* **Exhibit 1**, Article 6.1.7; Attachment "A" to the Subcontract, Paragraphs 6.W(e), 6.GG, 15; *see also* **Exhibit 5**, Drawing G-7, Detail: Anti-Tracking Pad. John Ford testified that after the tracking pad material -- which he called a "proactive measure in erosion and sedimentation control" -- was installed by Blue Diamond Quarry, sweeping was unnecessary in the area of Block G. *See* John Ford Direct Testimony, June 8, 2005, at 183:25-184:09.

300. **Exhibit 426**, Semac Electrical Contractors Invoice No. 2320, dated May 7, 2001, in the amount of $420.00, was backcharged against Neri because it constitutes the costs of repairs to the site lighting conduit in Block G at Townhouse No. 2, which was damaged by Neri's forces. *See* John Ford Direct Testimony, June 8, 2005, at 184:11-186:16; *see also* **Finding of Fact 57**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.O; **Finding of Fact 68**, *citing* Article 3.5 of the Subcontract.

301. **Exhibit 427**, Paul P's Welding Invoice No. 0228, in the amount of $445.00, dated March 12, 2001, was backcharged against Neri because it represents the costs to furnish and install thirty feet of stair railings in Block G, which was included in Neri's scope of work under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 186:17-189:07; *see also* **Findings of Fact 60-61**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.S.

302. **Exhibit 428**, Merritt & Company Invoice No. 30859420, dated April 26, 2001, in the amount of $962.64, was backcharged against Neri because it represents the costs of duplicating the claim books Neri provided in April 2001. Neri was obligated to provide these materials to Elm Haven, under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 189:09-190:08; *see also* **Finding of Fact 23**, *supra*, *citing* **Exhibit 1**, Articles 2.6 and

118

4.5 of the Subcontract.

303. **Exhibit 429**, Arrow Concrete Products Invoice Nos. 18179 and 18176, dated May 10, 2001, in the amount of $2,852.05, was backcharged against Neri because it represents the costs of pre-cast yard drains in Block G-2, which were included in Neri's scope of work under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 178:15-182:13; *see also* **Finding of Fact 55**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.J. John Ford testified that these yard drains were purchased as replacements for yard drains supplied by Neri, which did not comply with the Project Drawings because they lacked a drainage sump. *See* John Ford Direct Testimony, June 8, 2005, at 180:02-181:15; *see also* **Exhibit 1**, Article 10.2 of the Subcontract.

304. Although **Exhibit 429** was initially backcharged against Neri in the amount of $4,278.16, at trial, Mr. Ford reduced the amount of the backcharge by one-third, to $2,852.05. The original invoice was for nine drains, and only six were actually provided by Arrow Concrete. *See* John Ford Direct Testimony, June 9, 2005, at 03:20-06:06.

305. **Exhibit 412**, National Rent-a-Fence Invoices (various dates), in the amount of $4,392.00, were backcharged against Neri because it represents the costs to relocate or repair chain link fence after Neri had departed the site. *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.BB. John Ford testified that this work was included in Neri's scope of work, under the Subcontract. *See* John Ford Direct Testimony, June 8, 2005, at 190:21-191:12.

N.  **Elm Haven's Claim Against Neri**

306. Elm Haven's claim includes costs for "General Requirements," in the amount of $52,800.00. This line item is for the additional cost for field personnel -- including the Project Manager, Project Superintendents, and clerical staff, for twenty-two weeks from May 2001 through September 2001 -- incurred as a direct result of the delays in completing Neri's scope of work, after Neri left the jobsite. *See* John Ford Direct Testimony, June 8, 2005, at 198:16-203:05; *see also* **Exhibit 376**, Elm Haven Cost-to-Complete Summary.

> What I'm carrying in the general requirements is the field
> personnel. That's a direct cost of the job. The field personnel

119

are a direct cost and not an overhead cost.

John Ford Direct Testimony, June 9, 2005, at 08:03-08:06.

307.    Elm Haven's claim also factors in an increase to the Subcontract price of $22,276.00 for the premium paid to Tilcon Connecticut, Inc., to perform work from December 14-17, 1999. Elm Haven paid Tilcon Connecticut and Neri via a joint check in the amount of $76,324.00 on December 13, 1999. *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 20. The contract price was therefore increased by the amount of the premium. *See* **Exhibit 376**, Elm Haven Cost-to-Complete Summary; *see also* John Ford Direct Testimony, June 8, 2005, at 213:16-214:03.

308.    Elm Haven's claim also includes an increase in the Subcontract price for underground conduit work completed by Neri in Block G on a time and material basis, in the amount of $44,598.78. *See* **Exhibit 478**, Block G Underground Conduit Analysis; **Exhibit 479**, Backup for Block G Underground Conduit Analysis; **Exhibit 480**, Elm Haven Review of Neri Time and Material Tickets. John Ford testified that he analyzed Neri's extra work claims for changes to the electrical conduits in Block G in January 2001. *See* John Ford Direct Testimony, October 4, 2005, at 27:11-89:08. Although the changes in the routing of the conduit added just one transformer box and over one thousand linear feet to the length of conduit as previously designed in Block G (or approximately forty percent more than the original design), John Ford agreed to pay Neri an additional $44,598.78 (or approximately two hundred thirty percent more than the original cost in the Subcontract). *See* **Exhibit 479**, Backup for Block G Underground Conduit Analysis.

309.    Elm Haven's claim also includes a $5,500.00 credit against the Neri Subcontract price because Elm Haven was forced to clear a lien placed on the Project by Nicholas Murano Concrete, which performed sidewalk installation for Neri. Nicholas Murano Concrete was never paid by Neri, even though Elm Haven had paid Neri for the sidewalk work. Nicholas Murano Concrete placed a lien on the project, and Elm Haven ultimately expended $5,500.00 to have the lien cleared. *See* John Ford Direct Testimony, June 8, 2005, at 215:08-217:07; *see also* **Exhibit 1**, Articles 7.1 and 8.1 through 8.4 of the Subcontract.

310.    Finally, Elm Haven's claim also includes a five percent (5%) overhead mark-up in the amount of $60,394.00 on the labor, materials or equipment in the Subcontract scope of

work that it performed with others, as expressly provided for under the Subcontract. *See* **Exhibit 1**, Article 9.2.1 of the Subcontract; *see also* John Ford Direct Testimony, June 8, 2005, at 217:16-218:16. This line item is different from the General Requirements in that the five percent mark-up covers the additional administrative costs associated with completing Neri's scope of work with others, whereas the charge for General Requirements relates to the cost of Elm Haven's direct field personnel to complete Neri's work. *See* John Ford Direct Testimony, June 8, 2005, at 198:16-203:05 and June 9, 2005, at 06:08-08:06.

## II. PROPOSED CONCLUSIONS OF LAW

### A. General

1. The sifting and weighing of evidence is peculiarly the function of the trier. The trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony. The trier is free to accept or reject, in whole or in part, the testimony offered by either party. *Alan A. Neri v. Carl A. Neri*, 35 Conn. App. 812, 818, *cert. denied*, 231 Conn. 916 (1994).

2. In diversity actions involving construction contracts to build structures in Connecticut, the Connecticut courts will apply Connecticut's contract law. *See, e.g., Clee v. Remillard Bldg., Inc.*, 649 F. Supp. 1127, 1131 (D. Conn. 1986).

3. Connecticut courts will give effect to an express choice-of-law provision by the parties to a contract, provided the provision was made in good faith. *Elgar v. Elgar*, 238 Conn. 839, 848 (1996).

4. In breach of contract cases, the general rule is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. *See, e.g., Ambrogio v. Beaver Road Assocs.*, 267 Conn. 148, 155 (2003).

### B. Contract Interpretation

5. The question of contract interpretation is a question of the parties' intent, which is ordinarily a question of fact. If, however, the language of the contract is clear and unambiguous, the Court's determination of what the parties intended in using such language is a conclusion of law. *CAS Construction Co. v. East Hartford*, 82 Conn. App. 543, 552 (2004).

6. Under Connecticut law, the intent of the parties to a contract may only be determined from the clear and unambiguous language of the contract itself, by giving words therein their natural and ordinary meanings. If the contract language is definitive, then the determination of the parties' intent is a question of law:

> Where there is definitive contract language, the determination of

> what the parties intended by their contractual commitments is a question of law. When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. In addition, the circumstances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary to the plain meaning of the language used. Finally, the court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity.

*DeCarlo & Doll, Inc. v. Dilozir*, 45 Conn. App. 633, 638-39 (1997) (quotations omitted).

> A court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability.

*Gibson v. Capano*, 241 Conn. 725, 730-31 (1997).

      7.    Courts will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings. *Executive Airlines v. Electric Boat Corp.*, 271 F. Supp. 2d 392, 395 (2003).

      8.    Especially in the context of commercial contracts, courts assume that definite contract language is the best indication of the result anticipated in their contractual arrangements. *Tallmadge Bros., Inc. v. Iroquois Gas Transmissions, L.P.*, 252 Conn. 479, 500 (2000).

      9.    A party may not create ambiguity in an otherwise plain agreement merely by urging different interpretations of the agreement in the litigation. *See Lee v. BSB Greenwich Mortgage Ltd. P'ship*, 267 F.3d 172, 178 (2d Cir. 2001) (interpreting Connecticut law). Any ambiguity found in a contract must emanate from the language used in the contract, rather than from one party's subjective perception of its terms. *See id.* at 179.