10.     The law is also clear that a contract includes not only what is expressly stated therein, but also what is necessarily implied from the language used. *CAS Construction Co.*, 82 Conn. App. at 552-53, *quoting Foley v. Huntington Co.*, 42 Conn. App. 712, 729, *cert. denied*, 239 Conn. 931 (1996).

11.     The law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous. *Id.* at 553, *quoting United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 674 (2002).

12.     Under Connecticut law, the Subcontract, Geotechnical Report, Specifications, Plans, Drawings, and other Contract Documents must be construed as a whole in determining the parties' intent, and all of the relevant provisions are to be considered in connection with each other. *R.T. Vanderbilt Co. v. Continental Casualty Co.*, 273 Conn. 448, 462 (2005).

C.     **Conclusions of Law**

- **The Reconstruction of Ashmun Street South**

13.     The reconstruction of Ashmun Street South, as depicted on Drawing SS-26, was part of Neri's scope of work under the Subcontract. The terms and conditions of the Subcontract and the Contract Documents are clear and unambiguous in this regard. This conclusion is supported by considering the contract language in light of the purpose the parties sought to accomplish in making the Subcontract. Specifically, Drawing SS-26 is plainly listed as one of the Subcontract drawings for the Phase 1B portion of the Project. *See* **Exhibit 1**, Attachment "B" to the Subcontract; *see also* **Exhibit 437**, Letter of Transmittal. There is no limiting or other qualifying language in the Subcontract that eliminates, reduces or otherwise limits the road reconstruction and utility lateral installation work that is clearly depicted on Drawing SS-26. The Subcontract further provides that Neri was "to furnish all labor, materials, equipment . . . and perform all services and work necessary to complete the [site work, utilities, site concrete, paving] and any work reasonably inferable therefrom." **Exhibit 1**, Article 1.1 to the Subcontract. The Subcontract also states that "the Subcontract Work shall be performed in accordance with the following documents . . . which are incorporated herein and made a part hereof." *Id.*  As stated above, Drawing SS-26 was clearly listed on Attachment "B" as a Contract Document. The main essence of the Subcontract was to reconstruct and install utility laterals for all of the streets depicted on the "SS" drawings. No

other drawing clearly depicts roadway reconstruction work that was not a part of Neri's scope of work. To construe the Subcontract as not including the reconstruction of Ashmun Street South, as depicted on Drawing SS-26, would essentially render superfluous the roadway site work depicted on Drawing SS-26. The obvious purpose of the Subcontract was to reconstruct the existing Ashmun Street. Accordingly, the reconstruction of Ashmun Street South as depicted on Drawing SS-26 is included in Neri's scope of work under the Subcontract.

- **The Installation of Utility Laterals Beneath Ashmun Street North**

14. The installation of utility laterals into Blocks A-1, A-2 and K-1, as depicted on Drawings SS-5 and SS-6, was clearly included in Neri's scope of work under the Subcontract. This conclusion is supported by the depiction of laterals on drawings titled "Streets, Sewers and Utilities," and their express inclusion in the Subcontract and the Contract Documents. The Subcontract, which explicitly calls for the installation of water, storm sewer, and sanitary sewer laterals, does not differentiate between developed and undeveloped blocks on the Project, and does not refer to the Alternate in any way. *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraphs 6.I through 6.L. Furthermore, when Elm Haven informed Neri that the Alternate would not be accepted by Elm Haven, Neri was expressly directed to perform all site work associated with Ashmun Street North. *See* **Exhibit 465**, Elm Haven letter to Neri, dated March 27, 2000. To hold otherwise -- that the utility laterals were associated with the blocks and not the streets -- would contravene both the parties' intent in executing the Subcontract, as well as the express terms of the "Streets, Sewers and Utilities" drawings, which included these laterals in Neri's scope of work. *See, e.g.,* **Exhibit 5**, Drawings SS-1 and SS-25. As was stated above, the essence of this contract was to reconstruct and install utility laterals for all of the streets depicted on the "SS" drawings. Failing to include these laterals with the streets in Neri's scope of work would require Elm Haven to rip up the streets, curbs, sidewalks and other utilities when it ultimately developed the Alternate blocks in the future -- a result the parties could not have legitimately intended. Accordingly, the installation of all utility laterals on "Streets, Sewers and Utilities" drawings -- including and especially those into Blocks A-1, A-2 and K-1 -- was included in Neri's scope of work under the Subcontract.

- **Excavation, Removal and Disposal of Unsuitable Materials**

15. The excavation, removal, disposal, and replacement of unsuitable materials

125

within the contract limit lines were clearly and unambiguously included in Neri's scope of work under the Subcontract. This intention was unmistakably expressed in multiple locations in the Contract Documents, including, *inter alia*, the Subcontract, the Project Specifications, the Geotechnical Report, and the Contract Drawings. Specifically, the Subcontract provided:

> Perform <u>general site</u> and building cut and fill, mass excavation and rough grading to new grades established by Contract Drawings. <u>Site fill with onsite materials</u> (if deemed suitable) <u>or borrow materials</u>. <u>Building fill with onsite materials</u> (if deemed suitable) <u>or borrow materials</u>. Subcontract includes hauling and disposal of all unsuitable and/or surplus material offsite. All excavation shall be <u>performed on an unclassified basis</u>. <u>All unsuitable material within cut material and as noted in Geotechnical Report to be removed from site and legally disposed of</u>. Any unsuitable material not included in contract requirements that is required to be removed shall be done per Unit Prices included in this Subcontract.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G (emphasis added).

> This contract <u>excludes</u> the following:
>
> 2. Excavation and disposal of unsuitable materials (including urban debris) <u>beyond the limits</u> indicated in the Contract Documents.

**Exhibit 1**, Attachment "A" to the Subcontract, Page 10 of 10 (emphasis added). *See* **Findings of Fact 48-54 and 70-87**; *see also*, *e.g.*, **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G; **Exhibit 1**, Attachment "A" to the Subcontract, Page 10 of 10 (exclusions); **Exhibit 3**, Project Specifications Vols. I and II, §§ 02200-02210; **Exhibit 4**, Geotechnical Engineering Report dated January 14, 1997, § 6.10; **Exhibit 5**, Drawing A102.

      16.    This interpretation of the Subcontract is consistent with the parties' actions on the Project site. Neri did, in fact, operate a screening process on the Project site, to filter out unsuitable materials from excavated soil, and reuse the remaining soils as backfill. *See*

**Findings of Fact 71-72 and 86-87**. The excavation, removal, replacement and disposal of unsuitable materials were of the essence of the Subcontract.

17. The Subcontract also specifically states that all excavations on the Project are "unclassified," requiring Neri to excavate to the required subgrade elevations regardless of the character of materials and obstructions encountered. **Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 3.3B. As expressed in the Subcontract and Contract Documents, the parties clearly intended for Neri to excavate, remove, and either reuse or dispose of the materials excavated. To hold that the parties intended Neri to be compensated for all unsuitable materials on the Project would fly in the face of the parties' intent, and render clear language of the Subcontract and the Contract Documents superfluous. Accordingly, excavation, removal, replacement and disposal of unsuitable materials within the contract limit lines were clearly and unmistakably included in Neri's scope of work under the Subcontract.

- **Site Concrete and Concrete Stairs**

18. The installation of concrete stairs and railings was clearly included in Neri's scope of work under the Subcontract, which specifically includes "concrete staircases with handrails." *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.S. Moreover, concrete steps and handrails are described in detail in the Subcontract Drawings. *See* **Exhibit 5**, Drawing L13. Indeed, the Site Grading Plan drawings (*see, e.g.*, **Exhibit 5**, Drawings G1-G10) describe the homes in the blocks and the number of risers at each entrance, and the Architectural Drawings (*see, e.g.*, **Exhibit 5**, Drawing A104) identify the styles of homes with wood and/or concrete steps at each entrance. Therefore, the installation of site concrete, including concrete stairs and handrails, was included in Neri's scope of work under the Subcontract, as a matter of law. *See* **Findings of Fact 60-61**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.S.

- **Excavations for Foundations**

19. The Subcontract and Contract Documents clearly and unambiguously obligated Neri to perform all excavation and backfilling for building footings and foundations. *See* **Findings of Fact 62-63**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.H. Sonotubes -- defined as round concrete foundation columns to support exterior roofs -- are included in the contractual obligation for excavating and backfilling foundations on

127

the Project. Accordingly, the excavation and backfilling for foundations -- including sonotubes -- was clearly and unambiguously included in Neri's scope of work under the Subcontract.

- **Survey Control on the Project**

20.  By the express terms of the Subcontract, Neri was obligated to provide all instrumentalities and field measurements required for the proper performance and completion of the Subcontract Work, and perform layout, engineering and elevation control required to complete all site development work described in the Subcontract, as a matter of law. *See* **Findings of Fact 45-46**, *supra, citing* **Exhibit 1**, Article 6.1.14 of the Subcontract; Attachment "A" to the Subcontract, Paragraph 6.A. As Elm Haven provided Neri with survey control data, and Neri used this survey data during its performance of work under the Subcontract, Neri is responsible for the costs associated with these services.

- **Cleaning Streets and Areas around the Project**

21.  Several sections of the Subcontract and Contract Documents obligated Neri to maintain cleanliness in the streets and areas around the Project, including the cleaning of soil and debris resulting from work, the removal of trash and rubbish. *See* **Exhibit 1**, Article 6.1.7 of the Subcontract; Attachment "A" to the Subcontract, Paragraph 6.W(e), 6.GG, and 15. As a matter of law, Neri's failure to fulfill its obligations in this regard renders it responsible for the costs incurred by Elm Haven. *See* **Findings of Fact 66, 185, 274, 276, 299**, *supra*.

- **Items Damaged by Neri's Forces on the Project**

22.  The Subcontract explicitly obligated Neri to maintain a qualified workforce and to perform work in a skillful and workmanlike manner, in accordance with good construction industry and trade practice, and to maintain strict discipline and good order among its employees. *See* **Exhibit 1**, Articles 2.1, 2.2, and 2.5 of the Subcontract. Furthermore, Neri was obligated to coordinate its work with other subcontractors and trades on the Project site, so as to avoid delaying, interfering with or damaging those entities' performance of work on the Project. *See* **Exhibit 1**, Article 3.5 of the Subcontract. Any unreasonable failure to do so rendered Neri directly liable for all damages incurred thereby, including, *inter alia*, the repairs to the damaged meter in Block C along Webster Street, the replacement of a damaged lawn pedestal box, the replacement of damaged light poles, the resetting of manhole frames and

covers, the removal and replacement of sidewalks and handicapped ramps, and the replacement of damaged aluminum panels and posts in concrete footings. *Id.; see* **Findings of Fact 68, 169, 270, 282, 300**, *supra*.

- **Erosion and Sedimentation Control on the Project**

23.  The Subcontract explicitly required Neri to maintain erosion and sedimentation control measures on the Project in accordance with the Contract Drawings throughout its time of performance on the Project. *See* **Findings of Fact 47, 187, 299**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.C. Neri was further obligated to remove these measures from the Project site after the landscaping work was complete, and the new grass had taken hold, with the goal of returning the site to its original condition, as closely as possible. *See id.* The Contract Documents specifically identified several erosion and sedimentation control measures for use on the Project. *See, e.g.*, **Exhibit 5**, Drawing G-7 (various details). Accordingly, as a matter of law, Neri is responsible for costs incurred by Neri to complete this work with other forces.

- **Rough and Fine Grading on the Project, and Application of Topsoil**

24.  The Subcontract clearly and unambiguously obligated Neri to apply topsoil, as necessary, to grade the Project for the application of landscaping features. *See* **Findings of Fact 65, 102, 109, 175-179**, *supra*, *citing* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.CC.

- **Inspections**

25.  The Subcontract clearly and unambiguously obligated Neri to provide facilities at all times for the inspection or testing of its work by Elm Haven, the Architect, or the Owner, or any authorized representative of Elm Haven or the Owner. *See* **Findings of Fact 69, 180-182, 196**, *supra*, *citing* **Exhibit 1**, Article 2.9 of the Subcontract. Neri's failure to do so renders it liable for the costs to conduct these inspections, as a matter of law.

D.  *Contra Proferentem*

26.  The rule of *contra proferentem* -- that is, that ambiguous provisions in contracts of adhesion are to be construed against the drafter, *see Parrot v. Guardian Life Ins. Co. of*

129

*America*, 273 Conn. 12, 23 n.11 (2005) -- is inapplicable in this case because the Subcontract language is not ambiguous, and because the Subcontract is not a contract of adhesion, in that both parties participated in its drafting.

27.     *Contra proferentem* only applies if the contract language is deemed ambiguous. *See Israel v. State Farm Mutual Auto Insurance Company*, 259 Conn. 503, 509 (2002).

28.     A contract of adhesion is defined as a standard-form contract, prepared by one part, to be signed by the party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms. 342 BLACK'S LAW DICTIONARY (8th ed. 2004).

29.     The extensive negotiations and correspondence between Lorraine Beckwith and Stephen Simoncini prior to the execution of the Subcontract demonstrate that the Subcontract is not a contract of adhesion, as both parties participated equally in its negotiation, drafting, and execution, and Neri was a sophisticated, experienced site work contractor with significant control over the terms of the Subcontract. *See* **Findings of Fact 39-41,** *supra*.

E.     **Prejudgment Interest**

30.     Under Connecticut law, interest at the rate of ten percent per annum may be awarded in civil actions as an element of damages for the wrongful detention of money after it becomes payable. CONN. GEN. STAT. § 37-3a (2005).

31.     When the Court's jurisdiction is based on diversity, an award of prejudgment interest is governed by state law. *Brandewiede v. Emery Worldwide*, 890 F. Supp. 79, 82 (D. Conn. 1994).

32.     The purpose of prejudgment interest is to compensate plaintiffs who have been deprived of the use of money that was wrongfully withheld. *Ceci Bros v. Five Twenty-One Corp.*, 81 Conn. App. 419, 431, *cert. denied*, 268 Conn. 922 (2004).

33.     Even if a court finds that a claimed sum of money is payable, this is not decisive of the issue of whether the detention of the money is wrongful. *See Patron v. Konover*, 35 Conn. App. 504, 518, *cert. denied*, 231 Conn. 909 (1994).

34.     Under Connecticut law, a plaintiff is not entitled to an award of prejudgment

interest on a damage award for breach of contract where there is no evidence or finding by the trier of fact that the defendant acted wrongfully or in bad faith in its dealings with the plaintiff. *Brandewiede*, 890 F. Supp. at 82-83.

35. Equitable considerations and the demands of justice require that Elm Haven be granted prejudgment interest on the amount of money wrongfully withheld by Neri. *See Smithfield Associates, LLC v. Tolland Bank*, 86 Conn. App. 14, 26 (2004), *cert. denied*, 273 Conn. 901 (2005).

36. The commencement date for interest pursuant to Section 37-3a of the Connecticut General Statutes is a factual determination. *See, e.g., Spearhead Construction Corp. v. Bianco*, 39 Conn. App. 122, 134-35, *cert. denied*, 235 Conn. 928 (1995).

37. Where claims for prejudgment interest rest on a breach of contract, the statutory interest for the detention of money accrues from the date the contract was breached. *Patron*, 35 Conn. App. at 517.

### III. RESPONSES TO NERI'S EXTRA WORK CLAIMS

**A.    Neri's Extra Work Claims - Project Nos. 204 and 207 (Phases 1B and 1C)**

- **Exhibit 594 - Neri Extra Work Claim No. NC-013-204-1**

    1.    **Exhibit 594**, Neri Extra Work Claim No. NC-013-204-1, in the amount of $18,469.42, is invalid because the excavation of unsuitable materials and buried urban debris was included in Neri's original Subcontract scope of work.

    2.    Pursuant to the express terms of the parties' Subcontract, Neri was obligated to excavate and remove all unsuitable soils encountered within the contract limit lines of the project and to backfill such excavations with suitable material as determined by the project engineer. Neri's obligation in this regard is clearly set forth in the subcontract at Paragraph 6.G of Attachment "A" (Rider page 2 of 10) and Exclusion No. 2 of Attachment "A" (Rider page 10 of 10). For further elaboration of these contract provisions, Elm Haven refers the court to its **Proposed Findings of Fact 49-84 and 70-87** and **Proposed Conclusions of Law 15-17**. *See also* Lorraine Beckwith Direct Testimony, Sep. 23, 2005, at 112-120.

    3.    There is <u>no</u> contract clause that excludes from Neri's scope of work the excavation, removal and backfill of unsuitable materials from utility trenches.

    4.    The "general site" work provisions of Paragraph 6.G of Attachment "A" to the Subcontract make it clear that all of the backfilling for the general site work for the project was to be with onsite materials (if deemed suitable) or borrow materials, and that all unsuitable material within the cut material, as well as noted in the Geotechnical Report, is to be removed from the site and legally disposed. *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G.

    5.    Similarly, the Subcontract exclusions page makes it clear that Neri is to excavate and dispose of all unsuitable material within the contract limits:

> This subcontract excludes the following:
>
> Excavation and disposed of unsuitable materials
> (including urban debris) <u>beyond the limits indicated in</u>

the contract documents.

6.  Consistent with the general provisions of Paragraph 6.G and Exclusion No. 2, the other references to utility excavation in Attachment "A" to the Subcontract make no distinction as between unsuitable or suitable materials. Specifically, Paragraph 6.H of Attachment "A" provides that Neri is to perform "all underslab utility excavation and backfill." Similarly, Paragraph 6.I of Attachment "A" concerning excavations for sanitary sewer lines states:

> Furnish and install complete all sanitary sewer lines and appurtenances including but not limited to trenching, backfilling, fill material, compaction . . .

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.I (emphasis added).

7.  Likewise, for water utility lines, Paragraph 6.L of Attachment "A" states that Neri is to:

> Furnish and install complete all on-site water lines and appurtenances including but not limited to trenching, backfilling, fill materials, compaction, pipe, laterals to and including curb box to within 5 feet of buildings . . .

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.L (emphasis added).

8.  With respect to electrical and telephone utilities, Paragraph 6.N of Attachment "A" the Subcontract states that Neri is to:

> Furnish all trenching, backfilling and conduits for all primary and secondary electrical, telephone and CATV conductors.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.N (emphasis added).

9.  In summary, there are no exclusions, limitations or any other terms concerning Neri's scope of work as set forth in Paragraphs 6.G, H, I, L or N of Attachment "A" that limit

Neri's work to only having to excavate suitable materials and that onsite suitable materials would be available for backfilling purposes.

10. Also, the applicable provisions of the Subcontract specifications (**Exhibit 3**) concerning utility trench excavations and backfilling do not limit Neri's work to only the excavation of suitable material. Specifically, section 02200 entitled "Earthwork" sets forth the requirements for, among other things, utility trench excavation work. Specifically, Articles 1.2A.1 and 2 make it clear that the Earthwork specification includes:

> Preparing and grading subgrades for structures, <u>utilities</u>, walks, pavements, and landscaping.
>
> <u>Excavating and backfilling for underground site utilities and appurtenances</u>.

**Exhibit 3**, Project Specifications Vols. I and II, Bates no. EH02431 (emphasis added).

11. The relevant definitions set forth at Article 1.4 of Section 02200 are as follows:

> <u>Excavation</u> consists of the removal of material encountered to subgrade elevations and the <u>reuse or disposal</u> of materials removed.
>
> Subgrade: <u>the upper most surface of an excavation</u> or the top surface of a fill or backfill immediately below sub-base or top soil materials.
>
> Borrow: soil material obtained off-site when sufficient approved soil material is not available from excavations.

**Exhibit 3**, Project Specifications Vols. I and II, Bates no. EH02432 (emphasis added).

12. The specifications go on to provide at Article 2.1A that Neri is to:

> <u>Provide approved borrow soil materials from off-site when sufficient approved soil materials are not available from</u>