<u>excavations</u>.

**Exhibit 3**, Project Specifications Vols. I and II, Bates no. EH02434 (emphasis added).

13.    Article 2.1D of Section 02200 of the Project Specifications makes it clear that Neri is to use "satisfactory soil materials" for backfilling work. *See* **Exhibit 3**, Project Specifications Vols. I and II, Bates no. EH02434.

14.    Article 3.7 of Section 02200 sets forth the "Excavation For Utility Trenches" requirements, and these provision do not limit Neri's work to the excavation of suitable materials only. Rather, Neri is to excavate utility trenches to the indicated depth. It is only when unsatisfactory soil material is present at the required subgrade depth, therefore requiring additional excavation and backfilling beyond the contract limit lines, that the specifications allow for additional compensation. Specifically, Article 3.8 of Section 02200 provides as follows:

> APPROVAL OF SUBGRADE
>
> Notify owner when excavations have reached required subgrade.
>
> When owner determines that unforeseen unsatisfactory soil is present, continue excavation and replace with compacted backfill or fill material as directed.

**Exhibit 3**, Project Specifications Vols. I and II, Bates nos. EH02438-EH02439 (emphasis added).

15.    Accordingly, only <u>unforeseen additional excavation and replacement material</u> will be paid according to the Contract provisions for changes in Work.

16.    For utility trench backfilling, Article 3.13 of section 02200, entitled "Utility Trench Backfill," sets forth the type of material that is to be used for backfilling purposes. Specifically, the relevant provisions are as follows:

> Place and compact the initial backfill <u>of select material</u>, to a height of 12" (300 MM) over the utility pipe or conduit.

RJT/29497/3/761609v1
02/27/06-HRT/

> Fill voids <u>with approved backfill materials</u> as shoring and bracing, and sheeting is removed.
>
> Place and compact final backfill of <u>satisfactory structural soil</u> material to final subgrade.

**Exhibit 3**, Project Specifications Vols. I and II, Bates no. EH02441 (emphasis added).

17.    There are no contract provisions that provide that Neri's work only involves the excavation of suitable material, or that Neri was only obligated to use excavated materials for backfilling.  Rather, Neri is obligated to backfill with either "select material" or "satisfactory structural soil material," which terms have technical meaning as set forth at Articles 2.1B and G of section 02200.  *See* **Exhibit 3**, Project Specifications Vols. I and II, Bates no. EH02438-EH02434.

18.    Finally, Article 3.20 of the specifications, entitled "Disposal of Surplus and Waste Materials," clearly states:

> Disposal:  Remove surplus satisfactory soil and waste material, including unsatisfactory soil, trash and debris, and legally dispose of it off the owner's property.

**Exhibit 3**, Project Specifications Vols. I and II, Bates nos. EH02445.

19.    The geo-technical report for the project sets forth the subsurface conditions for the site at various locations and depths, including the depths to which Neri was obligated to dig the utility excavations.  The geo-technical report makes it clear that unsuitable materials should be expected at various depths throughout the contract limit lines.  *See* Elm Haven's **Proposed Findings of Fact 50, 85-86**.

20.    Consistent with its contract obligations to provide satisfactory backfill material, Neri established a screening operation in the vicinity of Canal Street and Locke Street, where unsuitable on-site materials were screened to remove such things as bricks, concrete chunks and other debris in order to make the on-site material suitable for backfilling purposes. Establishing such an operation was part of Neri's means and methods of construction in order to carry out its subcontract responsibilities.

RJT/29497/3/761609v1
02/27/06-HRT/

21.    As testified to by Lorraine Beckwith, the engineer for the project, LEA, must determine if material excavated from within the contract limit lines for site utility excavation, foundation excavation, slab on grade excavation or other trenching work called for in the contract documents, is suitable for backfilling purposes. Lorraine Beckwith Direct Testimony, Sep. 23, 2005, at 115-116. Once a particular excavation is dug down to the elevation or depth shown on the contract documents, Lorraine Beckwith further testified that the engineer would have to determine if the soil at the bottom of an excavation was suitable. If the soil was deemed unsuitable by the engineer, Neri would have to excavate beyond the contract limit lines to remove that soil and replace it with suitable soil. These procedures for determining and quantifying the volume of unsuitable soils were explained in Ms. Beckwith's letter to Neri dated August 19, 1999 (**Exhibit 662**). Under circumstances where Neri had to excavate beyond the contract limit lines, it would be entitled to additional compensation per the unit rates set forth in Ms. Beckwith's letter of August 3, 2000 (**Exhibit 551**). *See also* Lorraine Beckwith Direct Testimony, Sep. 23, 2005, at 118-120.

22.    The unsuitable materials that are the subject of the claim set forth at **Exhibit 594** involve unsuitable material (buried urban debris) <u>within</u> the contract limits of the specified excavation depth for the under slab utility trenches at issue. *See* Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 29:14-30:13.

23.    Finally, Neri has not offered any credible evidence to support its assertion that at subsequent times during the Project, Elm Haven paid for quantities of unsuitable material excavated from within the contract limit lines for utility trenches. No evidence was offered by Neri as to the exact nature of the extra work that was the subject of Change Order No. 207-6, *see* **Exhibit 298**, or whether the utility lines covered by the change order were additional utility lines as opposed to Neri's original scope of work. *See* Vincent Neri Direct Testimony, Oct. 5, 2005, at 171-21-172:09.

- **Exhibit 593 - Neri Extra Work Claim No. NC-010-204**

24.    **Exhibit 593**, Neri Extra Work Claim No. NC-010-204, in the amount of $5,246.88, dated March 30, 1999, is invalid because the scope of work described thereon is specifically listed in Neri's scope of work under the Subcontract.

25.    Vincent Neri testified that this exhibit represents the costs to backfill foundations

with screened materials, because the demolition purportedly left the site lower than expected:

> The site was -- Our drawings showed the site being at a certain elevation and when we went out to do the work in this area, it was evident that the site was left low.

> When the demolition sub had finished his work, he just -- he didn't place the material that he was supposed to place. For whatever reason, the site was lower than anticipated. So, we brought in material to bring it up to grade so we could build the foundations.

Vincent Neri Direct Testimony, June 14, 2005, at 23:12-23:20.

26. Under the Subcontract, however, Neri was expressly obligated to "[p]erform general site and building cut and fill, mass excavation and rough grading to new grades established by contract drawings" and to complete "[b]uilding fill with on site materials . . . or borrow materials." **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G (emphasis added).

27. As used in the Subcontract and Contract Documents, "borrow" is defined as "soil material obtained off-site when sufficient approved soil material is not available from excavations." **Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 1.4.C (emphasis added).

28. The exhibit is dated March 30, 1999, just twenty-five days after Neri executed the Subcontract. *See* **Exhibit 593**; *see also* **Exhibit 1**. It is illogical for Neri to request and expect additional compensation for backfill based on the grading following demolition, when it had not yet begun to excavate the site at the time and could not know the amount of available fill in the blocks.

29. The exhibit does not include any indication that the work was authorized or acknowledged by Elm Haven, that Elm Haven received this extra work claim, or that Elm Haven was ever notified that the site was "left low." *See* **Exhibit 593**. As Vincent Neri testified, **Exhibit 593** does not include any form of notation, authorization, or approval of the application of screened materials as extra work by any Elm Haven representative, *see* Vincent

RJT/29497/3/761609v1
02/27/06-HRT/

Neri Testimony on Cross-Examination, June 24, 2005, at 154:11-156:03, even though the exhibit itself asserts that it was authorized "by Change Order."

30.     Furthermore, the exhibit does not contain any proof that the site was actually "left low" by the demolition subcontractor. The exhibit itself consists solely of an unsigned invoice and field notes taken by Vincent Neri on March 29, 1999, indicating that backfilling of the foundations took place in Block F on that date, *see* **Exhibit 593**. The backfilling of foundations was expressly included in Neri's Subcontract:

> Perform <u>all excavation and backfill for building footings and foundations</u>, to include all subgrade preparation for footings.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.H (emphasis added).

31.     The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. As **Exhibit 593** does not include <u>any</u> credible evidence that Elm Haven approved this extra work claim or was even aware of its existence, and describes work which is explicitly included in Neri's scope of work under the Subcontract, Neri has not met its burden. Therefore, this extra work claim must be denied.

- **Exhibit 598 - Neri Extra Work Claim No. NC-017**

32.     **Exhibit 598**, Neri Extra Work Claim No. NC-017-204, in the amount of $21,833.31, is invalid because it was never authorized as extra work by Elm Haven.

33.     The exhibit requests additional compensation for excavation and "installation" of rigid insulation in various foundations on the Project. *See* **Exhibit 598**. The exhibit contains one receiving ticket and fourteen job invoices, but not one of these documents is signed by any Elm Haven representative. *See* **Exhibit 598**.

34.     Neri was obligated to perform all excavation and backfill for building footings and foundations, and all grading for slab-on-grade areas:

> Perform <u>all rough and finish grading of building slab-on-grade areas</u>. Perform all excavation and backfill for building footings

139

and foundations, to include all subgrade preparations for footings. <u>Backfilling to be in accordance with contract documents for material and compaction.</u>

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.H (emphasis added).

35.    The "job invoices" created by Neri to support the alleged labor and equipment hours associated with this claim were never accepted or signed by Elm Haven's superintendent, Ivan Carlsen, or any other Elm Haven representative. *See* **Exhibit 598**.

36.    Rigid insulation on the Project is described in the Subcontract Drawings, and consists of two-inch thick panels of "bead boards" applied atop gravel beds, beneath slabs-on-grade. *See, e.g.,* **Exhibit 5**, Drawing A303 (detail beneath slabs-on-grade, at foundations). The "installation" of this insulation consists solely of laying down these panels atop properly graded gravel.

37.    The Subcontract Drawings also expressly state the required elevations of each slab in every unit on the Project. *See, e.g.,* **Exhibit 5**, Drawing A114, Town House Units Block B South - Plans and Elevations, Foundation Plan (displaying slab elevations in Block "B" units B8-B14 as 39.5 feet).

38.    Neri is not entitled to additional compensation for this extra work claim because it failed to properly grade the building slab-on-grade areas, and added an excess of backfill to these areas. This excess of fill thereby precluded Santos Foundation from laying the rigid insulation and pouring the slabs-on-grade. Had Neri properly graded these areas, it would not have been required to return to the area and re-excavate for the installation of rigid insulation, per the Subcontract Drawings.

39.    The "job invoices" created by Neri to support the alleged labor and equipment hours associated with this claim were never accepted or signed by Elm Haven's superintendent, Ivan Carlsen, or any other Elm Haven representative. *See* **Exhibit 598**.

40.    Article 2.6 of the Subcontract provides that Neri will not make any alterations or additions to or deviations from the subcontract work except in accordance with written instructions from Elm Haven requiring alterations or additions to or deviations from the subcontract work. Neri has presented no evidence of any written instructions from Elm Haven

140

to perform the work at issue or that Elm Haven considered the work to constitute an alteration or addition to Neri's work. *See* **Exhibit 1**, Article 2.6 of the Subcontract.

41.    Furthermore, the exhibit does not include any notice from Neri to Elm Haven that Neri was directed to perform work for which it intended to submit a claim. *See* **Exhibit 598**.

42.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. As **Exhibit 598** was never authorized by Elm Haven -- and the exhibit does not contain any indication that Elm Haven even acknowledged that the work was in progress, in the form of either an approval or a rejection -- Neri has not met its burden. Therefore, this extra work claim must be denied.

- **Exhibit 599 - Neri Extra Work Claim No. NC-019**

43.    **Exhibit 599**, Neri Extra Work Claim No. NC-019, in the amount of $19,220.70, is invalid because the unsuitable material that is the subject of this claim was located within the contract limit lines for the drainage trenches and sanitary trenches at issue. *See* Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 36:14-38:16. As such, the work at issue is part of Neri's original scope of work.

44.    See **Responses 1 to 23** regarding the extra work claim in **Exhibit 594**, for a description of the relevant Subcontract provisions that are also applicable to **Exhibit 599**, and which require the rejection of this claim.

- **Exhibit 602 - Neri Extra Work Claim No. NC-023-207-1**

45.    **Exhibit 602**, Neri Extra Work Claim No. NC-023-207-1, in the amount of $19,860.00, is invalid because the unit prices offered by Neri are wholly without evidentiary support.

46.    While Elm Haven did direct Neri to perform this work on April 29, 1999, with a Construction Change Directive, there is no indication that Elm Haven approved the per linear-foot unit prices propounded by Neri. Ivan Carlsen's signature on the Neri invoice included with the exhibit specifically reads "verifying quantities only." *See* **Exhibit 602**.

RJT/29497/3/761609v1
02/27/06-HRT/

47.    As further evidence of the lack of any "meeting of the minds" as to the unit price to be applied for this work, Elm Haven introduced four exhibits into evidence which directly contravene Neri's assertion that the parties agreed on a price of $20.00 per lineal foot. On May 28, 1999, Lorraine Beckwith contacted Neri Project Manager Stephen Simoncini with LEA's recommended unit price of $20.00 per cubic yard for the subject work. *See* **Exhibit 464**, Elm Haven letter to Neri, dated May 28, 1999.

48.    On June 29, 1999, Lorraine Beckwith answered Neri's objection to the engineer's proposed price with a letter of her own, to which Neri never responded:

> I am in receipt of your letter dated June 22, 1999, regarding the unit prices for the unsuitable material and stone bedding at the sanitary. You advise in your letter that your firm is not in agreement with the unit prices the Engineer feels is proper. You do not explain why you do not agree, nor do you defend your proposed unit prices with a detailed explanation as we discussed.
>
> At our meeting on June 23, 1999, I explained to you that this was required. You indicated you would respond that afternoon. As of this date I have not received any response.
>
> I will remind you that I faxed LEA's proposed unit prices to your office on May 28, 1999. You did not respond until June 22, 1999.
>
> You request in your letter that we advise you on how you may secure payment for the additional work. Your prompt reply and final resolution of the unit prices between all parties will accomplish this.

**Exhibit 448**, Elm Haven letter to Neri, dated June 29, 1999.

49.    On July 21, 1999, and again on August 3, 1999, Lorraine Beckwith again requested backup for the unit pricing data from Neri, to no response:

> I still have not received any response from you on the revised

142

> unit price for the stone for the pvc sewer lines.

> Until this is received and approved, the process to prepare a
> Change Order shall not commence.

**Exhibit 469**, Elm Haven letter to Neri, dated July 21, 1999; **Exhibit 470**, Elm Haven letter to Neri, dated July 21, 1999.

50.     Using the $20 per cubic yard unit price for stone and $1 per square foot price for filter fabric, John Ford testified that an appropriate cost for this work is $2,730.75 for the stone and $552.00 for the filter fabric, for a total of $3,282.75. *See* John Ford Direct Testimony, Oct. 4, 2005, at 129:22-136:19; *see also* **Exhibit 481**, Calculations Summary. Applying a ten percent markup for overhead and profit to this amount, *see* **Exhibit 1**, Article 2.6 of the Subcontract, Neri is entitled to $3,611.03 for this extra work claim.

51.     The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. As **Exhibit 602** is without evidence as to an agreement on a unit-price basis, Neri has not met its burden. Therefore, this extra work claim should be denied, and the Subcontract price should only be increased by $3,611.03.

- **Exhibit 560 - Neri Extra Work Claim No. NC-051-207**

52.     **Exhibit 560**, Neri Extra Work Claim No. NC-051-207, in the amount of $4,777.87, is invalid because the scope of work described thereon is specifically listed in Neri's scope of work under the Subcontract.

53.     The work included in the exhibit is the air-pressure testing of water service laterals. *See* **Exhibit 560**. However, this work is included in Neri's scope, in several locations in the Subcontract:

> The Subcontractor shall, <u>at its own expense,</u> <u>provide facilities at</u>
> <u>all times for the inspection or testing of the work</u> by the
> Contractor, the Architect, or other authorized representative of
> the Contractor or Owner.

143

**Exhibit 1**, Article 2.9 of the Subcontract (emphasis added).

> The Subcontractor agrees that in performance of the Subcontract Work it will:
>
> <u>Provide sufficient, safe and proper facilities</u> at all times for the protection of the Subcontract Work and <u>for the inspection of the Subcontract Work</u> by the Contractor and the Architect, or their authorized representatives.

**Exhibit 1**, Article 6.1.3 of the Subcontract.

> <u>Furnish and install complete</u> all <u>on-site water lines</u> and appurtenances, <u>including but not limited to</u> trenching, backfilling, fill materials, compaction, pipe, laterals to and including curb box to within 5'-0" of buildings, coordination w/City water dept., <u>testing</u>, chlorination, thrust blocks, etc. Scope includes sand at pipe bed, water meter pits as required for all units/structures, <u>inspections</u>, adjustment to existing structures as noted to grade. This subcontractor responsible for all coordination with City, other utilities, other work proceeding on site, other contractors, and related work by the City of New Haven for separation of sewer/storm system.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.L (emphasis added).

54. Vincent Neri claimed that Ivan Carlsen approved the air testing and unit prices included in the exhibit. *See* Vincent Neri Direct Testimony, Sep. 12, 2005, at 30:10-33:12. Notwithstanding Elm Haven's Project Superintendents' inability to authorize any additional money on the Project, Ivan Carlsen's signature specifically reads "verify time only" and is affixed to a Job Invoice which does not include prices. *See* **Exhibit 560**.

55. The exhibit also does not indicate that Neri required the use of any special equipment to test the laterals in this fashion, or that Elm Haven and Neri ever agreed on any unit prices for this work. *See* **Exhibit 560**.

RJT/29497/3/761609v1
02/27/06-HRT/

56.    Lorraine Beckwith rejected this extra work claim on April 24, 2000. *See* **Exhibit 449**, Elm Haven letter to Neri, dated Apr. 24, 2000.

57.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. The testing of water service laterals "at all times" was included in Neri's scope of work under the Subcontract. Because there is no evidence that anyone at Elm Haven approved this work on a time and materials basis or that this work exceeded Neri's obligations under the Subcontract in any way, Neri has not met its burden. Therefore, this extra work claim must be denied.

- **Exhibit 561 - Neri Extra Work Claim No. NC-052**

58.    **Exhibit 561**, Neri Extra Work Claim No. NC-052, in the amount of $6,760.00, is invalid because the unsuitable material that is the subject of this claim was located within the contract limit lines for the water utility trenches at issue. *See* Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 40:16-45:22.

59.    See **Responses 1 to 23** regarding the extra work claim in **Exhibit 594**, for a description of the relevant Subcontract provisions that are also applicable to **Exhibit 561**, and which require the rejection of this claim.

- **Exhibit 562 - Neri Extra Work Claim No. NC-055-207**

60.    In November of 1999, Elm Haven initiated discussions with Neri concerning the progress of work in Block B. Pursuant to these discussions, Elm Haven offered Neri an "acceleration bonus" of $10,000, if Neri's work in Block B was substantially complete on or before December 17, 1999. *See, e.g.,* James Canning Direct Testimony, Sep. 22, 2005, at 185:20-191:11; Lorraine Beckwith Direct Testimony, Sep. 23, 2005, at 150:20-156:18.

61.    Although the parties originally disagreed as to whether Neri met the necessary conditions for receiving the bonus, Elm Haven stipulated to the bonus at the outset of the trial. *See* Elm Haven Opening Statement, June 6, 2005, at 13:06-13:17. Therefore, Elm Haven has included this bonus in the analysis of its claims. *See, e.g.,* **Plaintiff's Claims Grid**.

- **Exhibit 563 - Neri Extra Work Claim No. NC-056-207-1**

145

62.    **Exhibit 563**, Neri Extra Work Claim No. NC-056-207-1, in the amount of $22,241.71, is invalid because the scope of work described thereon is specifically listed in Neri's scope of work under the Subcontract, and Elm Haven did, in fact, issue a change order to Neri for adding a second crew to accelerate the installation of granite curb in December 1999.

63.    Under the Subcontract, Neri was obligated to furnish and install all granite curbing:

> Furnish and install all concrete curb, granite curb, concrete sidewalks (both city and residential) and all handicap ramp depressions where indicated on plans.  Work shall include but not limited to establishment of line and grade (baseline and benchmark by other) excavation and backfill for curbs and sidewalks, subbase material and installation, forming, rebar/WWM including installation, expansion joint material, concrete and placement of, finishing as required, curing/sealing, stripping of forms, etc.  Remove and salvage granite curb as shown, if alternate is selected.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.P (emphasis added); *see also* John Ford Direct Testimony, June 6, 2005, at 76:22-76:24.

64.    During the acceleration period in late 1999, Neri and Elm Haven negotiated a change order in the amount of $6,359.00, for which Neri would employ a second crew specifically to install 810 linear feet of granite curbing around Block B.  *See* **Exhibit 253**, Change Order No. 204-20.  Elm Haven formally approved this amount on January 30, 2000, and issued Change Order No. 204-20 on May 30, 2000.  *See* **Exhibit 253**, Elm Haven letter to Neri dated Jan. 30, 2000.

65.    In defining its scope, the terms of Change Order No. 204-20 were clear and unequivocal:

> Provide second crew for 810 L.F. granite curb installation Block B, per LEA Daily Reports.

146

**Exhibit 253**, Change Order No. 204-20, dated May 30, 2000.

66. The exhibit includes six tickets from Dispazio Construction Corp., which indicate that the company installed a total of 993 linear feet of granite curbing for Hammonasset Construction, LLC, from December 6 through December 15, 1999. *See* **Exhibit 253**.

67. As Vincent Neri testified, the change order covered acceleration by a second crew, and not additional curbing:

> Q.: <u>The work that's covered by this change order request, the lineal footage, is the lineal footage that was part of the original scope of the contract; isn't that accurate?</u>
>
> A.: <u>Yes</u>.
>
> Q.: Okay, but it doesn't involve is, not only -- what it doesn't involve is extra, an additional lineal footage above the requirements of the original contract documents, correct?
>
> A.: <u>We never charged for additional footage</u>.
>
> Q.: Right.
>
> A.: It was -- This was just <u>acceleration to get it done for '99</u>.

Vincent Neri Testimony on Cross-Examination, June 28, 2005, at 14:06-14:18 (emphasis added).

68. Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit. First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim. *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23; 44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04. Next, James Canning

147

testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact. *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01. Finally, Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation. *See* **Exhibit 1**, Article 2.6 of the Subcontract. Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 563** to compensate Neri for anything more than the second crew approved in Change Order No. 204-20.

69.     James Canning testified that he never saw Confirmations of Change, approved their use, or discussed such documents with Neri representatives. *See* James Canning Direct Testimony, Sep. 22, 2005, at 191:13-195:17; Sep. 23, 2005, at 47:05-47:12.

70.     Because the acceleration to complete the work in **Exhibit 563** was paid for in Change Order No. 204-20, this extra work claim must be denied.

- **Exhibit 564 - Neri Extra Work Claim No. NC-056-207-4**

71.     **Exhibit 564**, Neri Extra Work Claim No. NC-056-207-4, in the amount of $4,954.64, is invalid because it was Neri's obligation under the Subcontract to install the concrete in question, and because Neri failed to substantiate its request for payment under the Subcontract.

72.     Neri was clearly and unambiguously obligated to provide <u>all</u> materials and equipment necessary to install site concrete material and all associated items on the Project:

> This subcontractor responsible to provide <u>all materials and equipment required</u> to install the following site concrete items of work, including concrete material and all associated items: Concrete sidewalks both City and Residential, concrete dumpster pads, generator pads, handicap ramps, concrete patios, concrete stoops, concrete driveway aprons, concrete staircases with handrails, concrete retaining walls, concrete foundations for

148

benches, concrete unit pavers, precast concrete stepping stones.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.S (emphasis added).

73.     Despite its contractual obligations in this regard, the extra work claim in **Exhibit 564** seeks additional compensation for the entire concrete delivery, and not just for the additional concrete "additives" that Neri claims were "required" by the distributor. *See* **Exhibit 564**. Obviously, Neri cannot claim additional compensation for concrete that it was required to provide for, under the original Subcontract scope of work.

74.     Neri has offered no evidence that L. Suzio required the use of concrete additives, and James Canning testified that he never authorized the use of concrete additives other than hot water for slab-on-grade concrete in cold weather, that Elm Haven never approved the purchase of concrete with additives, and that Elm Haven never received backup documentation for either the purchase of these additives or L. Suzio's requirement that it would not ship the concrete without such additives. *See* James Canning Direct Testimony, Sep. 22, 2005, at 210:08-212:22; James Canning Testimony on Cross-Examination, Sep. 23, 2005, at 19:13-24:20.

75.     Vincent Neri testified that the annotation "NCA," which stands for "non-chloride accelerator," was the cold weather concrete additive supposedly "required" by L.Suzio Concrete. *See* Vincent Neri Testimony on Cross-Examination, June 28, 2005, at 20:01-20:14.

76.     The exhibit includes five receiving tickets, three of which are dated November 29, 1999; another dated December 6, 1999, and a fifth dated November 28, 1999. *See* **Exhibit 564**. None of the five tickets is signed, despite Ivan Carlsen's note with his signature, "please submit ticket." *See id.*

77.     The first of the three tickets dated November 29, 1999, includes nineteen line items. However, five line items include entries for "minimum load" and "waiting," in amounts totaling $292.50. Just five of the remaining line items are supported by invoices indicating "NCA," in the amount of $212.33. The remaining fourteen line items are supported by invoices which do not indicate "NCA," in the amount of $412.12. *See* **Exhibit 564**.

78.     The entry "minimum load" is connected to a charge for a concrete delivery that

RJT/29497/3/761609v1
02/27/06-HRT/

is less than an amount specified by the concrete provider, and has no relation to any "requirement" for concrete additives to be delivered. The entry "waiting" is designated for occasions when the concrete provider arrived but Neri was not immediately prepared to pour concrete right away. As each of these charges relates to Neri's planning (or lack thereof), and not the concrete additives "required" for delivery, they cannot be assessed against Elm Haven, when the concrete to be provided was specifically included in Neri's scope of work under the Subcontract.

79.     The second of the three tickets dated November 29, 1999, also includes nineteen line items. Three line items (with amounts totaling $227.50) include entries for "minimum load" or "waiting." Seven line items (with amounts totaling $228.81) are supported by invoices indicating "NCA." Eight line items (with amounts totaling $473.09) are supported by invoices which do not indicate "NCA." One line item (in the amount of $74.50) is not supported by any invoices. *See* **Exhibit 564**.

80.     The third ticket dated November 29, 1999, also includes nineteen line items. Five line items (with amounts totaling $211.25) include entries for "waiting." Nine line items (with amounts totaling $499.16) are supported by invoices indicating "NCA." Three line items (with amounts totaling $130.38) are supported by invoices which do not indicate "NCA." Two line items (in the amount of $100.58) are not supported by any invoices. *See* **Exhibit 564**.

81.     The remaining two tickets, dated December 6, 1999, and November 28, 1999, respectively, are not supported by any invoices. *See* **Exhibit 564**.

82.     In summary, the line items supported by invoices indicating "NCA" total just $940.30 -- but, as stated above, these invoices account for the delivery of the entire concrete mixture, and not the "NCA" additives alone. *See* **Exhibit 564**.

83.     Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit. First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim. *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23;

150

44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04. Next, James Canning testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact. *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01. Finally, Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation. *See* **Exhibit 1**, Article 2.6 of the Subcontract. Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 564** to compensate Neri for the concrete additives.

84.    Furthermore, Ivan Carlsen testified that he signed the Confirmation of Change to direct Neri to "lay concrete sidewalks and all kinds of work. We was [*sic*] trying to get Block B done, crunch time." Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 60:18-60:22.

85.    Because Elm Haven believed that concrete additives were unnecessary, Elm Haven denied Neri's claim for extra work. However, Elm Haven still offered Neri the opportunity to prove that these chemicals were necessary for use on the Project, or that L. Suzio Concrete would not ship concrete without the chemicals.

> Never authorized by [Elm Haven]. Request denied, unless proof of requirement by L. Suzio is provided.

**Exhibit 450**, Elm Haven letters (5) to Neri, dated Apr. 24, 2000 (emphasis added). *See* James Canning Testimony on Cross-Examination, Sep. 23, 2005, at 24:10-24:17. However, Neri neither responded to Elm Haven's letters nor provided such proof to Elm Haven.

86.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Because the installation of concrete items was included in Neri's scope of work under the Subcontract, and because there is no evidence that anyone at Elm Haven approved this work on a time and materials basis, Neri has not met its burden. Therefore, this extra work claim must be denied.

- **Exhibit 565 - Neri Extra Work Claim No. NC-058-207-1**

RJT/29497/3/761609v1
02/27/06-HRT/

87.    **Exhibit 565**, Neri Extra Work Claim No. NC-058-207-1, in the amount of $4,878.66, is invalid because the Contract Drawings clearly indicated that the low point on Canal Street was at Station 8+57.4, not at Station 8+40 as claimed by Neri.

88.    Under the Subcontract, Neri was obligated to furnish and install all granite curbing:

> Furnish and install all concrete curb, granite curb, concrete sidewalks (both city and residential) and all handicap ramp depressions where indicated on plans.  Work shall include but not limited to establishment of line and grade (baseline and benchmark by other) excavation and backfill for curbs and sidewalks, subbase material and installation, forming, rebar/WWM including installation, expansion joint material, concrete and placement of, finishing as required, curing/sealing, stripping of forms, etc.  Remove and salvage granite curb as shown, if alternate is selected.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.P (emphasis added); *see also* John Ford Direct Testimony, June 6, 2005, at 76:22-76:24.

89.    Neri was also obligated to perform all layout and engineering required to complete its work under the Subcontract:

> This subcontractor shall do layout, engineering and elevation control required to complete all site development work described herein.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.A (emphasis added).

90.    The Job Invoice associated with this exhibit reads, "NC058 Additional Work - Remove & Reinstall Granite Curb @ Canal St due to low point PVI vs. CB discrepancy on Plan [SS-3] 8+40 CB @ 8+57.4"  *See* **Exhibit 565**, Job Invoice dated Nov. 24, 1999. However, Drawing SS-3 clearly reads "Low Point @Sta. 8+57.4."  *See* **Exhibit 5**, Drawing SS-3.

RJT/29497/3/761609v1
02/27/06-HRT/

91.    John Ford testified that there was never a discrepancy between the drawings, and that the "PVI," or "Point of Vertical Inflection," is a geometric point for analysis only. John Ford added that Neri had misread the drawings, and should have known what was indicated on the drawings:

> [T]he drawings show the station for the PVC, and an elevation. They show the station for the PVI and an elevation, a PVT and an elevation, and they give a dimension, what's called "LVC," "length of vertical curve," and that's 120 feet, it says on this particular curve [on Canal Street], and with that data, you can calculate any point along that curve where the road is, but the road is never at the PVI.

> The PVI is simply a geometric point that's used, and at the intersection of these two slopes coming at each other, but it's never -- the road is never at that PVI, otherwise the road would have chords -- straight lines everywhere, and the other -- kind of typical when you look at something like this, a vertical curve, unless the grade coming into the curve is the same as the grade going out from the curve, the low point will never be in the middle. Only when they're the exact same is the low point in the middle. As soon as one gets less than the other, meaning coming in or leaving steeper, the low point always shifts, and that's what happened in this case.

> So I knew by looking -- by reading this, saying that Neri's claiming that the low point is 8+40, I could tell right away that they're wrong just by looking at the [slope] percentages coming in, it's a negative .91, and going out, it's a positive [.50]. You could just -- you know just by looking at it, it's not the low point.

John Ford Direct Testimony, Oct. 4, 2005, at 141:01-142:04 (emphasis added).

> THE COURT:  Why might someone think it would be at 8+40, because on the drawings --

THE WITNESS:  <u>If someone looked at it that didn't understand vertical curves, might think that this was a low point, and that's what Neri's claiming to be the low point, is this PVI.</u>  They're saying it's 37.05.  They're saying, "The drawings are wrong. Look.  The PVI is the lowest point on the drawing."

Well, <u>it is, but it's only a geometric point.  It's not the road</u>, and so, if you were building this curve, you'd be doing pretty good up to here, but then once you went and installed it to this point --

THE COURT:  You'd be off the --

THE WITNESS:  -- and the catch basin you'd build is over here --

THE COURT:  Right.

THE WITNESS:  -- because you built it under CSO, and now this thing's sitting up over here, and there's your granite --

THE COURT:  You got a problem.

THE WITNESS:  -- you say, "Hey, guys.  There's a problem.  A conflict in the drawings," but <u>in reality, it wasn't a conflict in the drawings.  You weren't looking at this PVI the way it was meant to be looked at.</u>

John Ford Direct Testimony, Oct. 4, 2005, at 149:15-150:14 (emphasis added).

92.    Ivan Carlsen testified that Neri did not provide any engineering analysis of the "discrepancy" or any drawings -- despite its contractual obligations -- when the Confirmation of Change was presented to him for his signature, and that James Canning instructed him to sign the Confirmation and direct Neri to perform the work:

Q.:  At this point in time, they did not present to you any detailed engineering analysis of the drawings at issue here, and that shows there was, in fact, a discrepancy, did they?

154

A.: There was an explanation, but <u>they didn't show me any drawings, no</u>.

Q.: Okay.

So just an explanation, they didn't show you any drawings?

A.: Correct.

Q.: Okay.

And you passed on that explanation to Mr. [Canning], correct?

A.: Correct.

Q.: And Mr. [Canning] said to you, "<u>Tell them to do the work, keep track of their time, and we'll iron it out later as to whether there's -- this warrants a change order or not</u>," correct?

A.: <u>Correct</u>.

Q.: And <u>that was the purpose of your signature on this document, correct</u>?

A.: <u>Correct</u>.

Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 132:25-133:21.

93.  Lorraine Beckwith expressly rejected this extra work claim on May 26, 2000. *See* **Exhibit 451**, Elm Haven letter to Neri, dated May 26, 2000.

94.  Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit. First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim. *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23;

155

44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04. Next, James Canning testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact. *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01. Finally, Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation. *See* **Exhibit 1**, Article 2.6 of the Subcontract. Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 565** to compensate Neri for a "discrepancy" that did not exist.

95.     The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Under the Subcontract, Neri was obligated to perform all engineering on the Project, with the exception of control points. *See* **Exhibit 1**, Article 2.8 of the Subcontract. Because there was never a discrepancy between the low point as depicted in the field and on the Subcontract Drawings, and because Neri did not perform any form of an engineering analysis to prove that one existed, Neri cannot now claim that the drawings were in error. These costs are Neri's responsibility, and this extra work claim must be denied.

- **Exhibit 566 - Neri Extra Work Claim No. NC-059-207-1**

96.     **Exhibit 566**, Neri Extra Work Claim No. NC-059-207-1, in the amount of $5,590.22, is invalid because the Contract Drawings clearly indicated that the low point on Canal Street was at Station 8+57.4, not at Station 8+40 as claimed by Neri.

97.     As with the "relocation" of granite curbing noted above, *see* **Exhibit 565**, *supra*, there was never a discrepancy between the drawings. Neri, in fact, had previously installed the catch basins on Canal Street in their proper locations at Station 8+57.4, pursuant to its CSO Contract. *See* Vincent Neri Testimony on Cross-Examination, June 28, 2005, at 32:25-34:05.

98.     Lorraine Beckwith expressly rejected this extra work claim on May 26, 2000. *See* **Exhibit 452**, Elm Haven letter to Neri, dated May 26, 2000.

RJT/29497/3/761609v1
02/27/06-HRT/

99.    Again, as with the "relocation" of granite curbing above, *see* **Exhibit 565**, *supra*, Ivan Carlsen testified that James Canning directed him to sign the document to direct Neri to perform the work and to keep track of its time and materials for later analysis, but not as a guarantee for a change order in the future. *See* Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 136:04-137:16.

> Q.:  And by you signing [the Confirmation of Change in **Exhibit 566**] . . . you weren't signing that with the intention that a change order will be issued to you in the future to do this work?
>
> A.:  No.

Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 139:03-139:07.

100.    Ivan Carlsen added that he signed the confirmation because "Neri was standing still," and to move the project forward:

> We felt that during the time, we need to finish and I use it before, the wrong language, by saying somebody put gun to my head.
>
> I felt that we have to proceed as Neri was asking us to proceed. We, you know, that's why I put all this note, saying "Verify time material.  Proceed with the work."
>
> At that time Neri was standing still.  We need to proceed.  We need to move forward.

Ivan Carlsen Direct Testimony, September 22, 2005, at 68:11-68:19 (emphasis added).

101.    Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit.  First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim.  *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23; 44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04.  Next, James Canning

RJT/29497/3/761609v1
02/27/06-HRT/

testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact. *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01. Finally, Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation. *See* **Exhibit 1**, Article 2.6 of the Subcontract. Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 566** to compensate Neri for a "discrepancy" that did not exist.

102.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Under the Subcontract, Neri was required to repair and replace, at its own expense and promptly at the discretion of the Contractor, any defects in workmanship or materials which appear within one year after the date of certificate of substantial completion. *See* **Exhibit 1**, Article 2.8 of the Subcontract. Because there was never a discrepancy between the drawings and the location of the catch basins in question -- which Neri itself installed, pursuant to its CSO Contract -- these costs are Neri's responsibility, and this extra work claim must be denied.

- **Exhibit 567 - Neri Extra Work Claim No. NC-060-207-1**

103.    **Exhibit 567**, Neri Extra Work Claim No. NC-060-207-1, in the amount of $2,699.95, is invalid because the work described thereon is included in Neri's scope of work under the Subcontract.

104.    Neri was obligated to provide all materials and equipment necessary to install concrete stairs on the Project:

> This subcontractor responsible to <u>provide all materials and equipment required to install</u> the following site concrete items of work, including concrete material and all associated items: Concrete sidewalks both City and Residential, concrete dumpster pads, generator pads, handicap ramps, concrete patios, concrete stoops, concrete driveway aprons, <u>concrete staircases with</u>

RJT/29497/3/761609v1
02/27/06-HRT/

handrails, concrete retaining walls, concrete foundations for
benches, concrete unit pavers, precast concrete stepping stones.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.S (emphasis added).

105.    Neri's assertions as to the effect of the signed Confirmation of Change are
entirely without merit.  First, as Ivan Carlsen testified, his signature on the Confirmations of
Change was intended simply to confirm that Neri was directed to perform that particular item
of work at issue, and that Neri should keep track of the labor time, equipment and material
costs so that it could then be determined at a later point whether the work at issue constituted a
valid extra work claim.  *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23;
44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04.  Next, James Canning
testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's
signature was solely intended to permit the parties to finish Block B on time, and determine
whether the work qualified as "extra work" after the fact.  *See* James Canning Direct
Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01.  Finally,
Confirmations of Change are not listed as potential Amendments under the contract, and no
one from Elm Haven authorized their use as approvals of extra work or additional
compensation.  *See* **Exhibit 1**, Article 2.6 of the Subcontract.  Therefore, it cannot be said --
as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in
**Exhibit 567** to provide extra compensation for concrete stairs which were included in Neri's
scope of work under the Subcontract.

106.    Furthermore, not one of the receiving tickets is signed by any Elm Haven
representative.  *See* **Exhibit 567**.

107.    Ivan Carlsen testified that he signed this Confirmation of Change to direct Neri
to perform the work, and to allow for a later analysis as to whether a change order would be
issued.

Q.:  By signing this document, you were signing that for the
purpose of directing Neri to pursue this work?

A.:  Correct.

Q.:  This work had to get done in order to get that certificate of

occupancy, in --

A.: <u>That's correct</u>.

Q.: -- December [1999], correct?

A.: Correct.

Q.: And you were telling Neri, "<u>Do the work and keep track of your time and material</u> associated with it?"

A.: <u>Correct, yes</u>.

Q.: And the <u>ultimate issue</u> of whether a change order will be issued, that has to be <u>decided at a later point in time, correct</u>?

A.: <u>That's correct</u>.

Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 144:18-145:07 (emphasis added).

108.    Lorraine Beckwith expressly rejected this extra work claim on May 30, 2000. *See* **Exhibit 453**, Elm Haven letters (3) to Neri, dated May 30, 2000.

109.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Because the installation of concrete items was included in Neri's scope of work under the Subcontract, and because there is no credible evidence that anyone at Elm Haven approved this work on a time and materials basis, Neri has not met its burden. Therefore, this extra work claim must be denied.

- **Exhibit 568 - Neri Extra Work Claim No. NC-061-207-1**

110.    **Exhibit 568**, Neri Extra Work Claim No. NC-061-207-1, in the amount of $4,294.17, is invalid because the work described thereon is included in Neri's scope of work under the Subcontract.

RJT/29497/3/761609v1
02/27/06-HRT/

111.    Vincent Neri claimed that Neri encountered underground structures and obstructions, as well as a vault, which were in conflict with granite curbing, and asserted that the removal of these items was not in Neri's scope of work under the Subcontract.  *See* Vincent Neri Direct Testimony, June 14, 2005, at 98:09-98:18.

112.    However, Neri was required by the Subcontract to remove all existing utilities, streets and underground structures, and dispose of them offsite.  Neri's obligation in this regard extended to all areas covered by the Phase 1B and 1C Subcontract:

> Demolish and remove from within limits of Phase 1B and 1C site all existing utilities and streets including but not limited to asphalt paving, concrete sidewalks, bluestone curb, granite curb, concrete curb, underground water lines and hydrants, underground storm lines and sanitary lines and all associated structures, electric poles and lines, and guard rails, as shown on Contract Documents, including removal and disposal offsite.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.D (emphasis added)

113.    Additionally, all excavations on the Project were "unclassified," meaning that Neri was to excavate to the required subgrade elevations regardless of the character of materials and obstructions encountered.  **Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 3.3B; *see also* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G (emphasis added); John Ford Direct Testimony, June 6, 2005, at 78:10-80:07.

114.    Vincent Neri testified that the vault listed in the Confirmation of Change was never removed by Neri's forces.  *See* Vincent Neri Testimony on Cross-Examination, June 28, 2005, at 96:20-97:13.

115.    Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit.  First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim.  *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23;

RJT/29497/3/761609v1
02/27/06-HRT/

44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04.  Next, James Canning testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact.  *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01.  Finally, Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation.  *See* **Exhibit 1**, Article 2.6 of the Subcontract.  Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 568** to provide extra compensation for excavations which were included in Neri's scope of work under the Subcontract.

116.     Furthermore, not one of the receiving tickets is signed by any Elm Haven representative.  *See* **Exhibit 568**.

117.     Ivan Carlsen testified that he signed this Confirmation of Change to direct Neri to perform the work, and to allow for a later analysis as to whether a change order would be issued.

A.: I discussed this [**Exhibit 568**] with Mrs. Beckwith.

Q.: This one you discussed with Ms. Beckwith?

A.: Yes.

Q.: You have a clear recollection of that?

A.: Clear.

Q.: And when was that?  That was on this time frame?

A.: On about that time, 12/10, 12/11 whatever, around that time.

Q.: Okay, but you signed it though, on 12/17?

RJT/29497/3/761609v1
02/27/06-HRT/

A.: That's correct.

Q.: Okay.

A.: We was thinking it was not going to be an issue, and becoming an issue later on.

Q.: Okay.

And Ms. Beckwith's direction to you was similar to Mr. Canning's, "Direct Neri this work has to be done.  Tell them to do it."

A.: Yes.

Q.: And tell Neri to keep track of his time and material, correct?

A.: That's correct.

Q.: And this issue of whether or not a change order is warranted or not, would be decided at a later point in time, but get the work completed, correct?

A.: That's correct.

Q.: Because this work had to be done to meet that goal of obtaining a certificate of occupancy by the end of December 1999, correct?

A.: That's correct.

Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 146:12-147:15 (emphasis added).

118.    Lorraine Beckwith expressly rejected this extra work claim on May 26, 2000. *See* **Exhibit 454**, Elm Haven letters (4) to Neri, dated May 26, 2000.

- **Exhibit 569 - Neri Extra Work Claim No. NC-062-207-1**

163

119.  **Exhibit 569**, Neri Extra Work Claim No. NC-062-207-1, in the amount of $60,165.65, is invalid because the work described thereon is within Neri's scope of work under the Subcontract.

120.  Neri is not entitled to additional compensation for this work because the Subcontract expressly requires the removal of the layers of bricks and concrete that existed under Ashmun Street.  Specifically, this information is expressly set forth at Drawing SS-18 of **Exhibit 5**.  This particular drawing sets forth various details for streets, sewers and utilities with respect to the reconstruction of various streets for the project, including Ashmun Street, Webster Street, Foote Street, Admiral Street and New Streets 1, 2, 3 and 4.  The drawing clearly sets forth a cross-section for Ashmun Street identified as "Cross-Section C," which describes the existing roadway removal work that Neri was obligated to perform.  Specifically, the Note for Cross-Section C (Ashmun Street) states as follows:

> NOTE:  REMOVE EXISTING CURBS
>
> REMOVE EXISTING BITUMINOUS PAVEMENT (2.5" TO 9")
>
> <u>REMOVE EXISTING BASE OF GRAVELLY SAND, WITH BRICK, CONCRETE AND METAL FRAGMENTS.</u>

**Exhibit 5**, Drawing SS-18 (emphasis added).

121.  As should have been expected from the information set forth on Drawing SS-18, Neri encountered a layer of brick and concrete under Ashmun Street that had to be removed in order to reconstruct the street.  Neri is not, therefore, entitled to additional compensation to perform this work.

122.  In addition, the project engineer, LEA, made a specific determination that the removal of the layer of brick and concrete under Ashmun Street was required by the subcontract documents.  *See* **Exhibit 442**, wherein Lorraine Beckwith states in her January 31, 2000 letter to Neri as follows:

> You have prepared a request for change order for removal of brick/concrete on Ashmun Street, and removal of native soils at

RJT/29497/3/761609v1
02/27/06-HRT/

roads.  See attached letter dated January 24, 2000 from Louriero
Engineering.  This letter provides your firm with the official
interpretation of their contract documents.  This work is clearly
included in your contract.  No additional monies will be
authorized.

**Exhibit 442**, Elm Haven letter to Neri, dated Jan. 31, 2000 (emphasis added).

123.    Additionally, Paragraph 6.D of Attachment "A" (Rider page 2 of 10) to the
Subcontract states that Neri is to:

Demolish and remove from within limits of Phase 1B and 1C site
all exiting utilities and streets including but not limited to asphalt
phasing, concrete sidewalks, blue stone curb, granite curb,
concrete curbs . . . as shown on Contract Documents, including
removal and disposal of site.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.D (emphasis added).

124.    The contract documents include Drawing SS-18, and that drawing specifically
highlights the requirement for Neri to remove the bricks and concrete under Ashmun Street.
*See* **Exhibit 1**, Attachment "B" to the Subcontract; **Exhibit 5**, Drawing SS-18.

125.    Also, section 02200 of the contract specifications (**Exhibit 3** at Bates stamp no.
EH02431) defines the earthwork required for excavations necessary for roadway construction.
Section 3.3 defines "unclassified excavation" as including excavation to required subgrade
elevations regardless, of the materials and obstructions encountered.  It also defines
"classified" earth excavation as:

Excavation of pavements and other obstructions visible on
surface; underground structures, utilities, and other items
indicated to be demolished and removed; together with soil and
other materials encountered that are not classified as rock or
unauthorized excavation.

**Exhibit 3,** Project Specifications Vols. I and II, § 02200 ¶¶ 3.3.BB and 3.3.C (emphasis

RJT/29497/3/761609v1
02/27/06-HRT/