added).

126.    It was on the basis of both the contract specifications and the clear information set forth in Drawing SS-18, that LEA rejected this change order request:

> Based on our review of the contract plans and specifications, it appears obvious that the subcontractor's request for additional compensation for the removal and replacement of the materials encountered for construction of [Ashmun Street] is inappropriate and should be rejected.

**Exhibit 442**, LEA letter to Elm Haven, dated Jan. 24, 2000 (emphasis added).

127.    Vincent Neri acknowledged that Drawing SS-18 explicitly states that brick, concrete and metal fragments were located beneath Ashmun Street, and that no other streets on Drawing SS-18 were so designated. *See* Vincent Neri Testimony on Cross-Examination, June 17, 2005, at 189:01-192:01.

128.    As Ivan Carlsen testified, he signed off on Neri's "Confirmation of Change" document included in **Exhibit 569** simply in order to confirm that Neri was, indeed, directed to perform this work in order to complete Block B by the end of 1999 and that Neri should keep track of the time and material spent performing this work for consideration at a later point in time if the work at issue was, in fact, a valid extra work claim.

129.    Neither Ivan Carlsen, Lorraine Beckwith, nor Jim Canning ever agreed that the removal of the bricks and concrete clearly depicted on Drawing SS-18 constituted extra work under Neri's contract. Ivan Carlsen testified that he signed the Confirmation of Change in **Exhibit 569** in order to complete the work by December 17, 1999.

> Q.:  You were not in a position, at this point in time, to just stop work on Ashmun Street, and just let it sit there, correct?
>
> A.:  Correct.
>
> Q.:  Right.  This work had to get done by 12/17.

RJT/29497/3/761609v1
02/27/06-HRT/

<u>You didn't have time, at this point in time, to start contacting</u>
<u>LEA, get LEA involved to look at the whole issue, correct</u>?

A.: <u>That's right, yes</u>.

. . . .

Q.: Okay.

And at this point in time, when Neri was coming to you on
December 11th and saying, "I want to be paid an additional sum
of money to do -- to remove bricks and concrete under the
pavement on Ashmun Street," at that point, you weren't making a
decision whether or not that was truly extra work or not, were
you?

A.: No.  I was just move forward.

Q.: Okay.

And no one at Elm Haven, Mr. Canning, wasn't agreeing at that
point in time, "Yes, this constitutes extra work," correct?

A.: That's correct.

Q.: Mr. Canning was saying, "Direct Neri to do the work,"
correct?

A.: Talk about later.

Q.: And talk about it later.  In the meantime, Neri should keep
track of its time and we'll review the time later, and we'll talk
about the scope issue later on, correct?

A.: Correct.

167

Ivan Carlsen Testimony on Cross-Examination, Sep. 23, 2005, at 127:03-130:18 (emphasis added).

130.    James Canning further testified that he directed Ivan Carlsen to sign the Confirmation of Change to get the work completed and not to authorize additional compensation, because he believed the work was included in Neri's scope of work.

> Q.: On December 11th [1999], during your discussions with Mr. Carlsen, do you recall this issue of removing concrete brick and pavement on Ashmun Street coming up?
>
> A.: I said, "Sign it, we'll look into it." I -- if I remember right, Ivan said, "This is shown on the drawings."
>
> Q.: Uh-huh.
>
> A.: And I had no real -- You know, I couldn't remember anything like that, so I said, "Well, listen, get it down. We'll come down here if it's in the drawings and it's in the scope of work, then it's just again another interpretation that went awry I guess," so I told him to sign it.
>
> Q.: Okay.
>
> A.: As it turned out, I think it was on the drawings.
>
> . . . .
>
> Did you ever have a face-to-face discussion with either Carl Neri or Vincent Neri about this issue, subsequent to December 11th, 1999?
>
> A.: I don't think so.
>
> Q.: Okay.

RJT/29497/3/761609v1
02/27/06-HRT/

A.: I think all their discussions was with Lorraine.

Q.: Okay.

A.: I don't remember sitting down with this. I think this was pretty cut and dry. I think it was shown on the drawings and was quite evident that they owned it, but.

. . . .

Q.: Did you ever tell the Neri people, at any time, that -- in the field or on the phone, that you will agree to issue a change order for any type of unsuitable material? You personally, Jim Canning?

A.: No. No. No. No.

James Canning Direct Testimony, Sep. 22, 2005, at 198:16-202:15 (emphasis added).

Q.: . . . [Y]ou never told Mr. Neri that you would have Mr. Carlsen sign this confirmation of change document, and that it would lead up to a change order for the work?

A.: No. No. Again, John, that's the project manager's job, not mine.

James Canning Testimony on Cross-Examination, Sep. 23, 2005, at 33:08-33:13.

131.    As explained above, LEA determined that the work at issue was required by the Project drawings and specifications. As such, it does not constitute a valid extra work claim. *See* **Exhibit 442.** This rejection was confirmed by Elm Haven on April 24, 2000. *See* **Exhibit 443**, Elm Haven letter to Neri, dated Apr. 24, 2000.

132.    Accordingly, the Court should find, based upon the clear and unambiguous provisions of the Subcontract, that the removal of brick or concrete under Ashmun Street is

169

part of Neri's original Subcontract obligations as a matter of law, and reject this extra work claim.

- **Exhibit 570 - Neri Extra Work Claim No. NC-063-207**

133.    **Exhibit 570**, Neri Extra Work Claim No. NC-063-207, in the amount of $2,019.87, is invalid because Elm Haven already paid for the concrete transformer pad itself and issued a change order for labor and materials to backfill the area around the transformer pad.

134.    Vincent Neri testified that if Elm Haven paid for the concrete foundation directly to United Concrete Products, then Neri should not be paid twice for the item:

> Q.:  . . . [I]f they had paid [the invoice referenced in **Exhibit 570**] directly to United Concrete Products, you shouldn't be making a claim for it in this litigation, obviously, isn't that, sir -- isn't that true, sir?
>
> A.:  At the time the ticket was made out, it wasn't paid.
>
> Q.:  Wasn't my question, sir.  My question is, now, in this litigation, you're pursuing [money for the invoice] at this point in time and if that invoice was paid by Elm Haven prior to today or prior to the start of this trial, Neri should not be looking to be paid twice for this item.
>
> A.:  Correct.

Vincent Neri Testimony on Cross-Examination, June 28, 2005, at 51:12-51:23.

135.    Elm Haven did, in fact, pay for the concrete transformer pad that was the subject of **Exhibit 570**.  *See* **Exhibit 455**, Elm Haven letter to Neri (enclosing copy of check dated Jan. 19, 2001, and invoices from United Concrete Products).

136.    Elm Haven also issued a change order which covered the costs to backfill the area around the transformer pad, and specifically referenced Neri Extra Work Claim No. NC-

RJT/29497/3/761609v1
02/27/06-HRT/

063-207:

> Backfill @ Precast Vault As Required By U.I. @ Block B/R1,
> Per Your Ticket Dated 12/06/1999, Referred To As NC-063-207.

> Total Add Item:  $181.96  (Revised Amount)

**Exhibit 330**, Change Order No. 207-39, dated Oct. 3, 2000.

137.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue.  *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588.  Because Elm Haven has already paid for the concrete transformer pad and issued a change order covering the labor and materials associated with its installation, Neri has not met its burden, and this extra work claim must be denied.

- **Exhibit 572 - Neri Extra Work Claim No. NC-064-207**

138.    **Exhibit 572**, Neri Extra Work Claim No. NC-064-207, in the amount of $1,568.83, is invalid because the work was not authorized to be performed on a time and materials basis, and was not extra work.

139.    Neither of the two receiving tickets included with this exhibit was signed by any Elm Haven representative.  *See* **Exhibit 572**.

140.    Although Vincent Neri testified that the work pertaining to this exhibit was performed in December 1999, the receiving tickets were not forwarded to Elm Haven until March 1, 2000, and the requests for change orders was rejected by Elm Haven on May 26, 2000.  *See* **Exhibit 456**, Elm Haven letters (2) to Neri dated May 26, 2000; *see also* **Exhibit 472**, Elm Haven Memorandum dated June 28, 2000.

141.    Under the Subcontract, Neri was expressly obligated to provide all labor, materials, equipment, tools and supervision to furnish and install all asphalt paving on the Project.

> This subcontractor will furnish and install <u>all labor, materials,</u>

RJT/29497/3/761609v1
02/27/06-HRT/

equipment, tools and supervision to do all Site Development Work per Contract Drawings and Specifications including but not limited to the following items:

Furnish and install all asphalt paving including all subbase materials as required by contract documents. Work shall include but not [sic] limited to establishment of line and grade, baseline & benchmarks by others, fine grade of sub-base and proof roll, installation of subbase material, asphalt binder course, asphalt wearing course and all traffic markings at parking lots as indicated per contract drawings. Asphalt "wearing" course shall not be installed until the end of the project or as determined by the contractor. All asphalt material must be from an asphalt batch plant approved by the City of New Haven for use in public street areas. Scope of work includes driveways, walks, parking lots, roads and streets. Included are bituminous walks with wood edging, pavement markings at parking lots, and all sawcutting and patching of existing bituminous as required, removal of existing pavement and removal from site and legally disposed of. Subbase for pavement may be reclaimed material from removed bituminous.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.Q (emphasis added).

142.    Lorraine Beckwith expressly rejected this extra work claim on May 26, 2000. *See* **Exhibit 456**, Elm Haven letters (2) to Neri, dated May 26, 2000.

143.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Because the work involved was not authorized to be performed on a time and materials basis, was not signed by any Elm Haven representative, and was not extra work, this claim must be denied.

- **Exhibit 573 - Neri Extra Work Claim No. NC-064-207-1**

172

144.   **Exhibit 573** describes the paving work performed by Tilcon Connecticut, Inc., from December 14-17, 1999.  Elm Haven paid Tilcon Connecticut and Neri via a joint check in the amount of $76,324.00 on December 13, 1999.  This amount included a premium of $22,276.00.  *See* **Exhibit 291**, Backcharge Change Order No. 204-55 Backup, Tab 20. Therefore, Neri's Subcontract price was increased by the amount of the premium.  *See* **Exhibit 376**, Elm Haven Cost-to-Complete Summary; *see also* John Ford Direct Testimony, June 8, 2005, at 213:16-214:03.

145.   Although the original version of Change Order No. 204-55 included this amount as a backcharge, John Ford modified the backcharge at trial, and added this amount to the Subcontract price.  *See* John Ford Direct Testimony, June 6, 2005, at 215:04-225:17; June 7, 2005, at 03:15-128:08.  Elm Haven have therefore included this premium in the analysis of its claims.  *See*, *e.g.*, **Plaintiff's Claims Grid**.

- **Exhibit 574 - Neri Extra Work Claim No. NC-065-207-2**

146.   **Exhibit 574**, Neri Extra Work Claim No. NC-065-207-2, in the amount of $7,230.33, is invalid because the scope of work described therein was expressly included in Neri's scope of work under the Subcontract.

147.   See **Responses 1 to 23** regarding the extra work claim in **Exhibit 594**, for a description of the relevant Subcontract provisions that are also applicable to **Exhibit 574**, and which require the rejection of this claim.

- **Exhibit 575 - Neri Extra Work Claim No. NC-065-207-4**

148.   **Exhibit 575**, Neri Extra Work Claim No NC-065-207-4, in the amount of $7,963.11, is invalid because the work included thereon is a part of Neri's scope of work under the Subcontract.

149.   The work described in **Exhibit 575** is the transportation of approximately 500 cubic yards of material from areas in and around Block B to a storage area near the intersection of Canal Street and Locke Street, during the December 1999 timeframe when Elm Haven was focused on completing Block B.  *See* **Exhibit 575**.

150.   Vincent Neri testified that Neri did, in fact, reprocess unsuitable materials at the

173

intersection of Canal Street and Locke Street, and reuse the screened materials elsewhere on the Project:

> Q.: That material that you had over there at the intersection of Canal and Locke Street, what you also had over there was a, forgive me if I don't use the right term, you had a screening operation set up, where you would take the material that was stockpiled there, put it through a screening process to screen out material that wouldn't pass through this screen, so you would then have a residual material that would fall through the screens, correct?

> A.: We had a screening operation and we also crushed, as well.

Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 108:14-109:13.

151.    Neri was obligated to excavate all unsuitable material within the cut lines of the Project, as specified in the Contract Drawings or in the Geotechnical Report, and remove and dispose of such unsuitable material offsite.

> Subcontract includes hauling and disposal of all unsuitable and/or surplus material offsite.  All excavation shall be performed on an unclassified basis.  All unsuitable material within cut material and as noted in Geotechnical Report to be removed from site and legally disposed of.  Any unsuitable material not included in contract requirements that is required to be removed shall be done per Unit Prices included in this Subcontract.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G; *see also* **Responses 1 to 23** regarding the extra work claim in **Exhibit 594**, for a description of the relevant Subcontract provisions that are also applicable to **Exhibit 575**.

152.    No evidence was offered that the material at issue was removed from beyond the contract limit lines, or that the work was approved as extra work by any Elm Haven representative. *See* **Exhibit 575**.

RJT/29497/3/761609v1
02/27/06-HRT/

153.    Lorraine Beckwith rejected this extra work claim on May 26, 2000. *See* **Exhibit 445**, Elm Haven letters (3) to Neri, dated May 26, 2000.

154.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Neri has not met its burden, as it was obligated under the Subcontract to remove unsuitable materials from within the contract limit lines and dispose of it offsite. Because there is no credible evidence that this material was excavated from beyond the contract limit lines, this work was included in Neri's scope of work, and therefore, this claim must be denied.

- **Exhibit 576 - Neri Extra Work Claim No. NC-067-207-1**

155.    **Exhibit 576**, Neri Extra Work Claim No. NC-067-207-1, in the amount of $9,024.86, is invalid because the concrete apron work at issue was part of Neri's scope of work under the Subcontract, as per the concrete apron detail set forth in **Exhibit 5**, Drawing L-13, Detail 5.

156.    The exhibit includes the costs to construct aprons in Block B, in December 1999. *See* **Exhibit 576**.

157.    Neri was obligated to provide all materials and equipment necessary to install all concrete aprons on the Project:

> This subcontractor responsible to <u>provide all materials and equipment required to install the following site concrete items of work, including concrete material and all associated items</u>: Concrete sidewalks both City and Residential, concrete dumpster pads, generator pads, handicap ramps, concrete patios, concrete stoops, <u>concrete driveway aprons</u>, concrete staircases with handrails, concrete retaining walls, concrete foundations for benches, concrete unit pavers, precast concrete stepping stones.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.S (emphasis added).

158.    The Subcontract obligated Neri to comply with the City of New Haven's

175

building codes, regulations and requirements, and expressly excludes extra work claims for costs to correct its failure to do so:

> The Subcontractor agrees that <u>its performance of the Subcontract Work will be conducted in accordance with all applicable governmental laws, regulations and requirements</u>, including but not limited to building, fire, safety and similar laws, codes and ordinances, and shall be subject to the approval of the Contractor and, to the extent provided in the Contract Documents, to the supervision and approval of the Architect <u>or any other person authorized therein to act on behalf of the Owner</u>. The Subcontractor shall be liable to the Contractor and the Owner for all loss, cost and expense attributable to any acts of commission or omission by the Subcontractor, its employees and agents resulting from the failure to comply with building, fire, safety and similar laws, codes and ordinances including, but not limited to, any fines, penalties or corrective measures. <u>There shall not be increases in the Subcontract Price for Amendments during construction necessary to comply with building, fire safety and similar laws, codes and ordinances</u>.

**Exhibit 1**, Article 2.4 of the Subcontract (emphasis added).

159.    Ivan Carlsen testified that he signed the Confirmation of Change to direct Neri to perform the work in accordance with City of New Haven requirements and specifications, as was required under the Subcontract, and not as a guarantee that a change order would be issued in the future:

> A.: There was a conversation that the City of New Haven says, "That's not the way we want the aprons. We wanted those different (inaudible)."

> So I let him pretty much put this in their hands. I say, "You pour it the way the City of New Haven wants it, and then if they approval, then I can pass this along with, you know, our bosses."

RJT/29497/3/761609v1
02/27/06-HRT/

Q.: Okay. Fair enough, I see.

So what you wanted to emphasize to the Neris was, "<u>Do what the City of New Haven is requiring.</u>"

A.: Correct.

Q.: Okay.

And, "<u>Proceed with what New Haven is telling you to do,</u>" correct?

A.: Correct.

Q.: All right.

You -- by signing off on this document, <u>you were not saying, "A change order will be issued to Neri at some point in the future to cover costs associated with this work,"</u> correct?

A.: <u>By any means, no.</u>

Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 149:14-150:09 (emphasis added).

160.    The original detail required by the Subcontract for the concrete aprons is set forth at Detail 5, Drawing L-13 in **Exhibit 5**. John Ford testified that there were never any revisions to this concrete apron detail, adding that the aprons originally placed in these locations by Neri were rejected by the City of New Haven because they did not conform to the City's standards:.

Q: [S]ir, based on your review of the file, have you set -- found any written revisions, as referenced in this claim document, **Exhibit 576**?

Have you found any revisions to that detail?

RJT/29497/3/761609v1
02/27/06-HRT/

A.: <u>There have been no revisions to that detail</u>.

Q.: You have not found any?

A.: I have not found any changes to that.

Q.: Now, when you went out there in the -- You went out there in March, you said. You came onboard in March, and looked at these aprons.

<u>Were they constructed in accordance with that detail you just described</u>?

A.: <u>No, they weren't</u>.

. . .

Q.:    When you were involved in the project in March of 2000, <u>did the City accept the concrete aprons the way they were poured by Neri -- constructed by Neri in December 1999</u>?

A.: <u>No, they did not accept them that way</u>.

Q.: And what did they require?

A.: They required their detail, and they were very adamant about that. They wanted a monolithic pour, Number 1, and they said they drew their details, and they stick with their details . . . so they did not want them, and told us to rip them out.

John Ford Direct Testimony, Oct. 4, 2005, at 205:15-207:25 (emphasis added).

161.    Lorraine Beckwith rejected this extra work claim on May 26, 2000. *See* **Exhibit 457**, Elm Haven letter to Neri, dated May 26, 2000.

162.    As it turned out, the concrete aprons that Neri installed in December 1999 and for which it seeks additional compensation were not accepted by the City of New Haven, and

178

required replacement.  On March 25, 2000, Blades & Goven issued its punchlist for Block B, which required the removal of four aprons in the block, because they were not of commercial grade, as required by the City and depicted on the original Subcontract detail.  *See* **Exhibit 5**, Drawing L-13, Detail 5; *see also* **Exhibit 313**, Blades & Goven Preliminary Site Punch List, dated Mar. 25, 2000.

163.    On April 14, 2000, Elm Haven issued Change Order No. 207-21 to Neri, in the amount of $14,000.00.  This change order, which was signed by both Carl Neri and John Ford, included driveway aprons as identified by Blades & Goven in its punchlist for Block B, on March 23, 2000:

RE: Remove & replace driveway aprons at Block B.

Provide all labor, equipment, material, survey and disposal of debris to complete the following work:

Remove and replace all driveway aprons indicated on the Blades & Goven punchlist dated 3/25/00, forwarded to Neri Construction LLC by EHC letter dated 3/29/00.  Price includes all saw cutting, bituminous pavement removal & replacement, granite curb work resulting from said operations, reforming of subbase material, and additional base material as required.

In addition, the concrete driveway apron at the Block B parking area entrance is to be a commercial apron as shown on drawing 5/L13.

**Exhibit 313**, Change Order No. 207-21, dated Apr. 14, 2000 (emphasis added).

164.    John Ford testified as to his reasons for issuing the change order to Neri, to replace the aprons in accordance with City details:

I gave him that change order [No. 207-21] because I talked to Vincent [Neri], he told me why he did what he did, why he built the apron that way.  I showed Vincent on the drawings, "That's not what the drawing says, Vincent."  That's not what it said.  I

RJT/29497/3/761609v1
02/27/06-HRT/

truly think that's what they thought it said.  It wasn't.

The City didn't approve it.  The City wanted it ripped out, so they owed us a ramp.  <u>They owed us a driveway apron -- concrete apron, per our original contract drawing</u>.

So I said, "You know what?  What you did there," <u>they did their contract work, I'll pay them to rip it out and put it in the way I know the City wants it, and the way the drawings show it</u>.

John Ford Direct Testimony, Oct. 4, 2005, at 210:20-211:09 (emphasis added).

165.    Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit.  First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim.  *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23; 44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04.  Next, James Canning testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact.  *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01.  Finally, Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation.  *See* **Exhibit 1**, Article 2.6 of the Subcontract.  Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 576** to provide extra compensation for concrete aprons which were both included in Neri's scope of work under the Subcontract and covered by Change Order No. 207-21.

166.    Furthermore, not one of the receiving tickets is signed by any Elm Haven representative.  *See* **Exhibit 576**.

167.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue.  *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170

RJT/29497/3/761609v1
02/27/06-HRT/

Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Neri has not met its burden, in that Neri was always obligated to install concrete driveway aprons as required by the City and depicted on the Subcontract detail. *See* **Exhibit 5**, Drawing L-13, Detail 5.

- **Exhibit 577 - Neri Extra Work Claim No. NC-067-207-2**

168. **Exhibit 577**, Neri Extra Work Claim No. NC-067-207-2, in the amount of $2,246.73, is invalid because these items were included in Neri's scope of work under the Subcontract.

169. Neri was obligated to provide all materials and equipment necessary to install all "site concrete" on the Project:

> This subcontractor responsible to <u>provide all materials and equipment required to install the following site concrete items of work, including concrete material and all associated items:</u> Concrete sidewalks both City and Residential, concrete dumpster pads, generator pads, handicap ramps, concrete patios, <u>concrete stoops</u>, concrete driveway aprons, concrete staircases with handrails, concrete retaining walls, concrete foundations for benches, concrete unit pavers, precast concrete stepping stones.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.S (emphasis added).

170. Neri was also responsible for all site work associated with the installation of all stoops:

> This subcontractor responsible for excavation, backfill and compaction for the following to include <u>all subbase, subgrading and preparation; layout; etc.</u>:
>
> Precast stepping stones, transformer pads, dumpster pads, unit pavers, entry pillars, <u>entry stoops and/or pads</u>, generator pads, handicap ramps, concrete patios, concrete driveway aprons, concrete staircases, concrete retaining walls, concrete foundations for benches, stone wall.

181

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.R (emphasis added).

171.    The receiving ticket included in **Exhibit 577** indicates that the work associated with this claim was performed over four days, but the exhibit only includes sketches associated with three days of work, however. *See* **Exhibit 577**. These sketches include annotations such as "prep forms for entry pads," "hand exc. for rev. conc. entry pads" and "form & pour rev. conc. entry pads," clearly suggesting that this work was included in Neri's scope of work under the Subcontract. *See id.*

172.    Neri also claims that Elm Haven authorized the extra work in this exhibit by the confirmation of change "executed" in **Exhibit 567**. *See also* Vincent Neri Direct Testimony, June 14, 2005, at 136:01-136:11. However, none of the documents in that exhibit references this extra work claim, and the confirmation of change included therein is specifically limited to the six "concrete footing/pads" described in that exhibit. *See* **Exhibit 567**, Neri Extra Work Claim No. NC-060-207-1. Furthermore, the receiving ticket in **Exhibit 577** expressly refers to Neri Extra Work Claim No. NC-056-207-2 for support, but this extra work claim is not included in this document and was not entered into evidence at trial.

173.    Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit. First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim. *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23; 44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04. Next, James Canning testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact. *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01. Finally, Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation. *See* **Exhibit 1**, Article 2.6 of the Subcontract. Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 567** -- which does not mention this extra work claim -- to provide extra compensation for concrete landings which were included in Neri's scope of work under the Subcontract.

174.    Furthermore, none of the documentation included in **Exhibit 577** was signed by any Elm Haven representative.  *See* **Exhibit 577**.

175.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue.  *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588.  Neri has not met its burden. Because concrete landings are included in Neri's scope of work under the Subcontract, this extra work claim must be denied.

- **Exhibit 578 - Neri Extra Work Claim No. NC-068-207-1**

176.    **Exhibit 578**, Neri Extra Work Claim No. NC-068-207-1, in the amount of $9,378.77, is invalid because the work described thereon was included in Neri's scope of work under the Subcontract.

177.    Neri was obligated to furnish and install all handicap ramps and sidewalks on the Project.

> Furnish and install all concrete curb, granite curb, concrete sidewalks (both city and residential) and all handicap ramp depressions where indicated on plans.  Work shall include but not limited to establishment of line and grade (baseline and benchmark by other) excavation and backfill for curbs and sidewalks, subbase material and installation, forming, rebar/WWM including installation, expansion joint material, concrete and placement of, finishing as required, curing/sealing, stripping of forms, etc.  Remove and salvage granite curb as shown, if alternate is selected.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.P (emphasis added); *see also* John Ford Direct Testimony, June 6, 2005, at 76:22-76:24.

178.    As with **Exhibit 576**, the Subcontract obligated Neri to comply with the City of New Haven's building codes, regulations and requirements, and expressly excludes extra work claims for costs to correct its failure to do so:

RJT/29497/3/761609v1
02/27/06-HRT/

> The Subcontractor agrees that <u>its performance of the Subcontract Work will be conducted in accordance with all applicable governmental laws, regulations and requirements</u>, including but not limited to building, fire, safety and similar laws, codes and ordinances, and shall be subject to the approval of the Contractor and, to the extent provided in the Contract Documents, to the supervision and approval of the Architect or any other person authorized therein to act on behalf of the Owner.  The Subcontractor shall be liable to the Contractor and the Owner for all loss, cost and expense attributable to any acts of commission or omission by the Subcontractor, its employees and agents resulting from the failure to comply with building, fire, safety and similar laws, codes and ordinances including, but not limited to, any fines, penalties or corrective measures.  <u>There shall not be increases in the Subcontract Price for Amendments during construction necessary to comply with building, fire safety and similar laws, codes and ordinances.</u>

**Exhibit 1**, Article 2.4 of the Subcontract (emphasis added).

179.    As John Ford testified, the extra work claim in **Exhibit 578** did not require Neri to perform any extra work beyond that included in its scope of work under the Subcontract. *See* John Ford Direct Testimony, Oct. 4, 2005, at 181:01-181:07.

180.    Specifically, the Subcontract Drawings include Drawing L-13, on which Detail 13 describes the handicapped ramps to be installed on the Project.  *See* **Exhibit 1**, Attachment "B" to the Subcontract, List of Drawings & Specifications; **Exhibit 484**, Drawing L-13.

181.    The Subcontract Addenda specifically states that "Handicap ramps as per detail 13/L-13 shall be provided at all intersections.  Ramps shall be provided in two directions at each intersection." **Exhibit 3**, Addendum 1, at ADD 1-2.

182.    Drawing L-13 specifically describes the two-ramp handicap ramp to be installed per the Addenda.  *See* **Exhibit 484**, Drawing L-13, Detail 13.

RJT/29497/3/761609v1
02/27/06-HRT/

183.    Both Vincent Neri's testimony and **Exhibit 578** itself refer to handicap ramp revisions on December 1, 1999. *See* Vincent Neri Direct Testimony, June 14, 2005, at 143:11-144:16; *see also* **Exhibit 578**.

184.    On December 1, 1999, Blades & Goven issued Sketch SSR-3, which revised Detail 13. *See* **Exhibit 485**, Sketch SSR-3, Detail 13a. The revision in Sketch SSR-3 was the basis for Neri's extra work claim. *See* John Ford Direct Testimony, Oct. 4, 2005, at 194:11-194:14.

185.    The revisions to Detail 13a in Sketch SSR-3 actually <u>reduced</u> the scope of work to be performed by Neri on the Project:

> Q.: Now . . . there's an extra work claim for having to construct the handicapped ramps per those revisions of 12/1/99.
>
> You agree that those revisions constitute extra work to the contract?
>
> A.: No.
>
> Q.: Why do you take that position?
>
> A.: The drawing -- the sketch, call it, of 12/1/99, is less of a ramp. <u>There's less work to do</u>. There's only one -- there's only a one-direction ramp. The one that was going to the other side in accordance with L-13, and the addenda, which said you're gonna have a ramp in two directions in every intersection, <u>you now only have one ramp at these intersections, and you've just added a concrete flat sidewalk in an area where there used to be a ramp</u>.

John Ford Direct Testimony, Oct. 4, 2005, at 195:12-196:02.

186.    Furthermore, Neri was clearly obligated under the Subcontract for the installation of handicap ramps depicted on Drawing L-13, *see* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.P, *supra*, but the extra work claim in this exhibit does not include any credit for the value to construct the ramps depicted on Drawing L-13. *See* **Exhibit**

RJT/29497/3/761609v1
02/27/06-HRT/

**578**.

187.    Lorraine Beckwith expressly rejected this extra work claim on May 26, 2000. *See* **Exhibit 458**, Elm Haven letter to Neri, dated May 26, 2000.

188.    Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit.  First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim.  *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23; 44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04.  Next, James Canning testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact.  *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01.  Finally, Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation.  *See* **Exhibit 1**, Article 2.6 of the Subcontract.  Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 567** -- which does not mention this extra work claim -- to provide extra compensation for concrete landings which were included in Neri's scope of work under the Subcontract.

189.    Ivan Carlsen never signed this Confirmation of Change, but testified that he directed Neri to perform the work, without guaranteeing that a change order would be issued in the future:

> Q.:  By putting this note ["procede with detail"] here, you weren't telling Neri that Elm Haven will be issuing you a change order in the future to cover the cost of this work, correct?
>
> A.:  <u>I was telling him to proceed</u>.  <u>Yeah, you're right</u>.  <u>Yes</u>.

Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 151:12-151:16 (emphasis added).

RJT/29497/3/761609v1
02/27/06-HRT/

190.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588.  Neri has not met its burden. Because concrete ramps are included in Neri's scope of work under the Subcontract, and because the December 1, 1999, revision in Sketch SSR-3 actually reduced the work to be performed by Neri under the Subcontract, this extra work claim must be denied.  Additionally, and assuming, *arguendo*, that this claim does constitute extra work, Neri has failed to properly price this claim because it does not include a credit for the value of the originally specified work.

- **Exhibit 580 - Neri Extra Work Claim No. NC-069-207-1**

191.    **Exhibit 580**, Neri Extra Work Claim No. NC-069-207-1, in the amount of $11,200.49, is invalid because it was included in Neri's scope of work under the Subcontract.

192.    Under the Subcontract, Neri was obligated to provide topsoil, and ready the site for landscaping:

> This subcontractor to respread topsoil, <u>supplement and screen as required</u>.  Rough and fine grade site per Contract Documents, ready for landscaping.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.CC (emphasis added).

193.    Vincent Neri testified that the spreading of topsoil was in Neri's scope of work under the Subcontract:

> Q.:  So I'm clear, what you always were responsible for under this contract was the spreading of topsoil.
>
> Putting aside what type [of] topsoil, whether it's screened and brought in from off-site or whether it's used on-site, <u>it was always part of your scope, the work to spread the topsoil in Block B</u>.
>
> A.:  <u>Yes</u>.

RJT/29497/3/761609v1
02/27/06-HRT/

. . .

> Q.:  But in your pricing, are you pricing up the cost of labor to spread [topsoil]?
>
> A.:  I don't believe we are.
>
> Q.:  All right, and you shouldn't do that, right, because <u>that was always part of your scope of work, to spread it</u>.
>
> A.:  <u>Yes</u>.

Vincent Neri Testimony on Cross-Examination, June 28, 2005, at 91:10-92:08 (emphasis added).

194.    **Exhibit 580** does not include any Elm Haven approval of the $19.85 per cubic yard unit price.  *See* **Exhibit 580**.  Moreover, Ivan Carlsen testified that Neri Construction alone developed the unit price.  *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 45:08-45:18.

195.    Furthermore, Neri never provided any proof as to the cost of these materials. The Valley Sand & Gravel documents included with the exhibit simply state the amount of material delivered to the site, and not the cost.  *See* **Exhibit 580**.

196.    Moreover, the unit price of $6.00 per square yard designated in the Subcontract for additional topsoil work includes the costs to screen, finish, and spread the topsoil.  *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 20, *citing* **Exhibit 3**, Project Specifications Vols. I and II, § 02200.  Neri was always obligated, as a part of its original Subcontract scope, to spread topsoil in the area in question.  Accordingly, the $6.00 per square foot unit price is inapplicable for this extra work claim.  Elm Haven, therefore, requested that Neri provide the actual invoices from Valley Sand & Gravel, but Neri never supplied this information.  *See* Vincent Neri Testimony on Cross-Examination, June 28, 2005, at 92:24-93:13.

197.    On direct examination, Ivan Carlsen testified that he signed this Confirmation of Change during "crunch time" in Block B to instruct Neri to perform the work, and was not

188

involved in any negotiation of a unit price, which was established unilaterally by Neri.

> Q.:  . . . [W]hat was the purpose of your signing this
> confirmation of change?
>
> A.: Crunch time, Block B.  Had to be done.
>
> Q.: Okay.
>
> What was your purpose?  <u>Were you instructing Neri to proceed
> with the work which is the subject of the confirmation of change</u>?
>
> A.: <u>Correct.</u>
>
> Q.:  . . . Did you have any role in negotiating that unit price?
>
> A.: No.
>
> Q.: <u>Who was it that established that unit price</u>?
>
> A.: <u>Neri Construction.</u>

Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 44:24-45:18 (emphasis added).

198.    Ivan Carlsen further testified that he signed the Confirmation of Change to direct Neri to perform the work, and to submit tickets from the topsoil supplier for later analysis, but not as a guarantee that a change order would be issued in the future.  *See* Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 152:04-152:23.

199.    Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit.  First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim.  *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23; 44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04.  Next, James Canning

RJT/29497/3/761609v1
02/27/06-HRT/

testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact. *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01. Finally, Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation. *See* **Exhibit 1**, Article 2.6 of the Subcontract. Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 580** to provide extra compensation for screened topsoil, when topsoil was included in Neri's scope of work under the Subcontract.

200.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Because Neri was obligated to provide and spread topsoil under the Subcontract, and because Neri never offered proof of its actual cost to provide the topsoil at issue, Neri has not met its burden. Therefore, this extra work claim must be denied.

- **Exhibit 581 - Neri Extra Work Claim No. NC-070-207**

201.    **Exhibit 581**, Neri Extra Work Claim No. NC-070-207, in the amount of $21,130.09, is invalid because the work is included in Neri's scope of work under the Subcontract.

202.    Neri was obligated to furnish and install all asphalt paving on the Project, including all sub-base materials as required by the Contract Documents. *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.Q.

203.    Neri was also obligated to perform general site building cut and fill, mass excavation and rough grading to new grades established by the Subcontract Drawings. *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G.

204.    The work associated with this extra work claim is for temporary pavement at Block B, including removal of chain link fences, excavation, grading, installation of base and preparations to pave -- all items included in Neri's scope of work. *See* **Exhibit 581**.

RJT/29497/3/761609v1
02/27/06-HRT/

205.    The Confirmation of Change included in this exhibit was signed by Dave Lucier, one of Elm Haven's Project Superintendents.  As Ivan Carlsen testified, Dave Lucier passed away at some point after the events associated with this exhibit occurred.  *See* Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 153:08-153:15.

206.    However, both Ivan Carlsen and James Canning testified that Project Superintendents were permitted to verify time and material, and never possessed the authority to unilaterally approve requests for change orders or additional compensation.

> Q.: [Y]ou understood that decisions concerning whether or not change orders should be issued to a subcontractor on this project were not decisions that you were authorized to make exclusively; isn't that correct?
>
> A.: No.
>
> Q.: Meaning correct, that was not your decision?
>
> A.: Yeah.  I did not -- I just follow what the instructions were.

Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 85:03-85:11 (emphasis added).

> Q.: . . . If a subcontractor comes to you in the field on this job --
>
> A.: Uh-huh.
>
> Q.: -- and says, "I want a change order issued because I feel I'm doing extra work," and requests a certain amount of money, you would not make that decision unilaterally on your own, correct?
>
> A.: No.
>
> Q.: You would take that request and have to discuss it and review it with your superiors?

191

A.: <u>Correct</u>.

Q.: Correct, and based on -- and they would make a decision whether or not that request is legitimate, and then give you instructions based on that discussion, correct?

A.: <u>Yes</u>.

Q.: Okay.

Now, sir, you talked about -- And you made that known, and that procedure we just talked about, for extra work claims, there are occasions on the job where you made that known to either Carl Neri or Vincent Neri, correct? . . . You made known that request for change orders, okay, for what they felt was additional work, <u>you made it known to them that you would have to review those kinds of issues with Lorraine Beckwith or Jim Canning or John Ford before any authorization can be given that a change order would, in fact, be issued</u>?

A.: Yeah.  It's <u>well known in the industry, yes</u>.

Ivan Carlsen Testimony on Cross-Examination, Sep. 22, 2005, at 85:24-87:04 (emphasis added).

Q.: What did you understand the $32.50 per cubic yard to represent?

A.: I didn't understand anything.

Q.: You didn't have any understanding of it at all?

A.: I -- <u>My instruction was not deal with dollars</u> [*sic*].

Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23 (emphasis added).

192

> Q.: Did you ever <u>instruct Mr. Carlsen to authorize the issuance of a change order</u> for this work that's described in this document **[Exhibit 576]**?
>
> A.: <u>No</u>. <u>Anytime there was a question, okay, he was given the authority to sign a slip to verify time of material</u>.

James Canning Direct Testimony, Sep. 22, 2005, at 218:14-218:19 (emphasis added).

207.    Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit.  First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim.  *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23; 44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04.  Next, James Canning testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact.  *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01.  Finally, Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation.  *See* **Exhibit 1**, Article 2.6 of the Subcontract.  Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 581** to provide extra compensation for paving and grading, when such work was included in Neri's scope of work under the Subcontract.

208.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue.  *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588.  Because Neri was obligated to furnish and install all paving on the Project, and to bring the site to grade in accordance with the Subcontract Drawings, and because there is no qualified Elm Haven signature anywhere in the exhibit, Neri has not met its burden of proving that the Subcontract was amended, and this extra work claim must be denied.

RJT/29497/3/761609v1
02/27/06-HRT/

- **Exhibit 582 - Neri Extra Work Claim No. NC-070-207-1**

209. **Exhibit 582**, Neri Extra Work Claim No. NC-070-207-1, in the amount of $2,489.01, is invalid because it includes work that is in Neri's scope of work under the Subcontract.

210. As with **Exhibit 581**, *supra*, paving and grading were included in Neri's scope of work under the Subcontract. *See* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraphs 6.Q and 6.G.

211. Notwithstanding Neri's contractual obligations to provide paving and grading on the Project, Neri's pricing for this extra work claim is mathematically flawed. The ticket indicates that Neri's foreman/superintendent and two operators worked from 11 o'clock in the morning until 2 o'clock in the afternoon, for a total of 2.5 hours each (assuming a half-hour lunch break). *See* **Exhibit 582**, Receiving Ticket dated Dec. 16, 1999. The ticket further indicates that two laborers worked five hours each -- but also lists their work as having occurred from 11 o'clock in the morning until 2 o'clock in the afternoon, presumably for a total of 2.5 hours each. *See id.* Two laborers working 2.5 hours each at a rate of $35.50 per hour totals $177.50, but the ticket indicates that the cost of this work was $355.00 -- or twice the actual cost, a likely overcharge of $177.50. *See id.*

212. Regardless, the ticket is not signed by any Elm Haven representative. *See* **Exhibit 582**.

213. Neri's assertions as to the effect of the signed Confirmation of Change are entirely without merit. First, as Ivan Carlsen testified, his signature on the Confirmations of Change was intended simply to confirm that Neri was directed to perform that particular item of work at issue, and that Neri should keep track of the labor time, equipment and material costs so that it could then be determined at a later point whether the work at issue constituted a valid extra work claim. *See* Ivan Carlsen Direct Testimony, Sep. 22, 2005, at 24:19-24:23; 44:24-45:06; 68:11-68:19; 74:09-76:22; 77:14-77:25; 85:03-87:04. Next, James Canning testified that he never authorized Ivan Carlsen to approve extra work, and that Ivan Carlsen's signature was solely intended to permit the parties to finish Block B on time, and determine whether the work qualified as "extra work" after the fact. *See* James Canning Direct Testimony, Sep. 22, 2005, at 194:03-194:23; 196:05-196:19; 218:20-219:01. Finally,

194

Confirmations of Change are not listed as potential Amendments under the contract, and no one from Elm Haven authorized their use as approvals of extra work or additional compensation. *See* **Exhibit 1**, Article 2.6 of the Subcontract. Therefore, it cannot be said -- as Neri asserts -- that Elm Haven agreed by "execution" of the Confirmation of Change in **Exhibit 582** to provide extra compensation for paving and grading, when such work was included in Neri's scope of work under the Subcontract.

214.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Because Neri was obligated to furnish and install all paving on the Project and to bring the site to grade in accordance with the Subcontract Drawings, and because there is no Elm Haven signature anywhere in the exhibit, Neri has not met its burden of proving the Subcontract was amended, and this extra work claim must be denied.

- **Exhibit 555 - Neri Extra Work Claim No. NC-022-207**

215.    **Exhibit 555**, Neri Extra Work Claim No. NC-022-207, in the amount of $4,914.54, is invalid because the unsuitable material that is the subject of this claim was located within the contract limit lines for the utility trench at issue. *See* Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 56:22-57:09.

216.    See **Responses 1 to 23** regarding the extra work claim in **Exhibit 594**, for a description of the relevant Subcontract provisions that are also applicable to **Exhibit 555**, and which require the rejection of this claim.

217.    Lorraine Beckwith expressly rejected this extra work claim on May 30, 2000. *See* **Exhibit 446**, Elm Haven letter to Neri, dated May 30, 2000; *see also* Vincent Neri Testimony on Cross-Examination, at 59:09-64:12.

- **Exhibit 556 - Neri Extra Work Claim No. NC-022-207-1-C**

218.    **Exhibit 556**, Neri Extra Work Claim No. NC-022-207-1-C, in the amount of $5,791.39, is invalid because the unsuitable material that is the subject of this claim was located within the contract limit lines for the utility trenches at issue. *See* Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 67.

195