suitable) or borrow materials.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G (emphasis added).

327.   On July 17, 2000, Neri claimed that revisions to the grading in Block G required an additional 347.5 cubic yards of fill material. *See* **Exhibit 610**; *see also* Vincent Neri Direct Testimony, June 15, 2005, at 82:10-83:18.

328.   John Ford responded to Neri's claim two weeks later, and stated that the changes in the contours were minor in nature, and were forwarded to Neri prior to their performance of any grading work in the block:

> [Elm Haven] has reviewed your firm's [July 17] request, and do not agree with your position that an additional 347.5 CY of fill was added by Drawing L-16, Rev 1 dated 1/10/00. In fact, the subject revision <u>only adjusts the contours at the east side of the Block G Parking Area</u> to redirect the runoff away from the duplex units along New Street 4. This revisions was <u>forwarded to Neri prior to any previous grading work</u>.

**Exhibit 459**, Elm Haven letter to Neri, dated Aug. 3, 2000 (emphasis added).

329.   John Ford further testified that the revisions did not create any extra work for Neri:

> Q.: So what I hear you saying, sir, is that there may be these revisions, but it doesn't require any -- <u>should not require any additional fills</u>?
>
> A.: <u>Right</u>.

John Ford Direct Testimony, Oct. 4, 2005, 124:10-124:13 (emphasis added).

330.   Neri never responded to John Ford's July 17, 2000, letter, nor did it otherwise offer any explanation to dispute the finding that the contour revisions did not require any additional fill. *See* John Ford Direct Testimony, Oct. 4, 2005, at 124:16-124:25; *see also*

221

**Exhibit 459**, Elm Haven letter to Neri, dated Aug. 3, 2000 (emphasis added).

331.     The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Neri has not offered any credible evidence that revisions to the contours in Block G did, in fact, result in the need for additional fill material, and has not met its burden. Because grading of the blocks is included in Neri's scope of work under the Subcontract, and the contour revisions in **Exhibit 610** did not create any additional work for Neri, this extra work claim must be denied.

- **Exhibit 611 - Neri Extra Work Claim No. NC-204-87**

332.     **Exhibit 611**, Neri Extra Work Claim No. NC-204-87, in the amount of $2,445.00, is invalid because the work relating to this exhibit is included in Neri's scope of work under the Subcontract.

333.     Neri was obligated to perform general site and building cuts and fills, mass excavations and rough grading to the new grades specified in the Contract Drawings, and to supplement the onsite materials with borrow materials, as necessary.

> Perform general site and building cut and fill, mass excavation and rough grading to new grades established by Contract Drawings. <u>Site fill with onsite materials</u> (if deemed suitable) <u>or borrow materials</u>. <u>Building fill with onsite materials</u> (if deemed suitable) <u>or borrow materials</u>.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G (emphasis added).

334.     As used in the Subcontract and Contract Documents, "borrow" is defined as "soil material obtained off-site <u>when sufficient approved soil material is not available from excavations</u>." **Exhibit 3**, Project Specifications Vols. I and II, § 02200 ¶ 1.4.C (emphasis added).

335.     Drawing G-5, which describes the Block F grading plan, was revised on April 27, 2000. *See* **Exhibit 5**, Drawing G-5.

336. **Exhibit 611** consists of a letter from Neri's Mark Rossetti to John Ford, claiming that the revision to Drawing G-5 required an additional 163 cubic yards of fill in Block F. *See* **Exhibit 611**, Neri letter to Elm Haven, dated July 28, 2000. The exhibit does not include any indication that Elm Haven ever approved of the letter, or that the work described therein was actually performed. *See id.*

337. Elm Haven submitted a Request for Information to Fletcher-Thompson, the Architect, concerning the revisions to Drawing G-5.

> Please confirm EHC determination that the grading revisions to G-5 were required mostly due to the conflict in grades with stoop grades. See Neri letter attached dated 7/28/00. EHC has denied the subject request stating that there have been little to no additional fill required to complete these grade revisions.

**Exhibit 460**, Request for Information dated Aug. 1, 2000.

338. Fletcher-Thompson's response to this Request for Information confirmed Elm Haven's assessment of the revisions to Drawing G-5:

> [T]he G5 revisions were not to result in any additional fill.

**Exhibit 460**, Response to Request for Information dated Aug. 25, 2000.

339. The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Neri has not offered any credible evidence that revisions to the contours in Block F did, in fact, result in the need for additional fill materials. Neri has not met its burden. Because revisions to Drawing G-5 did not result in any additional fill, Neri's extra work claim must be denied.

- **Exhibit 613 - Neri Extra Work Claim No. NC-204-131**

340. **Exhibit 613**, Neri Extra Work Claim No. NC-204-131, in the amount of $19,155.50, is invalid because the work at issue is part of Neri's original scope of work under the Subcontract.

341. The original design for the project in Block G called for one building along Foote Street that contained six townhouse units. This building is referred to as Townhouse 1. The original design also called for a second building along Dixwell Avenue that was to contain 10 townhouse units. The original plan, therefore, included a total of sixteen townhouse units.

342. Neri acknowledges that Paragraph 6.G of Attachment "A" to the Subcontract and the Geotechnical Report pertain at least to building foundation excavations, such that Neri was obligated to excavate, remove and replace all unsuitable materials that may be encountered to a depth of four feet below the bottom of the footing elevations for the originally designed Townhouse 1 and Townhouse 2. *See, e.g.,* Vincent Neri Testimony on Cross-Examination, June 24, 2005, at 22:17-23:05.

343. The Block G revisions that were the subject of Change Order 204-13 (**Exhibit 246**) involved the construction of two buildings along Dixwell Avenue instead of one building, under the original design. The two buildings along Dixwell Avenue under the revised plan would each contain six townhouse units. The two buildings along Dixwell Avenue under the revised plan were referred to as Townhouse 2 and Townhouse 3. John Ford Direct Testimony, Oct. 4, 2005, at 101-103. A summary of Townhouse revisions for Block G is as follows:

Original Plan

| | |
|---|---|
| Townhouse 1 (Foote Street) | 6 units |
| Townhouse 2 (Dixwell Avenue) | 10 units |
| Total | 16 units |

Revised Plan

| | |
|---|---|
| Townhouse 1 (Foote Street) | 6 units |
| Townhouse 2 (Dixwell Avenue) | 6 units |
| Townhouse 3 (Dixwell Avenue) | 6 units |
| Total | 18 units |

344. The Subcontract always contemplated the excavation of unsuitable materials to depths of four feet beneath building footings and one-and-one-half feet beneath building slabs in Block G. As the Block G townhouse unit drawings expressly state:

> Note:
>
> At Blocks A1, A2, B, C, and Block G, except the Seniors' Building, <u>remove 4'-0" of unsuitable material below bottom of footing elevations</u> and 1'-6" below slab subgrade elevations. Then <u>proofroll</u> under the supervision of a Geotechnical Engineer and <u>replace with compacted structural fill to bottom of footing elevations</u> or to the slab subgrade elevations. In the remaining areas, at footing locations, remove 1'-6" of unsuitable material from bottom of footing elevations and replace with compacted fill as stated above.

**Exhibit 5**, Drawing A119 (emphasis added); *see also* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.G ("all unsuitable material within cut material and as noted in Geotechnical Report to be removed from site and legally disposed of").

345. As a result of the Block G revisions, Neri, therefore, had to perform additional building footing excavation and backfill work for two additional units.

346. As expressly provided for in Elm Haven's Change Order 204-13 (**Exhibit 246**) to Neri in the amount of $188,766 for the Block G revisions noted in the referenced drawings and sketches, Neri was to, among other things, excavate and dispose off-site all unsuitable material up to 250 cubic yards. This change order does not pertain to items of work in Block G that remained unchanged.

347. The reference in Change Order No. 204-13 (**Exhibit 246**) that the scope of the change order work includes "[a]ll unsuitable material excavation and disposal offsite (up to 250 CY)" pertains to the <u>added</u> excavation for the additional two units, and not Neri's unchanged building foundation excavation obligations. *See* John Ford Direct Testimony, Oct. 4, 2005, at 98-104.

348. Neri is not entitled to additional compensation for the claim set forth at Exhibit 613 because it relates to Townhouse 1 along Foote Street, <u>which never changed</u>. *See* John Ford Direct Testimony, Oct. 4, 2005, at 105-111. In addition, there was no excavation

beyond the contract limit lines, which as applied to these foundations, is four feet below the footing.

349. It is not reasonable to construe Change Order No. 204-13 (**Exhibit 246**) as applying to work that was <u>not</u> changed by the Block G revisions.

350. There is no evidence that either the project engineer, LEA, or the project geotechnical engineer, Heynen Teale, made a determination as to either the existence or quantity of unsuitable material at the areas in question.

351. The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Neri has not met its burden. Because the work described in this claim is a part of Block G that never changed, and because Neri has provided no credible evidence that the change order should be applied to portions of Block G which did not change, Neri's extra work claim must be denied.

- **Exhibit 614 - Neri Extra Work Claim No. NC-204-134**

352. **Exhibit 614**, Neri Extra Work Claim No. NC-204-134, in the amount of $2,445.00, is invalid because the work associated with the exhibit included in Neri's scope of work under the Subcontract.

353. Under the Subcontract, Neri was obligated to clean and remove all debris and material caused by its work on the Project:

> This subcontractor is responsible for <u>clean up and removal of all debris and material</u> caused by this operation from the site and the legal disposal thereof.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.GG (emphasis added).

354. Vincent Neri testified that Neri deposited materials on City of New Haven-owned property near the intersection of Locke Street and Canal Street. *See* Vincent Neri Direct Testimony, June 15, 2005, at 92:20-92:24.

355. Elm Haven was directed by the City of New Haven to remove these materials from this location; therefore, Elm Haven directed Neri to remove these materials, but Neri initially failed to do so. *See* **Exhibit 461**, Elm Haven letter to Neri, dated Nov. 6, 2000.

356. In a letter to Elm Haven, which was carbon-copied to Neri, New Haven Chief of Construction Jacques Kressmann directed Elm Haven to remove the material from the location as quickly as possible:

> The stockpiled material must be removed as quickly as possible. You have the City's permission to enter the Canal Street Right of Way between Webster Street and Locke Street in order to perform this removal, using your own or your sub-contractor's forces. The cleared site must be made available to the City by the morning of Monday, the 27th of November 2000.

**Exhibit 462**, City of New Haven letter to Elm Haven, dated Nov. 16, 2000.

357. John Ford, therefore, issued a further direction to Neri that the subject site restored on or before November 27, 2000:

> Pursuant to discussions regarding the [stockpile area], it has been observed that Neri has now begun removing the subject material from the City's property as of 11/16/00. However, based on the current progress of this operation, it does not appear that all of your firm's material will be removed from the City's property within the time frame given by the city in their . . . letter dated 11/16/00, which was copied to Neri.
>
> [Elm Haven] requests that Neri discuss this situation further with the city, in an effort to come to some mutually agreeable time frame.

**Exhibit 463**, Elm Haven letter to Neri, dated Nov. 17, 2000.

358. Vincent Neri claimed that Neri was entitled to a staging area to stockpile excess materials from the Project, but could not identify any provision in the Subcontract which

required Elm Haven to provide such an area on the Project site, except for stripped topsoil. *See* Vincent Neri Testimony on Cross-Examination, June 28, 2005, at 147:16-150:20; *see also* **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.F. Rather, Paragraph 6.GG of Attachment "A" is clear that Neri is obligated for the "removal of all debris and material caused by this operation from the site and the legal disposal thereof." **Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.GG.

359.    Vincent Neri testified that the materials at this location which were the subject of this issue did not include topsoil. *See* Vincent Neri Testimony on Cross-Examination, June 28, 2005, at 150:17-150:23.

360.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Neri deposited these materials on City property, but this did not constitute a legal disposal. Therefore, Neri was required to remove them from the Project site, under the Subcontract. Neri has not met its burden, and this extra work claim must be denied.

- **Exhibit 615 - Neri Extra Work Claim No. NC-204-135**

361.    **Exhibit 615**, Neri Extra Work Claim No. NC-204-135, in the amount of $25,025.00, is invalid because it relates to the excavation and backfilling for Townhouse 2 footings along Dixwell Avenue, which was part of the original scope of work under the Subcontract, and no excavation was performed outside the Contract limit lines. *See* John Ford Direct Testimony, Oct. 4, 2005, at 111-112.

362.    See **Responses 340 to 351** regarding the extra work claim in **Exhibit 613**, for a discussion of the actual scope and intent of Change Order No. 204-13.

363.    Neri offered no evidence on the record that the Project Engineer, LEA, made a determination as to either the existence or quantity of unsuitable material at the areas in question.

364.    The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Because Neri has offered no

credible evidence that the materials it claims to be unsuitable were actually unsuitable or were removed from beyond the limit lines expressly stated in the Subcontract, Neri has not met its burden. Therefore, this extra work claim must be denied.

- **Exhibit 616 - Neri Extra Work Claim No. NC-204-139**

365.   **Exhibit 616**, Neri Extra Work Claim No. NC-204-139, in the amount of $26,145.00, is invalid because it relates to the excavation of the footing for the six units that comprise Townhouse 3. Excavation and backfilling for four of the six units was part of the Neri's original scope of work and not covered by Change Order 204-13. With respect to the excavation for the additional two units, no evidence was presented that Neri exceeded the 250 cubic yard unsuitable soil limitation set forth in the Change Order 204-13. *See* John Ford Direct Testimony, Oct. 4, 2005, at 112-113.

366.   Neri offered no evidence on the record that the project engineer, LEA, made a determination as to either the existence or quantity of unsuitable material at the areas in question. *See* **Exhibit 616**.

367.   See **Responses 340 to 351** regarding the extra work claim in **Exhibit 613**, for a discussion of the actual scope and intent of Change Order No. 204-13.

368.   The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Because Neri has offered no credible evidence that the materials it claims to be unsuitable were actually unsuitable or were removed from beyond the limit lines expressly stated in the Subcontract, Neri has not met its burden. Therefore, this extra work claim must be denied.

- **Exhibit 603 - Neri Extra Work Claim No. NC-028-204-1-G**

369.   **Exhibit 603**, Neri Extra Work Claim No. NC-028-204-1-G, in the amount of $93,577.79, is invalid because it contains inflated, excessive and unsupported pricing for the work at issue. The actual reasonable value of this work is $44,598.78. *See* **Plaintiff's Claims Grid**.

370.   The exhibit includes a memorandum from Lorraine Beckwith to Carl Neri,

authorizing Neri to install an underground electrical conduit in Block G on a time and material basis, expressly subject to further review by Elm Haven:

> You are authorized to proceed with the installation of the underground electrical ductbank to service the Senior Building per the latest sketches prepared by Elm Haven Construction on a Time and Material basis <u>with the following stipulation</u>:
>
> <u>We reserve the right to review the entire scope of work as it relates to your contractual obligations and adjust accordingly</u>.

**Exhibit 603**, Elm Haven letter to Neri, dated Jan. 11, 2000.

    371.    John Ford testified that the EL-series drawings -- depicting electrical, cable television, and telephone wiring -- for Block G were revised in late 1999. *See* John Ford Direct Testimony, Oct. 4, 2005, at 28:05-28:08; *see also* **Exhibit 5**, EL Drawings.

    372.    John Ford also testified that because of the timing of the revisions to the EL-series drawings, Elm Haven and Neri did not have time to negotiate a lump-sum price to complete the revisions to the Block G conduit; therefore, Elm Haven directed Neri to perform this work on a time and materials basis.

> We directed that work to be done on a time and material basis because, at that time, there wasn't -- for one reason or another, Elm Haven Construction felt it wasn't -- we didn't have time to negotiate a number at that point. It was winter.

John Ford Direct Testimony, Oct. 4, 2005, at 30:07-30:11; *see also* **Exhibit 603**, Elm Haven letter to Neri, dated Jan. 11, 2000.

    373.    John Ford further testified that the original EL-series drawings always contained conduit work in Block G, and that the late-1999 revisions merely relocated conduits in the block.

> There was always underground conduit on this project in Block G. It was always there. [Four-inch] conduit was always there.

> There were transformer pads always there. This change that
> happened to the drawings simply reorganized where these
> conduits went, so . . . it was the same material. It's the same
> process, same procedure. It's just laid out differently.

John Ford Direct Testimony, Oct. 4, 2005, at 33:10-33:19.

374.  On January 9, 2001, John Ford performed a detailed analysis of the scope of work contained in Neri's time and material tickets submitted for this work, and analyzed Neri's claim for compensation for extra work associated with the revised Block G conduit. *See* **Exhibit 478**, Block G Underground Conduit Analysis; *see also* **Exhibit 479**, Backup for Block G Underground Conduit Analysis; **Exhibit 480**, Elm Haven Review of Neri Time and Material Tickets.

375.  This analysis confirmed that the Block G revisions increased the length of the four-inch PVC conduit from 1,743 linear feet to 2,865 linear feet -- an increase of approximately forty percent -- and added one plastic transformer box. *See* John Ford Direct Testimony, Oct. 4, 2005, at 43:03-54:05; **Exhibit 479**, Backup for Block G Underground Conduit Analysis. Elm Haven also estimated that Neri's original scope of work on the Block G conduit constituted $19,417 of the original Subcontract price, based on information from Neri's own schedule of values. *See* John Ford Direct Testimony, Oct. 4, 2005, at 41:22-43:09.

376.  John Ford also reviewed the amount of labor and equipment expenses claimed by Neri. *See* John Ford Direct Testimony, Oct. 4, 2005, at 54:06-89:08; **Exhibit 480**, Elm Haven Review of Neri Time and Material Tickets.

377.  John Ford's review of labor and equipment eliminated Neri's claimed expenses which were not supported by evidence. For example, when Neri's tickets would represent more pieces of equipment than operators, John Ford testified that he would adjust Neri's claims to match the amount of equipment with the number of operators. *See, e.g.,* John Ford Direct Testimony, Oct. 4, 2005, at 55:02-55:20; 63:02-63:21; 73:18-74:04. Additionally, when Neri would request payment for laborers at rates above the prevailing wages on the Project, John Ford testified that he would also adjust Neri's claims accordingly. *See, e.g.,* John Ford Direct Testimony, Oct. 4, 2005, at 78:05-79:12.

378. Based upon this analysis, John Ford determined that $44,598.78 (or nearly two hundred thirty percent more than the original cost in the Subcontract) was the fair and reasonable value of this work, and Elm Haven informed Neri that a change order in this amount was agreeable. *See* **Exhibit 478**, Block G Underground Conduit Analysis; *see also* **Exhibit 479**, Backup for Block G Underground Conduit Analysis.

379. Neri has failed to offer credible evidence to support a claim for $93,577.79. Neri's extra work claim for $93,577.79 is excessive and unsupported. Elm Haven's claim for relief incorporates the accurate value for this work of $44,598.78 into its analysis. *See* **Plaintiff's Claims Grid**.

380. Finally, Neri has offered no evidence to support its assertion that "[i]n January 2001, Elm Haven had a pending Change Order with the Owner in the amount of $125,000.00" for the time and materials work related to the Block G underground conduit. *See* John Ford Testimony on Cross-Examination, Oct. 5, 2005, at 86:17-88:18.

- **Exhibit 612 - Neri Extra Work Claim No. NC-204-130**

381. **Exhibit 612**, Neri Extra Work Claim No. NC-204-130, in the amount of $23,231.90, is invalid because the work included in the extra work claim was included in Neri's scope of work under the Subcontract, and was never authorized by Elm Haven.

382. The exhibit includes eleven receiving tickets purportedly representing work performed between October 25, 2000 and November 17, 2000, as well as various memoranda and Sketches SK-G-4 and SK-G-5. *See* **Exhibit 612**.

383. The exhibit does not contain any indication that this work was authorized as extra work by any Elm Haven representative, or that the extra work claim was timely forwarded to Elm Haven. *See* **Exhibit 612**.

384. On or about June 27, 2000, the design sketch of the front layout to the Senior Building in Block G was revised by Blades & Goven. *See* **Exhibit 612**, Drawings SK-G-4 and SK-G-5. These sketches were transmitted to Neri on September 26, 2005. *See* **Exhibit 612**, Elm Haven letter to Neri, dated Oct. 25, 2000.

385. The revised sketches, however, simply moved the driveway catch basin laterally

to the low point, to maximize the collection of water in the driveway, and are not materially different from the original driveway included in Neri's scope of work under the Subcontract. *Compare* **Exhibit 612**, Drawings SK-G-4 and SK-G-5 *and* **Exhibit 5**, Drawing L-6; *see also* **Exhibit 5**, Drawing SS-10.

386. Changes to the driveway were required due to the reduction in the Webster Street road width. However, on August 22, 2000, Elm Haven issued change orders to Neri totaling $97,753.00, to accomplish these changes. Change Order No. 204-37 stated, *inter alia*, that "[t]he four driveway entrance aprons [which] are to be increased 2 feet to meet the revised gutter line." **Exhibit 272**, Change Order No. 204-37, dated Aug. 22, 2000. Change Order No. 204-38 covered the additional costs associated with the revisions to the underlying base material beneath Webster Street outside the Senior Building entrance. *See* **Exhibit 274**, Change Order No. 204-38, dated Aug. 22, 2000.

387. On September 11, 2000, Elm Haven issued Change Order No. 204-40 to address revisions to handicap ramps at the intersections of Dixwell Avenue and Webster Street, and of New Street 4 and Webster Street, on either side of the Senior Building entrance. *See* **Exhibit 275**, Change Order No. 204-40, dated Sep. 11, 2000.

388. Aside from the changes to the driveway entrance aprons addressed in Change Order No. 204-37, the quantity of sidewalks and ramps in the Block G entrance area included in Neri's scope of work did not change. *Compare* **Exhibit 612**, Drawings SK-G-4 and SK-G-5 *and* **Exhibit 5**, Drawing L-6; *see also* **Exhibit 5**, Drawing SS-10.

389. According to sketches included with **Exhibit 612**, the work involved with this exhibit included, *inter alia*, the placement of formwork for sidewalks and the relocation of a catch basin, before it was actually installed on the site. However, formwork was included in Neri's scope of work under the Subcontract.

> <u>Furnish and install all concrete curb, granite curb, concrete sidewalks</u> (both city and residential) and <u>all handicap ramp depressions where indicated on plans</u>. Work shall include but not limited to establishment of line and grade (baseline and benchmark by other) excavation and backfill for curbs and sidewalks, subbase material and installation, <u>forming,</u>

> rebar/WWM including installation, expansion joint material, concrete and placement of, finishing as required, curing/sealing, stripping of forms, etc. Remove and salvage granite curb as shown, if alternate is selected.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.P (emphasis added).

390. Vincent Neri testified that "it was just impossible to put a number on something where you're going to engineer it out in the field." Vincent Neri Direct Testimony, June 15, 2005, at 119:14-119:16. However, under the Subcontract, Neri was strictly obligated to perform all engineering required to complete its work under the Subcontract.

> This subcontractor shall do layout, <u>engineering</u> and elevation control required to complete all site development work described herein.

**Exhibit 1**, Attachment "A" to the Subcontract, Paragraph 6.A (emphasis added).

391. At this time on the Project, Elm Haven contracted with Waters Construction Company, Inc. ("Waters"), to complete the fine grading and paving portions of Neri's scope of work. *See* **Exhibit 80**, Waters Construction Subcontract, dated Oct. 11, 2000; *see also* John Ford Direct Testimony, June 6, 2005, at 173:04-179:16.

**Exhibit 1**, Article 3.3 of the Subcontract (emphasis added).

392. The party alleging that there has been a modification to a contract bears the burden of proof as to that issue. *See, e.g., Lar-Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 402 (1976), *citing* 17A C.J.S. *Contracts* § 588. Neri has not met its burden. Neri has not offered any credible evidence to support a claim of $23,231.90 for this work. The revisions to the Senior Building entrance were trivial and did not alter Neri's scope of work in any material way, with the exception of those items addressed in change orders issued by Elm Haven to Neri. For these reasons, this extra work claim must be denied.

## IV. SUMMARY OF ELM HAVEN'S CLAIM FOR RELIEF

1. In summary, the calculation of Elm Haven's claim for monetary damages in the amount of **$268,360.00**, exclusive of interest and costs, is as follows:

| | |
|---|---:|
| Original Contract Amount, Project Nos. 204 and 207 | 3,642,500 |
| Change Order Nos. 204-1 through 204-54 | 499,527 |
| Change Order No. 204-55 | (409,154) |
| Change Order Nos. 207-1 through 207-39 | 286,035 |
| Contract Adjustment for Block B Acceleration Bonus | 10,000 |
| Contract Adjustment for Tilcon Construction Premium | 22,276 |
| Contract Adjustment for Block G Conduit Work | 44,599 |
| Deleted Work - Block D - Credit | (254,417) |
| Deleted Work - Canal Street - Sidewalk (east side) | (14,885) |
| Deleted Work - Gregory Street - Site Demolition | (559) |
| Deleted Work - Scattered Site | (7,570) |
| Deleted Work - Change Order No. 204-12 (portion) | (990) |
| Neri Extra Work Claim No. NC-023-207-1 (partial) | 3,611 |
| Neri Extra Work Claim No. NC-015-204 (partial) | 640 |
| Neri Extra Work Claim No. NC-015-204-G (partial) | 337 |
| **Final Contract Amount** | **3,821,950** |
| Total Payments to Neri | (2,822,034) |
| **Unpaid Contract Balance** | **999,916** |
| **Costs to Complete Neri's Scope of Work** | |
| General Requirements | 52,800 |
| Sweeney Excavation (Contract and Change Orders) | 1,125,433 |
| Other Subcontractors and Vendors | 24,149 |
| Nicholas Murano Claim Reimbursement | 5,500 |
| 5% Overhead Mark-up per Article 9.2.1 | 60,394 |
| **Total Cost-to-Complete** | **1,268,276** |
| Unpaid Contract Balance | 999,916 |
| Total Cost-to-Complete | (1,268,276) |
| **ELM HAVEN'S CLAIM FOR RELIEF** | **$268,360** |

*See* **Plaintiff's Claims Grid** (enclosed).

      2.     Under Connecticut law, Elm Haven claims prejudgment interest in the amount of ten percent per annum. *See* **Proposed Conclusions of Law 30-37**. Ten percent of Elm Haven's revised claim for relief totals $26,836.00 in simple interest per year, or $73.52 per day.

      3.     Although Neri breached the clear terms of the Subcontract on multiple occasions, its costs were incurred on or before January 1, 2002, and Elm Haven claims prejudgment interest running from that date. For the 1,518-day span from January 1, 2002, through February 27, 2006, Elm Haven claims an additional **$111,603.40** in prejudgment interest, and an additional $73.52 per day thereafter.

      4.     Therefore, Elm Haven seeks a total of **$379,963.36**, including its revised claim for relief and interest accumulated through February 27, 2006, plus an additional $73.52 per day thereafter.

236

PLAINTIFF
ELM HAVEN CONSTRUCTION, L.P.

_____
Thomas G. Librizzi
Richard Twilley
Pepe & Hazard LLP
Goodwin Square
225 Asylum Street
Hartford, CT 06103-4302
(860) 522-5175
Fed. Bar Nos. CT04647 & CT26736

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ELM HAVEN CONSTRUCTION, L.P., <br> Plaintiff, | : <br> : <br> : | CIVIL NO. 3:01-CV-01307 (WIG) |
| v. | : <br> : | |
| NERI CONSTRUCTION, LLC, <br> Defendant. | : <br> : <br> : | FEBRUARY 27, 2006 |

## CERTIFICATION

I hereby certify that a copy of the above was mailed or electronically delivered on February 27, 2006, to all counsel and *pro se* parties of record, as follows:

**Counsel for Neri Construction, LLC:**

John J. O'Brien, Jr., Esq.
Law Offices of Peck & O'Brien, P.C.
433 Silas Deane Highway
Wethersfield, CT 06109-2115

_____
Thomas G. Librizzi

238

RJT/29497/3/761609v1
02/27/06-HRT/