UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------X

ELM HAVEN CONSTRUCTION LIMITED     :
PARTNERSHIP,

    :

    Plaintiff & Counterclaimed-Defendant,

    :

    vs.                   No. 3:01CV1307(WIG)

    :

NERI CONSTRUCTION, LLC,

    :

    Defendant, Counterclaimant &
    Third-Party Plaintiff,         :

    vs.               :

AMERICAN CASUALTY COMPANY OF     :
READING, PA.,

    :

    Third-Party Defendant.
---------------------------------------------------------------X

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This litigation arises out of a subcontract for site work on a public housing project in New Haven, Connecticut.   Plaintiff, Elm Haven Construction Limited Partnership ("Elm Haven"), which was the general contractor on the project, seeks damages in the amount of $268,360.00, exclusive of interest and costs, from subcontractor Defendant, Neri Construction, LLC ("Neri"), for its alleged breach of the site work subcontract based upon, <u>inter alia</u>, Defendant's failure to complete the work, defective workmanship, failure to perform the work in compliance with the plans and specifications, failure to adhere to the project's construction schedule, and abandonment of the project.  (Pl.'s Compl. ¶ 13).  Defendant Neri has counter-claimed against Elm Haven for, <u>inter alia</u>, non-payment, and filed a third-party complaint against its payment

bond surety, American Casualty Company of Reading, PA., ("American Casualty"), for damages of $1,493,149.00 for extra work for which it has not been compensated, as well as for the unpaid balance allegedly due on the subcontract. Both Elm Haven and Neri seek prejudgment interest at the rate of ten percent (10%) per annum.

This case was tried to the Court for eighteen days over the course of five months, following which the parties submitted proposed findings of fact and conclusions of law. After careful review of the parties' submissions and after consideration of all of the evidence presented at trial, the Court hereby renders the following Findings of Fact and Conclusions of Law.

## I.    FINDINGS OF FACT

### A.    Background

1.    Elm Haven Construction Limited Partnership, a Beacon/Corcoran Jennison Company, is a Delaware limited partnership with its principal place of business in Boston, Massachusetts, and was the General Contractor for the construction of a public housing project known as Elm Haven Hope VI Urban Revitalization Housing ("the Project"). (Ex. 8). The Project involved the demolition of an old two-story, brick housing project in New Haven, Connecticut, (Ex. 224A), the construction of new buildings, the refurbishment of several streets, and the construction of four new streets. An overview of the Project is attached hereto as Addendum "A." (Ex. 6).

2.    Elm Haven Rental Limited Partnership I and II was the owner of the Project ("Owner"), and had a development contract with the City of New Haven to develop the parcel of land on which the Project was located. The Project was funded by both the City of New Haven Housing Authority and the United States Department of Housing and Urban

Development ("HUD").

3.    On or about January 26, 1999, Elm Haven and the Owner entered into a guaranteed

maximum price contract for the construction of the Project.

4.    Neri, a limited liability company with its principal place of business in Clinton,

Connecticut, is a work site subcontractor with over forty (40) years of experience in the

business of performing site work and, as more fully described below, was responsible for

the roadwork and site work for the Project.

5.    On or about March 5, 1999, Elm Haven entered into a subcontract ("the Subcontract")

with Neri, pursuant to which Neri agreed to provide materials, tools, equipment, and

labor necessary to complete the site work on Phase I of the Project, for the lump sum of

$3,642,500.00 ("the Subcontract Price"), as more particularly set forth in the Subcontract

documents.

6.    In addition to its Subcontract work on the Project, Neri had a contract with the City of

New Haven known as the Combined Sewer Overflow Separation Contract ("the CSO

Contract"), for the installation of new water lines, sewer lines, and storm drains in the

vicinity of the Project ("CSO Work").  The CSO Contract included installation of new

storm drains on Ashmun, Canal, Foote, and Webster Streets.  This work was taking place

simultaneously with Neri's work under the Subcontract with Elm Haven.  Neri's work as

the CSO contractor was terminated by the end of 2000. (Ford Testimony 6/6/05 at 59-60).

7.    James Canning was Elm Haven's Vice President and Project Executive through August

2000.  He was succeeded by Jonathan Woods as Project Executive.

8.    Lorraine Beckwith was the original Project Manager for Elm Haven on this Project until

the spring of 2000.  She was replaced by John Ford as Project Manager.  The Project

Manager was responsible for ensuring that the Project was built to the plans and

specifications.   Ivan Carlsen was Elm Haven's Project Superintendent from 1998 until

August 2000, after which Thomas Jensen took over as Project Superintendent until the

end of Neri's involvement with the Project.  The Project Superintendent's duties included

verifying the performance of additional work on the Project and reviewing and verifying

time and material tickets.  (Carlsen Testimony 9/22/05 at 6-10).

9.      Neri's chief estimator and original Project Manager on the Project was Stephen

Simoncini.  Vincent Neri was also a Project Manager on the Project, as was Mark

Rossetti.  Commencing in April of 2001, Douglas King was Neri's representative who

communicated with John Ford concerning scheduling and performance of the remaining

work on the Project.  (Ex. 145).  Carl Neri was the General Manager of the Project for

Neri.  His involvement primarily concerned the financial end of the Project.  (C. Neri

Testimony 9/13/05 at 3-4).      Kimberly Neri handled all aspects of the administrative and

accounting work on this Project for Neri, including payrolls, payment requisitions, and

the pricing and preparation of Neri's change orders.  (K. Neri Testimony 9/13/05 at 168-

69).

10.     Kimberly Neri was also the owner and managing member of Hammonasset Construction

Company ("Hammonasset"), which performed all of the paving and granite curbing on

the Project for Neri.  (K. Neri Testimony 9/13/05 at 169).

11.     Loureiro Engineering Associates, Inc., ("LEA") is a Connecticut engineering and

environmental services company.  At all times relevant to this action, LEA had contracted

4

with the Owner to provide inspection services for the Owner and the City of New Haven with respect to the construction of public utilities, roadways, and right-of-ways on the Project, which extended from sidewalk to sidewalk on each side of the street. (Ex. 11).

12.  Fletcher Thompson, Inc., ("Fletcher Thompson") is a Connecticut corporation with its principal place of business in Shelton, Connecticut, and was at all times relevant hereto engaged in the business of architecture, engineering, and interior design.  Pursuant to an architectural services contract with the Owner, Fletcher Thompson was the architect of record on the Project.  (Ex. 9).

13.  Blades & Govern was at all times relevant hereto the landscape architect on the Project.

**B.    The Subcontract**

14.  The Subcontract (Ex. 1), signed by Vincent Neri on behalf of Neri, and Lorraine Beckwith on behalf of Elm Haven, provided that it was to be governed by the laws of the State of Connecticut.  (Subcontract, Art. 11.7).

15.  The Subcontract provided in relevant part:

> 1.1    The Contractor has entered into a contract (the "General Contract") with the Owner to perform the Work for the above Project in accordance with the Specifications and Drawings prepared by the Architect.  The Subcontractor hereby agrees to furnish all labor, materials, equipment, facilities, supervision and/or administration required, and perform all services and work necessary, to complete the following portion of the Work and any work reasonably inferable therefrom (the "Subcontract Work"):

> **SITEWORK, UTILITIES, SITE CONCRETE, PAVING**

> The subcontract Work shall be performed in accordance with the following documents (the "Contract Documents"), which are incorporated herein and made a part hereof:

> Attachment "A" - Rider Page 1 - 10

5

> Attachment "B" - Contract Documents; Phase 1B pages 1- 8;
> Phase 1C pages 1-7; Senior Building pages 1- 3
> Attachment "C" - Schedule of Insurance Requirements
> Attachment "D" - Safety Requirements for Subcontractors
> Attachment "E" - Contract Provisions Required by Federal Law or The
> Amended and Restated Subgrant Agreement by and
> Between the Housing Authority of the City of New
> Haven and Elm Haven Homes Partnership
> Attachment "F" - Wage Rates; U.S. Department of Housing & Urban
> Development, General Decision Number CT970002,
> Modification Number 0, Dated 2/24/97.

> In the event of a conflict between this Agreement and the Contract
> Documents, this Agreement shall govern.

16.   Attachment "A" was a rider that described various items of work that were either within

the scope of work or outside the scope of work.   Attachment "B" was a list of the Project

specifications, drawings, and other documents that were part of the Subcontract.

17.   The Subcontract, Art. 2.1, provided that the Subcontractor's date of commencement shall

be the date of the Subcontract Agreement. The Subcontractor's Work "shall be

substantially complete not later than dates shown on the Construction Schedule."  (Id.).

The Subcontract further provided that time was of the essence.

18.   The Subcontract, Art. 2.2, further provided that the Subcontractor agreed to perform the

Work "in strict accordance with the Contract Documents.  All work covered by this

Agreement shall be performed in a skillful and workmanlike manner according to good

construction industry or trade practice."

19.   In Article 2.4, the Subcontractor agreed that its performance of the Subcontract Work

would be in accordance with

> all applicable governmental laws, regulations and requirements,
> including but not limited to, building, fire, safety and similar laws,

6

codes and ordinances, and shall be subject to the approval of the Contractor and, to the extent provided in the Contract Documents, to the supervision and approval of the Architect or any other person authorized therein to act on behalf of the Owner. The Subcontractor shall be liable to the Contractor and the Owner for all loss, cost and expense attributable to any acts of commission or omission by the Subcontractor, its employees and agents resulting from the failure to comply with building, fire, safety and similar laws, codes and ordinances including, but not limited to, any fines, penalties or corrective measures. There shall not be increases in the Subcontract Price for Amendments during construction necessary to comply with building, fire, safety and similar laws, codes and ordinances.

20.    The Subcontract allowed the Contractor to issue "written instructions (Amendments, which term as used [therein] shall include Change Orders and Construction Change Directives), requiring alterations or additions to or deviations from the Subcontract Work," which the Subcontractor agreed to accept and further agreed that it would make no alterations, additions to, or deviations from the Subcontract Work except in accordance with an Amendment. (Subcontract, Art. 2.6). "The amount of any addition to or deduction from the Subcontract Price and any extension of time shall be determined in accordance with the Contract Documents and shall be specifically stated in such Amendment, except in no case shall the Subcontractor be paid on account of overhead and profit at a rate in excess of ten percent (10%) of the cost of the work." (Id.). Once the Subcontractor received a notice of a Change Order Request, the Subcontractor had seven days to respond in writing as to the effect on the Subcontract Price and/or Subcontract Work Schedule. (Subcontract, Art. 2.7). Additionally, Article 4.1 stated that no increase in the Subcontract Price would be permitted unless an Amendment had been issued.

21.     Section 3 of the Subcontract concerned time of performance.   Article 3.1 stated that upon

receipt of the Notice to Proceed, the Subcontractor agreed to begin, prosecute, and

complete the Subcontract Work "in a prompt and diligent manner."  "[P]romptly after the

Date of Agreement," the Subcontractor was required to provide to the Contractor a

schedule showing proposed time periods in which the Subcontractor intended to perform

the Subcontract Work.  If reasonably required in the opinion of the Contractor to achieve

compliance with the Subcontract Work Schedule or to avoid delays in the progress of the

Project, where the delay was attributable to the Subcontractor, the Subcontractor agreed

to provide additional and overtime labor at the request of the Contractor and at no

additional cost to the Contractor.  (Subcontract, Art. 3.1).

22.     The Subcontractor agreed to give the Contractor written notice within forty-eight (48)

business hours after the occurrence of any cause, event or condition that would hinder or

delay performance of the Subcontract Work in accordance with the Subcontract Work

Schedule.  In the notice, the Subcontractor was required to estimate the additional time

needed for completion of the Subcontract Work.  (Subcontract, Art. 3.2).

23.     The Contractor agreed that the time for performance of the Subcontract Work would be

extended by the time of any delay caused by the act or neglect of the Contractor, its

employees, agents, other contractors performing any portion of the Work, and of the

Owner and the Architect, so long as the Subcontractor was not responsible in any way

and had given notice as required in Section 3.2.  (Subcontract, Art. 3.3).

24.     The Contractor was given the right to decide the time, order, and priority for the various

portions of the Subcontract Work.  The Contractor's project schedule, which was to be

mutually agreed upon with the Subcontractor, would determine the Subcontractor's time for performance.  (Subcontract, Art. 3.4).

25.    The Subcontract also required the Subcontractor to attend all job meetings scheduled by the Contractor.  Failure to attend a job meeting was considered a "material breach" of the Subcontract.  (Subcontract, Art. 3.4).

26.    With regard to payment, within ten (10) days of the Date of Agreement, the Subcontractor was required to provide the Contractor with a schedule of values, giving a breakdown on the work to be performed and the dollar amount allocated to each item comprising the Subcontract Work. (Subcontract, Art. 4.2).  Thereafter, on the eighteenth day of each month, the Subcontractor was required to provide a requisition for payment for work actually performed with an itemization consistent with the schedule of values.  Payment of the Subcontract Price was further subject to the approval of the Architect and Owner. (Subcontract, Art. 4.3).  Once the progress payment requisition was approved, the Contractor agreed to pay ninety percent (90%) of the amount of the requisition. However, the Contractor was not required to make any payment when the remaining amounts to become due under the Subcontract were insufficient to complete the Subcontract Work or were necessary to pay claims by third parties who performed the work or supplied materials and equipment.  (Subcontract, Art. 4.6).  All amounts remaining to be paid to the Subcontractor were to be paid by the Contractor within sixty-five (65) days after acceptance by the Architect of the entire Work which constituted the Project and final payment by the Owner.  (Subcontract, Art. 4.7).

27.    In terms of the execution and progress of the Subcontract Work, the Subcontractor

9

agreed, <u>inter alia</u>, to provide and supply a sufficient number of properly trained and skilled workmen required to complete the Subcontract Work in accordance with the Agreement, Art. 6.1.1.

28.    If the Subcontractor, after notice, did not correct or remove defective work within twenty-four (24) hours, the Subcontract provided that the Contractor was permitted to correct the defects or remove the defective work and charge the reasonable cost of such work to the Subcontractor.  (Subcontract, Art. 6.1.6).

29.    The Subcontractor was further required to provide on the Project site a full-time, competent, and experienced superintendent with full authority to accept the directions of the Contractor, the Project Manager, and the Architect.  (Subcontract, Art. 6.1.10).

30.    Prior to commencing any work, the Subcontract required the Subcontractor to check accurately and to verify to the best of its ability all previous work done by others and notify the Contractor in writing if any work was not acceptable or not in conformance with the Contract Documents.  If Neri proceeded without notification, the Subcontract provided that any defects that subsequently appeared were the Subcontractor's responsibility as to repairs, replacement, and costs in connection with any non-acceptable or non-conforming work, which should have been discovered by the Subcontractor. (Subcontract, Art. 6.1.11).

31.    Section 6 also required the Subcontractor to provide all instrumentalities and field measurements required for the proper performance of the Subcontract Work, with the Contractor supplying all of the control points, a base line, and bench marks. (Subcontract, Art. 6.1.14; Attachment "A", ¶ 6.A.).  The baseline was used for horizontal

control.  It consisted of two coordinated points for the Subcontractor to use in laying out the Project.  The benchmark was for vertical control.  (Ford Testimony 6/6/05 at 84).

32.    Article 9 governed default and remedies. It provided that the Subcontractor shall be in default, inter alia, if the Subcontractor failed to perform in strict accordance with the Subcontract or the Contract Documents, or breached any term or condition of the Subcontract Agreement, or failed to diligently prosecute and perform all or any part of the Subcontract Work, or failed or refused to supply sufficient and proper quality workmen, equipment, and materials to the satisfaction of the Contractor.  (Subcontract, Art. 9.1.2). In the event of default, the Subcontract required the Contractor to give the Subcontractor seventy-two (72) hours written notice.  If the Subcontractor had not cured the default at the expiration of that period, the Contractor could elect any or all of the following remedies: provide the labor, materials, or equipment necessary to perform the Work and deduct the cost thereof, including five percent (5%), representing the Contractor's overhead, from any payments due to the Subcontractor; withhold payment of any monies due the Subcontractor pending corrective action; or terminate the employment of the Subcontractor and take possession of all materials on the Project for the purpose of completing the Subcontract Work, and employ other persons to finish the Subcontract Work.  In such event, the Contractor could deduct the cost of such substituted performance, including ten percent (10%) representing the Contractor's overhead, from any monies due to the Subcontractor.  (Subcontract, Art. 9.2).

33.    Article 11.4 provided that the Subcontractor acknowledged that it had carefully reviewed the Subcontract, all contract documents, and all other documents directly or indirectly

relating to the Contract.  "In case of any ambiguity or discrepancy in this Contract, the Subcontractor shall promptly submit the matter to the Contractor, in writing, otherwise the Subcontractor will be held solely liable to make any change necessary to correct same."  (Subcontract, Art. 11.4).

34.    Attachment "A" to the Subcontract for "Elm Haven Phases 1B, 1C New Construction, New Haven, CT," described the scope of work in more detail.  It provided that the Subcontract included all Contract Documents listed in Attachment "B" as well as certain additional sketches set forth in Attachment "A" ¶ 1, and the Geotechnical Engineering Reports prepared by Heynen Teale Engineers dated 1/97, 6/97, 12/97.

35.    Paragraph 2 of Attachment "A" provided that the Subcontract Agreement was for work in "Phase 1B New Construction which includes Blocks D, E, F, G, and Senior Building in Block G; and Phase 1C New Construction which includes [ ] Blocks B, C and all work (including utilities) associated with Ashmun Street between Henry and Admiral Streets."  Paragraph 5 stated that the Subcontract included an Alternate for work (same scope as base contract) associated with Blocks A1, A2, and K1 in the amount of $620,000," which would be added to the Subcontract Price if accepted by Owner prior to June 30, 1999.

36.    Paragraph 6 provided that Neri was to "furnish and install all labor, materials equipments, tools and supervision to do all Site Development Work per the Contract Drawings and Specifications," including the following work relevant to the disputed issues between the parties:

a.    doing the layout, engineering and elevation control required to complete the site development work, with the Contractor providing the base line and bench marks

(¶ 6.A.);

b.    providing all erosion and sedimentation control work required by the Contract Drawings, including maintaining all such measures during the time the Subcontractor is on the job (¶ 6.C.);

c.    demolishing and removing from within the limits of Phase IB and IC site all existing utilities and streets and disposing of them off site (¶ 6.D.);

d.    performing general site and building cut and fill, mass excavation and rough grading to new grades established by Contract Drawings and site fill and building fill with on site materials (if deemed suitable) or borrowed materials and hauling and disposing of all unsuitable and/or surplus material off site. All excavation was to be performed on an unclassified basis. All unsuitable material within the cut material and as noted on the Geotechnical Report was to be removed from the site and legally disposed of. Any unsuitable material not included in the contract requirements and that was required to be removed was to be done based on the per unit prices in the Subcontract (¶ 6.G.);

e.    performing all rough and finish grading of building slab-on-grade areas and all excavation and backfilling for building footings and foundations, including all subgrade preparation for footings and all underslab utility excavation and backfill (¶ 6.H.);

f.    furnishing and installing all sanitary sewer lines and appurtenances including but not limited to trenching, backfilling, fill material, compaction, sheeting, shoring, pipe, manholes with covers, laterals to within five feet of buildings, testing and

13

taps into the existing sewer system, and complete installation of new sewer system as shown. The Subcontractor was responsible for coordination with the City, other utilities, and other work proceeding on site and related work by the City of New Haven for the separation of the sewer/storm systems (¶ 6.I.);

g.　　furnishing and installing all storm sewer lines and appurtenances (¶ 6.J.);

h.　　furnishing and installing all on-site water lines and appurtenances, including curb boxes to within five feet of buildings (¶ 6.L.);

i.　　 furnishing all trenching and backfilling and conduits for all primary and secondary electrical, telephone, and CATV conductors (¶ 6.N.);

j.　　furnishing all trenching and backfilling for site and street lighting per the Contract Drawings (¶ 6.O.);

k.　　furnishing and installing all concrete curb, granite curb, concrete sidewalks (both city and residential), and all handicap ramp depressions where indicated on the plans (¶ 6.P.);

l.　　 furnishing and installing all asphalt paving, including all sub-base materials as required by the Contract Documents. The scope of work included driveways, walks, parking lots, roads, and streets (¶ 6.Q.);

m.　　performing all excavation, backfill and compaction, and providing all materials and equipment for all site concrete items of work, including transformer pads, dumpster pads, entry pillars, entry stoops and/or pads, generator pads, handicap ramps, concrete patios, concrete driveway aprons, concrete staircases, concrete retaining walls, and concrete foundations for benches (¶¶ 6 R. & S.);

14

n.    respreading topsoil and supplementing and screening as required, rough and fine grade site per Contract Documents, ready for landscaping (¶ 6.CC.); and

o.    cleaning up and removing all debris and material caused by this operation from the site and legally disposing thereof (¶ 6.GG.).

37.    Attachment "A" further provided that the Owner was responsible for all soil and concrete testing as it related to the Subcontract (¶ 10).

38.    Attachment "A" also delineated certain work that was expressly excluded from the Subcontract, including but not limited to excavation and disposal of unsuitable materials (including urban debris) beyond the limits indicated in the Contract Documents. (Attachment "A" at 10, ¶ 2).

39.    Attachment "B" listed the drawing and specifications for the Project, including grading plans (designated G-xx); streets, sewer and utility plans (designated SS-xx); electrical, cable TV, and telephone plans (designated EL-xx); site lighting plans (designated SE-xx); site plans (designated L-xx); architectural plans (designated G-xx for general information plans and A-xx for the building units); structural plans (designated S-xx); mechanical and plumbing (designated M-xx); and electrical (designated E-xx). Included in Attachment "B" was Drawing SS-26, "Phase 2 Streets, Sewers & Utilities - Ashmun Street, Sta. 14+68 to 21+15," discussed below.

40.    Additionally, detailed Project Specifications were set forth in two volumes.  (Ex. 3).

41.    For contract administration purposes, the work under the Subcontract was divided into two parts: Project No. 204, also known as Phase IB, and Project No. 207, also known as Phase IC.  The work associated with Project No. 204, Phase IB, included Blocks D, E, F,

G, and the Senior Building in Block G; and Phase IC New Construction included Blocks

B and C, and all work (including utilities) associated with Ashmun Street[1] between Henry

and Admiral Streets.  (Attachment "A" at 1).

42.    Prior to signing the Subcontract in March of 1999, Lorraine Beckwith and Stephen

Simoncini had negotiated the Subcontract over several months, exchanging proposals

back and forth, with each party making annotations, line-outs, and corrections to what

would eventually become the Subcontract.  (Beckwith Testimony 9/23/05 at 80).  In order

to bid on the Subcontract, Neri was given a set of drawings.  On October 19, 1998, Elm

Haven gave Neri some additional drawings to include in its bid on the Subcontract.

These included the "Phase II"[2] drawings, including Drawings SS-25 through SS-38.  The

transmittal letter from Lorraine Beckwith stated:

> Phase 1 revisions by Addendum and Drawing revision.  Phase 2
> Blocks D & E are new and added to Phase 1 Bid Package.
>
> Note: Your Phase 1 Bid To Be Revised As Follows:
> 1.  Add blocks D & E.
> 2.  Deduct Blocks A1, A2, K1 – Price these as alternates.
> 3.  All sitework on Ashmun St. adjacent to Blocks A1, A2, K1 to be included in
> Phase 1 base bid.
> 4.  Revisions to remainder of Phase 1.

---

[1]  As discussed below, one of the issues at trial was which portions of Ashmun Street
were included in Phase I of the Project. Throughout the trial, the portion of  Ashmun Street from
the cul-de-sac to Henry Street was referred to as "Ashmun Street North," the portion of Ashmun
Street between Webster Street and Bristol Street was referred to as "Ashmun Street South" and
the remaining portion of Ashmun Street between Webster Street and New Street 1 was simply
referred to as "Ashmun Street."

[2]  The documents use both Roman numerals and Arabic numerals to refer to the phases of
the Project.  For consistency, the Court has used Roman numerals throughout, except when
quoting from a document.

(Ex. 437, Transmittal Letter dtd. 10/19/98).

43.    In November 1998, Neri submitted several different proposals.   (Ex. 438-440; Simoncini

Testimony 6/13/05 at 140-45).   As discussed above, the Subcontract was signed on

March 15, 1999.  The total Subcontract Price was divided into a price for Phase IB and a

price for Phase IC.  The price for Phase IB was $2,470,258.00. (Ford Testimony 6/6/05 at

59).   The price for work on Phase IC was $1,172,242.00.  (Id.)

44.    The Subcontract Agreement included an Alternate for the work (same scope as the base

contract) associated with Blocks A1, A2, and K1, in the amount of $620,000.00.  This

dollar amount was to be added to the Subcontract price if accepted by the Owner no later

than June 30, 1999.  (Ex. 1, Attachment A ¶ 5).  The Alternate was intended to allow Elm

Haven to move ahead rapidly with the development of those blocks if it chose to do so.

(Ford Testimony 6/6/05 at 83).

45.    Eventually the work inside Block D was eliminated from Neri's scope of work and a

credit in the amount of $254,417.00 was applied to the balance of the Subcontract.  Neri

has accepted this credit.  (Ex. 376, Ex. 660).

**C.    Progress Of The Project**

46.    Work began on the Project in the Spring of 1999, and continued through 2000 and into

the Spring of 2001.   Initially, Elm Haven's goal was to have the entire Project completed

by the spring or summer of 2000.  However, as discussed below, a number of delays

prolonged the completion of the Project, necessitating the issuance of numerous schedule

and deadline revisions.

47.    In November 1999, Jim Canning with Elm Haven initiated discussions with Neri about

17

accelerating the progress of work in Block B in order for Elm Haven to take advantage of

a significant tax savings if the work was completed before the end of 1999.  (C. Neri

Testimony 9/13/05 at 40-42).  As a result of these discussions, Elm Haven offered Neri an

"acceleration bonus" of $10,000.00 if Neri's work in Block B was substantially

completed by December 17, 1999.  (Canning Testimony 9/22/05 at 191-96; Beckwith

Testimony 9/23/05 at 124-32).  Although Elm Haven disputed Neri's entitlement to this

bonus throughout this litigation, at the commencement of the trial, the parties reached an

agreement and stipulated that Neri is entitled to receive this bonus.

48.    As discussed more fully below, it was during this "acceleration period" that Carl Neri

came up with the idea of using a document entitled "Confirmation of Change" in an effort

to get Elm Haven's approval for additional work as expeditiously as possible.  (C. Neri

Testimony 9/13/05 at 44-45).  However, on January 21, 2000, Lorraine Beckwith sent a

memo to Ivan Carlsen and Dave Lucier confirming their discussions at a January 19,

2000 meeting, that from that day forward, Elm Haven would not sign any "Confirmation

of Change" forms submitted by Neri.  (Ex. 468).

49.    By the end of 1999, only Block B and the surrounding streets, including portions of

Ashmun Street, New Street 1, New Street 2, and Canal Street, had been completed to the

point that a temporary certificate of occupancy was issued.   Some of the sidewalks,

handicap ramps, and bituminous pavement still needed to be completed, and two inches

of topsoil needed to be installed.  (Ford Testimony 6/6/05 at 92, 101).

50.    In March of 2000, John Ford took over as Project Manager.  At that point, the

foundations for all of the buildings except the townhouses in Block G had been

18

completed and the buildings were in various stages of completion.   Canal Street from

New Street 1 to New Street 2 only had a binder course of pavement, with its structures,

manholes and catch basins raised to accommodate the two remaining final courses of

pavement.   New Street 1 and New Street 2 from Canal to Ashmun were also paved to the

binder course but without some or all of the granite curbing.   Ashmun Street was paved

to the binder course from New Street 1 to Webster Street but there had been no progress

on Ashmun Street North, Ashmun Street South, Foote Street, New Street 3, and New

Street 4.   On Webster Street the pre-existing pavement was still in place.   (Ford

Testimony 6/6/05 at 86-91).

51.     On March 21, 2000, James Canning, Ivan Carlsen, Lorraine Beckwith, and John Ford met

with Kevin Maguire and Bill MacMullen of Beacon/Corcoran Jennison to discuss "open

issues affecting job progress and completion," including the design of handicap

requirements at sidewalks, grading issues on all blocks, resolution of sanitary connections

on Block G, discrepancies in the CSO/LEA drawings on the location of the storm drain

on Canal Street, which was preventing the granite curbing and sidewalk installation, and

the final lift of bituminous paving.  (Ex. 624).   The letter noted that Elm Haven had

demanded that Neri respond to an aggressive site schedule, to which demand Neri had

responded with a manpower count of twenty-one (21) as of March 21, 2000, and that Elm

Haven anticipated that Neri would request compensation for the delays and required

acceleration to complete the work.  (Id.).

52.     On March 27, 2000, Lorraine Beckwith wrote Neri to advise them that the work on

Blocks A1, A2, and K1 would not be proceeding at that time and, accordingly, Elm

Haven was not accepting the Alternate costs included in the Subcontract Agreement for those Blocks. Her letter further stated that the Subcontract did include all work associated with Ashmun Street from Henry Street to Block B (Ashmun Street North). (Ex. 465).

53. Block B was eventually completed in April 2000 when Elm Haven hired Executive Landscaping to apply the remaining two inches of topsoil. (Ex. 291, Tab 7).

54. Shortly after his arrival on the Project, John Ford had bifurcated Block G into Block G-1, consisting of the Senior Center, duplexes and the surrounding areas, and Block G-2, consisting of redesigned townhouse buildings and the surrounding areas. The revisions to Block G also increased the total number of townhouse units from sixteen (16) to eighteen (18) and reconfigured some of the townhouse buildings. Elm Haven issued Change Order No. 204-13 to Neri on April 12, 2000, for the cost of the extra work associated with the Block G-2 revisions in the amount of $188,766.00. (Ex. 246, Ex. 604).[3] At the time this Change Order was issued, Neri maintained that it had completed all required work on Block G except for the new revisions. (C. Neri Testimony 9/13 05 at 19). Change Order No.204-13 provided that it was being issued with the mutual agreement that the work required to complete Block G must be completed by May 15, 2000 and that Neri would meet the scheduled completion dates for Blocks C, E, and F indicated on the April 12, 2000 Elm Haven Project Schedule. (Ex. 246, Ex. 18, Ex. 20).

---

[3] Carl Neri testified that this Change Order not only reflected required additions due to the changes in Block G, but also reflected the deletion of numerous specific items of work from Neri's original scope of work for Block G. (C. Neri Testimony 9/13/05 at 12-18). The Change Order also limited the excavation of unsuitable materials to 250 cubic yards. Any additional excavation of unsuitable materials would be paid for using an agreed upon unit price. (Id. at 18).

55.    Neri did not meet the scheduled deadlines set forth in Change Order No.204-13.  (Ford

Testimony 6/6/05 at 110).

56.    On May 18, 2000, Elm Haven notified Neri by letter that due to its failure to meet the

scheduled deadlines for completion of the work on Block C and the surrounding streets,

Elm Haven would consider it in default under Article 9.1 of the Subcontract if specified

work on Block C did not commence immediately with assurances that the work would be

completed by May 25, 2000. (Ex. 30).

57.    Neri eventually completed almost all of the remaining work on Block C.  (Ford

Testimony 6/6/05 at 121).

58.    On May 10, 2000, Ford wrote Kevin Maguire at Beacon/Corcoran Jennison Partners with

a list of items that had dramatically impacted their ability to stay on schedule, including

the lack of contract drawings with survey coordinated control points, conflicting

information on the design drawings, and the timely determination of unsuitable materials.

He described these as "primarily design issues" and stated that it was Elm Haven's

position that "the delays incurred to date in Blocks C and G were a direct result of the

issues listed above."  (Ex. 626).

59.    On May 15, 2000, Mark Rosetti, the Senior Project manager for Neri, wrote John Ford

about inaccurate information on the Project plans, plan inadequacies, lack of coordinates,

and missing details.  (Ex. 655).   Again on June 5, 2000, he wrote Ford complaining that,

despite numerous conversations and promises, they were still waiting for engineering

coordinates that would allow their survey crew to perform the required construction

stakings on Blocks E and F.  (Ex. 637).   He indicated that this had been a serious

21

problem since Project start-up and continued to cause serious delays.  (Id.).

60.    Elm Haven then wrote Beacon/Corcoran Jennison Partners, on June 5, 2000, and June 13, 2000, complaining that it had still not received survey information for the remaining Blocks C, E, F, and G.  Elm Haven indicated that it had proceeded with work on Block G without this information at significant additional costs and with major delays, which would significantly impact the completion of Blocks E and F.  (Ex. 637 & 638).

61.    On June 6, 2000, Neri submitted a revised schedule for completion of the work on Blocks E, F, and G, and a few remaining items on Block C.  Per Neri's schedule, Block C was to be completed on or before June 14, 2000; Block G on or before July 21, 2000; Block E on or before August 31, 2000; and Block F on or before September 1, 2000.  Neri further set forth a list of outstanding issues that were hindering its performance on Blocks C and G, many of which were the subject of outstanding Requests for Information ("RFIs").  Additionally, the letter listed "general issues on all blocks, including unsuitable materials, project plan issues, additional survey time required because of project plan discrepancies, staging areas, clearing and grubbing, damage to installed construction, and payments."  (Ex. 43).

62.    Between July 20, 2000, and September 11, 2000, Elm Haven issued twenty-six (26) change orders addressing many of the issues that had been delaying completion of the Project.

63.    By August 2000, the focus was to complete Blocks E, F, and G, as well as the surrounding roadways.  (V. Neri Testimony 6/17/05 at 150).

64.     As more fully discussed below, disputes arose between Elm Haven and Neri as to the

scope of Neri's work.

65. Eventually in the fall of 2000, Elm Haven brought in Waters Construction Company ("Waters") to perform some of the fine grade and paving work initially subcontracted to Neri on Foote Street, New Streets 3 and 4, Ashmun Street by Blocks B and C, New Street 1, Canal Street, and the section of Webster Street around Blocks B and C.

66. On September 14, 2000, representatives of Elm Haven and Neri met to discuss the work required to complete Neri's scope of work. Following that meeting, Elm Haven set forth the following schedule: Neri was to complete work on Block E no later than September 22, 2000; on Block F no later than September 29, 2000; on Block G no later than October 6, 2000; roadway preparatory work no later than October 16, 2000; fine grading and paving of the remaining roadways no later than October 20, 2000; and the remaining topsoil and other finishing work no later than October 27, 2000. (Ex. 67).

67. Neri did not meet all of these milestone dates, which led to several other letters from Elm Haven.

68. In October 2000, Elm Haven became concerned about getting all of the remaining paving work done before the onset of winter, when the paving plants close, and eventually advised Neri that it was removing all of the fine grade and paving work and all bituminous paving from Neri's scope of work and was having this work performed by others. Additionally, it indicated that it would be supplementing Neri's efforts in completing all other work in order to facilitate an October 27, 2000 completion date, including concrete sidewalks, handicap ramps, and patios, stair railings, granite curbing, concrete curbing, drainage, utility lateral repairs, grading/topsoil, bituminous walks, and

maintenance and protection of traffic. (Ex. 84; <u>see also</u> Ford Testimony 6/6/05 at 132, 151-52). John Ford testified that he was concerned about Neri's ability to complete the paving work on a timely basis given its previous difficulties in completing paving work on schedule. (Ford Testimony 6/10/05 at 20). Neri protested the removal of this work from its scope of work, to which Elm Haven remained firm that the fine grade and paving work was to be performed by another contractor due to Neri's continued failure to meet scheduled deadlines. (Ex. 88). As discussed more fully below, Elm Haven eventually contracted with Waters Construction to perform the paving work, as well as the installation of certain concrete sidewalk, handicap ramps, patios, granite curbing, walks, and to perform utility repairs, grading and the application of topsoil. (Ex. 80; Ford Testimony 6/6/05 at 174-206). As discussed below, much of the work performed by Waters is the subject of back charges sought by Elm Haven in Change Order No. 204-55.

69.     On October 30, 2000, Elm Haven and Neri had a project meeting at which they discussed whether the sewer laterals beneath Ashmun Street North were part of the original contract. Neri maintained that the cost of these laterals was included in its Alternate price and was not part of the original Subcontract. Elm Haven maintained that under the Subcontract, Neri was required to install water and sewer laterals beneath the streets and extend them to within five feet of the buildings on all blocks that were to be fully developed as part of the Project, and for blocks not scheduled to be developed, the laterals were to be installed to the end of the City of New Haven's right-of-way, <u>i.e.</u>, the inside edge of the sidewalk, and then "stubbed" at that end. John Ford testified that if laterals from the main utility line to the edge of the right-of-way for undeveloped blocks

were not installed, any future development would require cutting the newly installed roadway to install water and sewer connections. (Ford Testimony 6/7/05 at 135-37).

70.  In January 2001, as problems between Elm Haven and Neri continued to escalate, the parties began to discuss the possibility of a mutually acceptable arrangement whereby Neri would not perform any more work on the Project in exchange for an appropriate credit to Elm Haven for the work not completed. (Ford Testimony 6/7/05 at 172-73). In the meantime, Neri had submitted $1,554,774.00 in extra work claims, which were rejected, but Elm Haven gave Neri the opportunity to substantiate its claims within seven days. (Ex. 114, Ltr. dtd. 1/18/01 from Ford to C. Neri). This information was not received, and Elm Haven directed Neri to complete its scope of work under the Subcontract. (Ex. 114; Ford Testimony 6/7/05 at 179-80).

71.  In February, 2001, Elm Haven presented Neri with a schedule for the completion of the remaining townhouse units in Block G-2. Neri never responded to the proposed schedule. (Ex. 127; Ford Testimony 6/7/05 at 187-88).

72.  In March 2001, Elm Haven demanded that Neri commence the work on Block G-2 in accordance with Elm Haven's schedule. At that time, the only work that Neri had performed on Block G-2 was the foundation excavation for the three townhouse buildings. (Ex. 130 & 135).

73.  On March 27, 2001, Elm Haven submitted Change Order No. 204-55 in the amount of $483,097.00, as a back charge against Neri's Subcontract Price for work that Elm Haven maintained was within Neri's scope of work but which it had paid other subcontractors to perform. (Ex. 290 & 291). At trial, Elm Haven reduced the amount of this back charge

to $409,154.00, which, as discussed below, is contested by Neri.

74. In April, Elm Haven sent Neri an updated Block G-2 schedule, which Neri accepted. (Ex. 143 & 146).

75. Except for sending two workers to correct some excavation problems, Neri did not have anyone on the Project until mid-April. During this time period, Elm Haven was concerned about the lack of supervision by Neri as well as Neri's failure to attend mandatory job meetings. (Ford Testimony 6/8/05 at 16-19; Ex. 156 & Ex. 165).

76. With respect to the remaining road work in the spring of 2001, the following items had not been completed: installation of service laterals and the reconstruction of Ashmun Street North, including sidewalks and curbing; Ashmun Street South reconstruction, including laterals, sidewalks and curbing; repairs to Canal Street near its intersection with Webster; Dixwell Avenue shoulder reconstruction and sidewalks; Webster Street reconstruction and sidewalks, curbing, and laterals from Ashmun Street to Dixwell Avenue; and Foote Street sidewalks, curbing and roadway tie-in with Dixwell Avenue. (Ex. 143). According to Carl Neri, the reason Neri was not proceeding with work on Ashmun Street North and Webster Street at this time was that Elm Haven was still revising the plans[4] and had not issued schedules for the work to be done. (C. Neri Testimony 9/13/2005 at 66-69).

77. On April 2, 2001, Elm Haven issued a road work schedule to Neri that established

---

[4] The changes involved utility and drainage issues. The City and Elm Haven had agreed to change the width of the street from 30 feet as shown in the drawings to 28 feet. (C. Neri Testimony 9/13/05 at 66). This issue had already arisen with respect to Ashmun Street South, since to construct it according to the plans, Neri would have had to take down trees, to which the City objected. (Id. at 67).

26

milestone dates for commencing and finishing the outstanding roadwork (Ex. 143), to which Neri responded with its own proposed schedule, which called for starting the road work on April 16, 2001, and completing it by November 16, 2001. Neri also disputed whether some of the work on Elm Haven's schedule was within its scope of work, including some of the lateral work and Ashmun Street South. (Ex. 146). Elm Haven agreed to the April 16th start date if Neri submitted all required permits, certificates, and a detailed sequence of operations, and coordinated its work with the City of New Haven's CSO work, which was now being performed by another CSO contractor. (Ex. 147). If Neri failed to start work by April 16th, Elm Haven advised it that it would have the work performed by other subcontractors in accordance with Article 9.2.1 of the Subcontract. (Ex. 147). Elm Haven and Neri exchanged a number of letters concerning Ashmun Street South and eventually Neri informed Elm Haven that it would not proceed with the work on Ashmun Street South unless it was issued a change order to the Subcontract for the cost of the work. (Ex. 148, 152). Elm Haven responded that it would complete the work using other subcontractors. (Ex. 148, 152).

78. Likewise, with respect to Ashmun Street North, when work did not commence on April 16th, Elm Haven wrote Neri on April 25, 2001, that it would complete this portion of the Project using other subcontractors if Neri did not commence work and pull the required permits immediately. (Ex. 157). When Neri had not commenced work on Ashmun Street North by April 30th, Elm Haven wrote Neri advising it that this work would be performed by others. (Ex. 158).

79. During this period, there were other disputes between Neri and Elm Haven concerning

Neri's failure to obtain permits from the City (Ex. 157), safety issues (Ex. 163), damage

caused by Neri's equipment (Ex. 164), a lack of supervision on the jobsite (Ex. 165), a

lack of manpower on the jobsite (Ex. 166), Neri's failure to attend Project meetings (Ex.

170), and its failure to perform outstanding work on a timely basis.

80.    On May 2, 2001, Elm Haven notified Neri that, due to its "continued refusal to provide

supervision and qualified tradesmen to this project," Elm Haven would supplement

Neri's workforce with other workers as necessary to complete the work on Block G-2.

(Ex. 166).   According to John Ford, Neri's refusal to adhere to the scheduled deadlines

was also impacting the work of other trades who were coming in after Neri to do other

work on Block G-2. (Ford Testimony 6/8/05 at 34).

81.    May 9, 2001, was the last day that Neri supplied any manpower to the Project.  (Ex. 475;

Ford Testimony 6/8/05 at34).

82.    The last requisition submitted by Neri that was approved by Elm Haven was for October

2000.  (K. Neri Testimony 9/13/05 at 203).  After that, Kim Neri continued to submit

requisitions on a monthly basis, but these were not even acknowledged.  (Id. at 204).

83.    As for the remaining work on Webster Street, when Neri failed to respond to Elm

Haven's request that it confirm that it would commence this work in accordance with the

City's CSO schedule, on May 14, 2001, Elm Haven wrote Neri that it was taking over the

work on Webster to have it performed by another subcontractor.  (Ex. 172).

84.    Thus, as of May 14, 2001, Elm Haven had removed from Neri's scope of work under the

Subcontract the performance of road work on Ashmun Street South, Ashmun Street

North (including work on Admiral Street), and Webster Street, and had stated that it

would supplement Neri's workforce as necessary for the Block G-2 site work, in order to maintain the Project Schedule. (Ex. 172 & 166).

85.   Prior thereto, on May 9, 2001, Elm Haven had forwarded drawings and bid packages to three subcontractors, Waters, Executive Landscaping, and Sweeney Excavation, to solicit bids for the completion of the road and utility work on Ashmun Street North and South, Webster Street, Dixwell Avenue, and Henry Street, which Elm Haven considered to be part of Neri's scope of work.  (Ex. 434).  Elm Haven received two proposals to perform the road and utility work, a combined proposal from Waters and Executive, in which Waters would perform the road work and Executive would install the utilities, and a single proposal from Sweeney, which would perform all of the work.  (Ford Testimony 6/8/05 at 50-53).

86.   On May 17, 2001, Elm Haven and Sweeney executed a subcontract agreement for work that Elm Haven maintains was within Neri's scope of work.

87.   On July 11, 2001, Elm Haven commenced the instant law suit against Neri.[5]

88.   On or about July 19, 2001, Carl Neri and other representatives from Neri attended a job meeting with John Ford, at which Ford provided them with updated schedules dated July 11, 2001, for completing the remaining work in Block G-2, Townhouses 1, 2, and 3.  (Ex. 653 & 654; C. Neri Testimony 9/13/05 at 51).  At the time of this meeting, Neri was not aware that Elm Haven had filed suit against it.  According to the schedules, much of the

---

[5]   United States Fidelity & Guaranty Company ("USF&G") was also named as a defendant in the original complaint.   Summary judgment was entered in favor of USF&G, which judgment was affirmed on appeal to the United States Court of Appeals for the Second Circuit.  See Elm Haven Construction Limited Partnership v. Neri Construction LLC, 376 F.3d 96 (2d Cir. 2004).

work that was Neri's responsibility had been completed or substantially completed. However, there were other items of work, such as the site concrete around the townhouses, that Neri had not been able to perform because of work being done in the same vicinity by other trades. (C. Neri Testimony 9/13/05 at 54, 59). Neri's cost to complete this work was $9,800.00. (Id. at 65; Ex. 649). The start date for some of the work was as late as August, 2001. (Id. at 62). Neri, however, never performed this work because of this lawsuit. (Id. at 63).

**D.    Damage Claims**

89.    Throughout the course of the Project, Elm Haven issued payments to Neri totaling $2,822,034.00.

90.    Throughout the course of the Project, Elm Haven issued to Neri fifty-four (54) change orders for Phase IB, totaling $499,527.00 (Pl.'s Ex. 234-290), and thirty-nine (39) change orders for Phase IC, totaling $286,035.00 (Pl.'s Ex. 293-330). The parties have stipulated that all change orders, with the exception of Change Order No. 204-55 (Pl.'s Ex. 291-92), issued by Elm Haven to Neri should be factored into the adjusted Subcontract Price.

91.    Elm Haven has also factored into the final Subcontract price an increase of $22,276.00 for the premium Neri paid to Tilcon Construction, Inc., to perform the accelerated bituminous paving work on Canal Street, Ashmun Street, and New Streets 1 and 2 in 1999. (Ex. 376 & 573). Elm Haven has also increased the Subcontract price by $44,599.00 for underground conduit work performed by Neri in Block G on a time and material basis (Ex. 478-80 & 603; Ford Testimony 10/4/05 at 27-89);[6] and has

---

[6] See Discussion infra regarding Neri's Extra Work Claim NC-028-204-1-G, Ex. 603.

acknowledged that partial payments are due on three of Neri's Extra Work Claims ($3,611.00 on Claim No. NC-023-204-1;[7] $640.00 on Claim No. NC-015-204; and $337.00 on Claim No. NC-016-204-G).[8]

92.    Elm Haven has reduced the Subcontract Price for work deleted from Neri's scope of work, including Block D, discussed above, in the amount of $254,417.00; the sidewalk on the east side of Canal Street in the amount of $14,885.00 (Ex. 376); site demolition on Gregory Street in the amount of $559.00 (Ex. 376); scattered site work in the amount of $7,570.00 (Ex. 376); and a portion of Change Order No. 204-12 in the amount of $990.00 (Ex. 376).  Neri has not objected to any of these deductions in its proposed Findings of Fact and Conclusions of Law.

93.    Elm Haven has also added to its claim the costs to complete what it maintains was within Neri's scope of work, including:

a.    "General Requirements" in the amount of $52,800.00, for additional personnel from May 2001 to September 2001 after Neri left the job site (Ex. 376; Ford Testimony 6/8/05 at 198-205);

b.    the amounts paid Sweeney on its subcontract in the amount of $841,406.00, which included $32,570.00 for site demolition, earthwork, bituminous concrete pavement , and site concrete for Henry Street; $46,527.00 for Admiral Street; $73,400.00 for Dixwell Avenue; $302,736.00 for Webster Street; and

---

[7]  This Extra Work Claim was incorrectly designated by Elm Haven as NC-023-207-1. The summary references Exhibit 602, which is the Extra Work Claim No. NC-023-204-1.

[8]  This last credit references Exhibit 597, which was Neri's Extra Work Claim NC-016-204-G.  Elm Haven has incorrectly labeled this as NC-015-204-G.

$386,173.00 for Ashmun Street (North and South) (Ex. 377, 392 & 403;  Ford

Testimony 6/8/05 at 75-93). During the course of Sweeney's performance of work

on the Project, Elm Haven also issued nine change orders to Sweeney, totaling

$271,337.00 (Ex. 381-390);

c.     $6,700.00 paid to Sweeney for milling and patching on Foote Street in the vicinity

of Dixwell Avenue, an area of paving that it maintains was within Neri's scope of

work  (Ex. 411), and for $5,990.00 for relocating a sanitary lateral on Block E

(Ex. 376, 391);

d.     $24,149.00 for work performed by Executive Landscaping and several other

contractors in late April and May 2001 primarily on Block G-2 (Ex.412 - 429);

e.     $5,500.00 for the cost of a lien placed on the project by Nicholas Murano

Concrete, which performed sidewalk installation for Neri (Ford Testimony 6/8/05

at 215-17); and

f.     a five percent (5%) overhead mark-up of $60,394.00 on the labor, materials, and

equipment for work performed by others that it claims was included in Neri's

scope of work under the Subcontract. (Subcontract Art. 9.2.1).

94.     Thus, according to Elm Haven, the final adjusted Subcontract Price was $3,821,950.00.

In arriving at its damage claim of $268,360.00, Elm Haven has subtracted the payments

to Neri of $2,822,034.00 from the adjusted Subcontract Price, and added the costs that it

claims that it incurred to complete Neri's scope of work, $1,268,276.00 (total costs-to-

complete).  The figures that have been agreed to by the parties are marked with an

asterisk (*).

**Subcontract Price with Adjustments**

| | |
|---|---:|
| Original Subcontract Price, Project Nos. 204 & 207 | $ 3,642,500.00* |
| Change Order Nos. 204-1 through 204-54 | 499,527.00* |
| Change Order No. 204-55 (Back charge) | (409,154.00) |
| Change Order Nos. 207-1 through 207-39 | 286,035.00* |
| Contract Adjustment for Block B Acceleration | 10,000.00* |
| Contract Adjustment for Tilcon Construction Premium | 22,276.00* |
| Contract Adjustment for Block G Conduit Work | 44, 599.00* |
| Deleted Work - Block D | (254,417.00)* |
| Deleted Work - Canal Street Sidewalk (East Side) | (14,885.00)* |
| Deleted Work - Gregory Street - Site Demolition | (559.00)* |
| Deleted Work - Scattered Site | (7,570.00)* |
| Deleted Work - Change Order No. 204-12 (portion) | (990.00)* |
| Neri Extra Work Claim No. NC-023-204-1 (partial) | 3,611.00* |
| Neri Extra Work Claim No. NC-015-204 (partial) | 640.00* |
| Neri Extra Work Claim No. NC-016-204-G (partial) | 337.00* |
| **Final Subcontract Amount** | **$ 3,821,950.00** |
| **Total Payments to Neri** | **(2,822,034.00)*** |
| **Unpaid Subcontract Balance** | **$  999,916.00** |

**Costs to Complete Neri's Scope of Work**

| | |
|---|---:|
| General Requirements | $     52,800.00 |
| Sweeney Excavation (Contract, Change Orders & Invoices) | 1,125,433.00 |
| Other Subcontractors & Vendors | 24,149.00 |
| Nicholas Murano Claim Reimbursement | 5,500.00 |
| 5% Overhead Mark-up per Art. 9.2.1 | 60,394.00 |
| **Total Costs-to-Complete** | **$1,268,276.00** |

**Elm Haven's Claim for Relief**

| | |
|---|---:|
| **Unpaid Subcontract Balance** | **$ 999,916.00** |
| **Total Costs to Complete** | **(1,268,276.00)** |
| **Total Damages Sought:** | **$ 268,360.00** |

95.    Additionally, Elm Haven is seeking prejudgment interest in the amount of 10% per

annum from January 1, 2002.

96.    In its counterclaim against Elm Haven, Neri is seeking $1,493,149.00.  Neri has

calculated this figure as follows (Ex. 660):

33

| | |
|---|---|
| **Total Adjusted Subcontract Price** | **$4,428,066.00\*[9]** |
| **Total Payments to Neri** | **(2,822,034.00)\*** |
| **Total Due** | **$1,606,032.00** |

**Deductions**

| | |
|---|---|
| Deleted Work – Block D | ( $254,417.00)\* |
| October 2000 Paving | ( 148,081.00)[10] |
| Neri's Cost to Complete Road Work - Bl, E, F & G | ( 375,075.00) |
| **Total Deductions** | **($777,573.00)** |

**Additions**

| | |
|---|---|
| Acceleration Bonus | $10,000.00\* |
| Payment to Tilcon to Accelerate Paving in 1999 | 22,276.00\* |
| Extra Work on Block G Duct Bank | 44,599.00[11]\* |
| **Total Additions** | **$ 76,875.00** |

**Neri's Extra Work Claims**

| | |
|---|---|
| Project 207[12] | $284,580.00 |
| Project 204 | 303,235.00 |
| **Total Extra Work Claims** | **$ 587,815.00** |

**Neri's Unpaid Contract Balance**

| | |
|---|---|
| Total Due Before Deductions & Additions | $1,606,032.00 |
| Total Deductions | ( 777,573.00) |

---

[9]  This is the total adjusted Subcontract Price without any credits or deductions and including Change Order No. 204-55, i.e., the original Subcontract Price plus Change Orders 204-1 through 204-54, plus Change Orders 207-1 through 207-39.  (The Court has rounded the figures to the nearest dollar and, thus, the numbers set forth above may deviate from the parties' figures by a dollar or two.)

[10]  This is the amount that Neri would have paid its paving subcontractor had it performed the paving work in October 2000.

[11]  Neri claimed that $103,319.00 was due for the extra work it performed to complete the Block G electric ductbank.  Elm Haven has acknowledged that $44,599.00 is due on this claim.  Thus, Neri continues to claim the remaining $58,720.00 on this claim.  (Neri's Proposed Findings of Fact at 23).

[12]  Neri has reversed these figures on its Claim/Contract Summary.  (Ex. 660).  Additionally, the Court has deducted from the total claimed on Project 204, $347,834.00, the $44,599.00 that Elm Haven concedes is due on Neri's Extra Work Claim NC-028-204-1-G, which has already been factored into Neri's damage claim.

34

| | |
|---|---:|
| Total Additions | 76,875.00 |
| Total Extra Work Claims | 587,815.00 |
| **Total Counterclaim** | **$ 1,493,149.00** |

97.    Prior to filing its Counterclaim, Neri filed a claim for payment against Elm Haven's

payment bond surety, American Casualty.

98.    Neri is seeking prejudgment interest, calculated from July 11, 2001, at the rate of 10% per

annum.

II.    **CONCLUSIONS OF LAW**

A.    **Choice of Law**

1.    This Court's jurisdiction in this case is invoked based upon the diversity of citizenship of

the parties, pursuant to 28 U.S.C. § 1332(a).

2.    A federal court sitting in diversity will apply the choice-of-law rules of the forum state, in

this case, Connecticut.   Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  In cases

involving construction contracts, Connecticut courts will give effect to the parties'

choice-of-law provision in the contract, provided the provision was made in good faith.

Elgar v. Elgar, 238 Conn. 839, 848 (1996).  In this case, the contract provides that it is to

be governed by the law of Connecticut.  Thus, this Court will apply Connecticut

substantive law in interpreting the terms of the contract.

B.    **Contract Interpretation**

3.    "A contract is interpreted by the intent of the parties expressed in the language of the

agreement."   Topf v. Warnaco, Inc., 942 F. Supp. 762, 767 (D. Conn. 1996).  If the

language of the contract is ambiguous, the intent of the parties becomes a question of fact.

Id.; see also Gaudio v. Griffin Health Servs. Corp., 249 Conn. 523, 533 (1999); Bead

35

Chain Mfg. Co. v. Saxton Prods., Inc., 183 Conn. 266, 274-75 (1981).  However,

"[w]here there is definitive contract language, the determination of what the parties

intended by their contractual commitments is a question of law" for the Court to decide.

Thompson & Peck, Inc. v. Harbor Marine Contracting Corp., 203 Conn. 123, 131 (1987).

When the terms of an agreement are clear, "there is no room for construction" of the

language.  Levine v. Massey, 232 Conn. 272, 277-78 (1995); see also HLO Land

Ownership Assocs. Ltd. P'ship v. Hartford, 248 Conn. 350, 356-57 (1999).

4.      Under Connecticut law, when only one interpretation of contract language is possible, the

Court need not look outside the four corners of the document itself.   DeCarlo & Doll,

Inc. v. Dilozir, 45 Conn. App. 633, 638-39 (1997).  The circumstances surrounding the

making of the contract, the purposes the parties sought to accomplish, and their motives

in making the contract cannot establish an intent contrary to the plain meaning of the

language in the contract.  Id.  Moreover, the Court will not torture words to impart an

ambiguity where the ordinary meaning of the words leaves no room for ambiguity.

Ambiguity must arise from the language of the contract, not from the subjective

interpretations of the parties.   Id.; Executive Airlines v. Electric Boat Corp., 271 F. Supp.

2d 392, 395 (D. Conn. 2003); Sanitary Servs. Corp. v. Greenfield Village Ass'n, 36

Conn. App. 395, 399 (1994).

5.      "A court must enforce the contract as drafted by the parties and may not relieve a

contracting party from anticipated or actual difficulties undertaken pursuant to the

contract, unless the contract is voidable on grounds such as mistake, fraud or

unconscionability."  Gibson v. Capano, 241 Conn. 725, 730-31 (1997).

6.   Especially in the context of commercial contracts, courts assume that definite contract language is the best indicator of the parties' intent.  Tallmadge Bros., Inc. v. Iroquois Gas Transmissions, L.P., 252 Conn. 479, 500 (2000).

7.   A party may not create ambiguity in otherwise plain language by urging different interpretations of the agreement in the course of litigation.  Lee v. BSB Greenwich Mortgage Ltd. P'ship, 267 F.3d 172, 178 (2d Cir. 2001) (applying Connecticut law).  Any ambiguity in the contract must emanate from the language used in the contract rather than one party's subjective perception of its terms.  Id. at 179.

8.   The law is also clear that a contract includes not only what is expressly stated therein, but what is necessarily implied from the language used.  CAS Constr. Co. v. East Hartford, 82 Conn. App. 543, 552-53 (2004); Foley v. Huntington Co., 42 Conn. App. 712, 729, cert. denied, 239 Conn. 931 (1996).

9.   The law of contract interpretation militates against interpreting a contract in a manner that renders a provision superfluous.  CAS Constr, 82 Conn. App. at 553; United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 674 (2002).

10.   "When interpreting a contract [the Court] must look at the contract as a whole, consider all relevant portions together, and if possible give operative effect to every provision in order to reach a reasonable overall result."  R.T. Vanderbilt Co. v. Continental Cas.Co., 273 Conn. 448, 462 (2005) (quoting O'Brien v. United States Fid. & Guar. Co., 235 Conn. 837, 843 (1996)).

11.   Thus, in this case, the Subcontract, Geotechnical Report, Specifications, Plans, Drawings and other contract documents must be considered relevant portions of the contested

37

contract.

12. To the extent that the language of the contract is ambiguous, the rule of <u>contra</u>

<u>proferentem</u> requires that ambiguous provisions be construed against the drafter of the

contract.  <u>See</u> <u>Parrot v. Guardian Life Ins. Co.</u>, 273 Conn. 12, 23, n. 11 (2005); <u>Israel v.</u>

<u>State Farm Mut. Auto Ins. Co.</u>, 259 Conn. 503, 509 (2002).

**C.    Agency**

13. The Connecticut Supreme Court has defined "agency" as "the fiduciary relationship

which results from manifestation of consent by one person to another that the other shall

act on his behalf and subject to his control, and consent by the other so to act." <u>Gordan v.</u>

<u>Tobias</u>, 262 Conn. 844, 849 (2003) (quoting <u>Restatement (Second) of Agency</u> § 1

(1958)). In order to determine the existence of such a relationship the following three

elements must be shown: "1) a manifestation by the principal that the agent will act for

him; 2) acceptance by the agent of the undertaking; and 3) an understanding between the

parties that the principal will be in control of the undertaking." <u>Id.</u> (citing <u>Beckstein v.</u>

<u>Potter & Carrier, Inc.</u>, 191 Conn. 120, 132-33 (1983)).

14. An agent's authority may be actual or apparent. <u>Id.</u> (citing  <u>Maharishi School of Vedic</u>

<u>Sciences, Inc. v. Connecticut Constitution Assocs. Ltd. P'ship</u>, 260 Conn. 598, 606-07

(2002)).

15. "Actual authority" "is the power of the agent to affect the legal relations of the principal

by acts done in accordance with the principal's manifestations of consent to him."

<u>Restatement (Second) of Agency</u> § 7 (1958). Actual authority may furthermore be express

or implied. <u>Gordon</u>, 262 Conn. at 850 (quoting <u>Maharishi</u>, 260 Conn. at 607); <u>see</u> <u>also</u>

38

Johnson v. Schmitz, 237 F. Supp. 2d 183, 190 (D. Conn. 2002) (stating "[a]ctual authority refers to communications between the principal and the agent and may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act") (internal quotation marks and citation omitted).

16.    "Express authority" is sufficiently self-explanatory; should the principal direct the agent to perform on his behalf then the agent has express authority to act. See e.g., 3 Am. Jur. 2d Agency § 70 (2007) ("[I]f it appears that the principal sought to be charged has, orally or in writing, delegated authority to another by words which authorize such other to do a certain act or series of acts, then the authority of the agent in that respect is express authority.").

17.    "Implied authority," however, "is the authority which the principal intended his agent to possess. Implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and [the] agent." Id. (quoting Connecticut Nat'l Bank v. Giacomi, 242 Conn. 17, 70 (1997)).  It includes that authority implicitly granted to the agent by the principal to effectuate the express authority.

18.    "Apparent authority" is "that semblance of authority which a principal, through his own acts or inadvertances, causes or allows third persons to believe his agent possesses. . . Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal." Gordon, 262 Conn. at 850-51 (citing Tomlinson v. Board of Educ., 226 Conn. 704, 734-35 (1993)); see also Restatement (Second) of Agency § 8 (1958) ("Apparent authority is the power to affect the legal relations of

another person by transactions with third parties professedly as agent for the other, arising from and in accordance with the other's manifestations to such third parties."). Whether or not apparent authority exists depends upon two criteria. "First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the authority to bind the principal to the agent's actions." Gordon, 262 Conn. at 851.

**D.    Elm Haven's Requested Back Charges – Change Order No. 204-55**

19.    On Project No. 204, Phase IB, Elm Haven issued a total of fifty-five (55) change orders to Neri.  As set forth above, the first fifty-four (54), totaling $499,527.00, are not in dispute. However, Change Order No. 204-55, consisting of twenty separate items that Elm Haven seeks to back charge against Neri, totaling $409,154.00, is disputed by Neri. Each item of this Change Order is discussed below.

<u>Item 1 - Back charge for Repair of Meter Pit, Block C</u>

20.    Elm Haven seeks a back charge of $515.00 that it paid to Page Excavation for the repair of damaged meter pits along Webster Street, Block C, which Elm Haven claims was Neri's responsibility because it failed to provide adequate protection for the work that it had performed prior to its acceptance by Elm Haven.  (Ex. 291, Tab 1).

21.    John Ford testified that two water meter pits between two townhouses, one on Webster and one on Canal, had been crushed.  He repeatedly told Neri that it needed to repair them, but Neri refused.  (Ford Testimony 6/6/05 at 113).  In May to June 2000, Elm

Haven paid Page Excavation to do this work instead. (Id. at 114). Neri was obligated for this repair because Neri failed to provide protection for that work until it was approved. (Id. at 114, 221).

22. Neri has failed to provide any evidence to rebut Elm Haven's position in this regard.

23. The Subcontract provided that Neri was required to provide sufficient, safe, and proper facilities at all times for the protection of the Subcontract Work. (Ex. 1, Subcontract, Art. 6.1.3).

24. The Court finds that this was an appropriate back charge.

<u>Item 2 - Back Charge for Lawn Pedestal Box Replacements</u>

25. Elm Haven asserts a charge of $794.00 for installing two new pedestal lawn boxes in Block E to replace those that had been installed by Neri, but which had been damaged in May 2000, and which Neri refused to replace. (Ex. 291, Tab 2).

26.  John Ford testified that Neri was responsible for these boxes because it had failed to provide adequate protection for the original ones that were installed, as it was required to do under the terms of its Subcontract. (Ford Testimony 6/7/05 at 6).  If Neri had placed a barrier around the boxes and someone had plowed through the barrier and damaged the boxes, Mr. Ford would not have considered this to be Neri's responsibility. (Id. at 7).

27. Elm Haven provided written notice to Neri of the need to fix these boxes. (Ex. 291, Tab 2, Bates No. EH3724). After Neri failed to replace them, Mr. Ford had Semac Electric Company purchase new boxes and deliver them to the work site, and Elm Haven's superintendent installed them. (Ford Testimony 6/7/05 at 8).  He did not charge Neri for the labor. (Id.).

28.    Neri has failed to provide any evidence to counter Elm Haven's argument.

29.    The Subcontract provided that Neri was required to provide sufficient, safe and proper

facilities at all times for the protection of the Subcontract Work.  (Ex. 1, Subcontract, Art.

6.1.3).

30.    The Court finds that Neri is responsible for this back charge.

<u>Item 3 – Back Charge for Light Poles</u>

31.    Elm Haven has requested a back charge in the amount of $14,742.00 for costs it incurred

in replacing two light poles that it claims were damaged by "Neri forces" on New Street

3.  (Ex. 291, Tab 3).

32.    John Ford testified that these were special, decorative New Haven-type light poles,

"Century Poles," which were run over by Neri's dump trucks, one in June 2000 and

another in August 2000.  (Ford Testimony 6/7/05 at 9).

33.    After the first light pole was damaged, Neri responded to John Ford by letter, stating that

their subcontractor, C. Stokes, Inc., from which they rented the Tri-Axel Dump Truck,

had notified its insurance carrier and that an adjuster would be visiting the site within two

to three days.  "Payment for the damage will be forwarded in the near future."  (Ex. 291,

Tab 3, Bates No. EH03737).  Elm Haven never received payment from C. Stokes, Inc., or

its carrier.

34.    Neri has not responded to this claim.

35.    Elm Haven has provided an invoice from Semac Electric for $14,472.00 for two light

poles plus labor and materials for installation. (<u>Id.</u>, Bates No. EH03732).

36.    Accordingly, the Court finds that Elm Haven is entitled to a back charge against the

amount due and owing to Neri in the amount of $14,742.00.

<u>Item 4 – Back Charge for Additional Survey Costs</u>

37.    Elm Haven seeks a back charge in the amount of $35,000.00 for additional survey costs

that it incurred.  It states that in accordance with the Subcontract, Elm Haven was

required to provide a survey baseline, but that Neri was responsible for the layout of its

own work.  Elm Haven states that it was required to provide additional surveys to Neri

and incurred in excess of $70,000.00 in survey costs, which it is willing to split with Neri.

(Ex. 291, Tab 4).

38.    The accounts payable record from Elm Haven lists fourteen invoices from Diversified

Technologies ("DTC"), dating from 12/09/98 to 6/5/00.  (Ex. 291, Tab 4, Bates No.

EH03742).  Of these, two invoices totaling $6,985.00 pre-date Neri's Subcontract with

Elm Haven.

39.    John Ford testified that Elm Haven was required under the Subcontract to provide control

points, including a baseline for horizontal control, and a benchmark for vertical control.

These points would then be used by the Subcontractor to lay out the Project.  (Ford

Testimony 6/6/05 at 84; Ford Testimony 6/7/05 at 14).   Neri was responsible for

providing the survey layout engineering for the Project.  (Ford Testimony 6/6/05 at 84);

<u>see also</u> Subcontract, Art. 6.1.14; Attachment A, ¶ 6.A.

40.    Both Elm Haven and Neri used DTC for their survey work.  (Ford Testimony 6/7/05 at

15).  Mr. Ford testified that there were many times that Elm Haven had paid DTC's bills

that were actually Neri's responsibility.  Mr. Ford testified that he had looked at the DTC

invoices to determine what portion of the surveying work was Neri's responsibility, but

that there was "no way that [he] could take the invoice and take exactly what was required by Neri's contract out of these invoices." (Ford Testimony 6/7/05 at 40).

41. From the beginning of the Project through February 2000, the total amount that Elm Haven paid to DTC was $71,918.00. John Ford spoke with Elm Haven employees who had been on the job when DTC was called to do survey work and, based on those conversations, he estimated that about half of the calls were from Elm Haven and half from Neri. (Ford Testimony 6/7/05 at 18-19). He felt that a "more than fair" division of these bills was to split them with Neri. (Ford Testimony 6/7/05 at 16).

42. Throughout the trial, Neri's witnesses testified that survey problems had plagued the Project from the inception. Vincent Neri testified that DTC had been involved with the Project since 1998. The survey problems dated back to 1998, prior to Neri's involvement with the Project. (V. Neri Testimony 6/15/05 at 168). He said that Neri had worked out a deal with Jim Canning about having DTC perform additional survey work. (Id.).

43. The impact on the Project of the lack of survey information was documented in a June 5, 2000 letter from Mr. Ford to Kevin Maguire, a representative of the Owner of the Project. Mr. Ford wrote that as of that date, Elm Haven still had not received any survey control information and that Elm Haven had incurred significant additional costs and delays as a result of this lack of information. (Ford Testimony 6/10/05 at 42-44; Ex. 637). This letter was sent when the completion of Blocks E and F was reaching a critical point. He enclosed a letter Elm Haven had received from Neri, stating in part:

Pursuant to numerous conversations and promises we are still

> awaiting the engineering coordinates which will allow our survey
> crew to perform the required construction staking on Blocks "E"
> and "F".
>
> As you are aware this issue has been a problem since project start
> up and continues to cause financial impact and serious delays in
> the construction schedule. Pursuant to the subcontract
> agreement between NCLLC [Neri] and EHC [Elm Haven], your firm is
> responsible for said coordinate base line and bench marks. This
> layout has not taken place.

(Ex. 637, Bates No. EH05209).

44.   The Court finds that Elm Haven is not entitled to this back charge for several reasons.

First, several of the charges were incurred before Neri was even on the Project. Second,

the 50/50 division by Ford is purely speculative and is not supported in any way by

underlying documentation or testimony from DTC. This is a matter on which Elm Haven

bears the burden of proof. Third, Ford himself had little, if any, personal knowledge of

who ordered the survey work. Most of the work occurred prior to his involvement with

the Project. Lastly, there has been no proof that any of the charges that were paid by Elm

Haven were in fact for work ordered by Neri or that the charges were Neri's

responsibility. Therefore, the Court finds that Elm Haven has failed to carry its burden of

proof with respect to this particular back charge.

   Item 5 – Back Charge for Removal of Unsuitable Material from Blocks E and G

45.   Elm Haven seeks a back charge of $5,076.00 that it paid to Executive Landscaping for the

removal of unsuitable material stored on Blocks E and G after Neri refused to perform

this work. (Ex. 291, Tab 5).

46.   The fact that unsuitable materials would be encountered during excavations on this

Project was clearly anticipated by the parties and was addressed extensively in the Contract Documents. The Project site had formerly been used as a public housing project. The Geotechnical Report described the buildings that once stood on the vacant land between Ashmun and Canal Streets as six ten-story buildings with basements that were razed in 1988. The razing included removing the structures and foundations, crushing the building debris, and placing the crushed debris with some form of compaction in the open excavations. (Ex. 4 - Geotechnical Engineering Report dtd. 1/17/97 §§ 1.30, 3.10, 6.20).

47.    Mr. Ford testified that Neri had excavated unsuitables in Blocks E and G and had stockpiled the unsuitables in the center of those blocks, instead of disposing of them, which was preventing other trades from entering the Project to perform their work. (Ford Testimony 6/7/05 at 21; Ford Testimony 6/6/05 at 144). To the extent that the material could be reused, it had to first be removed. It could not be reused on site. (Ford Testimony 6/6/05 at 143). Mr. Ford said that he pushed and pushed Neri to remove the materials and finally, when he could not wait any longer, he contracted with Executive Landscaping to load and haul away the material. (Id. at 144-45).

48.    Neri took the position that these unsuitables were excavated from areas not covered in its original scope of work, and it wanted to be paid before it removed them from Blocks E and G.

49.    On August 10, 2000, Mr. Ford wrote Vincent Neri demanding that all unsuitables be removed from Blocks E, F, and G by the close of business the following day. (Ex. 291, Tab 5, Bates No. EH03756). Another letter demanding removal of the materials stored

in Blocks E and G was sent on August 14, 2000 (Ex. 58), and finally on September 22, 2000, Elm Haven wrote Neri stating that it would proceed to have the materials removed by others and hold Neri responsible for the cost thereof as well as all damages resulting from Neri's failure to proceed as previously directed.  (Ex. 68; <u>see also</u> Ford Testimony 6/7/05 at 25).

50.     Executive Landscaping performed this work between September 25 and 28, and billed Elm Haven $5,160.00.  (Ford Testimony 6/7/05 at 21-25).

51.     Under the terms of the Subcontract, Neri was required to excavate all unsuitable material within the cut lines of the Project, as specified in the Contract Drawings or the Geotechnical Report, and remove and dispose of such unsuitable material offsite.

> Subcontract includes hauling and disposing of all unsuitable and/or surplus material offsite. . . . All unsuitable material <u>within cut material and as noted in Geotechnical Report to be removed from the site and legally disposed of.  Any unsuitable material not included in contract requirements that is required to be removed shall be done per Unit Prices included in the Subcontract.</u>

Ex. 1, Attachment "A" to Subcontract ¶ 6.G (emphasis added).   The Subcontract specifically excluded excavation and disposal of unsuitables "beyond the limits indicated in the Contract Documents."  (Attachment "A" at 10).  The Project Specifications, § 02200 ¶ 1.4A (Ex. 3) defined "excavation" as consisting of the "removal of materials encountered to subgrade elevations and the reuse or disposal of materials removed."   The Project Specifications § 02200 ¶ 2.1.B. further strictly defined "satisfactory soil materials" as "ASTM D 2487 soil classification groups GW, GP, GM, SW, SP, and SM; free of rocks or gravel larger than 2 inches (50 mm) in any dimension, debris, waste,

frozen materials, vegetation and other deleterious matter."

52.     According to John Ford, under the terms of the Subcontract, Neri was to remove and

        dispose of all unsuitables within the excavation lines of the Project from existing grade to

        the bottom, where the plans called for footings or the bottom of a pipe. (Ford Testimony

        6/6/05 at 78-79). Thus, the excavation and disposal of unsuitables within the limits

        indicated in the Subcontract was part of Neri's scope of work. Excavation and disposal

        of unsuitables beyond the limits indicated in the Subcontract documents were outside of

        Neri's scope of work, for which they were to be compensated. (V. Neri Testimony

        6/28/05 at 13-15; V. Neri Testimony 6/24/05 at 62-63).

53.     The procedure for determining the status and quantity of soil materials was set forth in a

        letter from Lorraine Beckwith to Simon Simoncini dated August 19, 1999:

        > For the record, the procedure which I have stated numerous times,
        > both in writing and verbally, for determining and quantifying
        > unsuitables is as follows:
        >
        > > 1. Neri Construction is to immediately notify Elm Haven
        > > Project Superintendent, Ivan Carlsen, if possible unsuitable
        > > material has been encountered. EHC will respond and view
        > > the condition, verify the material is unsuitable and quantify
        > > same.
        > >
        > > 2. If Neri Construction and EHC are unable to reach an
        > > agreement on whether the material is unsuitable or the
        > > quantity of same, then the Site Engineer will be contacted.
        > > The Site Engineer, LEA, as the interpreter of their contract
        > > documents, will make the final determination.

        (Ex. 662; see also Carlsen Testimony 9/22/05 at 13-15).

54.     With respect to the materials at issue, there appears to be no question that they were

        unsuitables. (Ex. 677, Ltr. from Ford to Owner, stating that these soils were determined

by LEA to be unsuitable).  However, there is no evidence as to the source of these

materials. Since the removal cost is a back charge on which Elm Haven bears the burden

of proof, the Court finds that Elm Haven has not carried that burden and denies its request

for a back charge in the amount of $5,076.00.

Item 6 – Back Charge for Sonatube Excavation

55.    Elm Haven has asserted a back charge of $6,281.00[13] for "excavation for sonatube

installation and corrective work."   Neri takes the position that excavation for sonatubes

was never part of its scope of work and, on at least one occasion, Elm Haven paid Neri

for this work as an extra on the Project.

56.    John Ford described sonatubes as footings or foundation for a portion of a building. In

this case, they were eight-inch round concrete columns installed below the frost line to

support the roof over the stairs.  (Ford Testimony 6/9/05 at 167-69; Ford Testimony

6/7/05 at 26).   The sonatubes were installed by Santos Construction, the concrete

foundation contractor, but, according to Mr. Ford, the excavation for the sonatubes for

Blocks E and F was part of Neri's original scope of work because Neri was to "perform

all excavation and backfill for building footings and foundations."  (Ford Testimony

6/9/05 at 169-71, citing Subcontract, Attachment A, ¶ 6.H).  Mr. Ford testified that on

many occasions, he directed Neri to do the excavation, but they refused because they did

not "own" the sonatubes, i.e., they did not consider it part of their original scope of work.

(Ford Testimony 6/7/05 at 30-31).  He, however, believed that they "owned" all

---

[13] This figure is derived from the invoices attached as Tab 6 to Exhibit 291, plus the invoices Bates stamped EH3752 and EH3754.

foundation excavation and backfilling and, therefore, it was their responsibility. (Id.) "[J]ust as you would dig out for a foundation, you [sic] got to dig out for a sonatube." (Id. at 32).

57. Vincent Neri, on the other hand, testified that Neri was not required to excavate for sonatubes because no where in their Subcontract did it required them to do this work. In fact, on several occasions, Elm Haven paid them to do this work on a time and material basis. (V. Neri Testimony 6/15/05 at 169; Exh. 267). They never discussed this with Elm Haven when the Subcontract was signed.

58. Exhibit 5, Drawing A-103, depicts sonatubes in the "Foundation and First Floor" drawing.

59. With respect to Exhibit 267, a Change Order dated July 24, 2000, which Mr. Ford signed authorizing payment to Neri for sonatube excavation, Mr. Ford testified that he could not recall why he signed it, whether it was for premium time because the work was done on Saturday, or for some other reason. (Ford Testimony 6/10/05 at 124-25).

60. Based on a review of the testimony and documents, the Court concludes that sonatubes were part of the foundation. Because Neri "owned" the excavation and backfilling work for foundations, Neri was responsible for excavation and backfilling for sonatubes, even though this was not expressly spelled out in the contract. Accordingly, the Court finds that a back charge against the Subcontract Price of $6,281.00 for monies paid to Executive Landscaping for sonotube excavation was proper.

<u>Item 7 - Back Charge for Application of 2 Inches of Top Soil in Block B</u>

61. Elm Haven seeks to back charge Neri for $290.00 for the material costs associated with

the top soil placement in Block B, since Neri did not install top soil to the required depth of six inches.  (Ex. 291, Tab 7).

62.    Mr. Ford testified that Neri "owned" the placement of top soil in all of the blocks.  In December 1999, when they were rushing to complete Block B, Neri put four inches of top soil on Block B and wanted the opportunity to screen the unsuitable material that had been stockpiled for the additional two inches of top soil, rather than having to bring in new top soil, or "borrow," which was more expensive.  In March, 2000, when they returned to the Project, Elm Haven offered to pay the difference between Neri's processing the existing soil and having new soil brought in and issued Change Order No.207-17 for $8,890.00 to cover these additional costs.  Neri, however, continued to refuse to install the additional two inches, so in April, Elm Haven contracted with Executive Landscaping to perform this work for $9,180.00 (Ex. 291, Tab 7, Bates No. EH03772),  which was $290.00 more than Elm Haven had offered to pay Neri.

63.    Neri does not dispute this charge of $290.00.

64.    Therefore, the Court finds that Elm Haven is entitled to a back charge of $290.00 for application of an additional two inches of topsoil on Block B.

<u>Item 8 - Back Charge for Video Inspections of Sewer Laterals</u>

65.    Item 8 of Change Order No. 204-55 is for $2,045.00, which Elm Haven paid to Mr. Rooter for video inspection of the sewer laterals, which was required by the City of New Haven Water Pollution Control Authority.   (Ex. 291, Tab 8).

66.    Mr. Ford testified that Elm Haven had issued a change order to Neri to perform a video inspection of the sewer laterals.  On numerous occasions, he had asked for the video and

a report as to which laterals were damaged. Neri refused to respond. Before additional paving was performed, he needed to know that the sewer laterals were correct and so he hired Mr. Rooter (d/b/a Connecticut Sewer) to perform this work on three separate occasions. (Ford Testimony 6/7/05 at 40). The video inspections performed by Mr. Rooter indicated that there were a number of construction problems and debris in the laterals and main sewer line. (Ex. 291, Tab 8, LEA Report, Bates No. EH03785).

67.    On November 6, 2000, Mr. Ford wrote Vincent Neri acknowledging that Neri had already performed the video inspections of the lines in question, but because Neri had refused to forward to Elm Haven any records of the inspection, Elm Haven was required to duplicate this work. (Ex. 291, Tab 8, Bates No. EH03783). Mr. Ford advised Neri that "[d]ue to NERI Construction's failure to properly perform the inspection as outlined in the Change Order issued to your firm for this work, EHC [Elm Haven] will be issuing a deduct Change Order deleting the work from your contract." (Id.)   Additionally, "[a]ll costs incurred by EHC in repairing the sanitary sewer lines installed by NERI will be deducted from NERI Construction Contract Amount." (Id.)

68.    Neri has not addressed this back charge in its proposed Findings of Fact and Conclusions of Law .

69.    The Court finds that the inspection of the sewer laterals was the responsibility of Neri and that due to its failure to provide Elm Haven with the videos and report, Elm Haven was justified in having another subcontractor duplicate this work. The Court approves a back charge in the amount of $2,045.00.

Items 9 - 12 - Back Charge for Concrete Steps, Walks & Railings

52

70.     As part of Change Order No. 204-55, Elm Haven seeks to back charge  Neri for

$47,698.00 for the construction of concrete steps, walks, and railings.  This figure

includes payments to Santos Foundations, Inc. ($33,823.00) for the installation of

concrete steps; to Shawnlee Construction ($6,624.00) for the framework and handrails for

the concrete stairs in Block B, as well as moving floor trusses and truss repairs; to

Lengyel Construction ($5,931.00) for the installation of fifteen (15) sets of wood stair

railings and the repair of a concrete sidewalk and installation of a concrete pad; and to

Paul P's Welding ($1,680.00) for the installation of pipe handrails.  Elm Haven contends

that all of this work was within Neri's scope of work, which Neri denies.  (Ex. 291, Tabs

9-12).

71.     The payments to Santos included $4,661.00 for sonatube excavation in blocks C and E,

which is discussed under Item 6 and will be allowed as a back charge for the reasons set

forth therein.  (See Ford Testimony 6/7/05 at 51 "Same issue, different block").

72.     With respect to the concrete stairs, Neri maintains that the plans did not call for concrete

steps on the units and, therefore, they did not "own" the steps.  (V. Neri Testimony

6/15/05 at 171, 174).  They did not include the concrete steps in their bid.  Vincent Neri

testified that no one, including Elm Haven, knew from what material the steps were to be

constructed. Based on his review of the plans, he thought that they showed a "stringer

detail" which would indicate that the stairs were wood.  Additionally, there was no

footing for the stairs.  They were sitting on concrete pads, which also indicated to him

that the stairs were probably made of wood.  (V. Neri Testimony 6/17/05 at 4).  Mr. Neri

thought it was highly unlikely that Elm Haven would install concrete stairs because of the

cost involved.  (Id.).  He discussed this matter with Dave Lucier with Elm Haven, who did

not know the answer, but their feeling was that the stairs were wood, which would not

have been within Neri's scope of work.  In late October 1999, Lucier sent an "RFI" to the

architects asking what material was to be used for the stairs at the rear of certain units.

(Ex. 633).  Ultimately, Mr. Lucier advised Neri that the stairs were to be concrete and that

Neri should proceed with this work on a time and material basis, as set forth in the RFI.

(Ex. 632 & V. Neri Testimony 6/15/05 at 172).  "He gave us the addendum — the RFI.

Right on there it says perform it on a T&M basis."  (Id. at 172).  "Dave Lucier told us we

were going to get T&M on Block B and we figured that would follow through on the rest

of the blocks, if they requested that we do the work."  (V. Neri Testimony 6/17/05 at 5).

Prior to Neri's receipt of this change order, no one at Elm Haven had indicated that the

unit steps were part of Neri's scope of work.  (Id.).

73.    Likewise, Vincent Neri maintains that the plans did not call for railings on the stairs at the

units.  The only detail that showed railings was for the site stairs, which were clearly

identified as within Neri's scope of work.  (V. Neri Testimony 6/17/05 at 6).  The only

other plans that showed railings were on the porches and were part of the framing plans,

which were within Shawnlee's scope of work. (V. Neri Testimony 6/17/05 at 3-6).  Thus,

Neri did not consider the hand rails to be within their scope of work.  (Id.).

74.    With respect to the work performed by Lenygel repairing a sidewalk that Neri had

previously installed (Ex. 291, Tab 11, Bates No. EH03813), Vincent Neri testified from

contemporaneous notes that he had made that the problem was caused by the entry roof,

which was larger than on the plans, thus requiring a larger entry pad. (V. Neri Testimony

6/17/05 at 8).  The framing for this larger roof was incorrect so that, rather than changing

the framing, Elm Haven decided to rip out the sidewalk and entry pad and back charge

Neri for this.  (Id. at 8-9).  He testified that no one at Elm Haven ever asked them to

correct their work.  (V. Neri Testimony 6/15/05 at 178).   He questioned Tom Jensen as to

why Elm Haven had not tried to resolve this with Neri prior to bringing in another

subcontractor.  (V. Neri Testimony 6/17/05 at 8).

75.    As to Lenygel's installation of concrete stairs at the units, Vincent Neri testified that they

never owned this work because it was not specified in the drawings as to whether they

were to be concrete or wood.  (V. Neri Testimony 6/15/07 at 174).  He admits, however,

that they did own the cement site stairs.  (Id.  at 175).   Site stairs were the stairs that

would take you from the parking lot to the sidewalks and eventually to the buildings; unit

stairs were connected to the buildings.  (Id.).

76.    As to Elm Haven's requested back charge for having Paul P's retrofit the railings,

Vincent Neri testified that Neri agreed that they "owned" the concrete step site stairs, but

they did not own the unit stairs and railings adjacent to the building.  (Id. at 11).  He was

not sure if this back charge related to site stairs or unit stairs.  (Id. at 12).  These railings

were not on any of the detailed drawings that he had ever seen.  Rather, when Elm Haven

decided to accelerate the work on Block B, they instructed Shawnlee to install temporary

wood handrails and to later come back in and retrofit them with a pipe railing.  (Id. at 10.)

 No one from Elm Haven ever told Neri that they were having Paul P's perform this work

or that Neri would be back charged for this work.  (Id. at 11).

77.    Mr. Ford, on the other hand, testified that these items were all within Neri's scope of

work.  (Ford Testimony 6/7/05 at 50).  Mr. Ford explained that the site contractor is often

the first one in on a job and the last one out, and that their work involves not only big

projects, but also some detail work like railings.  (Id. at 72-73).  He said that Neri had

actually installed some of the concrete steps that were later damaged, and questioned why

they would have done the original installation if the concrete steps were not within Neri's

scope of work.  (Id. at 54).

78.    As to the concrete sidewalk and entrance pad that Lengyel poured, Mr. Ford testified that

this was a handicap unit, for which Neri had poured the original sidewalk and patio,

which did not meet the standard ADA code.  Their work had to be ripped out and the

patio had to be raised to meet the threshold and the sidewalk had to be repoured to the

correct grade.  (Id. at 63).  He acknowledged that Neri took the position that the original

sidewalk and patio were poured according to the plans.  (Id. at 64).

79.    The Court finds that, as discussed above, Neri was responsible for the sonatube

excavation and, therefore, $4,661.00 was properly back charged against what is owed to

Neri.

80.    The Court recognizes that under the Subcontract, Attachment "A," ¶ 6.S, Neri was

obligated to provide and install concrete sidewalks and concrete staircases with handrails

as part of its site concrete work.   Nevertheless, the Court finds that the Subcontract

Drawings are ambiguous as to the construction of the unit steps.  This ambiguity must be

construed against Elm Haven.   Moreover, Elm Haven's own agent, Mr. Lucier, advised

Neri to proceed with installation of the steps on a time and material basis.  Therefore, the

Court holds that Elm Haven may not back charge Neri for any of the costs associated with

installation of the concrete unit stairs, including the amounts paid to Santos and the cost of the framework paid to Shawnee.

81.    Also with the unit railings, the Court agrees with Neri that this was not within its scope of work and, therefore, the amounts paid to Lengyel and Paul P's for the wood railings and later retrofitting these with pipe should not be back charged to Neri.

82.    As for the cost of the concrete sidewalk repair and repouring of the entrance pad for the handicap unit in the amount of $2,035.00, the Court finds a direct conflict in the testimony of Mr. Ford and Mr. Neri as to whether the repairs were necessitated by Neri or another subcontractor. Because Elm Haven has not carried its burden of proving that this additional work was caused by the improper installation of the initial sidewalk and pad by Neri, the Court holds that Elm Haven is not entitled to back charge this amount against the money due to Neri under the Subcontract.

83.    Therefore, out of the total $47,698.00 sought by Elm Haven, the Court authorizes a back charge of only $4,661.00 for sonatube excavation.

<u>Item 13 – Back Charge for Street Cleaning</u>

84.    Elm Haven seeks to back charge Neri for $769.00 for street cleaning that Neri refused to perform. Elm Haven states that it was forced to hire High Tech Mobile Company to perform this work on May 11, 2000, and August 7, 2000, and that this work was necessary for dust control and safety reasons. (Ex. 291, Tab 13; Ford Testimony 6/7/05 at 73-78).

85.    Neri admits that it was responsible for sweeping the streets during its own activities but maintains that the street cleaning charges incurred by Elm Haven were necessitated by

57

mud and debris generated by other subcontractors. (Ex. 651).

86.    The Subcontract, Article 6.1.7, sets forth the obligation of Neri to clean up rubbish and debris caused by its Subcontract Work and further provides that the determination of Elm Haven as to who was liable for the removal was final.

> The Subcontractor agrees that in the performance of the Subcontract Work it will:
>
> Clean and remove all stains, marks, splatters and dirt resulting from the performance of the Subcontract Work; clean up and remove from the Project site all rubbish and debris resulting from the performance of the Subcontract Work; in the event of a controversy as to whether the Subcontractor is required to remove specific rubbish or debris, the determination of the Contractor as to the liability for removal of such rubbish or debris shall be final.

(Emphasis added).  Additionally, Attachment "A" to the Subcontract, ¶ 6.W.(e), states that Neri shall be responsible for street cleaning during its activities. Paragraph 6.GG. further provides that Neri is responsible for clean-up and removal of all debris and material caused by the operation from the site.

87.    It is clear from the Subcontract that Neri was responsible for clean-up caused by its activities and that Neri was bound by Elm Haven's determination as to which subcontractor was liable for the removal of particular rubbish and debris.   While it is not clear that the street cleaning was necessitated by activities of Neri, the Subcontract did provide that Elm Haven's determination in that regard would be final.  Accordingly, the Court finds that Neri is responsible for this back charge of $769.00.

Item  14 - Back Charge for Erosion and Sedimentation Control Measures

88.    As part of Change Order No. 204-55, Elm Haven seeks to back charge Neri for various

erosion control measures that it failed to perform and which Elm Haven hired other subcontractors to perform. (Ex. 291, Tab 15). The amount sought is $4,137.00.[14]

89.    Under the terms of the Subcontract, Neri was required to maintain erosion and sedimentation control throughout the period of performance of the Subcontract:

>   Provide all Erosion & Sedimentation Control work required by Contract Drawings including the maintenance of all [Erosion & Sedimentation Control] measures during the time [Neri] is on the job.

Subcontract, Attachment "A" ¶ 6.C. Neri was to remove these structures at the end of the Project after landscaping was complete and the grass had taken hold. (Id.)

90.    According to John Ford, Elm Haven had notified Neri on numerous occasions dating back to December 30, 1999, that its efforts to control the erosion and sedimentation on the Project were deficient. When Neri refused to respond to the demand letters from Elm Haven, Elm Haven purchased erosion control materials, such as hay bales and silt fences, and then hired workers from Labor Ready to perform the work. (Ford Testimony 6/7/05 at 83-84).

91.    Neri has not disputed this back charge and the Court will allow a back charge for erosion control measures.

92.    Elm Haven concedes that the total amount claimed for erosion control $5,031.91, should

---

[14] Tab 15, Ex. 291, indicates that the amount sought is $5,883.00. According to Mr. Ford, the document bearing a Bates No. EH03847 is a handwritten summary of the charges totaling $5,883.00. However, the charges on EH03847 total $5,031.91, from which he has subtracted $397.50 for street sweeping, which is part of Item 13. Additionally, he concedes that the $380.00 paid to Executive Landscaping for topsoil and the $515.00 for replacing meter pits need to be deleted. (Ford Testimony 6/7/07 at 81-87). Mr. Ford thus arrives at a total of $4,136.91. (Id. at 87). Based on the Court's calculations, that figure should be $3739.00.

be reduced by $397.50 for street sweeping charges paid to High Tech Mobile, $380.00

paid to Executive Landscaping for topsoil; and $515.00 for replacing the meter pits in

Block C.  Additionally, the Court deletes the $606.32 paid to Suzio Concrete for pads at

Block C and the $539.00 paid to Semac for temporary power to Block C caused by

unauthorized fence/gate removal.  These charges have nothing to do with erosion control.

Thus, the Court allows a back charge  of $2,594.00.

<u>Item 15 - Back Charge for Fine Grading and Paving</u>

93.     The next item that Elm Haven seeks to back charge against the amounts due and owing to

Neri is $182,283.00 for the fine grading and paving work paid to Waters Construction.

(Ex. 291, Tab 16).

94.     Mr. Ford testified that this charge relates to the fine grading and paving work on Blocks

E, F, and G.  He testified that he had previously had problems with Neri's performing

paving work in Blocks B and C and that with the approach of winter, it was critical to

make sure that a paving subcontractor had been lined up and that the work would be

completed in a timely fashion.  On October 4, 2000, he issued a request to Neri to provide

to him by October 6, 2000, the name of Neri's paving subcontractor, confirmation that it

would begin paving on October 16, 2000, and complete paving by October 20, 2000, and

a copy of the paving subcontract.  (Ford Testimony 6/6/05 at 132, 151-54; Ex. 291, Tab

16, Bates No. EH03873).  At approximately 5:00 p.m. on October 6, 2000, Neri

forwarded to Elm Haven a "Subcontract Agreement" between Empire Paving and

Hammonasset Construction, in the amount of $148,080.85. (Ex. 635).  Mr. Ford testified

that he was "absolutely positive" that he did not have the Subcontract Agreement when

he made the decision to remove the fine grading and paving work from Neri's scope of

work on October 6, 2000.  He told Carl Neri that they had missed the deadline and that

he was going to have the work performed by others.  (Ford Testimony 6/6/05 at 162).

Mr. Ford admitted that he had already contacted Waters prior to October 6, 2000, to see if

they could perform the work and to get pricing, and he had met with them at the Project.

(Id. at 167-70).  Additionally, Mr. Ford objected to the subcontract provided by Neri since

it was a copy of a two-month-old quotation from Empire Paving, executed on October 6,

2000, with Hammonasset Construction LLC.  Elm Haven immediately notified Neri that

this quotation did not satisfy its request as it was a "quote" that was only good for 30

days, it had no schedule, and it was provided to Hammanosset, not Neri. (Id. at 157).  Elm

Haven then notified Neri that it would perform the fine grading and paving work using

another subcontractor and back charge Neri for the cost of this work.  (Ex. 76).  Elm

Haven further stated that "due to NERI Construction's failure to prosecute the work in

Blocks E, F, and G in accordance with the NERI Construction Schedule dated 9/14/00,

and NERI's continued failure to provide [Elm Haven] with a detailed recovery plan to

complete the work in Block E, F, and G1 by 10/27/00, EHC will be supplementing your

firm's forces as necessary to complete the balance of the work remaining."  (Ex. 76).

95.    Vincent Neri testified that in 1999, Elm Haven had executed a release with regard to the

roadwork that had been completed around Blocks B and C, approving the work that had

been performed.  (V. Neri Testimony 6/17/05 at 16-17).  Additionally, LEA and the

testing lab had signed off on their roadwork except for a couple of minor areas.  Thus,

any costs associated with the shimming of these roads should not be back charged to

Neri.  (<u>Id.</u> at 17-18).

96.     Kim Neri testified that, prior to Ford's demand that Neri provide a copy of the paving

        subcontract, she had already negotiated the subcontract with Empire Paving, probably a

        month earlier.  (K. Neri Testimony 9/13/05 at 178-79).  The subcontract (Ex. 635)

        between Hammonasset and Empire dated September 21, 2000, and signed on October 6,

        2000, provided that Empire would perform all of the fine grading/rolling, paving, and

        related work on Foote Street, New Streets 3 and 4, Webster Street, Dixwell Avenue,

        Ashmun Street, Admiral Street, and various parking lots. (<u>Id.</u>)  It further stated that all

        work would be in accordance with the Subcontract documents and that Empire would

        commence work on October 16, 2000, and would complete work by October 20, 2000.  It

        was signed by Kim Neri on behalf of Hammonasset.  (<u>Id.</u>)  Elm Haven was aware of

        Hammonasset because it had previously performed paving work on the Project through

        Tilcon, another contractor.   (K. Neri Testimony 9/13/05 at 176).  After Ford expressed

        concerns about the paving deadlines, Kim Neri called the owner of Empire Paving and

        confirmed with him that he could meet the deadlines.  (K. Neri Testimony 9/13/05 at

        179).  On October 6, 2000, at 4:53 p.m., Kim Neri faxed a copy of the executed contract

        between Hammonasset and Empire to Mr. Ford. (Ex. 636).  Kim Neri then called Mr.

        Ford and confirmed his receipt of the contract and noted that they had committed to his

        completion dates in item 13 of the subcontract.  (K. Neri Testimony 9/13/05 at 180).

        When she finished her conversation with Mr. Ford, she thought everything was fine and

        that Empire would be doing the paving.  (<u>Id.</u> at 181).   Subsequent to Kim Neri's

        telephone conversation, that evening, Mr. Ford faxed Neri a letter stating that he was

having the paving work performed by another company. (K. Neri Testimony 9/13/05 at 184).

97.    As of October 6, 2000, Empire was already on the Project performing fine grading of the roads, which were ultimately paved by Waters.  (K. Neri's Testimony 9/13/05 at 181-82). Had Empire performed the paving work, the cost to Neri would have been $148,080.85. (Id. at 195).

98.    The Court finds more credible the testimony of Neri's witnesses that they complied with Mr. Ford's instructions and had faxed to him a signed contract with Empire for the paving work prior to close of business on Friday, October 6, 2000.  The Court further finds that the contract with Empire substantially complied with Mr. Ford's request for information. The contract was signed by Kim Neri and Mr. Ford testified that he knew that Hammonasset was part of the Neri construction companies.  (Ford Testimony 6/6/05 at 157).   The Waters contract is dated October 6, 2000, and from the time stamp appears to have been prepared that morning before the expiration of the time for Neri to provide Ford with a paving subcontract.  (Ex. 80).

99.    Accordingly, the Court will allow this back charge but limit it to the amount that Neri would have paid Empire, or $148,081.00, rather than the higher amount that Elm Haven paid to Waters.

<u>Item 16 - Back Charge for Sanitary Sewer Repairs</u>

100.    Elm Haven next seeks to back charge Neri for repairs to the sanitary sewer laterals performed by Waters in October 2000 in the amount of $30,011.00, which includes the labor and materials to repair the laterals and the costs of excavating through pavement or

concrete to access the laterals.  The specific laterals at issue were two laterals in Block E, two on Foote Street, and two in Block F.  According to Elm Haven, the lines had either been installed incorrectly or had been damaged.  (Ex. 291, Tab 19, Bates No. EH03949).

101.    John Ford testified that in addition to performing the fine grading work and paving on Foote Street, New Street 3 and New Street 4, and the parking lots and driveways in Blocks E, F, and G, Waters also completed a number of other items on the Project pursuant to a purchase order issued by Elm Haven.  (Ex. 80; Ford Testimony 6/7/05 at 106-07).  This included repairs to the sanitary sewer laterals, for which Elm Haven paid Waters $30,011.00. (Id.)

102.    As discussed above, after Neri failed to produce the testing report and video on the sanitary laterals that it had installed, Elm Haven contracted with Mr. Rooter to perform video inspections of the sanitary laterals, which revealed sagging, depressed joints, dropped and/or separated pipes, and blockages.  (Ex. 291, Tab 19, Bates No. EH03943).

103.    Neri maintains that the installed sanitary laterals had been inspected by LEA and approved prior to backfilling and that they were subsequently damaged by the utility companies, which were scheduled by Elm Haven and for which Neri should not be held responsible.  (V. Neri Testimony 6/15/05 at 188-92).  In fact, Neri points out, Kevin Maguire with Beacon/Corcoran Jennison wrote Fletcher Thompson on February 7, 2001, summarizing construction change orders on the Project and in the attached schedule, entitled "Construction Change Order Summary," described a new pending Change Order for $30,000 as "Lateral Repairs due to Utility/Sitework Conflict" and in the Change Order Log, described it as "Exposure on Lateral repairs caused by utility."  (Ex. 676) (emphasis

added).   Vincent Neri testified that although the Subcontract required them to coordinate their work with the utility companies, this meant that they would work in another area if the utility companies were present.  Elm Haven handled all of the scheduling of the utility work, and Neri had no involvement with this.  (V. Neri Testimony 6/15/05 at 188-92).  Under the Subcontract, paragraph 3.5, Neri was to be compensated for repairs caused by damage to work by others and, thus, had it performed these repairs, the cost of the repairs would have been an extra to the Subcontract.

104.    On September 22, 2000, Elm Haven directed Neri to immediately make all necessary repairs to the sanitary laterals and advised Neri that if it failed to proceed with this work by September 27, 2000, Elm Haven would make provisions to have the work performed by others and hold Neri responsible for the cost.  (Ex. 291, Tab 19, Bates No. EH03953).

105.    On October 19, 2000, Elm Haven advised Neri that Waters had been mobilized to perform this work, which was necessary so that the area could be paved.  (Ex. 291, Tab 19, Bates No. EH03951).  Neri did not offer to perform this work until after Waters had already commenced performance.

106.    Although the Court appreciates Neri's argument that it should not be responsible for repairs to laterals that were damaged by others, the LEA report setting forth the repairs that were needed does not support Neri's argument that all or even most of the damage was caused by utility companies.  Most of the required repairs were due to sagging or blocked laterals.  (Ex. 291, Tab 19, Bates No. EH03943).  This does not appear to be the type of damage that would have been caused by a utility company.

107.    Accordingly, the Court finds that repair of the laterals was within Neri's scope of work

and that a back charge in the amount of $30,011.00 is appropriate.

<u>Item 17 - Back Charge for Resetting Manhole Frame and Covers</u>

108.    The next back charge is in the amount of $11,675.00 for amounts paid to Waters for

resetting manhole frames and covers.

109.    On October 3, 2000, Elm Haven notified Neri that as part of Change Order No. 207-19,

the manhole covers and frames on Ashmun Street, Canal Street, New Streets 1 and 2, and

Webster Street around Blocks B and C were too high and needed to be reset to grade.

The work needed to be completed by October 4, 2000.  (Ex. 291, Tab 19, Bates No.

EH03952).  When Neri did not respond or perform the work, Elm Haven contracted with

Waters to perform it.   (Ford Testimony 6/7/05 at 104).

110.    Neri has not disputed this back charge in its proposed Findings of Fact and Conclusions

of Law.

111.    The Court finds that Neri is liable for this back charge.

<u>Item 18 - Back Charge for Removing and Replacing Sidewalk and Handicap Ramps</u>

112.    Elm Haven also seeks to back charge Neri for the $65,800.00 it paid to Waters for

removing and replacing sidewalks and handicap ramps in Blocks E, F, and G.  Waters

had subcontracted this work out to PDF Construction Company.

113.    The invoice from PDF to Waters states that it is for handicap ramps, granite curbing,

concrete stairs, and miscellaneous.  (Ex. 291, Tab 19, Bates No. EH03917).

114.    Neri maintains that it is not liable for this because on October 17, 2000, Elm Haven had

requested that Neri stop work on these handicap ramps due to the need for a change in the

design of the handicap ramps to meet local New Haven requirements.  (Ex. 639 & Ex.

66

643).  While Neri was waiting for the design changes (Ex. 640),  Elm Haven informed it

that it was going to have the work performed by others.  (Ex. 641 & Ex. 642).  Neri

immediately wrote Elm Haven, taking exception to having the work performed by

another subcontractor.  (Ex 642).  The redesign was not developed until after Neri had

been taken off the job.  (Ex. 643; Ford Testimony 6/10/05 at 58-59).  If Neri had

performed the work based on the redesign, it would have been an extra to its Subcontract.

As of January 2001, Elm Haven had a pending Change Order submitted to the Owner for

the revised handicap ramps performed by PDF.

115.  John Ford conceded that Elm Haven had issued a Change Order to Neri for the handicap

ramps because they needed to be redesigned.  (Ford Testimony 6/10/05 at 52).  The

problem was that the granite curbs abutting the ramps were three and one-half to six

inches lower than the approved grade.  (Id. at 60).  Neri had installed the granite curbs.

However,  John Ford admitted that the granite curbing had been installed in accordance

with the contract drawings and that the problem was with the design and not Neri's

installation of the curbing.  (Id. at 61; Ex. 643).

116.  The Court finds that Neri had been instructed not to perform this work and was never

provided with the new designs for the ramps.  Therefore, its performance of this work

was excused. Had Neri performed the work it would have been an extra to the

Subcontract.  Therefore, the Court finds that a back charge for this work is improper and

disallows it.

Item 19 - Back Charge for Direct Payment for Radius Curbing and Bull Nose Concrete

117.  Item 19 on Change Order No. 204-55 is a back charge for $1,467.00 for granite curbing

67

that Elm Haven ordered directly from the North Carolina Granite Company for New Streets 3 and 4.

118.    The Subcontract required Neri to furnish all granite curbing where indicated on the plans. (Ex. 1, Attachment A, ¶ 6.P).

119.    Neri maintains that the original contract drawings called for curbing with a 45-degree angle, which was what Neri used in ordering granite for the curbing.  There was no requirement for radius granite, which is far more expensive, and would have been an extra to Neri's contract.  (V. Neri Testimony 6/17/05 at 19-25).

120.    Neri had ordered all of the granite curbing from North Carolina Granite, which had met with the engineers and representatives of Elm Haven to review all of the plans and shop drawings developed by Neri and approved by Elm Haven to determine the quantities of granite needed.  (K. Neri Testimony 9/13/05 at 171-75).

121.    Vincent Neri had raised this issue with Elm Haven, which then generated an RFI directed to the engineers asking for clarification.  LEA responded:

> Although the original design of the curb returns did not specify a radius for the transition piece of curb, it was shown with a radius. The design of the curb returns was subsequently revised . . . . to reflect the final configuration and the proper materials of construction per the City of New Haven  requirements.

(Ex. 291, Tab 21, Bates No. EH03977).  In order to meet these requirements, a five-foot piece of granite was needed for the eight corners between New Streets 3 and 4.  (Ford Testimony 6/7/05 at 123). Neri refused to purchase the material, so Elm Haven ordered it directly.  (Id.).

122.     The Court finds that because this granite curbing was not called for in the original

drawings, it is not an appropriate back charge to Neri, and the Court will disallow it.

<u>Item 20 – Back Charge for Aluminum Fence Panel</u>

123.    The last item that is the subject of Change Order No. 204-55 is a charge for $572.00,

which Elm Haven claims is what it paid to replace an aluminum fence panel and post that

had been damaged by Neri.

124.    John Ford testified that, in the process of removing a tree from Block C, Neri had

damaged the aluminum fence when part of the tree fell on it.  Elm Haven had its fence

contractor, The Frankson Fence Company, replace the damaged panel and a post set in

concrete footings.  (Ford Testimony 6/7/05 at 127).  Elm Haven sent this bill to Neri, but

Neri never responded.  Elm Haven paid the bill instead.

125.    Neri had not disputed this particular charge.

126.    The Court finds that Neri should be back charged for $572.00.

<u>Summary of Charges on Change Order No. 204-55</u>

127.    As set forth above, the Subcontract Price should be reduced by $223,030.00, representing

the following:

| | | |
|---|---|---|
| i. | Repair of Meter Pit, Block C, along Webster Street | $     515.00 |
| ii. | Lawn Pedestal Box Replacement | $     794.00 |
| iii. | Replacement of Light Poles Damaged by Neri | $ 14,742.00 |
| iv. | Additional Survey Costs | $        -0- |
| v. | Removal of Unsuitables, Blocks E & G | $        -0- |
| vi. | Excavation for Sonatube Installation | $ 6,281.00 |
| vii. | Application of 2" Topsoil to Block B | $     290.00 |

69

| | | | |
|---|---|---|---:|
| viii. | Video Inspection of Laterals | $ | 2,045.00 |
| ix. | Concrete Steps (Sonatube Excavation) | $ | 4,661.00 |
| x. | Stair Railings at Concrete Steps | $ | -0- |
| xi. | Furnish & Install Concrete Steps & Walks | $ | -0- |
| xii. | Handrailing at Concrete Steps | $ | -0- |
| xiii. | Street Cleaning | $ | 769.00 |
| xiv. | Erosion Control Measures | $ | 2,594.00 |
| xv. | Fine Grading & Paving (Waters) | $ | 148,081.00 |
| xvi. | Sanitary Sewer Repairs | $ | 30,011.00 |
| xvii. | Reset Manhole Frames & Covers | $ | 11,675.00 |
| xviii. | Remove/Replace Sidewalk & HC Ramps | $ | -0- |
| xix. | Direct Payment for Radius Curbing & Bullnose | $ | -0- |
| xx. | Replace Damaged Aluminum Panel, etc. | $ | 572.00 |
| | TOTAL | $ | 223,030.00 |

128.    Thus, the final contract price, taking into account all change orders, deleted work, and Neri extra work claims to which Elm Haven has agreed, is $4,008,074.00. Elm Haven has made payments to Neri of $2,822,034.00, leaving a balance due of $1,186,040.00, before any reductions for Elm Haven's costs-to-complete, discussed below.

**E.    Costs-to-Complete Sought by Elm Haven**

129.    Elm Haven has broken down its "costs-to-complete" into five categories, each of which will be discussed below: (1) General Requirements; (2) Sweeney Excavation; (3) Other Subcontractors and Vendors; (4) Nicholas Murano Claim Reimbursement; and (5) 5%

70

Overhead Mark-up per Article 9.2.1. Elm Haven maintains that it is entitled to a credit

against the amounts owing to Neri for the costs it incurred in having other subcontractors

perform the work that was within Neri's original scope of work, and to the extent that

these costs exceed what it owes to Neri, it is entitled to recover these costs-to-complete as

damages for Neri's default on the Subcontract.

### 1.  General Requirements - $52,800.00

130. The first category of costs-to-complete is what Elm Haven describes as "general

requirements," which includes the cost of additional manpower for twenty-two (22)

weeks, specifically a project manager for sixteen (16) hours/week at the rate of $75/hour,

a superintendent for sixteen (16) hours/week at the rate of $60/hour, and clerical help for

eight (8) hours/week at the rate of $30/hour.  (Ex. 376).

131. Mr. Ford testified that he arrived at this figure in the following manner:

> I analyzed what additional costs it took for us to, in effect, take
> over Neri's work, and proceed with others, the amount of time it
> took myself and the superintendents in the field, my clerical help
> for making out all of these change orders, and just kind of
> following all of the paperwork, the enormous amount of paperwork
> that had to be dealt with because of this situation, and I felt that
> two days a week for the project manager, myself, as the project
> manager, a superintendent, and a clerk for 22 weeks is – which is
> five months, which would be from May 2001 through September
> 2001, even though we went further than that, I figured we turned
> the buildings over in October, to be fair about it, we'll bring it to
> that point, even though I continued to do work and our
> superintendents continued to do Neri's work, as far as 2003, I
> figured – I felt that was a good cutoff, so I used that.  That's my
> estimated cost for our general requirements.

(Ford Testimony 6/8/05 at 200).  He admitted that they did not have to hire any additional

people but he was not able to reduce his staff as he would have toward the end of the

Project.  (Id. at 201).

132.    The Court disallows this credit. The amount of time requested is speculative and not

documented in any way.   Mr. Ford admitted that Elm Haven did not have to pay any

overtime.  (Id.).  Additionally and more importantly, regardless of how they are labeled,

these costs represent overhead for which Elm Haven is seeking an additional five percent

(5%) mark-up.  To allow an additional recovery for these overhead costs would amount ot

a double recovery.  The Subcontract, Article 9.2.1, provides that in the event of a default,

Elm Haven could employ other subcontractors to provide the labor, materials and

equipment necessary to perform the Subcontract work and deduct the cost thereof,

"including an amount equal to 5% thereof, representing the Contractor's overhead," from

any payments due to Neri.  Thus, based on the plain and unambiguous language of the

Subcontract, the Court finds that the parties intended this five percent (5%) mark-up on

Elm Haven's costs-to-complete to cover all overhead costs, which is precisely what these

"general requirements" costs represent.

2.    Payments to Sweeney Excavation - $1,125,433.00

133.    Admiral Street: The Sweeney Subcontract included site demolition, earthwork,

bituminous pavement, and site concrete work on Admiral Street in the amount of

$46,527.00, for which Elm Haven seeks a credit as a cost to complete work originally

within Neri's scope of work.

134.    Mr. Simoncini estimated Neri's cost to complete the work on Admiral Street as of

April/May 2001 as $18,668.00 (Ex. 649), which is almost the same as Mr. Ford's figure

in January 2001 of $18,736.00. (Ex. 627).

72

135.  There is no question that the Admiral Street work was within Neri's original scope of work.  The only question is whether Elm Haven is entitled to a credit for the amount it paid Sweeney or the amount that it would have cost Neri to complete the work.

136.  Admiral Street was part of the discussions between Mr. Ford and Neri throughout the spring of 2001 concerning the need for a specific schedule for the commencement and completion of the site work.  On April 30, 2001, and again on May 14, 2001, Mr. Ford gave written notice to Neri that, pursuant to Article 9.2.1 of the Subcontract, it was going to have this work performed by another subcontractor due to Neri's failure to perform, including its failure to provide updated permits for the work, its failure to commence the work on schedule, and its failure to provide adequate coordination of activities for the work.  (Ex. 158 & 172).  Mr. Ford advised Neri that all costs, damages, and delays to complete the work would be the sole responsibility of Neri.  (Id.).

137.  Elm Haven provided evidence that it solicited more than one bid for this work and that Sweeney was the low bidder.

138.  Under Article 9.2.1 of the Subcontract, upon 72 hours written notice of default, Elm Haven had the right to provide labor, materials, and equipment to perform the work under the Subcontract and to deduct the cost thereof, including an amount equal to five percent (5%) thereof, representing Elm Haven's overhead, from any payments then or thereafter due to the Subcontractor.  Thus, based on the plain language of the Subcontract, Elm Haven was entitled to a credit for the amount it paid Sweeney, rather than the amount that it would have cost Neri to complete the work.

139.  Accordingly, the Court finds that Elm Haven is entitled to a credit for the Admiral Street

work performed by Sweeney in the amount that it paid to Sweeney, $46,527.00, plus 5% overhead, discussed below.

140. <u>Dixwell Avenue:</u> Similarly, Elm Haven seeks a credit of $73,400.00 for the cost of having the site work on Dixwell Avenue performed by Sweeney.

141. The parties do not dispute that this work was within Neri's scope of work. Neri maintains that Elm Haven should only be entitled to recover its remaining costs to complete, or $62,076.85.

142. Dixwell, like Admiral, was the subject of several default letters from Elm Haven to Neri. On April 2, 2001, Elm Haven issued a road schedule to Neri that established milestone dates for commencing and completing the work on six streets, including Dixwell Avenue, which had a start date of July 30, 2001, and a completion date was August 31, 2001. (Ex. 143). Elm Haven defaulted Neri on the Subcontract and awarded this work to Sweeney prior to the commencement date. (Ex. 172).

143. Elm Haven is entitled to a credit in the amount of $73,400.00, which is the amount it paid Sweeney to perform this work, plus 5% overhead.

144. <u>Henry Street:</u> Elm Haven next seeks a credit in the amount of $32,570.00 for site demolition work, earthwork, bituminous paving, and site concrete performed by Sweeney on Henry Street.

145. Again there is no dispute that this work was within Neri's scope of work under the Subcontract, but Neri maintains that Elm Haven should be limited to recovering Neri's cost to complete, or $29,305.00.

146. For the reasons set forth above, the Court will allow a credit for the amount paid to

Sweeney, $32,570.00.

147.   <u>Webster Street</u>: On May 14, 2001, Elm Haven notified Neri that, due to its failure to
respond to its request for confirmation of Neri's proposed start date for Webster Street, in
an effort to coordinate this work with the City CSO work, Elm Haven would proceed
with others to coordinate and perform the work.  (Ex. 172).  In so doing, Elm Haven
states that it was exercising its rights under Articles 9.1.2 and 9.2.1 of the Subcontract.
As set forth above, Elm Haven had already solicited bids from three subcontractors to
perform this work, eventually signing a contract with Sweeney Excavation.  The Sweeney
subcontract included site demolition, earthwork, bituminous concrete pavement, and site
concrete work on Webster Street in the amount of $302,736.00, which Elm Haven now
seeks to charge against the balance due to Neri under the Subcontract as a "Cost-to-
Complete."   (Ex. 376 & 377).

148.   Vincent Neri testified that the reason that Neri had been unable to perform work on
Webster Street was that it was being redesigned along with the CSO work.  There had
been a street width issue, the base material was being changed, and the laterals were
being redesigned for Blocks H and I.  (V. Neri Testimony at 6/17/05 at 39).   With the
number of changes, Mr. Neri stated that they could not schedule the work because no one
knew when it was going to be accomplished.  (<u>Id.</u>)  The CSO work that had yet to be
completed would impact the drainage work, pipe work, catch basins, manholes, and
"everything." (<u>Id.</u> at 40).  Mr. Neri testified that Neri was prepared to go forward with
Webster Street after the City's CSO work had been completed.  (<u>Id.</u>)

149.   To that end, Elm Haven had executed Change Order No. 38 with Neri on August 29,

2000(Ex. 272), which provided that a reduction in the width of Webster Street as indicated in the revised drawings, an increase in the size of the driveway aprons, and an increase in the topsoil. Change Order No. 38 specifically provided:

> This Change Order is being issued with the understanding that the roadway work on Webster Street will be performed <u>after the completion of work on Blocks E, F, and G, and the CSO work has been completed</u> as required by the City of New Haven.

(Ex. 272) (emphasis added). The total amount of the Change Order was $46,600.00, although this also included work on Foote Street and the removal of existing trees. (<u>Id.</u>)

150. Neri maintains that based on Change Order No. 38, Elm Haven had agreed that the road work on Webster Street would not be performed until after the City of New Haven's CSO work had been completed. Although Neri was obligated under its Subcontract to coordinate its work with the City's CSO work, it had no control over when the CSO work was performed. The design drawings for the City's CSO work on Webster Street were not completed until May 2001 and at that point, the City still had not solicited bids for the CSO work affecting Webster Street. (V. Neri Testimony 6/17/05 at 40-44).

151. On May 1, 2001, Elm Haven notified Neri that the City's CSO work was expected to commence on June 11, 2001, and be completed within thirty (30) days. Elm Haven requested that Neri confirm by May 4, 2001, that it would commence the Webster Street work on June 18, 2001. (Ford Testimony 6/8/05 at 46). When Neri failed to respond to this demand, Elm Haven issued its default letter dated May 14, 2001, and gave this work to another subcontractor.

152. Neri indicated that it was prepared to perform the Webster Street work in accordance with

Change Order No. 38, but Elm Haven removed the work from Neri. Neri asserts that Elm Haven's default of Neri relating to the Webster Street work was improper and argues that the only credit that should be allowed is what it would have cost Neri to perform this work, or $124,075.00. (Ex. 649).

153. Neri also points out that the subcontractor that Elm Haven hired to perform the work, Sweeney Excavation, also was performing the CSO work for the City and that some of the revised drawings Elm Haven provided to Sweeney for purposes of soliciting its bid, as well as benchmark and baseline information, were never provided to Neri. (V. Neri Testimony 6/17/05 at 45-46; Ford Testimony 6/9/05 at 111-14). Neri would have needed these drawings to properly perform its work on Webster Street.

154. According to the schedule prepared by Elm Haven, Neri had completed $39,459.00 worth of work on Webster Street, with $168,268.00 worth of work to be completed. (Ex. 376). Thus, Neri's total scheduled value for the Webster Street work was $207,727.00 versus Sweeney's contract, which was $302,736.00. (Ex. 376; Ford Testimony 6/10/05 at 129). Mr. Ford testified that Sweeney's scope of work was the same as Neri's. (Ford Testimony 6/8/05 at 71).

155. The Court finds that, as set forth in Change Order No. 38, Neri was justified in not commencing the work on Webster Street in light of the fact that the CSO work had not been completed. Nevertheless, this work was completed by another subcontractor, albeit at a higher price. The Court will allow Elm Haven to recover the amount that it would have paid Neri to complete this work, or $168,268.00. (Ex. 627 & Ex. 375).

156. Ashmun Street: Elm Haven seeks to deduct from the Subcontract Price the costs-to-

77

complete paid to Sweeney for Ashmun Street in the amount of $386,173.00.  Mr. Ford
testified that this figure was not broken down between Ashmun Street South and North.
(Ford Testimony 6/10/05 at 131-32). Because the circumstances surrounding these streets
differ dramatically, the Court will consider them separately.

157.    Ashmun Street South (Ashmun Street between Webster and Bristol): Elm Haven seeks to
back charge Neri for its costs to perform the Ashmun Street South roadwork, which it
maintains was part of Neri's original scope of work.   Mr. Ford testified that Ashmun
Street South was shown on Drawing SS-26, which was listed as one of the Subcontract
Documents, and therefore included within Phase I, despite the fact that the engineer who
prepared Drawing SS-26 indicated on the drawing that it was part of Phase II.  (Ford
Testimony 6/9/05 at 94-95).

158.    Neri concedes that it received Drawing SS-26 as part of its bid package but maintains that
Ashmun Street South was always part of Phase II of the Project, and its bid did not
include the roadwork relating to Ashmun Street South.  (Simoncini Testimony 6/13/05 at
18, 26). According to Mr. Simoncini, Phase I included Blocks A1, A2, K1, B, C, F, and
G, Webster Street, Foote Street, New Streets 1, 2, 3, and 4, Admiral Street, and Ashmun
Street from New Street 1 to Webster Street.  (Simoncini Testimony 6/13/05 at 9).  The
drawings provided to Neri as part of the invitation to bid showed Ashmun Street South as
part of Phase II and, therefore, they did not include it in their bid.  (Id. at 10).

159.     Neri maintains that Elm Haven provided it with Drawing SS-26 for purposes of the
utility laterals, which it did include as part of its original bid.  (Simoncini Testimony
6/13/05 at 201; V. Neri Testimony 6/17/05 at 66).

78

160.    Drawing SS-26 (Ex. 5) dated October 9, 1998 bears the title "Phase II - Streets, Sewers,

and Utilities Ashmun Street Sta. 14+68 to 21+15," indicating that the southern portion of

Ashmun Street was part of Phase II.  Additionally, Drawing SS-7 (Ex. 5) dated January

29, 1998, entitled "Phase I - Streets, Sewers, and Utilities Ashmun Street Sta. 11+40 to

14+88" indicates on the "Plan" at the top of the page that at Sta. 14+88 and southward

"PHASE 2- NOT IN CONTRACT - END NEW PAVEMENT (STA. 14+88)."  There is a

second notation below this that the southern portion of Ashmun Street on this Plan is part

of "PHASE 2 - NOT IN CONTRACT."  The bottom of Drawing SS-7 shows the

"Profile" for this section of the road and again indicates at Sta. 14+88  "END NEW

PAVEMENT."  (Ex. 5, Drawing SS-7).   Drawing SS-18, "Phase I - Street, Sewers, and

Utilities - Details - Streets - 1" also indicates that Ashmun Street from the southern side

of Webster Street southward is "not in contract" and the cross section drawings of the

various streets on SS-18 do not include the southern portion of Ashmun Street.  Drawing

SS-25, labeled "Phase II - Streets, Sewers, and Utilities - Key Plan," states in the Notes, ¶

7, that "[t]he paving and grading of Webster Street and streets to the <u>north</u> will be done

under the Phase I contract," (emphasis added), thus leading to the logical conclusion that

paving to the <u>south</u>, which would include Ashmun Street South, would not be done as

part of Phase I. On Drawing SS-32, there is a "New Pavement Plan," which again shows

the paving of Ashmun south of Webster to be part of Phase II.  (Ex. 5, Drawing SS-32).

161.    Drawing SS-26 was revised on September 1, 2000, as SS-26-A (Ford Testimony 6/9/05 at

104), and again on February 2, 2001, May 11, 2001, and October 25, 2001.  Elm Haven

never forwarded to Neri any of the revisions to Drawing SS-26, which Neri would have

needed to perform the roadwork on Ashmun Street South. (V. Neri Testimony 6/17/05 at 27-29).

162.    On July 20, 2000, Elm Haven issued Change Order No. 23 to Neri, which included an increase in price for the base material for "all remaining roadways for the completion of Phase I." Ashmun Street South was not listed as one of the remaining roadways. (Ex. 256). Likewise, on August 10, 2000, when Elm Haven issued Change Order No. 39 to reflect an increase in price for the aggregate base for all of the then-remaining roadways, Ashmun Street South was not mentioned. (Ex. 274).

163.    Mr. Ford admitted that he became aware in October 2000 that Neri was claiming that Ashmun Street South was not within its scope of work. (Ford Testimony 6/9/05 at 105). He relied on Drawing SS-26, which was provided to Neri as part of the original bid package, to support his position that it was in fact included in their scope of work for Phase I of the Project. (Id. at 106). His opinion in this regard never changed. (Id. at 107-08).

164.    In January 2001, Mr. Ford prepared a schedule setting forth credits that Neri might receive for work not performed. This was prepared for "settlement purposes only." It indicated that Ashmun Street South carried a dollar figure of zero on Neri's Schedule of Values, indicating that Neri had not allocated a portion of the Subcontract Price to Ashmun Street South. (Ex. 627; Ford Testimony 6/9/05 at 108). Mr. Ford also indicated in a footnote "Feel BCJ [Beacon/Corcoran Jennison] will lose this unless we have additional infor to support inclusion." (Ex. 627, n. e).

165.    On April 11, 2001, Neri stated unequivocally to Elm Haven that it would not proceed

with work on Ashmun Street South unless a change order was issued for the cost of that work, which Elm Haven refused to do. (Ford Testimony 6/8/05 at 10). Elm Haven notified Neri on April 12, 2001 that, pursuant to Article 9.2.1 of the Subcontract, it would complete the work on Ashmun Street South with other subcontractors and assess all costs against Neri. (Ford Testimony 6/8/05 at 11-15; Ex. 148 & 152). A new subcontract for this work was subsequently awarded to Sweeney.

166. The Court finds that the Subcontract Drawings repeatedly show Ashmun Street South as part of Phase II, which was not included in Neri's bid and was not part of its Subcontract. There is nothing in the Subcontract that includes Ashmun Street South as part of Phase IB or IC, which were the only phases of the Project included in Neri's Subcontract. The mere fact Ashmun Street South appeared on one of the Contract Drawings does not render Neri responsible for all of the roadwork from Webster Street South. Neri's bid included the cost of the lateral work from Ashmun Street South into Block D and this drawing would have been needed for that purpose. Additionally, the Court finds it significant that Elm Haven never forwarded to Neri the amended drawings for SS-26 and did not include Ashmun Street South in its Change Order No. 23, setting forth the increased price for base material for all remaining roadways in Phase I. Therefore, the Court disallows Elm Haven a credit for the cost to complete work on Ashmun Street South.

167. <u>Ashmun Street North</u>: Ashmun Street North, running from Henry Street to the cul-de-sac, is bordered to the east by Blocks A1 and A2 and to the west by Block K1.

168. Vincent Neri testified that, in the fall of 2000, the focus of the Project was on Blocks E,

F, and G, where the buildings had already been constructed.  Blocks A1, A2, and K1 were being redesigned. Due to the change in width of other portions of Ashmun Street and the fact that Blocks A1, A2, and K1 were being redesigned, Neri had anticipated that there would also be changes to Ashmun Street North.   (V. Neri Testimony 6/17/05 at 35-38). There had been several revisions made to the drawings for Ashmun Street North and Blocks A1, A2, and K1, the last of which was not provided to Neri until April 2001.  (Id. at 30-36; Ex. 630, 631).   Neri could not schedule the work on Ashmun North without these revisions.  (Id. at 32-35).  The street width had changed, which in turn impacted elevations, the gutters, the cul-de-sac, the catch basins, and the driveway aprons.  Without knowing the road width, they could not know where the center line would be, which impacted every aspect of the road layout. (Id. at 32-35, 39).  Mr. Neri testified that they made numerous requests for the revisions, but before Neri had an opportunity to review the impact of these changes on its schedule of values for Ashmun Street North, Elm Haven had taken the work away from it.  (Id. at 34-35).

169.  Due to tree conflicts with the original proposed curbline on Ashmun Street North, the City of New Haven approved reducing the width of the road by two feet. (Ex. 632).  This change required a number of revisions to the drawings for Ashmun Street North.  (Id.) As late as May 1, 2001, LEA, Elm Haven, and Fletcher Thompson were still discussing the need for additional changes to the SS drawings to show the width reduction in Ashmun Street North.  (Id.)   The Court finds that the site work on Ashmun Street North could not have commenced until these drawings were prepared and received by the Subcontractor.

82

170.    Additionally, an issue arose as to whether the utility laterals for Blocks A1, A2, and K1

off of Ashmun Street North were included in Neri's Subcontract, or whether they were

included in the Alternate pricing for these blocks.  Mr. Ford testified that Elm Haven's

subcontract with Sweeney included the laterals under Ashmun Street and the stubbing of

these laterals into the adjacent blocks.  (Ford Testimony 6/8/05 at 72).  Elm Haven

contends that likewise Neri's scope of work on Ashmun Street North included running

the utility laterals under the street to stubs within the blocks.  The Subcontract, Drawings

SS-5 and SS-6, it argues, did not differentiate between developed and undeveloped

blocks.  The "essence" of the Subcontract was to reconstruct and install utility laterals for

all of the streets depicted in the drawings.  Failure to include these laterals within Neri's

scope of work would require Elm Haven to rip up the streets, curbs, and sidewalks and

other utilities when it ultimately developed the Alternate blocks in the future, a result the

parties could not have intended.

171.    When Elm Haven did not accept Neri's Alternate pricing for these blocks, Lorraine

Beckwith expressly advised Neri that its Subcontract "does include all work associated

with Ashmun Street from Henry Streets to Block B," which would include Ashmun Street

North. (Ex. 465).

172.    Neri maintains that it had always carried the cost of the lateral work in its block pricing as

opposed to its street pricing (see, e.g., Ex. 335 Schedule of Values for Phase IC) and,

thus, when Blocks A1, A2, and K1 were eliminated from the scope of work on the

original Subcontract, so, too, were the utility laterals. Neri states that its Schedule of

Values clearly showed the utility work as part of the block pricing.

173.    Additionally, Neri points out that when Block D was eliminated from its scope of work,

the utility laterals were also eliminated.  Moreover, when Elm Haven wanted laterals run

into Blocks A1 and A2 from New Street 1, it issued a change order.  Change Order No.

4[15] (Ex. 296) issued on September 28, 1999, by Elm Haven to Neri provided that Neri

was to:

> Provide all labor, materials, and equipment required to install
> electric ductbank in Blocks A1 and A2 and the water and sewer
> laterals in New Street #1 to serve the units in Blocks A1 and A2,
> per your quotation dated 4/7/99

for an additional cost of $21,660.00. (Ex. 296).  Thus, Neri argues that a Change Order

should have been issued for Neri to run the laterals from Ashmun Street North into these

undeveloped blocks.

174.    On April 11, 2001, Douglas King with Neri wrote to John Ford regarding "Redesign

Sanitary Laterals for Blocks A-2, K-1, H and I," requesting the redesigns for the sanitary

sewer laterals for these blocks so that Neri could determine if there was a change in scope

similar to other sanitary sewer lateral changes which had already been incorporated into

---

[15]  With regard to Change Order No. 4, in an April 20, 2001 memo from Lorraine
Beckwith to John Ford regarding "Neri Change Order #4/207, Electric Ductbank in A1/A2," (Ex.
436), Ms. Beckwith explained that Neri's contract did not include the work in Blocks A1 and A2.
It was an "add alternate" price in their contract that was never acted upon.  "The limit of the work
included in the A1/A2 scope was from the inside of the sidewalk along New Street #1."  The
electric ductbank that served Block B was shown on the plans to run through Block A1/A2 and,
when this was discovered, Elm Haven obtained a price from Neri to install the ductbank and
extend the water and sewer mains an additional ten feet.  She noted that Neri's contract scope of
work included the laterals from the street to the inside of the sidewalk, but Elm Haven needed
them to be extended another ten feet to allow the lateral to be brought into the block past the
electric ductbank to avoid undermining the ductbank at a later date.  She stated that this was the
work covered by Change Order No. 4, which "in reviewing the wording, it should have been
clearer."  (Ex. 436).

the Project under a change order.  (Ex. 630).  Neri indicated that it had tentatively

scheduled this work in its completion schedule starting April 20, 2001 for Blocks A2 and

K1, and would proceed with work but under protest, tracking its costs and requesting an

equitable contract adjustment.  (Id.).  Citing the Contract Specifications dated January 12,

1998, section 02730 - Sanitary Sewer System (Ex. 3, EH02483), Mr. King maintained

that "This work [was] included in the Building Construction as the blocks are

constructed, with the exception of New Streets 2, 3, and 4, which [were] to be included in

this contract." (Ex. 630, Ltr. dated 4/11/01).  The Contract Specifications to which he

referred indicate that the Sanitary Sewer System included new sanitary street sewers for

New Street 2, 3, and 4, and new building sewers from new buildings to existing and new

street sewers.  (Ex. 3, EH 02483).

175.  Mr. King advised Mr. Ford that they were unable to locate any requirement that Neri was

to provide lateral stubs for future development and pointed out the Elm Haven had

executed a Change Order on September 28, 1999, for Neri to install water and sewer

laterals for future development in to Blocks A1 and A2 on New Street [1].  "In view of

EHC past actions, issuance of a Change Order for the same work in different blocks, it

was agreed that this work was outside the scope of the Neri-EHC contract."  (Ex. 630).

176.  Mr. Simoncini testified that when Block D was removed from Neri's scope of work, the

credit included the utility lines.  (Simoncini Testimony 10/5/05 at 127; Ex. 668).  The

work sheet for Block D attached to his letter to Lorraine Beckwith dated October 7, 1999,

specifically listed sanitary laterals, underground duct banks, and secondary service lines

as part to the credit for Block D.  (Ex. 668 at 4).

177.    The Court finds that Elm Haven is entitled to a credit in the amount of $121,560.00,
which is the remaining balance that it would have paid to Neri had Neri finished the work
on Ashmun Street North.  (Ex. 627).  Due to design changes to Ashmun Street North and
the adjacent blocks, over which Neri had no control, Neri was unable to complete this
work prior to the time that the subcontract was awarded to Sweeney.  Thus, the Court
declines to award Elm Haven a credit for the full amount of $386,173.00 paid to Sweeney
for work on Ashmun Street North and South.  Having so held, the Court need not
determine whether the scope of Sweeney's work on Ashmun Street North, including
installing the laterals into Blocks A1, A2, and K1, was the same as Neri's scope of work
under its Subcontract.

178.    <u>Mobilization and Demobilization</u>:   Elm Haven seeks a credit of $21,962.00 for charges
paid to Sweeney pursuant to four change orders issued to Sweeney:

   a.    Change Order No. 5 (Ex. 383) for $1,630.00 for clean-up of debris on Block K1,
         which Mr. Ford testified was debris left by Neri (Ford Testimony 6/8/05 at 118-
         20);

   b.    Change Order No. 6 (Ex. 384) for $10,482.00 for running water and sanitary
         sewer laterals into Block A1 from New Street 1, which Mr. Ford testified was
         work that should have been done by Neri pursuant to Change Orders 207-3 issued
         to Neri in 1999 (Ford Testimony 6/8/05 at 121-23);

   c.    Change Order No. 7 (Ex. 385) for $9,260.00 to remove approximately 1,160
         cubic yards of soil and debris along Canal Street, which Mr. Ford testified was
         again material and debris left on the work site by Neri (Ford Testimony 6/8/05 at

125-27); and

d.    Change Order No. 8 (Ex. 386) for $590.00 for a private duty police officer for

traffic control at Ashmun and Gregory so that the laterals into Block A1 could be

completed, which had been part of Neri's scope of work under Change Order No.

204-6 (Ford Testimony 6/8/05 at 127-28).

179.    Neri has not specifically addressed these credits in its proposed Findings of Fact and

Conclusions of Law.

180.    The Court finds that each of these items were included in Neri's scope of work and that

the charges Elm Haven incurred in having the work performed by Sweeney were

reasonable.  Therefore, the Court will allow a credit in the amount of $21,962.00.

181.    Block E - Relocate Sanitary Lateral: Elm Haven next seeks a credit in the amount of

$5,990.00 for Change Order No. 13 issued to Sweeney for mobilization of equipment

($500.00); repairs to concrete curb, sidewalks, and aprons at corner of Canal and Webster

and the Community Center ($2,635.00); locate, install, and clean out sewer lateral at 23

Webster Street ($1,185.00); and replace sewer frame and cover at 231 Ashmun Street and

repairs to pavement as needed ($1,670.00).   The proposal from Sweeney is dated April

30, 2003, and the Change Order is dated June 5, 2003.  (Ex. 391).

182.    Elm Haven has provided no evidence that this work performed by Sweeney in 2003, two

years after Neri left the Project, was within Neri's original scope of work or was

necessitated by anything for which Neri was responsible.  The only supporting testimony

or document cited by Elm Haven is Exhibit 391, which is not even mentioned in Elm

Haven's proposed Findings of Fact.  Additionally, Mr. Ford testified that there were

numerous change orders issued to Sweeney, some of which he has sought to charge against Neri's Subcontract, and others which he has not.  On the top of every charge from Sweeney, Mr. Ford testified, he indicated whether the charge was an "Owner" cost, an "EHC" cost, or a back charge against Neri.  (Ford Testimony 6/8/07 at 152-53).   This particular exhibit contains no such notation.

183.    The Court finds that Elm Haven has failed to carry its burden of proving that this particular Change Order should be charged against Neri and disallows it.

184.    <u>Block E - Site Concrete</u>: Elm Haven seeks a credit in the amount of $11,022.00, which is part of Change Order No. 3 issued to Sweeney for replacing the sub-base that had been improperly laid by Neri at the intersection of Ashmun Street and Webster Street ($1,260.00); for concrete sidewalks, ramps, and aprons ($8,703.00), and water service materials ($1,059.00).  (Ex. 381;Ford Testimony 6/8/05 at 106-10).  Although designated as Block E Site Concrete on Elm Haven's Schedule, these items on the Change Order pertained to other aspects of the Project.

185.    Mr. Ford testified that Neri had installed the sub-base too high at the intersection of Webster and Ashmun and the pavement had to be replaced by Sweeney. (<u>Id.</u> at 106-07).

186.     Regarding the charges for the sidewalks, handicap ramps, and aprons, Mr. Ford testified that these were on the north side of Webster and part of Neri's scope of work.  (<u>Id.</u> at 108).

187.    Concerning the water service materials, these were omitted from Sweeney's original contract, and thus had to be addressed by a Change Order and were part of Neri's original scope of work.  (<u>Id.</u> at 109).

188.    Neri has not refuted these particular charges, which the Court will allow.

189.    Block G - Underground Duct Work: Elm Haven has requested a credit for $14,720.00

paid to Sweeney pursuant to this same Change Order No. 3 (Ex. 381) for the installation

of conduit and bases for Dixwell Avenue street lighting ($13,500.00) and repairing

underground utility piping and bringing the site to subgrade ($1,220.00).

190.    Mr. Ford testified that Neri had originally installed the underground utility piping but the

electrician was unable to get the electrical wires through them because of dirt inside the

piping.  Thus, he held Neri responsible for the cost of replacing the piping. (Ford

Testimony 6/8/05 at 102-03).

191.    With respect to the street lighting on Dixwell Avenue in Block G, at the time Elm Haven

solicited a bid from Sweeney to do certain site work, he had anticipated that Neri would

still be completing the work on Block G and, thus, this was not included in Sweeney's

subcontract. Neri, however, did not perform this work and Elm Haven issued a Change

Order to Sweeney in September 2001 covering this work, which had been within Neri's

original scope of work.  (Id. at 104-06).

192.    The Court finds that Elm Haven is entitled to a credit of $14,720.00 for these charges.

193.    Block G - Sitework: Pursuant to Change Order No. 4 issued to Sweeney on October 22,

2001, for site work in Block G (Ex. 382), Elm Haven seeks a credit of $149,000.00.

194.    The total amount of Change Order No. 4 is $189,159.20, which includes not only the

Block G site work, but also $40,159.00 for site work on Foote Street.  (See Ex. 376).

195.    According to Mr. Ford, the Block G site work was part of Neri's Change Order No. 204-

13.  (Ford Testimony 6/8/05 at 116).  It included earthwork, sonotubes, storm drainage,

sanitary sewers, water meter vaults, electrical conduit work, and concrete paving in Block G.

196. Elm Haven showed the work performed by Neri under Change Order No. 204-13 to have been 25% complete, with a $141,766.00 balance to finish. (Ex. 376).

197. The Court finds that this credit of $149,000.00 is appropriately charged against Neri.

198. <u>Canal Street - Earthwork</u>: Elm Haven seeks a credit of $5,960.00 for charges paid to Sweeney based on Change Order No. 12 (Ex. 390), dated December 19, 2002, for paving and sidewalks along Canal Street, which were part of Neri's scope of work under the Subcontract.

199. Sweeney's Change Order states that it was for additional work associated with extending Canal Street at the south end, including the installation of a concrete sidewalk at the southeast corner and paving. (Ex. 390). Mr. Ford testified that this work was shown on Drawing SS-4, which was part of Neri's original Subcontract, which work Neri had not finished. (Ford Testimony 6/8/05 at 146-48).

200. Neri has not refuted this charge and the Court will allow it.

201. <u>Foote Street - Earthwork and Others</u>: Elm Haven next seeks a credit in the amount of $40,159.00 for earthwork performed by Sweeney, pursuant to Change Order No. 4, discussed above.

202. Mr. Ford testified that this work was for curbing on Foote Street adjacent to Block G-2 that Neri had not installed. (Ford Testimony 6/8/05 at 111).

203. The Court will allow this credit.

204. <u>Foote Street - Milling and Patching</u>: In addition to seeking credits for payments made to

Sweeney for work done pursuant to the change orders discussed above, Elm Haven also seeks to assess a credit against the Subcontract Price for payments made pursuant to invoices from Sweeney. The first of these relates to milling and patching performed by Sweeney on Foote Street in the vicinity of Dixwell Avenue. (Ex. 411). The charge for this work was $6,700.00. (Id.).

205. This work was performed in late 2003 and was invoiced after Sweeney's contract had closed. (Ford Testimony 6/8/05 at 152).

206. Neri had been responsible for putting the sub-base to within an inch of finished grade. When Neri excavated this area, it did not excavate all the way to the station where Foote Street started. Thus, Sweeney had to patch the existing paving. (Id. at 150-51).

207. The Court will allow this credit.

208. New Street 1 - Bituminous Concrete Paving:   Elm Haven next seeks a credit in the amount of $19,118.00 for work performed by Sweeney pursuant to Change Order No. 11, dated November 6, 2002. This work involved paving at the intersection of New Street 1 and Ashmun Street to tie the intersection in with the finished pavement, including necessary adjustments to manhole frames and the saw-cutting of pavement; replacing manhole frames and covers on Ashmun Street and Canal Street because the manhole frames installed by Neri did not meet the City's specifications; replacing damaged sidewalks throughout the Project per LEA; and excavating the south end of Canal Street to grade. (Ex. 389; Ford Testimony 6/8/05 at 139-44).

209. These items were part of Neri's original scope of work. Although the Court questions whether Mr. Ford could accurately determine that Neri was responsible for the damage to

the sidewalks more than a year after Neri left the jobsite, Neri has not refuted Mr. Ford's testimony in this regard.  The Court will allow the requested credit.

210.  <u>Block C - Punch List (Various Repairs)</u>:    The last credit that Elm Haven seeks for work performed by Sweeney pertains to Change Order No. 10 (Ex. 388) dated September 17, 2002, in the amount of $9,396.00.  Pursuant to this change order, Sweeney reset water meter vaults and curb boxes, which Neri had installed improperly, and repaired sidewalks per an inspection report from the City and LEA.

211.  According to Mr. Ford, he only charged Neri for those damaged sidewalks that they had poured and that were not close to areas where Elm Haven or other subcontractors were performing work. (Ford Testimony 6/8/05 at 129-37).

212.  As noted above, the Court questions whether the damage to the sidewalks can be attributed to Neri's work more than a year after it left the jobsite.  Nevertheless, Neri has not refuted Mr. Ford's testimony in this regard.  The Court will allow the credit for this work.

213.  Accordingly, the total credit the Court will allow for work performed by Sweeney is $720,362.00.

<u>3.  Other Subcontractors and Vendors - $24,149.00</u>

214.  <u>Executive Landscaping</u>: Elm Haven seeks to recover the $14,626.00 it paid Executive Landscaping on twelve (12) invoices for site work performed on Block G-2 in May 2001. (Ex. 413-424).  The work detailed on the invoices involved installing storm drains, sewer lines, electric hook-ups, roof drains, and sanitary lines, all of which were part of Neri's scope of work.  The Court finds that Elm Haven is entitled to recover these amounts paid

92

to Executive.

215.    National Rent-A-Fence: Elm Haven next seeks to recover $4,392.00 paid to National

Rent-A-Fence for relocating the fence that had been installed around the Project, which

was part of Neri's scope of work.  (Ford Testimony 6/8/05 at 190-92, 206).

216.    According to the invoices comprising Exhibit 412, National Rent-A-Fence installed

various quantities of chain-link fencing at various times between March 1999 and January

2001 and then billed Corjen for the use of this fence on a monthly, semi-annual, or annual

basis.  However, none of the invoices shows the relocation of fencing, as testified to by

Mr. Ford.  Additionally, the Court is unable to determine from these invoices, which total

nearly $16,000.00, how Mr. Ford arrived at the figure of $4,392.00.

217.    While the Court recognizes that under Article 6.1.3 of the Subcontract, Neri was

responsible for providing "sufficient, safe and proper facilities at all times for the

protection of the Subcontract Work," the Court finds that Elm Haven has failed to

substantiate the basis for this particular charge against Neri.

218.    Arrow Concrete: Elm Haven also seeks to recover from Neri the $2,852.00 paid to Arrow

Concrete Products, Inc., in May 2001 for yard drain catch basins delivered to Block G-2

and which were installed by Executive Landscaping.  (Ex. 429; Ford Testimony 6/8/05 at

178-79).  The Court finds that these were within Neri's scope of work and will allow this

charge.

219.    Merritt & Company Printers: Elm Haven seeks to recover from Neri $962.00 paid to

Merritt & Company Printers for copying Neri's claims books in April 2001.  (Ex. 428).

According to Mr. Ford, Neri provided them with six volumes of claims to analyze "and

we made copies of those, and we analyzed them, and we ended up not – there was really no valid reason for us to make all of these copies. It cost us $1,000, and it was – there was very little substantiation in those documents, so that's included here." (Ford Testimony 6/8/05 at 190).

220. The fact that Mr. Ford found "little substantiation" in the documents does not warrant imposing the costs of the copies on Neri. The Court finds no basis for allowing Elm Haven to recover these copying costs from Neri and, thus, denies recovery of this charge.

221. Blue Diamond Quarry: The next charge that Elm Haven seeks to recover is for $452.00 paid to Blue Diamond Quarry for Block G-2 tracking pads (also referred to as anti-tracking pads). (Ex. 425). Mr. Ford explained that tracking pads are two-inch stone pads, which trucks drive over before reaching the street and which cause the mud to come off of the trucks' tires. He described them as a "proactive measure in sedimentation and erosion control." (Ford Testimony 6/8/05 at 182-83). Because it appears that this was part of the site work for Block G-2, the Court will allow this charge against Neri.

222. Paul P's Welding: Elm Haven seeks to charge Neri for $445.00 paid to Paul P's Welding for thirty (30) feet of hand railing delivered and installed on Block G-2. (Ex. 427). As discussed above, the Court has determined that hand railings were not part of Neri's scope of work and disallows this credit.

223. Semac Electric: Elm Haven seeks to recover $420.00 paid to Semac Electric for repairing site lighting conduits in Block G at Townhouse #2, which had been "dug up by excavator - Neri." (Ex. 426). The Court finds that this is an appropriate charge and will allow it.

224. Thus, the Court will allow a total of $18,350.00 for costs-to-complete paid to

subcontractors and vendors other than Sweeney.

### 4.  Nicholas Murano Claim Reimbursement - $5,500.00

225.  Nicholas Murano was a subcontractor who performed sidewalk work for Neri in Blocks B and C.  When he was not paid by Neri, on July 17, 2000, he placed a lien on the Project. In order to get the lien removed, Elm Haven paid $5,500.00 in settlement of his claim, even though it had already paid Neri for the sidewalk work.  (Ex. 167 & 162; Ford Testimony 6/8/05 at 215-17).  Elm Haven demanded that Neri and its bonding company reimburse Elm Haven for this amount but it was never reimbursed.

226.  The Court holds that Elm Haven is entitled to recover this amount from Neri.

### 5.  5% Overhead Mark-up per Article 9.2.1

227.  As discussed above, Article 9.2.1 provided for a 5% mark-up to cover overhead costs if Elm Haven had to hire other subcontractors to perform work on which Neri had defaulted.  Pursuant to this provision, Elm Haven seeks $60,394.00.

228.  The Court finds that Elm Haven is entitled to a 5% mark-up on the costs-to-complete incurred as a result of work performed by Sweeney and other subcontractors and vendors, which the Court has allowed.  The total of this work (categories (2) and (3) under Costs-to-Complete) equals $738,712.00.  Five percent is $36,936.00, which the Court awards to Elm Haven.

## F.  Conclusion as to Elm Haven's Claims Against Neri

229.  To summarize, the total Costs-to-Complete that the Court will allow Elm Haven to recover include $720,362.00 (Sweeney) + $18,350.00 (Other Subcontractors) + $5,500.00 (Murano) + $36,936.00 (5% Mark-up), totaling $781,148.00.

230.    As set forth above (Concl. of Law ¶ 128), the unpaid contract balance is $1,186,040.00.

Subtracting Elm Haven's costs-to-complete from the unpaid balance leaves a total due to

Neri of $404,892.00.

**G.    Neri's Extra Work Claims**

231.    In addition to the unpaid balance due under the Subcontract, Neri seeks payment on its

extra work claims totaling $587,815.00.  (Ex. 660).  Initially, twenty-one (21) unpaid

extra work claims were asserted with respect to Project 204, or Phase IB, totaling

$347,834.00, and forty-one (41) unpaid extra work claims on Project 207, or Phase IC,

totaling $284,580.00.[16] (Ex. 660).  According to Neri, these extra work claims now total

$587,815.00.[17] (Neri's Concl. of Law at 98).

--------

    [16]  These figures appear to have been reversed on Neri's Claim/Contract Summary,
Exhibit 660.

    [17]  The Court has had great difficulty in reconciling the amounts claimed by Neri on its
extra work claims.  The amounts shown on Exhibit 660 do not agree with many of the amounts
claimed by Neri in its proposed Findings of Fact and Conclusions of Law.  Additionally, this
total figure should be reduced to reflect amounts that Elm Haven has agreed to pay, including
$44,599.00 on Extra Work Claim No. NC-028-204-1-G (Ex. 603); $22,276.00 for the Tilcon
Construction Premium (NC-064-207-1, Ex. 573); $640.00 on Extra Work Claim No. NC-015-
204 (Ex. 595); $337.00 on Extra Work Claim No. NC-016-204-G (Ex. 597); and $3,611.00 on
Extra Work Claim No. NC-023-204-1 (Ex. 602).  Lastly, the Court notes that a number of the
extra work claims shown on Exhibit 660 for Project 207 have not been addressed by Neri (or
Elm Haven for that matter) in its proposed Findings of Fact and Conclusions of Law.
Specifically, these are NC-002-207-1 (Ex. 552) in the amount of $1,951.70; NC-013-207-1 (Ex.
553) in the amount of $19,498.11; NC-017-207-1 (Ex. 554) in the amount of $4,992.00; NC-
045-207-1 (Ex. 558) in the amount of $1,533.64; NC-063-207-1 (Ex. 571) in the amount of
$2,048.50; NC-069-207 (Ex. 579) in the amount of $3,209.62; NC-207-136 (Ex. 589) in the
amount of $4,882.50; and NC-207-140 (Ex. 591) in the amount of $5,251.02.  The Court
assumes that Neri is no longer pursuing these extra work claims as part of its Counterclaim and,
therefore, the Court has not addressed these in this ruling.  With these adjustments, Neri's total
extra work claim, based on the figures reflected on Exhibit 660, is reduced to $521,196.00.
However, as noted above, some of the amounts set forth in Neri's proposed Findings of Fact and
Conclusions of Law differ from the amounts shown on Exhibit 660.  For purposes of this ruling,

232.  Neri bears the burden of proof on each of these extra work claims.  See Lar-Rob Bus. Corp. v. Town of Fairfield, 170 Conn 397, 402 (1976).

233.  A number of these Extra Work Claims fall into four general categories: (i) those covered by signed Confirmation of Change Documents; (ii) those relating to the excavation of unsuitable materials and refilling; (iii) those relating to changes in grade; and (iv) those relating to granite curbing.

### 1. Confirmation of Change Documents

234.  The first group of Extra Work Claims for which Neri seeks to recover involve work performed by Neri on Block B in late 1999 during the acceleration period pursuant to fourteen (14) "Confirmation of Change" documents, Exhibits 563 through 574, 576 through 578, and 580 through 582.  All were signed by Ivan Carlsen except for Exhibit 581, which was signed by Dave Lucier, a Project Superintendent for Elm Haven, and Exhibit 578, which, as discussed below, Mr. Carlsen authorized but did not actually sign. Additionally, most of these Confirmation of Change documents were faxed to Elm Haven, attention James Canning, although Elm Haven denies having received them.  (Ex. 664).

235.  Elm Haven takes the position that these Confirmation of Change documents, which were prepared by Neri, did not constitute approved Change Orders under the Subcontract.  Elm Haven states that Jim Canning, the Project Executive, never saw these documents and never authorized their signing.  Although Elm Haven concedes that they were signed by

the Court has used the amounts in Neri's Findings of Fact and  Conclusions of Law, because these should reflect the amount Neri is seeking after all of the evidence was presented at trial.

Ivan Carlsen as the Project Superintendent when he was under extreme pressure to accelerate the work on Block B, it maintains that he did so simply to confirm that Neri was directed to perform the work at issue and that Neri should keep track of its time, equipment, and material costs, but that it would be determined at a later date whether the work constituted a valid extra work claim. The Court disagrees.

236.    The Subcontract provided in relevant part,

> The Subcontractor acknowledges that the Contractor may issue to the Subcontractor . . . written instructions (Amendments, which term as used herein shall <u>include</u> Change Orders and Construction Change Directives) requiring alterations or additions to or deviations from the Subcontract Work.  The Subcontractor agrees that it will accept such Amendments and that it will make no alterations or additions to or deviations from the Subcontract Work, except in accordance with an Amendment.  The amount of any addition to or deduction from the Subcontract Price and any extension of time shall be determined in accordance with the Contract Documents and shall be specifically stated in such Amendment. . . .

Subcontract, Article 2.6 (emphasis added).

237.    Elm Haven urges the Court to interpret Article 2.6 as limiting "Amendments" to "Change Orders and Construction Change Directives" and excluding all other written documents. The Court finds that the plain language of Article 2.6 does not support Elm Haven's interpretation. While Article 2.6 provides that the term "Amendments" shall "include" these two types of documents, no where does it state that the term "Amendments" is limited to or excludes all other written documents which meet the requirements of Article 2.6 but bear a different title.  Had Elm Haven intended "Amendments" to be so limited, it could have so stated.

238.    The Confirmations of Change at issue were prepared by Carl Neri.  (C. Neri Testimony

9/13/05 at 44, 46;V. Neri Testimony 6/13/05 at 222).  Carl Neri testified that this form,

which indicated not only what extra work needed to be done but also the price for the

work,  was used to facilitate getting the paperwork done and to have something in writing

authorizing Neri to commence with the work.  (C. Neri Testimony 9/13/05 at 45).  He

testified that he discussed this form with Jim Canning, the Project Executive, who agreed

to the use of it.  (Id.).

239.    Although entitled "Confirmation of Change" rather than "Change Order," the body of the

form contained a space for "CHANGE ORDER" which was marked with an "X" and the

form specifically stated, " THE FOLLOWING CHANGE IN THE SCOPE OF WORK IS

HEREBY AUTHORIZED & APPROVED."  The work was then set forth with a specific

price, as required by the Subcontract.  Each form was signed and dated by Ivan Carlsen,

sometimes with notations.  There is nothing on any of the documents indicating that Elm

Haven reserved its right to contest whether the work was extra or whether Neri would be

paid for performing this work.  (See Carlsen 9/22/05 Testimony at 156.)

240.    Carl Neri testified that it was at a meeting on November 22, 1999, when he first discussed

the use of this form with Jim Canning.  (C. Neri Testimony 10/5/05 at 133).  They were

discussing accelerating the work on Block B.  Jim Canning said he would give Neri

verbal approval to proceed with the work, but Carl Neri wanted to have his approval in

writing.  (Id. at 134).  He discussed each and every one of these Confirmations of Change

with Mr. Canning, who then instructed Carl Neri to prepare the Confirmations of Change

to reflect their discussion of what work needed to be performed, and to have Ivan Carlsen

sign them.  (C. Neri Testimony 9/13/05 at 46).   Mr. Neri then prepared the completed

Confirmation of Change documents and gave them to Ivan Carlsen for his signature.  (<u>Id.</u>

at 47).  The form had a section describing the nature of the work and a section dealing

with the form of payment, both of which were completed before Mr. Carlsen was asked to

sign the form.  (<u>Id.</u> at 159-60).  Carl Neri testified that Ivan Carlsen was specifically

authorized by Jim Canning to sign them.  (<u>Id.</u> at 47).  Mr.  Carlsen would call Mr.

Canning, while Carl Neri was standing there waiting for the form to be signed, and get his

authorization to sign the form.  (<u>Id.</u> at 160-62).  The significance of the signed form was

that it was Neri's "vehicle" for knowing what Elm Haven wanted them to do and how

they were going to be paid for the work.  (<u>Id.</u> at 48).   No one from Elm Haven ever

objected to the use of the "Confirmation of Change" forms in 1999 (<u>id.</u>),  nor was there a

single occasion when Mr. Carlsen indicated that he did not consider the work to be extra

work.  (<u>Id.</u> at 163).

241.    Vincent Neri likewise testified that the Confirmation of Change documents were prepared

by Neri as a method to get approval for extra work and payment for the extra work once it

was performed.  (V. Neri 6/13/05 Testimony at 222).  He would submit these documents

to an Elm Haven representative for review, who would then contact "whoever the higher

up was that needed to approve it, and if it waExs acceptable, they would sign it."  (<u>Id.</u>)

Once it was signed, Neri would then prosecute the work.  (<u>Id.</u>)  The reason they used the

Confirmation of Change documents was because of the fast pace with which Elm Haven

wanted the work done, and Neri needed signed confirmations.  (V. Neri Testimony

6/14/05 at 62-63).  Only after the Confirmation of Change document was signed would

Neri prosecute the work.  (Id. at 63).  Vincent Neri understood Ivan Carlsen's signature to

mean that they would get paid for the work, and Jim Canning also confirmed that.  (Id.).

242.    Ivan Carlsen's own testimony confirms that he was authorized to sign these documents on

behalf of Elm Haven and, by so doing, he was authorizing Neri to perform the work for

which Neri would be paid.  (Carlsen Testimony 9/22/05 at 65-67, 155-56).   He testified

that in his role as Superintendent on the Project, his duties included verifying the

performance of additional work by Neri.  (Id. at 7).  He testified that when he was

presented with these Confirmation of Change documents, he would contact David Lucier,

the Assistant Project Manager, who would then contact Lorraine Beckwith and Jim

Canning.  They would authorize him to sign the Confirmation of Change documents,

sometimes with a notation of a slight change.  (Id. at 65, 158).  The purpose of his signing

these and instructing Neri to submit tickets on a time and material basis was "[t]o have

Neri proceed with the work," which he clarified was additional or extra work.  (Id. at 65.)

243.    John Canning, the Project Executive, testified that he never authorized the use of these

forms and that he had never seen these documents until just recently, but he also clarified

that this was not something with which he would have been involved.  Rather, it was

something that should have been handled by Lorraine Beckwith, the Project Manager.

(Canning 9/22/05 Testimony at 191-94).  He does recall, however, conversations on

December 11, 1999, in which he authorized Ivan Carlsen to sign verifications of time and

material so that Neri could get the job done by December 31st, although he could not

recall specifically what he authorized.  (Id. at 196.)  He did recall authorizing Neri to hire

a second crew to install curbing (Id. at 196-97), which was the subject of a Confirmation

of Change, Exhibit 563.

244.    On January 21, 2000, Lorraine Beckwith addressed a memo to Ivan Carlsen and Dave

Lucier regarding "Elm Haven – Neri Construction 'Confirmation of Change,'"

confirming their discussion at a January 19, 2000 meeting, that from that day forward,

Elm Haven would not sign any "Confirmation of Change" forms from Neri.  (Exh. 468.)

245.    The Court finds that Ivan Carlsen and Dave Lucier were acting as Neri's agent and that in

signing the Confirmation of Change documents, they acted at the very least with apparent

authority.  Indeed, based on the testimony of Carl Neri, it appeared that Ivan Carlsen had

express authority to sign these.  Moreover, the Court finds that the Confirmation of

Change documents were unambiguous and that the plain language of these documents

authorized Neri to perform the work in question and required Elm Haven to pay for the

work performed.

246.    There is no question that these documents were prepared by Neri and signed by Ivan

Carlsen on behalf of Elm Haven at a time when there was a great deal of pressure on both

sides to get the work on Block B completed by the end of the year (see Carlsen Testimony

9/22/05 at 68), but that does not lessen the fact that they were signed by an authorized

agent of Elm Haven so that the work would proceed at the prices indicated, that the work

was performed, and that Neri has not been paid.

247.     The following is a summary of the Extra Work Claims covered by the Confirmation of

Change Documents:

a.    NC-056-207-1 (Ex. 563) - Neri seeks $22,242.00[18] for acceleration of the

installation of granite curbing on Blocks B and C.  (V. Neri Testimony 6/14/05 at

64).  The Court will allow this Extra Work Claim but will deduct $6,359.00,

which was the subject of Change Order No.204-20 (Ex. 253) for Dispazio

Construction Company's work as the second crew and which has already been

included in the adjusted Subcontract Price. Indeed, Neri appears to acknowledge

this adjustment on Exhibit 660. Thus, the amount allowed on Extra Work Claim

NC-056-207-1 is $15,883.00.

b.    NC-056-207-4 (Ex. 564) - Neri seeks $4,955.00 for concrete additives, which

were necessary due to the winter conditions.  Elm Haven takes the position that

this charge includes the concrete as well, which would not be an extra to the

Subcontract. The Court disagrees.  The attached tickets specifically state that the

price was for "concrete-additives" at $7.45 per cubic yard, a price far too low to

include the concrete as well as the additives.  (See, e.g., Ex. 277 (concrete priced

at $80/c.y.) and Ex. 280 (concrete priced at $130/c.y.)).  The Court finds that this

extra work charge was necessitated by Elm Haven's acceleration of the paving

work to get it completed before the asphalt plants closed for the winter months.

The Court will allow this extra work claim.

c.    NC-058-207-1 (Ex. 565) - Neri seeks $4,240.00[19] for the removal and re-

---

[18]  Exhibit 660 shows the amount of this claim to be $7,378.50.  The Court will use the
higher figure which both sides have addressed in their Findings of Fact and Conclusions of Law.

[19]  Exhibit 565 shows a total amount due of $4,878.66.  Neri has not explained why it has
reduced the amount of its claim for NC-058-207-1, but the Court will use the lower figure set

installation of granite curbing on Canal Street due to plan discrepancies.  While Elm Haven claims that this extra work was due to Neri's misinterpretation of the plans, as opposed to plan discrepancies, Ivan Carlsen did sign off on this Confirmation of Change and the Job Invoice.  Therefore, the Court finds that Neri is entitled to $4,240.00 on this extra work claim.

d.    <u>NC-059-207-1 (Ex. 566)</u> - Neri claims that it is entitled to $5, 590.00 for work performed in relocating two catch basins again due to plan centerline discrepancies pursuant to this Confirmation of Change doccument.  Elm Haven contests this extra work claim on the same basis as the previous one.   The Court finds that Neri is entitled to recover on this claim.

e.    <u>NC-060-207-1 (Ex. 567)</u> - Neri seeks to recover $2,670.00 for the excavation and construction of six concrete footings/pads for cast-in-place concrete steps in Block B per revised sketches.  (V. Neri Testimony 6/14/05 at 90-97).  Elm Haven maintains that this work was within Neri's original scope of work (<u>see</u> Ex. 453) and points out that none of the receiving tickets was signed by any representative of Elm Haven.  Contrary to this assertion, two of the receiving tickets are signed by Ivan Carlsen, as well as the Confirmation of Change document itself. Additionally, this Court has previously found that the plans were ambiguous as to whether the stairs were to be constructed of concrete or wood.  The Court will allow this extra work claim.

f.    <u>NC-061-207-1 (Ex. 568)</u> - The next extra work claim for which Neri seeks

forth in its Findings of Fact and Conclusions of Law at 44.

compensation was for the removal of concrete obstructions and vault, which were in conflict with the granite curbing on the east side of Canal Street. This extra work claim is for $4,235.00.[20] Elm Haven argues that Neri's original scope of work included the removal of all existing utilities. (Subcontract, Attachment A, ¶ 6.D.; Ex. 454). Moreover, all excavations on the Project were "unclassified," meaning that Neri was to excavate to the required subgrade elevation regardless of the character of the materials and obstructions encountered. (Id. at ¶ 6.G.). Vincent Neri testified that Neri performed this work in early December, after which Mr. Carlsen signed the Confirmation of Change on December 17, 1999, after getting approval from Jim Canning to do so. (V.Neri Testimony 6/14/05 at 94-99). Because this Confirmation of Change was approved by Mr. Carlsen, the Court will allow this extra charge.

g.    NC-062-207-1 (Ex. 569) - This extra work claim was for the removal of concrete and brick pavement on Ashmun Street to eleven inches as directed by the City of New Haven. Ivan Carlsen signed the Confirmation of Change with a note that the work was to be completed by December 17, 1999. (Ex. 569). Vincent Neri explained that removing concrete pavement and brick pavement is entirely different than excavating soil with debris. When they encountered this pavement, they had discussions with Ivan Carlsen and Jim Canning about whether this was extra work. Ultimately they arrived at a price for Neri to perform the work,

---

[20]  Exhibit 660 carries a figure of $4,294.17 for this extra work claim. The Court will use the figure in Neri's proposed Conclusions of Law.

$18.00/s.y., with an estimated quantity of 2,100 square yards.  Neri performed the work ,which Mr. Carlsen observed and then measured the quantity of materials removed, which totaled 2,833.33 square yards.  The amount of this extra work claim is $60,166.00,[21] which the Court will allow.

h.   NC-065-207-2 (Ex. 574) - This extra work claim is related to the previous one and involved refilling that portion of the excavation performed by Neri.  Ivan Carlsen authorized Neri to replace the removed concrete and brick pavement with process, three inches thick, as directed by the City of New Haven.  The agreed upon price was $15.00/ton, with an estimated quantity of 276 tons, the actual quantity to be verified.  Valley Sand & Gravel provided the materials, totaling 408.59 tons.  Neri's extra work claim for these materials is $7,230.00, which the Court will allow.

i.   NC-067-207-1 (Ex. 576) - This Confirmation of Change, signed by Ivan Carlsen on December 17, 1999, was for the additional cost to construct concrete aprons at the city sidewalks per revisions at the cost of $850.00 each.   When he signed this, Mr. Carlsen specifically noted that it was subject to approval by the City and a representative of LEA. (Ex. 576).  Vincent Neri testified that there was a discrepancy between the plans and the City's requirements.  Revisions were made to the plans, and Neri was instructed to price the revision, which they did.  (V. Neri Testimony 6/14/05 at 129).  The $850.00 price per apron reflected the

---

[21]  This figure, as with many of the extra work claims, includes a mark-up of 10% to account for overhead, and a bond premium of 1.7%.

additional cost to make the driveway aprons larger per the revised plans. (V. Neri Testimony 10/5/05 at 156). Again, Elm Haven maintains that this was within Neri's original scope of work, as Neri was required under the Subcontract to perform all of its work in accordance with all applicable laws and ordinances. (Ex. 457; Subcontract, Art. 2.4). Moreover, Elm Haven states that on March 25, 2000, when the architect Blades & Govern issued its punchlist for Block B, it required the removal of four aprons in Block B, because they were not of commercial grade as required by the City. (Ex. 313). Elm Haven then issued Change Order No. 207-21 to Neri to remove and replace all driveway aprons on the punchlist, as well as the concrete driveway apron at the Block B parking area entrance, which was to be of commercial grade. The total charge for the nine aprons was $7,650.00, which after mark-up for taxes, overhead, and bond premium, totaled $9,025.00. The Court finds that Neri is entitled to be compensated for the aprons that were approved, but not the aprons that had to be replaced and for which it was compensated under Change Order No. 207-21. Accordingly, the Court will allow Neri to recover five-ninths of the requested extra work claim, or $5,014.00.

j.    NC-067-207-2 (Ex. 577) - Neri next seeks to recover $2,247.00 for installing concrete landings in Block B at nineteen (19) units. Neri states that this work was authorized by the Confirmation of Change marked Exhibit 567. (V. Neri Testimony 6/14/05 at 136). Vincent Neri testified that this work was necessitated during the acceleration period on Block B after Elm Haven realized that the

precast landings that had been ordered for the units in Block B had no frost

protection.  Therefore, Neri was instructed to remove the precast landings and

pour these landings with a thickened edge on a time and material basis.  On the

units with porches, they had to excavate the sonatubes as well, as directed by

Dave Lucier, and then pour the sonatube and pad in one "monolithic pour."  (Id. at

135-39).  Elm Haven argues that these landings were part of the site concrete for

which Neri was responsible under the Subcontract.  Moreover, Exhibit 567 has

nothing to do with this particular work.  It states that it is for the excavation and

construction of six concrete footing/pads for cast-in-place concrete steps per plan.

It also indicated that the location of the work was at six particular units in Block

B, none of which was among the nineteen units listed on the receiving ticket that

is part of Exhibit 577.   Additionally, none of the receiving tickets included in this

claim is signed by a representative of Elm Haven.  The Court agrees with Elm

Haven that the receiving ticket for NC-067-207-2 is not covered by the

Confirmation of Change that is Exhibit 567.  Therefore, the Court will disallow

this extra work claim.

k.    NC-068-207-1 (Ex. 578) - Neri's next extra work claim is for the additional cost

to construct concrete ramps at the City sidewalks due to revisions dated December

1, 1999, at the price of $795.00 each.  Pursuant to this Confirmation of Change,

Neri constructed ten handicap ramps on Block B, for which it seeks $9,379.00,

which includes a mark-up for taxes, overhead, and the bond premium.  Vincent

Neri testified that this change was in response to a revision dated December 1,

1999. This particular Confirmation of Change is not signed by Ivan Carlsen, although he wrote at the bottom of the form, "Verify & approval by City of New Haven and LEA. Inst. by Ivan to proceed with detail," which Vincent Neri interpreted to mean that Neri was authorized to proceed with the work. (V. Neri Testimony 6/14/05 at 142-45). Mr. Neri explained that throughout the course of the Project, the handicap ramps had been a huge problem because the drawings did not meet the City's requirements. (Id. at 145-51). As with several of Neri's other extra work claims, Elm Haven responds that it was Neri's responsibility to furnish handicap ramps according to the City's building codes, regulations and requirements. (Subcontract, Art. 2.4). Moreover, Blades & Govern's revised drawing, which generated this change, required less work than the original drawing because the ramp was only a one-directional ramp, as opposed to two, as called for in the original plans. (Ford Testimony 10/4/05 at 195; Ex. 485). Vincent Neri disagreed, testifying that under the original plans, many of the handicap ramps would have been poured with the sidewalks, but under the revised plans, they had to be poured in two different sections. (V. Neri Testimony 10/5/05 at 160-61). In fact, it was such a difficult layout that Earl Govern had to be present in the field to direct the layout. (Id.). The $795.00 price per ramp reflects only the extra cost associated with the revisions. (Id.). Based on the testimony throughout the trial, the Court recognizes that repeated problems plagued the Project with respect to the handicap ramps and finds that Neri should be compensated for the extra work involved in having to make these difficult

revisions.  Although this particular confirmation of change was not signed by Mr.

Carlsen, he testified that he did authorize Neri to perform the work that is the

subject of this confirmation of change.  (Carlsen Testimony 9/22/05 at 40-44).  He

further testified that the City would not have issued a certificate of occupancy for

Block B if it did not approve the handicap ramps.  (Id. at 44).  Thus, the Court will

allow this in the amount requested, $9,379.00.

l.    NC-069-207-1 (Ex. 580) - The next Confirmation of Change document pertains to

Neri's claimed additional work in providing screened off-site topsoil in lieu of on-

site topsoil at the adjusted unit price of $19.85/yard.  The total requested claim is

$11,200.00.  Ivan Carlsen signed this document with a note stating "please supply

ticket from supplier."   Attached to the Confirmation of Change are four receiving

tickets with invoices from Valley Sand & Gravel.  Vincent Neri testified that the

use of off-site topsoil was necessitated by Elm Haven's failure to provide Neri

with a staging area so that the on-site topsoil could be dried and screened.

Because of the accelerated pace of work on Block B, Neri did not have time to get

the on-site topsoil screened and, thus, had to obtain topsoil from outside the

Project.  (V. Neri Testimony 6/14/05 at 157-59).   Again, Elm Haven argues that

providing top soil was part of Neri's scope of work.  The Court finds that Elm

Haven authorized this additional claim by virtue of Mr. Carlsen's signature and

will allow the extra work charge.

m.    NC-070-207 (Ex. 581) - Pursuant to this Confirmation of Change signed by David

Lucier on behalf of Elm Haven, Neri was authorized to put temporary pavement at

the intersections of Ashmun and Webster Streets and Ashmun and New Street 1 as part of the Block B acceleration.  Mr. Lucier noted on the document "This is O.K. per traffic dep[artment]. This needed to be done."  (Ex. 581).  Payment was to be made on a time and material basis.  Neri seeks $23,619.00[22] for this extra work.  Elm Haven takes the position that Mr. Lucier, as a Project Superintendent, had the authority to verify time and material, but he never possessed the authority to unilaterally approve change orders.  The Court has previously rejected this argument as it related to Ivan Carlsen, also a Project Superintendent.  The Court further finds that this additional work was mandated as a result of Elm Haven's acceleration of Block B.  Therefore, the Court will allow the requested additional work claim of $23,619.00.

n.   NC-070-207-1 (Ex. 582) - This claim stems from the previous Confirmation of Change.  According to Vincent Neri, this additional request in the amount of $2,489.00 was for the base material supplied by Valley Sand & Gravel.   For the reasons set forth above, the Court will allow this extra work claim but will reduce it by $177.50.  As Elm Haven points out, it appears from the Receiving Ticket that the two laborers' time from 11:00 a.m. to 2:00 p.m. was double-billed.  Thus, the amount of this claim that will be allowed is $2,311.00.

248.   Thus, the total of extra work claims allowed to Neri pursuant to the Confirmation of Change Documents, as set forth above, is $156,492.00 (Additional/Extra Work Claims NC-056-207-1, NC-056-207-4, NC-058-207-1, NC-059-207-1, NC-060-207-1, NC-061-

---

[22]  This figure differs from the amount shown on Exhibit 660, which is $20,716.02.

207-1, NC-062-207-1, NC-065-207-2, NC-067-207-1, NC-067-207-2, NC-068-207-1,

NC-069-207-1, NC-070-207, and NC-070-207-1).

2.  Excavation of Unsuitables

249.    The second category of extra work claims relates to the excavation of unsuitable

materials.  This encompasses Extra Work Claims NC-013-204-1 (Ex. 594), NC-019-204-

1 (Ex. 599), NC-019-204-1-G (Ex. 600), NC-019-204-2-G (Ex. 601), NC-204-56 (Ex.

608), NC-204-131 (Ex. 613), NC-204-135 (Ex. 615), and NC-204-139 (Ex. 616) on

Project 204, Phase IB; and Extra Work Claims NC-022-207-1 (Ex. 555), NC-022-207-1-

C (Ex. 556), NC-052-207 (Ex. 561), NC-0650207-4 (Ex. 575), and NC-207-126 (Ex.

587) on Project 207, Phase IC.[23]

250.    The excavation of unsuitables was discussed above in connection with Elm Haven's back

charge for the removal of unsuitables stock-piled by Neri in Blocks E and G .  (See

Concl. of Law ¶¶ 45-55, supra).  Here, Neri takes the position that, while the Subcontract

Documents clearly indicated how unsuitable materials encountered during building

excavations would be handled, they did not clearly and unambiguously provide how

unsuitable materials encountered in other types of excavations should be handled.  Most

of these extra work claims relate to unsuitables encountered during excavations for utility

trenches.  Neri points out that on two separate occasions, Elm Haven inquired of the

design engineer, LEA, how these should be handled, and on both occasions, the design

engineer indicated that unsuitable material from excavations other than building

---

[23]  The Court has used Neri's numbers for its extra work claims, which sometimes places the project number first followed by the number of the extra work claim, and other times reverses the order of these numbers.

excavations was to paid for as an "extra." Lorraine Beckwith then set up a procedure for determining and quantifying unsuitable materials, for which Neri was paid on a per unit basis. (V. Neri Testimony 10/5/05 at 169-70; see also Ex. 683 & 684, the back-up invoices for the excavation of unsuitables in the conduit trenches in Blocks B & C; Ex. 298, Change Order No.207-6, where Elm Haven paid Neri $29,722.51 for the excavation and replacement of these unsuitables). However, after John Ford took over as Project Manager, Elm Haven quit paying Neri for these unsuitable materials. Neri also points out that the Geotechnical Report, which at least to some degree provided the parties with notice as to the quality of soil materials, did not cover utility trenches. It was specific to the buildings, and had nothing to do with the utility work. (V. Neri Testimony 10/5/05 at 169).

251. Elm Haven, on the other hand, draws no distinction between the types of excavations and argues that the Subcontract was clear that all general site and building excavations were on an "unclassified basis" and were to be treated the same with respect to the excavation of unsuitable materials. (Subcontract, Attachment "A" ¶ 6.G.).

252. Neri responds that paragraph 6.G., of Attachment "A," cited by Elm Haven, related only to general sitework in preparation for the buildings. Paragraph 6.J. dealt with the utility trenches and did not mention unsuitables. (V. Neri Testimony 10/5/05 at 169).

253. After a thorough review of all of the Subcontract documents, the Court disagrees with the positions espoused by both parties. The Court finds that a distinction was made between building excavations and general site excavations. The Court further finds that, with respect to general site, including utility, excavations, only those unsuitables excavated

beyond the limits set forth in the Subcontract documen-ts were to be paid for on a Unit

Price basis.

254.    Paragraph 6.G. of Attachment "A" provides in relevant part:

> This subcontractor will furnish and install all labor, materials, equipment,
> tools and supervision to do all **Site Development Work** per contract
> Drawings and Specifications including but not limited to the following
> items:
> . . . .
> G.    Perform general site and building cut and fill, mass
> excavation and rough grading to new grades
> established by contract drawings.  Site fill with on
> site materials (if deemed suitable) or borrow
> materials.  Building fill with on site materials (if
> deemed suitable) or borrow materials.  ~~Building fill~~
> ~~with borrow structural fill.~~  Subcontract includes
> hauling and disposal of all unsuitable and/or surplus
> material off site.  All excavation shall be performed
> on an unclassified basis.  All unsuitable material
> within cut material and as noted in Geotechnical
> Report to be removed from site and legally disposed
> of.  Any unsuitable material not included in contract
> requirements that is required to be removed shall be
> done per Unit Prices included in this subcontract.

(Emphasis added; strikeout in original).

255.    The Court finds that Paragraph 6.G. governed all excavation activities on the Project,

both general site and building site excavation.  Paragraph 6.G. specifically references

both general site and building work, and states clearly that suitable materials or borrow

materials would be used for both site fill and building fill.  It further states that the

Subcontract includes the hauling and disposal off-site of all unsuitable materials and

surplus materials, but draws a distinction between unsuitables within the cut and as noted

on the Geotechnical Report and those unsuitables not included in the contract

114

requirements: the removal of the latter being compensated for based on the unit prices in the Subcontract; the removal of the former not being compensated for at Unit Prices.

256. The Geotechnical Report (Ex. 4) addressed only subsurface conditions within the building areas.

257. Paragraph 20, which set forth the Unit Prices, specifically referenced two sections of the Project Specifications, Section 02200 and Section 02210, covering Earthwork and Building Earthwork, although the only unit prices listed for unsuitable materials were under Section 02210 - Building Earthwork. (Ex. 1, Attachment "A" ¶ 20 & Ex. 3). Under "Section 02210,"[24] a unit price of $15.00 per cubic yard was set for the removal and disposal of off-site unsuitable material "not included in the contract requirements." (Ex. 1, EH11400).

258. The last page of Attachment "A" lists the exclusions, specifically, the "[e]xcavation and disposal of unsuitable materials (including urban debris) ~~other than required in Contract Documents~~ <u>beyond the limits</u> indicated in the Contract documents." (Ex. 1, EH11401) (emphasis added; strikeout in original). No distinction is made between unsuitables encountered during general site excavations and those encountered during building excavations.

259. Paragraph 6.H. pertains to the site work for building footings and foundations and underslab utility excavation. (Ex. 1, EH11393). Paragraph 6.I. sets forth a general description of the site work for sanitary sewer lines to within five feet of buildings;

---

[24] This refers to a section of the Project Specifications discussed below. Section 02210 pertains to "Building Earthwork."

paragraph 6.J. covers storm sewer lines; paragraph 6.K. discusses the underground roof collection system; paragraph 6.L. sets forth the general site work for all on-site water lines; paragraph 6.N. discusses trenching and backfilling and conduits for all electrical, telephone, and CATV conductors; paragraph 6.O. pertains to trenching and backfilling for site and street lighting.  Each of these subsections includes, <u>inter alia</u>, trenching and backfilling, but makes no mention of unsuitable materials.

260.  Paragraph 10 states that the Owner was responsible for all soil testing.

261.  The Subcontract Documents include the Project Specifications.  Of relevance to the issue of unsuitables encountered in the excavation of utility trenches are:

a.    Section 01026, which sets forth the items for which unit prices are to be established, although no specific prices are listed, including the removal and disposal of unsuitable material off-site (Section 02210);

b.    Section 02200, governing Earthwork, which governs the preparation and subgrades for structures, utilities, walks, pavements, and landscaping; excavating and backfilling for underground site utilities and appurtenances; and excavating and backfilling for water main tapping; and

c.    Section 02210, which pertains to Building Earthwork, including excavating and backfilling for buildings and structures; excavating and backfilling trenches within five feet of the building lines; preparing and grading subgrades for slabs-on-grade; and drainage and moisture control fill course for slabs-on-grade.

Additionally, Section 02660 - Water Distribution System, Section 02720- Storm Drainage System, and Section 02730 - Sanitary Sewer System - state that the earthwork operations

116

for these systems are to be performed in accordance with Section 02220, "Earthwork."[25]

262. Section 02200 - "Earthwork" - defines "excavation" as consisting of "the removal of material encountered to subgrade elevations and the reuse or disposal of materials removed." (Ex. 3, EH02432, ¶ 1.4.A.). "Subgrade" is defined as "the uppermost surface of an excavation or the top surface of a fill or backfill immediately below subbase or topsoil materials." (Ex. 3, EH02432, ¶ 1.4.B.).[26] "Borrow" is defined as "[s]oil material obtained off-site when sufficient approved soil material is not available from excavations." (Ex. 3, EH02432, ¶ 1.4.C.). "Utilities" include all underground pipes, conduits, ducts, and cables five feet outside building lines. (Ex. 3, EH02432, ¶ 1.4.F.). Paragraph 1.6 states that the Owner will employ a qualified independent geotechnical engineering testing agency to classify proposed on-site and borrow soils to verify that the soils comply with specified requirements. Part 2 - "Products" - sets forth a list of satisfactory and unsatisfactory structural soil materials, listed by soil classification groups, and states that backfill and fill materials include satisfactory soil materials, thus excluding the unsatisfactory soil materials. (Ex. 3, EH02434). Part 3 - "Execution" - then sets forth the preparation, dewatering, and excavation procedures. Paragraph 3.6, "Excavation for Structures," provides that site and utility structures are to be excavated to the indicated elevations providing working clearance on each side of structure. (Ex. 3, EH02438, ¶ 3.6). The Specifications provide for the excavation of utility trenches to the

---

[25] Presumably this section number is a typographical error, for there is no section 02220 in the Specifications. Section 02200 is the "Earthwork" section.

[26] The definition of "subgrade" in Section 02210 - Building Earthwork - is the essentially the same but refers to the foundation instead of topsoil materials. (Ex. 3, EH02447).

indicated slopes, lines, depths, and invert elevations, and to uniform widths and trench walls vertically from trench bottoms to twelve inches higher than top of pipe or conduit, unless otherwise indicated. (Ex. 3, EH02438, ¶ 3.7). The next section of the Specifications is entitled "Approval of Subgrade" and states that the Owner is to be notified when excavations reached subgrade. "When ~~Owner~~ ENGR[27] determines that ~~unforeseen~~ unsatisfactory [with a handwritten note "UNSUITABLE MATERIAL REFERENCE"] soil is present, continue excavation and replace with compacted backfill or fill material as directed. ~~Unforeseen~~ additional excavation and replacement material will be paid according to the Contract provision for changes in Work. UNIT PRICES [illegible][28]." (Ex. 3, EH02439, ¶ 3.8B.1.) (strike-outs in original). Paragraph 3.10 then sets forth the requirements for the storage of soil materials. Paragraph 3.11 describes backfill requirements generally. Paragraph 3.12 sets forth the requirements for structural backfill. Both clearly indicate that only approved backfill materials may be used. (Ex. 3, EH02440 & EH 02441). Paragraph 3.13 discusses utility trench backfill, which required used of satisfactory soil material. (Ex. 3, EH02441). Paragraph 3.20 discusses the disposal of surplus and waste materials with satisfactory soils being stored on Owner's property and waste material, including unsatisfactory soil, trash, and debris, being legally disposed of off the Owner's property. (Ex. 3, EH02445).

263. Thus, under the General Earthwork section, excavation limits were established. The

---

[27] This was a handwritten notation substituted for Owner.

[28] The last word of this handwritten notation is not legible on the Court's copy of the Specifications.

Owner was to be notified when the excavation reached subgrade.  When the

Owner/Engineer determines that unsatisfactory or unsuitable materials are present, Neri

was to continue excavating.   The specifications state that only <u>additional</u> excavation and

replacement materials will be paid as changes in work, to which Unit Prices would apply.

264.   Section 02210 is somewhat different concerns only "Building Earthwork."  It states that it

applies to preparing and grading for slabs on grades, excavating and backfilling for

buildings and structures, drainage and moisture control fill for slabs-on-grade, and

excavating and backfilling trenches within five feet of the building lines.  (Ex. 3,

EH024446, ¶ 1.02A).  The definition of "excavation," set forth in this section, includes

not only "the removal of material encountered to subgrade elevations," but also, "<u>if</u>

<u>unsuitable materials are encountered at the subgrade elevation, to the overexcavation</u>

<u>elevation indicated on the drawings,</u> and the reuse or disposal of materials removed."

(Ex. 3, EH02447) (emphasis added).  Thus, excavation for building earthwork includes

the "overexcavation elevation indicated on the drawings" if unsuitables are encountered.

Excavation for more general earthwork purposes, to which the utility sections refer, does

not include this provision.

265.   "Unsuitable material" is defined in Section 02210 as "[o]n-site materials which are of

improper gradation to allow adequate compaction, are organically contaminated or are

identified as improper to the intended use by the Geotechnical Engineer."  (Ex. 3,

EH02447).   No such definition of "unsuitable material" is set forth in the preceding

section, Section 02200, on Earthwork.

266.   In the Building Earthwork section, "utilities" include only underground services within

five feet of the buildings.  (Ex. 3, EH02447).

267.    Here, as in the previous section, the subcontractor is required to notify the architect when the excavations have reached subgrade.  (Ex. 3, EH02450).  "When Architect or Geotechnical Engineer determines that unsatisfactory soil is present," the subcontractor is directed to "continue excavation and replace with compacted backfill or fill material as directed.  Bid price shall include overexcavation of unsuitable materials as indicated on drawings."  (Ex. 3, EH02450, ¶ 3.08 B.).  Thus, Unit Prices do not apply to unsuitables encountered during overexcavation.

268.    The Subcontract Documents are anything but a model of clarity on this issue.  To complicate matters further, the practices of the parties were inconsistent at best.  The issue of unsuitables encountered in non-building excavations was the subject of several RFIs addressed to LEA, the design engineer.  On August 19, 1999, Douglas Day, Project Engineer with LEA, wrote Elm Haven in response to an inquiry from Lorraine Beckwith concerning "pay limits and unsuitable materials."  (Ex. 669).  Mr. Day referenced Sections 02210 and 01026 of the Specifications and Drawing SS-23,[29] which he found to be "quite clear," and stated that the unit prices in Section 01026 "would be used when unsuitable material is encountered during utility trench excavation."  (Ex. 669).

269.    Again, on May 9, 2000, Mr. Ford sent LEA a RFI regarding the procedures required by the specifications when unsuitables are encountered during operations other than building excavation.  LEA responded by referencing "Section 02200 - EARTHWORK" and stated

_____

[29] Drawing SS-23 shows a typical pipe bedding detail and Notes "A" and "B" on the drawing address the pay limits for a typical pipe trench section.

120

that, although the phrase "unsuitable" materials is not used in that section, similar phrases such as "unforeseen unsatisfactory soil" have the same meaning.  LEA stated that if the Owner determines that unsatisfactory soil is present in the excavation, the unsatisfactory soil should be "removed and replaced with satisfactory soil as directed in the field and paid for under the provisions for changes in work."  (Ex. 677, EH05374)(emphasis added).

270.   On August 3, 1999, Lorraine Beckwith wrote Steven Simoncini that "the following unit prices for unsuitable material removal and replacement" had been approved: $35.00/cubic yard for foundation excavation and $32.50/cubic yard for utility excavation.  (Ex. 551). Her letter stated that these unit prices were to be "utilized for all 'approved' quantities of unsuitable material. Once unsuitable material is encountered, the Elm Haven Construction staff must be notified to allow LEA to make the final determination if the material is unsuitable. The quantities will then be agreed upon and a detailed proposal submitted by Neri Construction for approval and processing."   A formal Change Order would then be prepared once processing was complete.  (Ex. 551).

271.   On August 19, 1999, Lorraine Beckwith sent a letter to Steven Simoncini regarding the "Determination of Unsuitable Material Status and Quantities."  (Ex. 662).  In her letter, she reiterated the procedure for determining and quantifying unsuitables.  Neri was to immediately notify the Elm Haven Project Superintendent if possible unsuitable material has been encountered, after which Elm Haven would view the conditions and verify that the material was unsuitable and quantify same.  If they could not reach an agreement, LEA was to be contacted.  (Ex. 662).

272. Significantly, neither letter drew a distinction between unsuitables encountered inside or outside contract limits.

273. Ms. Beckwith testified, however, that it was her belief that the Subcontract stated that Neri "owns the removal and replacement of all unsuitable material within the contract limit line." (Beckwith Testimony 9/23/05 at 114). By "contract limit lines," she meant anywhere on the drawings "where it shows what Neri must do to excavate for whatever." (Id.). It was her understanding that there were contract limit lines associated with all types of excavation, including foundation excavation, slab-on-grade excavation, and site utility excavation. (Id.). Once Neri had excavated to the limits set forth in the Contract and had encountered unsuitables, to the extent that Neri had to excavate beyond the contract limits and dispose of the unsuitables encountered, it would be compensated for this work based on the Unit Prices that were negotiated. (Id. at 116-19).

274. On at least two occasions, Elm Haven submitted to the Owner Change Order proposals for the removal and replacement of unsuitables in utility trenches, which change orders were approved. (See Ex. 683, Letter from Beckwith to Owner dtd. 1/10/00 re. Change Order Proposal #15/IC New, Unsuitables at Drainage Block C, approved by Owner on 2/9/00; Ex. 684, Letter from Beckwith to Owner dtd. 1/10/00 re. Change Order Proposal #11/IC New, Unsuitable Material Removal at Electric Ductbank Trench, approved by Owner on 2/9/00). It is not clear from these change orders whether the unsuitables had been excavated from within or without the contract limit lines.

275. On at least two occasions, Elm Haven issued change orders to Neri for the removal of unsuitables and the replacement with on-site material. (See Ex. 238, Change Order

No.204-10, dtd. 8/13/99, for $3,366.00; Ex. 298, Change Order No.207-10, dtd. 11/3/99,

for $29,722.51).  Again, it is not clear whether the unsuitable materials were excavated

from within or without contract limit lines.

276.    The Court finds that with respect to utility trench excavation, when the Subcontract

Documents are read in their entirety, Neri was entitled to compensation based upon the

Unit Prices for the excavation of unsuitable materials encountered when it became

necessary for Neri to excavate beyond the dimensions or limits set forth in the Project

Specifications or Drawings, in other words, when "overexcavation" was required because

of the presence of unsuitables.  Attachment "A," paragraph 6.G. states that Unit Prices

included in the Subcontract will apply to the removal of any unsuitable material not

included in "contract requirements."  The Specifications state that the Owner was to be

notified once subgrade was reached and, at that point, if the Owner/Engineer determined

that unsuitable material was present and the Subcontractor was required to perform

additional excavation, the Subcontractor would be paid according to the Subcontract

provisions for changes in work and Unit Prices would apply.  Thus, it was the additional

excavation beyond subgrade that triggered the Subcontractor's right to submit an extra

work claim, to which the Unit Prices would apply.  To the extent unsuitables were

encountered during excavation within the cut – that is, within the dimensions called for

by the Project Specifications and Drawings for utility trenches – Neri would not be

compensated for the removal and disposal of these materials.  The excavation of soil

materials within the cut was anticipated regardless of whether they were unsuitable or not,

and the Contract specifically provided that all excavation was to be performed on an

"unclassified basis."

277.    Because these are extra work claims, Neri bears the burden of proving that it was entitled to compensation for the excavation and removal of these unsuitable materials.

a.    <u>NC-013-204-1 (Ex. 594)</u> - Neri seeks compensation of $18,469.42 for the excavation of 568.29 cubic yards of unsuitable materials from underslab utility trenches between March 29, 1999, and May 19, 1999.   In an RFI dated March 22, 1999, Mr. Simoncini wrote Mr. Carlsen that they had encountered buried urban debris while performing underslab utilities excavation.  He stated that the Subcontract excluded any work associated with buried urban debris and requested advice as how to proceed.   Four months later, Mr. Carlsen responded by letter dated July 13, 1999, that they should advise Elm Haven if they encountered unsuitable or buried urban debris upon excavating trenches, at which time Elm Haven would notify LEA for their approval and verification before they continued with excavation and backfill.  Thereafter, Mr. Simoncini wrote Mr. Carlsen that they were continuing to encounter unsuitables and buried urban debris at the underground conduit, storm drainage, and underslab utilities.  "As requested, we will continue to notify Elm Haven Construction L.P. and to verify with the onsite inspectors.  As agreed, we will provide tickets for the associated removal and replacement of these materials as a result of these conditions."  (Ltr. dtd. 7/14/99). On July 29, 1999, and August 2, 1999, he wrote Lorraine Beckwith requesting "appropriate contract amendments" to address the issue of the unsuitable materials and urban debris that they were encountering in excavating for the utilities.  (Ltd.

124

dtd 8/2/99).  Subsequently, on August 3, 1999, Elm Haven established a unit price of $32.50 for the excavation of unsuitable materials from the utility trenches.  As noted above, no distinction was made as to unsuitables within the cut or without.  Thereafter, a procedure was established by which Neri was to have Elm Haven or LEA verify that unsuitables were present and to quantify same.  Vincent Neri testified on cross-examination that this urban debris was encountered within the limits of the excavation depths called for by the Subcontract.  (V. Neri Testimony 6/24/05 at 30).  Accordingly, the Court finds that this was not subject to an extra work claim.

b.  NC-019-204-1 (Ex. 599) - This extra work claim for $19,221.00 relates to the excavation of unsuitables from April 19 to 21, 1999, and on June 10, 1999, at drainage and sanitary trenches in Blocks B and C and a conduit bank on Ashmun Street.  Attached to Neri's extra work claim are field notes prepared by Vincent Neri showing the work performed and the measurements used to arrive at the quantity of unsuitables.   Vincent Neri testified that Ivan Carlsen would contact LEA or Heyman Teale when they encountered unsuitables, who would then inspect the materials and make a determination as to whether they were unsuitables.  It was Mr. Neri's understanding that they would then get paid for this as an extra work claim based upon the negotiated unit price.  (V. Neri Testimony 6/14/05 at 39-41).   Elm Haven maintains that this claim is invalid because the unsuitable material was located within the contract limit lines for the utility trenches at issue. It is not clear from the Vincent Neri's testimony or the

supporting documents[30] whether Neri had to over excavate to remove these unsuitables. (V. Neri Testimony 6/24/05 at 38). Thus, the Court finds that Neri has failed to carry its burden of proof on this extra work claim.

c.    NC-019-204-1-G (Ex. 600) - Neri next seeks compensation on an extra work claim for the removal and replacement of unsuitable materials at the parking lot in Block G on May 5, 2000. The amount of this claim is $30,625.00. LEA determined that the materials were unsuitable for use as backfill and measured the quantity to be approximately 747 cubic yards. This information was given to John Ford. (Ex. 600, EH09935). Mr. Ford then sent an RFI to LEA dated May 9, 2000, to which LEA responded that unsatisfactory material should be paid for under the provisions for changes in work. (Ex. 677). Elm Haven maintains that this material was excavated from within contract limits. (Ex. 444). It is not clear from the testimony or documents whether the excavated material was from within or without contract limits. (V. Neri Testimony 6/24/05 at 124-28). The Court disallows this extra work claim.

d.    NC - 019-204-2-G (Ex. 601) - This extra work claim relates to the excavation of additional unsuitable materials from utility trenches on Block G for water service at New Street 4. The total claim is for $1,925.00. The attached field notes from April 28, 2000, indicate that LEA confirmed the quantity of unsuitables. (See also V. Neri Testimony 6/15/05 at 53). Again, however, Neri has failed to carry its

---

[30] Neri's work notes do contain the dimensions of each excavation. However, Vincent Neri never testified as to whether any of these excavations were beyond contract limits, and the Court is unable to decipher the hand-written notes to make this determination on its own.

burden of showing that these unsuitables were excavated from outside the contract limits. Therefore, the extra work claim is denied.

e.    NC-204-56 (Ex. 608) - Neri's next proposed extra work claim for unsuitables is for $10,628.00 for the excavation of 600.62 cubic yards of unsuitables, masonry rubble, debris, and concrete from Block E. Vincent Neri testified that this materials had been stock-piled on Block E. A representative of Elm Haven measured the pile prior to Neri's removal of the materials. Neri then generated a field sketch and a receiving ticket, which it submitted to Elm Haven. (V. Neri Testimony 6/15/05 at 72-74). John Ford testified that the materials had been excavated from within the cut lines. (Ford Testimony 10/5/06 at 115; Ex. 444). Because Neri has failed to establish that these unsuitables that it removed came from outside the cut lines of the Project, the extra work claim is denied.

f.    NC-204-131 (Ex. 613) - On November 22, 2000, Mr. Rossetti with Neri wrote John Ford seeking compensation for unsuitable excavation and structural fill material in Block G. Vincent Neri testified that a Change Order had been generated for Block G, but that it limited the quantity of unsuitables that Neri was required to remove to 250 cubic yards. Anything over and above that, Elm Haven would compensate Neri at the rate of $15.00 per cubic yard for the excavation and $20.00 per cubic yard for the structural fill, since this was a foundation excavation. When Neri encountered unsuitables, it notified Tom Jensen, who confirmed the quantities. (V. Neri Testimony 6/15/05 at 86-90). Elm Haven concedes that as a result of Change Order No. 204-13 (Ex. 246), Neri did, in fact,

have to perform additional excavations for two new townhomes, created by the Block G revisions. However, Elml Haven claims that Neri was compensated for the extra work on these two townhomes, which would have involved approximately 250 cubic yards of additional excavation. (Ford Testimony 10/4/05 at 100-02; Ex. 246). With respect to this extra work claim, Mr. Ford testified that it related to Townhouse 1, which never changed from the original plans. (Id. at 103-05). Change Order No. 204-13 (Ex. 246) provided that it included all labor and materials required to complete all Block G revisions, per documents listed therein, and described the scope of work as including, inter alia, "All unsuitable material excavation and disposal off site (up to 250 cy)." (Strikeout in original, parenthetical handwritten). The Court agrees with Neri that this Change Order compensated Neri for the removal and disposal off-site of the first 250 cubic yards of unsuitables from Block G. Thereafter Neri was entitled to compensation at the negotiated Unit Prices. Accordingly, the Court will allow this proposed extra work claim in the amount of $19,156.00.

g.     NC-204-135 (Ex. 615) - This extra work claim is for the excavation of unsuitables and installation of fill at Townhouse 2 in Block G. For the same reasons as set forth above, the Court finds that Neri is entitled to recover on this claim as extra work over and above Change Order No. 204-13. The Court will allow Neri's extra work claim in the amount of $25,025.00.

h.     NC-204-139 (Ex. 616) - Like the two preceding extra work claims, this relates to the revisions to Block G not covered by Change Order No. 204-13, in particular

Townhouse 3.  The Court will allow this extra work claim in the amount of $26,145.00.

i.    <u>NC-022-207-1 (Ex. 555)</u> - This extra work claim is for $4,915.00 for the removal of unsuitables and debris and the installation of refill material based upon revised plans for the utility conduits on Block C at units C 24 though C 28.   The Receiving Ticket indicates that the work had been ordered by Jim Canning and Ivan Carlsen on January 3, 2000, and the ticket was signed by Ivan Carlsen, in accordance with the procedures set forth in Lorraine Beckwith's letter of August 19, 1999.  (Ex. 555 & Ex. 662).  Ivan Carlsen testified that he was authorized to sign this ticket to verify the additional work. (Carlsen Testimony 9/22/05 at 15-18; Ex. 550).   Because Mr. Carlsen had the actual or apparent authority to approve this extra work, the Court finds that Neri is entitled to recover on this extra work claim.

j.    <u>NC- 22-207-1-C (Ex. 556)</u> – Likewise, this receiving ticket for the excavation of unsuitables in Block C was signed by Ivan Carlsen, who testified that he was authorized to approve this extra work. (Carlsen Testimony 9/22/05 at 18-20).  The Court finds that Neri may recover on this extra work claim in the amount of $5,791.00.

k.    <u>NC-052-207 (Ex. 561)</u> - In accordance with the procedures set up by Elm Haven, Neri presented this job invoice for excavation of unsuitables and refilling in Block B to Ivan Carlsen for his signature.  He would not sign it and, thus, Neri had to have this resolved by LEA.  (Carlsen Testimony 9/22/05 at 20-23).  LEA took

measurements of the trenches and reviewed the quantities with Vincent Neri.  (Ex.
561).  LEA determined that the amount of unsuitables to be 208 cubic yards,
slightly less than Neri's measurement, out of a total volume of 376 cubic yards.
(Ex. 561).  Neri has failed to carry its burden of proving that the unsuitables that
are the subject of this extra work claim of $6,760.00[31] were removed from outside
the cut lines of the Project.  Accordingly the Court will disallow this claim.

l.    NC-065-207-4 (Ex. 575) - This extra work claim relates to the removal of
unsuitables from Canal Street and New Street 1.  Neri takes the position that it
was entitled to compensation for this work as an extra because only excavation of
unsuitables in designated areas under foundations was within their scope of work.
(V. Neri Testimony 6/14/05 at 126).  As discussed above, the Court disagrees and
will therefore disallow this extra work claim in the amount of $7,963.00.

m.    NC-207-126 (Ex. 587) - The last extra work claim relating to the excavation of
unsuitables is for $5,134.00.  This involved the removal and disposal of
unsuitables stock-piled on the east side of Canal Street.  According to Vincent
Neri's work notes, Ivan Carlsen inspected the materials and photographed them.
(V. Neri Testimony 6/15/05 at 22).  However, he did not sign the ticket
authorizing this extra charge, and Neri has not shown that these unsuitables were
excavated from outside the cut lines of the Project.  Therefore, the Court will
disallow this extra work claim.

---

[31]  Exhibit 660 shows a figure of $8,259.65 for this extra work claim. The Court has used
the lower figure set forth in Neri's Proposed Findings of Fact and Conclusions of Law.

### 3.  Changes in Grade

278.    The third category of extra work claims concerns those necessitated by changes in grade. These extra work claims are: NC–010-204 (Ex. 593), NC-204-78 (Ex. 610), and NC-204-87 (Ex. 611).

279.    <u>NC-010-204 (Ex. 593)</u> - This extra work claim dated March 30, 1999, for $5,247.00, is for Neri's backfilling foundations with screened materials on Block F, which was necessitated after the demolition subcontractor left certain areas below the elevations shown on the Subcontract Drawings.  When Neri began working on Block F, they determined that certain areas around units F1-F4 and F27-F28 were subgrade.  It was necessary for them to bring in additional screened backfill to bring these areas up to grade so that they could build the foundations.  Elm Haven was aware that they were performing this work.  Neri has documented the man hours and equipment hours required to perform this work (Ex. 593), and Vincent Neri testified that Lorraine Beckwith approved the rates.  (V. Neri Testimony 6/14/05 at 26).

280.    Elm Haven argues that this work was within Neri's original scope of work.  Neri was obligated to perform all rough grading to new grades established by the Subcontract Drawings.  If there was not enough approved soil material available, Elm Haven concedes that under the Subcontract Neri could obtain "borrow" material from off site.  (Ex. 3, Project Specifications § 02200, ¶ 1.4.C.).  However, Elm Haven argues, it was illogical for Neri to borrow soil materials from off site in this instance, just twenty-five days after the Subcontract was signed, since Neri had not yet begun excavations and could not know the amount of fill that would be available.   Moreover, Exhibit 593 does not indicate that

this work was ever approved by Elm Haven.

281. The Court finds that Neri was entitled to assume that the elevations shown on the Subcontract Drawings were correct and to the extent that it was necessary for Neri to perform additional work to bring certain areas up to grade, Neri should be compensated. Accordingly, the Court will allow this extra work claim in the amount of $5,247.00.

282. <u>NC-204-78 (Ex. 610)</u> - Vincent Neri testified that grade changes were made to a number of blocks in the Project to comply with certain building codes. This particular extra work claim pertains to the northeast corner of Block G-1 and involved extra fill required to increase the grade around certain buildings. Elm Haven had agreed to a lump sum price of $15.00/cubic yard for the extra fill needed to accomplish these grade changes. Mark Rossetti wrote John Ford on July 17, 2000, advising him that 347.5 cubic yards of fill material were required. Neri performed this work but was never compensated. (V. Neri Testimony 6/15/05 at 81-83).

283. Elm Haven concedes that there were revisions to the grading in Block G-1, but maintains that these were minor contour changes to redirect the runoff away from the duplex units along New Street 4, which should not have required additional fill. (Ford Testimony 10/5/05 at 123-24; Ex. 459). Thus, on August 3, 2000, Mr. Ford responded to Mr. Rossetti's letter denying the extra work claim.

284. The Court finds credible the testimony of Vincent Neri that this extra fill material was necessary and was actually used to achieve the grade changes set forth on the amended drawings. Therefore, the Court will allow this extra work claim in the amount of $5,213.00.

285. <u>NC-024-87 (Ex. 611)</u> - This extra work claim also relates to additional fill that Neri maintains was required to accomplish grade changes set forth in three revisions to the grading plans for Block F.  The total amount requested is $2,445.00.

286. Elm Haven again concedes that Drawing G-5, which describes the Block F grading plan , was revised on April 27, 2000, "to add yard drains and revise grading" (Ex. 460), but maintains that the revisions did not result in the need for additional fill.  In fact, in this instance, it sent an RFI to the Architect Fletcher Thompson, which responded that additional fill was not necessary.  (Ex. 460).

287. Vincent Neri testified that additional fill was required and actually used on Block F.  The Court will allow the extra work claim in the amount of $2,445.00.

4.  Granite Curbing

288. Neri has submitted three extra work claims relating to the installation of granite curbing on Phase IC, Project 207.   These are NC-039-207-2-B (Ex. 557); NC-074-207-2-B (Ex. 583); and NC-076-207-3-C (Ex. 584).

289. <u>NC-039-207-2-B (Ex. 557)</u> - This extra work claim is for additional time and material required for the installation of granite curbing in Block B in March of 2000.  According to Vincent Neri, Neri had not been able to install this granite curbing at the time it was finishing the acceleration work on Block B because a telephone pole had not been relocated.  After the pole was relocated, they had to revisit this area and reinstall the granite curbing, which required hand excavation and additional work.  Either Ivan Carlsen or Dave Lucier had told Neri during the acceleration period that they could "submit a ticket" for this work.  They did but were never paid.  (V. Neri Testimony

133

6/14/05 at 188-90).

290.   Elm Haven argues that Neri was contractually obligated to install all granite curbing and this should have been part of its original scope of work.  Neri was also obligated to coordinate its work with other contractors, subcontractors, and suppliers.

291.   Elm Haven had the "right to decide the time, order, and priority in which the various portions of the Work shall be performed."  (Subcontract, Art. 3.4).  Elm Haven was responsible for the timely relocation of the telephone poles.   Its failure to accomplish this prior to the acceleration of the work in Block B necessitated this extra work by Neri. Therefore, the Court will allow the extra work claim.  However, as pointed out by Elm Haven, it does appear that Neri has overcharged for labor by 24.0 hours.  The receiving ticket indicates that there were three laborers on the job for 12.0 hours each.  Yet, the driver and all equipment were only on the job for 4.0 hours, and the back-up documentation lists four individuals on the job from 9:30 a.m. to 2:00 p.m.  There is no documentation to support the claimed 12.0 hours for each laborer.  Logically, it would seem that each of the three laborers was on the job for 4.0 hours each, for a total of 12.0 hours, as opposed to a total of 36.0 hours. Thus, the Court will reduce this extra work claim by 24.0 hours or $940.00, plus ten percent (10%) for overhead and 1.7% for bond premium, for a total reduction of $1,072.00.  The Court will allow Neri to recover $1,047.00 on this extra work claim.

292.   NC-074-207-2-B (Ex. 583) – This extra work claim is for time and material necessary to repair curbs and sidewalks in Block B damaged by others after Neri had completed its work in Block B.   Vincent Neri testified that this repair was part of a "punch list"

134

prepared by Elm Haven or the City, and that the work was performed in April of 2000, long after Neri had finished all of its work in Block B. (V. Neri Testimony 6/14/05 at 192). Elm Haven maintains that Neri was required by the Subcontract to provide facilities to protect its work. Moreover, it argues that this receiving ticket is not specific as to where the work was performed.

293.    While Neri had a contractual duty to protect its work, Block B had been completed in December 1999 and a Certificate of Occupancy had issued. The Court finds that Neri was not responsible for the damage to the sidewalk and curb and was entitled to be compensated for this repair work. However, as above, it appears that Neri has overcharged for the two laborers. The Court will reduce the labor charge by 12.0 hours or $480.00, which also reduces the "O.H. & P."[32] of ten percent (10%) by $48.00 and the bond premium of 1.7% by $8.16. Thus, the allowed extra work claim should be reduced from $2,373.56 to $1,837.00.

294.    <u>NC-076-207-3-C (Ex. 584)</u> - This extra work claim is from May 18, 2000 for Neri's installation of granite curbing on Canal Street, where there had been a previous conflict with an AT&T vault; the installation of granite curbing at the corner of Canal and Webster where there had been a conflict with an old foundation; and the removal and installation of granite curbing on Ashmun Street in Block C, which had been damaged by an SNET truck. The total amount of this claim is $2,540.00 for time and materials.

295.    Again, Elm Haven objects to this claim on the ground that Neri was required to protect

---

[32] "O.H. & P." stands for "overhead and profit," and was charged at the rate of 10.0%. (V. Neri Testimony 6/14/05 at 26; Subcontract Art. 2.6).

135

its work.  It also points out that the labor costs are incorrect.

296.  Vincent Neri testified that Neri had already completed its work on Block C at the time of these repairs and that John Ford had directed Neri to perform this work.  (V. Neri Testimony 6/14/05 at 197-99).  Elm Haven has not refuted this statement.

297.  The Court will allow this extra work claim, but agrees with Elm Haven that the hours have been overstated.  The hand-written field notes indicate that the two laborers were there for 8.0 hours each, not 16.0 hours each as reflected on the receiving ticket.  Thus, the Court will reduce the extra work claim by $715.00, which includes the mark-up for overhead and bond premium, and will allow $1,825.00.

### 5.  Remaining Extra Work Claims on Phase IB - Project 204

298.  The remaining ten extra work claims submitted by Neri on Project 204, Phase IB, do not fall into any particular category or order.

299.  <u>NC-015 (Ex. 595)</u> - This is an extra work claim for $1,031.00, for core drilling of existing brick sanitary laterals in June of 2000.  This work was specifically authorized by Lorraine Beckwith.  Ivan Carlsen signed the Job Invoice and specifically signed off on the rates, which were higher than authorized by Ms. Beckwith because the sewer walls were of double thickness.  Neri applied a factor of 1.5 to her price for single- wall core drilling, which Mr. Carlsen approved.  (V. Neri Testimony 6/15/05 at 36-39).  Elm Haven has agreed to pay $640.00, which has already been figured into the adjusted Subcontract Price.  The Court will allow this extra work claim for the difference, or $391.00.

300.  <u>NC-16-204-G (Ex. 597)</u> - This extra work claim pertains to the installation of sanitary chimneys/risers at existing laterals on Foote Street for Units 17-22 in Block G. This work

was authorized by Lorraine Beckwith in a memorandum dated March 31, 1999, which set forth unit prices for this work. Ivan Carlsen signed the field ticket verifying that the work was performed. Elm Haven has objected to the amount of this claim on the ground that Neri is charging per linear foot rather than per chimney, as authorized by Ms. Beckwith. Elm Haven seeks to limit the claim to two chimneys or $337.00. While the invoice and receiving ticket do list quantities in linear feet, the field notes indicate that Neri installed sanitary chimneys for sanitary laterals to "units G11-16 and G 17-22 (2 each)." Thus, it appears that four chimneys were installed. Applying the prices set forth in Ms. Beckwith's letter of $153.00 per chimney, the Court finds that Neri is entitled to receive $612.00, plus an additional $108.00 for taxes, overhead, and bond premium, for a total of $720.00. Elm Haven has already agreed to pay $337.00. Thus, the total due and owing to Neri on this claim is $383.00.

301. <u>NC-017-204-1 (Ex. 598)</u> - This extra work claim in the amount of $21,833.00 is for the excavation and installation of rigid insulation around the foundation of certain units. Fourteen job invoices are attached to the receiving ticket. None are signed by Elm Haven. The Subcontract Drawings call for two-inch thick panels of "bead boards" beneath slabs-on-grade and at foundations. Neri maintains that this was work that should have been performed by Santos Foundation. Vincent Neri testified that Santos either did not have the manpower or materials present to install the rigid insulation, which prevented Neri from progressing with the grading work. He arranged with Ivan Carlsen that Neri would perform this work and submit a ticket for it, if Santos was not able to perform the work. (V. Neri Testimony 6/14/05 at 26-30). Elm Haven concedes this

Santos was responsible for the installation of the insulation, but argues that Neri failed to properly grade the building slab-on-grade areas and added an excess of backfill to these areas, which precluded Santos from laying the rigid insulation and pouring the slabs-on-grade. Had Neri properly graded these areas, Elm Haven asserts, Neri would not have been required to return to the area to re-excavate for the installation of the rigid insulation. (Elm Haven's Proposed Concl. of Law at 140 ¶ 38). Elm Haven, however, sites no testimony or other evidence in support of this argument. Since Neri performed work that was assigned to another subcontractor, it should be compensated for this work. The Court will allow this extra work claim in the amount of $21,833.00.

302. <u>NC-023-204-1 (Ex. 602)</u> - This extra work claim, in the amount of $19,860.00, is for the installation of stone and filter fabric at the sewer main at New Streets 2, 3, and 4. Elm Haven agrees that it authorized this work by construction change directive dated April 29, 1999 (Ex. 602), and it also does not challenge the fact that the work was performed. The only issue is the unit price being charged by Neri of $24.00 per linear foot. The change directive stated that the unit price would be negotiated with all parties. Neri responded that same day with a unit price of $24.00 per linear foot. (Ex. 602). Neri performed this work on May 5 and 18, 1999, at which time the parties had not reached an agreement as to the unit price. On May 28, 1999, Lorraine Beckwith sent Mr. Simoncini a memo stating that LEA had recommended a price of $20.00 per cubic foot. She requested that he contact her to discuss this so they could move forward with approvals. (Ex. 464). Approximately one month later, Neri advised her that they did not agree with this price. (Ex. 448). However, a final price was never agreed upon. (Ex. 469). John Ford

testified that an appropriate price for the stone would be $20.00 per cubic foot and $1.00 per square yard for the filter fabric. Applying those figures to Neri's claim, Neri would be entitled to compensation for $3,282.75, plus appropriate mark-ups. (Ex. 481). Vincent Neri testified that they had a lot of discussions with LEA and Ivan Carlsen over this work and that Neri was specifically instructed to submit a lineal foot price, as opposed to cubic or square yards. (V. Neri Testimony 6/14/05 at 43). He testified that normally fabric is priced by the square yard and stone by the cubic foot. (Id.). The Court finds that there was never a meeting of the minds as to the unit price at which Neri was to be compensated for this extra work and that Neri performed this work at its peril without an agreement having been reached. Therefore, the Court will allow the claim but at the figure proposed by Elm Haven. Thus, the total amount of the claim is $3,282.75, plus a mark-up of six percent (6%) for taxes, ten percent (10%0 for profit and overhead, and 1.7% for a bond premium, or $581.05, for a total of $3,864.00. Elm Haven has already included $3,611.00 in its figures for an adjusted Subcontract Price. Thus, the Court will allow Neri to recover $253.00 on this extra work claim.

303. NC-045-204-1 (Ex. 605) - Neri seeks compensation for $1,533.64 in extra costs associated with having to purchase materials in smaller quantities because of work performed out of sequence on Blocks E, F, and G. The receiving ticket states "price adjustment (lump sum)" $1,300.00 and indicates that it was approved by Jim Canning. Mr. Canning has denied having any knowledge of this. (Canning Testimony 9/23/05 at 3-4). There is nothing attached to the receiving ticket documenting what materials were purchased, and Vincent Neri was very unclear about this. He testified that it might relate

to "water services or something like that." (V. Neri Testimony 6/15/05 at 56). Storage

was an issue on the job site, and there was an issue about Neri's purchasing smaller

quantities. Mr. Neri testified that they worked out something with Jim Canning so that

Elm Haven would pay a portion of those additional costs. (Id. at 57). The Court finds

that Neri has failed to carry its burden of proving that these charges were a valid extra

charge and will disallow them.

304.    NC-075-204-1-E (Ex. 607) - The next extra work claim is for time and material involved

in the construction of chimney foundations at buildings E4, E6, and E13, on March 2nd to

9th, 2000, in the amount of $7,951.56. Four of the eight receiving tickets are signed by

Ivan Carlsen. (Ex. 607). Vincent Neri testified that their contract did not include the

construction of foundations. That was work performed by Santos Foundation. For some

reason Santos did not construct these particular foundations, so Mr. Carlsen asked Neri to

do it on a time and material basis. (V. Neri Testimony 6/15/05 at 70-71). Elm Haven

maintains that this work was covered by Change Orders issued to Neri, specifically

Change Order No. 204-21 in the amount of $1,446.28 dated May 30, 2000, covering

tickets from March 2nd and 5th, 2000, and Change Order No. 204-22, in the amount of

$1,279.00, dated June 30, 2000, covering tickets from March 4th [sic], 2000. (Ex. 254 &

255). The Court agrees with Elm Haven that Neri has already been compensated for

work performed on March 2nd, 4th, and 5th. Thus, the Court will deduct this amount

from the requested and allow Neri to recover only $5,226.00.

305.    NC-204-57 (Ex. 609) - This is an extra work claim in the amount of $1,893.00 for the

excavation of sewer laterals on New Street 4 and the testing for breakage. Vincent Neri

testified that these sewer laterals had already been installed and inspected by LEA.  When

Elm Haven requested that he perform this work, he informed them that he considered it

extra work since the laterals had already been inspected.  (V. Neri Testimony 6/15/05 at

76-77).  Elm Haven argues that the inspection of the sewer laterals was within Neri's

original scope of work.  The Subcontract specifically provided that Neri was to provide

for the inspection of its work at all times and that it was specifically obligated for the

testing of sanitary sewers.  (Subcontract, Art. 2.9, 6.1.3, & Attachment "A" ¶ 6.I.).  The

Court agrees with Elm Haven that this work was encompassed in Neri's scope of work

and was not an extra.  This extra work claim is denied.

306.  <u>NC-204-130 (Ex. 612)</u> - Neri's next claim is for "redo work" performed in late October

and early November 2000 at the main entrance to the Senior Building in Block G-2 due to

plan revisions.  This claim is for $23,232.00.  There is no question that several revisions

were issued by Blades & Govern because of the change in width and design grade of

Webster Street, which affected the driveway entrance aprons, the sidewalks, curbs, and

ramps, and the catch basin in front of the Senior Building in Block G-2.  Elm Haven,

however, takes the position that this revised work was included in Neri's original scope

of work, and the extra work was never authorized by Elm Haven.  Furthermore, Elm

Haven issued at least three Change Orders, Change Order Nos. 204-38, -39, and -40,

which addressed most of these changes.  (Ex. 272, 274, 275).

307.  Problems between Elm Haven and Neri were beginning to escalate at this time.  (<u>See</u> Ex.

612, Memo dtd. 11/6/00 from Ford to Bill MacMullen, BCJ, stating "EHC, as you are

well aware is having some Contract issues with NERI regarding the Changes on this

project, and we need to address these design issues promptly, and accurately."). Vincent Neri described the work covered by this proposed Change Order as the "Nightmare on Webster Street." (V. Neri Testimony 6/15/05 at 112). His field notes attached to the Change Order detail the problems that were encountered. On October 25th, additional revisions were required due to conflicts in the elevations between the Blades & Govern drawings, LEA's elevations, and elevations set by the City. There were also direct conflicts in the drawings regarding the driveway aprons. Neri sent an RFI to Elm Haven. Elm Haven responded with revised sketches to be used in conjunction with the drawings and indicated that someone from Blades & Govern would be on site to confirm the changes. (Id. at 113-15). Vincent Neri testified that Neri was trying to build this area according to the drawings but it could not be done based on the elevations and details that were provided to them. (Id. at 115). His field notes from October 26th again note the elevation conflicts. Field revisions were made by Blades & Govern and Tom Jensen with Elm Haven, which were to be reviewed with LEA and the City. (Id.). An October 26th facsimile transmittal from Earl Govern to John Ford and Tom Jensen enclosed a revised sketch as directed by the New Haven Department of Engineering, lowering the design grade of Webster Street by .10 feet, which was accomplished by reducing the pitch from .55% to .50%. A 7" curb was to utilized and a 1/4" crosspitch on the sidewalk. (Ex. 612). Govern asked that the revised sketch be distributed to staff and contractor. (Id.). On October 27th, John Ford sent Neri sketch revisions for the Senior Building turnaround and told Neri to proceed immediately with the enclosed revised work. (Ex. 612). Neri attempted to perform the work as revised but additional field revisions were necessary.

142

(V. Neri Testimony 6/15/05 at 116-17).   Field notes from October 31st indicate that Neri

had to remove sidewalk forms installed prior to redesign and reform and regrade due to

elevation changes.   Work continued on November 1st and 2nd.   Field notes from

November 3rd again note work that had to be removed and redone because of the

redesign of the handicap ramps and curbs.   (Ex. 612).    On November 6th, Neri informed

Elm Haven that Blades & Govern had instructed it to stop work on the driveway

turnaround, as it would be issuing another revision.   (Ex. 612).

308.    Vincent Neri testified that he advised Elm Haven that he considered this extra work.

What would have been two or three days' worth of work was stretched out to weeks.   He

said that Neri did not bid this work anticipating that there would be daily revisions which

required a whole crew to redo work that had already been done, resetting elevations,

regrading areas.   There were at least five revisions to this area.   (V. Neri Testimony

6/15/05 at 116-20).   Mr. Neri tracked the hours and material required to do this extra

work and calculated it to be $23,231.90.

309.    It had been Elm Haven's practice to issue Change Orders to Neri to cover work as a result

of revised contract drawings.   Change Order No. 204-38 (Ex. 272) covered revised

drawings from May 2000, some of which involved the reduction of roadway width of

Webster Street, including an increased width in the driveway aprons by two feet.   Change

Order No. 204-39 (Ex. 274) dated August 22, 2000, covered additional base material for

seven streets, including Webster Avenue from 0+03 to 10+90.   Change Order No. 204-40

(Ex. 275), dated September 11, 2000, covered the installation of concrete handicap ramps

in accordance with the new design details forwarded to Neri for the following locations,

one of which was Canal and Webster.  Neri received a cost differential of $795.00 per ramp.  None of these Change Orders, however, addressed the revisions that were made in October and November 2000.

310.    The Court finds that Neri was required to perform additional work, including the removal of work already performed, as a result of numerous revisions to the entrance area of the Senior Building after October 1, 2000.  None of the Change Orders cited by Elm Haven covered this work.  The Court finds that Neri has documented the time and materials necessary to perform this additional work in the ten job invoices that are part of this claim and in the field notes attached to the job invoices.  Accordingly, the Court will allow Neri to recover on this extra work claim in the amount of $23,232.00.

311.    NC-204-134 (Ex. 614) - This extra work claim in the amount of $5,340.00, and dated November 20, 2000, is for the hauling of excess fill from a stockpile at Canal and Lock Streets.  This "laydown area" was not part of this Project, but was holding materials generated from this Project.  (Ex. 461).  Neri asserts that Elm Haven authorized this extra work, which it paid Midway Trucking to perform.  Elm Haven insists that this was within Neri's original scope of work, since Neri was responsible for the clean-up and removal of all debris and material caused by its operations from the site and the legal disposal thereof.  (Attachment "A" ¶ 6.GG.).

312.    Vincent Neri testified that Elm Haven had never provided it with a staging area for work on the Project.  However, the City had provided Neri with this particular area as a staging area for its CSO work.  The City agreed that, if Neri cleaned up this area that had been used by a previous contractor on an earlier CSO job,  Neri could use this as a staging area

144

for its Subcontract work, which it did.  Mr. Neri does not recall why Elm Haven ordered them to move the materials from this area, but he did recall having been instructed to do so by Elm Haven.  (V. Neri Testimony 6/15/05 at 92-93).

313.    Elm Haven states that it was directed by the City to remove these materials from this area and, thus, it directed Neri to remove them.  (Ex. 461 & 462).  Neri initially failed to do so, after which John Ford issued another directive to Neri to remove the materials.

314.    The Court finds that this extra work claim is warranted in that Neri was required to clean-up and remove materials that had been placed there by a previous CSO contractor.  The Court will allow this extra work claim in the amount of $5,340.00.

315.    NC-028-204-G-1 (Ex. 603) - The last extra work claim on Phase IB, Project 204, is NC-028-204-G-1, which was originally in the amount of $103,319.00. Elm Haven has agreed to pay $44,599.00 on this claim.  Only the remaining $58,720.00 is at issue.  This claim involves the installation of underground electrical conduit at the Senior Building in Block G based upon revised electrical drawings, which work, Neri maintains, it was directed to perform on a time and material basis.  The parties devoted at least a half day of trial to this claim, which covers approximately twenty extra work tickets.

316.    According to John Ford, the EL drawings for Block G, depicting the electrical, cable television, and telephone wiring, were revised in late 1999.  Elm Haven and Neri did not have an opportunity to negotiate a lump-sum price for these revisions, and thus Elm Haven directed Neri to perform the work on a time and material basis.  (Ford Testimony 10/4/05 at 28-30).

317.    On January 11, 2000, Lorraine Beckwith wrote Carl Neri stating, "You are authorized to

145

proceed with the installation of the underground electric ductbank to service the Senior Building per the latest sketches by Elm Haven Construction on a Time and Material basis with the following stipulation. We reserve the right to review the entire scope of work as it relates to your contractual obligations and adjust accordingly." (Ex. 603).

318.   Ivan Carlsen observed Neri performing this work and signed daily tickets verifying that the work had been performed. On several occasions, he revised the time submitted. (Carlsen Testimony 9/22/05 at 55- 58).

319.   According to the attached receiving tickets, work was performed from January 5 to February 3, 2000. On February 15, 2000, Elm Haven forwarded to Neri revised electrical plans. On March 7, 2000, Ivan Carlsen issued instructions to Neri to proceed on a time and material basis in accordance with the revised drawings. The receiving tickets show that work was performed on March 2, and 14 through 16, 2000. On April 24, 2000, John Ford sent a fax to Vincent Neri stating "Pursuant to our conversations today, proceed with the completion of the conduit duct bank work on a T & M basis Block G. All tickets to be signed daily by EHC." Neri performed work on April 26 through April 29, 2000. (Ex. 603).

320.   According to John Ford, the original drawings called for conduit work in Block G. The revisions to the Block G drawings simply changed the lay-out for the conduits. (Ford Testimony 10/4/05 at 33, 42). Based upon an analysis he performed, the revisions increased the length of PVC conduit from 1,743 linear feet to 2,865 linear feet[33] and

---

[33] John Ford testified that this represented a 40% increase in the amount of conduit. (Ex. 479). This is incorrect. The amount of PVC conduit increased by 1,122 linear feet, which represents an increase of 64.37% over the original 1,743 linear feet (1,122/1,743).

added one transformer box.  Based on Neri's original schedule of values, Mr. Ford estimated that $19,417.00 of the original Subcontract Price was for the conduit work on Block G.  (Ex. 479 & 480, Ford Testimony 10/4/05 at 41-43).  Mr. Ford also reviewed the labor and equipment expenses submitted by Neri, noting that sometimes Neri had more equipment on the job than laborers.   He deducted from the amount that Neri was seeking time charged for equipment that was idle.  (Ford Testimony 10/4/05 at 55, 57).  Mr. Ford also testified that Neri was requesting payment for laborers at rates above the prevailing wages on the Project.  (Ford Testimony 10/4/05 at 55, 63, 73-74, 78-79).   Based on his analysis, Mr. Ford determined that $44,599.00  was fair and reasonable compensation for this extra work claim, which Elm Haven has agreed to pay.  (Ex. 478 & 479).

321.    Initially, the Court rejects Elm Haven's supposition that the $6,795.00 already paid to Neri for the Block G conduits covered all of Neri's material costs.  This amount barely covers the material costs incurred during the first week of work.   Additionally, the Court rejects Elm Haven's calculations to the extent that they do not compensate Neri for the 1.7% bond premium, which was charged throughout the course of this Project.  Mr. Ford also excluded all equipment charges if Ivan Carlsen indicated on the Receiving Ticket that the equipment was "on site," which Mr. Ford interpreted to mean that it was not being used.  There was no other evidence, including the testimony of Mr. Carlsen, to support his theory in this regard.  Often, when Mr. Carlsen indicated that equipment was on-site, his notations included every piece of equipment.  It is illogical to assume that none of the laborers, operators or foremen were using any of this equipment during the time they were on the job given the work that was being performed, as documented by

147

Vincent Neri's contemporaneous field notes.  (See, e.g., Receiving Ticket dated 1/12/00, which shows 1 foreman/superintendent, 1 operator, 1 foreman/operator, and 4 laborers on the job, but every piece of equipment is noted as "on site," yet the field notes show that excavation was performed on that date).  However, the Court does agree with Elm Haven that there are several excessive equipment charges included in this claim.  To the extent that equipment was sitting idle on the job or was charged for more hours than there were laborers or operators on the job,  Neri's claim should be reduced.  Additionally, there are several overcharges for labor.  Accordingly, the Court has reduced the amount of this claim by the following amounts:

a.      January 6, 2000 - The Court reduces the equipment costs by 25% to account for the fact that the laborers were only on the job for 6.0 hours, but the equipment was charged at 8.0 hours.   This reduces this Receiving Ticket by $417.00.

b.      January 10, 2000 - The Court has reduced all of the equipment costs by 3.0 hours for a total reduction of $214.00.

c.      January 13, 2000 - The Court has reduced all of the equipment costs by 2.5 hours for a total reduction of $602.00.

d.      January 19, 2000 - The Court has reduced all equipment charged for 9.5 hours by 1.5 hours, for a total reduction of $320.00.

e.      April 26, 2000 - Neri has overcharged for 30 hours of labor at $35.50/hour for a reduction of $1,189.00, including mark-ups for overhead and bond premium.

f.      April 28, 2000 - Ivan Carlsen did not approve of the time for the driver, which results in a reduction of $126.00, including mark-ups for overhead and bond

premium.

g.    April 29, 2000 - Neri has overcharged for Operators by 4.0 hours, resulting in a reduction of $222.00.

Additionally, the amount of this claim should be reduced by $6,795.00 which Elm Haven has already paid Neri, and which Neri does not dispute. The total reductions are $9,885.00. Subtracting that from the total amount of this claim that is disputed by Elm Haven, $58,720.00, results in a balance due to Neri of $48,835.00.

        6.  Remaining Extra Work Claims on Phase IC - Project 207

322.    There are eight remaining extra work claims on Project 207, Phase IC.

323.    NC-051-207 (Ex. 560) - This extra work claim in the amount of $4,778.00 is for the air pressure testing of the water service laterals in Blocks B and C to allow for backfilling in November 1999. Ivan Carlsen signed the Job Invoice, verifying time only. Neri maintains that it is entitled to extra compensation for this work because Elm Haven required it to perform this testing prior to the installation of the water taps, which was different than that originally contemplated by the Subcontract, in order to accelerate the work on Blocks B and C. Vincent Neri explained that normally the water taps would be installed, and Neri would tie the water lines into the taps, turn the water on, test for leaks, and then backfill. However, in this instance, because the taps were not installed, Neri had to perform the testing in a different manner so that the backfilling could be expedited. Neri seeks $450.00 for each of the nine water laterals tested.

324.    Elm Haven claims that the testing of the water laterals was part of Neri's original scope of work and rejected this claim on this basis. (Ex. 449).

149

325.  The Subcontract provides that Neri shall install all on-site water lines, including

trenching, backfilling, coordinating with the City water department, testing, and

inspecting.  (Attachment "A " 6.L.).  There is nothing that specifies the manner in which

the testing is to be performed, or the timing of the testing.  The Court finds that Neri has

not carried its burden of proving that this work was outside the scope of its original

Subcontract Work and denies this extra work claim.

326.  NC-063-207 (Ex. 570) - This extra work claim is in the amount of $2,020.00 for

excavation and installation of a precast concrete foundation on Block K1.  Ivan Carlsen

signed the receiving ticket for this work.   According to Vincent Neri, Jim Canning, Ivan

Carlsen, and Dave Lucier had authorized this extra work.  (V. Neri Testimony 6/14/05 at

112).  Mr. Neri testified that Dave Lucier had ordered the concrete transformer pad from

United Concrete Products but had charged it to Neri's account because Elm Haven did

not have an account with United.  (Id. at 113).

327.  Elm Haven, however, states that it reimbursed Neri for the concrete transformer pad (Ex.

455, enclosing a check dated January 19, 2001, and Invoice No. 067415 from United

Concrete for $920.00), and it issued a Change Order covering the costs to backfill around

the transformer pad.  (Ex. 330, Change Order No. 207-39, including "backfill @ precast

vault as required by U.I. . . per your ticket dated 12/06/99, referred to as NC-063-207).

The amount of this Change Order was $181.96.

328.  The Court finds that Neri was in fact reimbursed for the transformer pad and will deduct

$920.00, plus the additional 17.7% or $163.00, from this extra work claim.  Additionally,

the Court will deduct $182.00, which was covered by Change Order No. 207-39.  The

Court finds, however, that this reimbursement and Change Order do not cover all of

Neri's labor and material costs, which were required as part of this extra work claim.

Therefore the Court will allow Neri to recover the balance of this claim or $755.00.

329.  <u>NC-064-207 (Ex. 572)</u> - This extra work claim encompasses two Receiving Tickets for

additional work performed based on design changes to Ashmun Street due to changes in

the road width from the original plans. The first is dated December 13, 1999, in the

amount of $885.00 for additional work to cut bituminous paving at Ashmun Street from

New Street 2 to Webster Street.  The second is for $684.00 for the installation of granite

curbing.  The total amount of this claim is $1,569.00.  Vincent Neri testified that, during

the acceleration period, Elm Haven decided to adjust the curb lines for Ashmun Street in

the vicinity of Blocks B and C to avoid having to cut down trees.  DTC made field

adjustments to move the curb lines, and Neri performed the work at the direction of Ivan

Carlsen in accordance with these adjustments.  Neri's claim is for the extra work

associated with those adjustments.  (V. Neri Testimony 6/14/05 at 117).  Lorraine

Beckwith rejected this claim on May 26, 2000, as within Neri's original scope of work.

(Ex. 456).   The Court finds that Neri's extra work, which is documented on the

Receiving Tickets, was necessitated by revisions made subsequent to the Subcontract

being signed.  The Court will allow this claim in the amount of $1,569.00.

330.  <u>NC-076-207-6-B (Ex. 585)</u> - Through this extra work claim, Neri seeks $6,710.00 for

revisions made to the parking lot entrance and apron at Block C.  Neri maintains that Elm

Haven directed it to perform this additional work.  Elm Haven asserts that this work was

already covered by Change Order No. 207-28, which included the driveway apron at the

parking area drive for Block C.  (Ex. 320).   Moreover, even if the Court were to allow this as an extra work claim, Elm Haven correctly points out that Neri has overcharged for labor by a factor of four, thus reducing the labor cost, before any mark-up, from $4,160.00 to $1,040.00.   The Court agrees with Elm Haven that this work was covered by Change Order No. 207-28 and will disallow it.

331.    <u>NC-207-115 (Ex. 586)</u> - This extra work claim for $1,684.00 is for the removal of metal posts, stumps, and brush at Webster Street and Canal Street.  Neri argues that this work was performed pursuant to a field directive from Ivan Carlsen, who agreed to compensate Neri on a time and material basis, and who signed the "Rapid Memo" and Job Invoice, verifying that the work had been performed.   Elm Haven asserts that the clearing and grubbing of trees within the limits of the Project was part of Neri's original scope of work.  Moreover, Ivan Carlsen did not have the authority to approve requests for Change Orders, only to verify time and material.

332.    The Rapid Memo from Elm Haven to Neri dated May 23, 2000, states "Per John Ford, Procede [sic] on T/M.  Remove Post Fencing,  Stumps, Const. Debris at Webster St. 75$\pm$ LF.  All T/M Tickets to be sign [sic] by Superint. by end of Working Day."  (Ex. 586). The memo was signed by Ivan Carlsen, and in accordance with these instructions, the Job Invoice was also signed by him.  The Court finds that Neri is entitled to recover on this extra work claim in the amount of $1,684.00.

333.    <u>NC-207-129 (Ex. 588)</u> - Extra Work Claim NC-207-129 is for the installation of an anti-tracking pad at the staging/lay down area off of Ashmun Street on Block K1.  Neri seeks to recover $1,263.00 on this claim.  Elm Haven contends that this was part of Neri's

original scope of work, since Neri was using this area to store trucks and equipment and the anti-tracking pads were a necessary erosion and sedimentation control measure specifically listed in the Subcontract Drawings. Neri, however, argues that it should be compensated for this pad installed in Block K1, since Block K1 was part of its alternate pricing that Elm Haven did not accept, and this pad would be used by other trades doing work in Block K1. Moreover, the installation of this pad was ordered by John Woods, John Ford's boss. (V. Neri Testimony 6/15/05 at 26-28). The Court finds that Neri is not entitled to recover on this extra work claim. The Court has previously found, and indeed Neri concedes, that the installation of anti-tracking pads was withing Neri's scope of work. (See Concl. of Law ¶ 221). The only thing different about this particular pad was that it was installed in a block that was not part of Neri's Subcontract Work. Nevertheless, it appears that Neri used this as a staging area and kept its equipment and materials there. Without the pad, the movement of the equipment and materials would have likely required the streets to be cleaned, which was also within Neri's scope of work. (See Ford Testimony 6/8/05 at 183-84). Accordingly, the Court will disallow this claim.

334. <u>NC-207-138 (Ex. 590)</u> - The next extra work claim is for $1,061.00 for repairing a handicap ramp at Canal Street and New Street 2 on May 2,2000. Neri states that this work was necessitated by an on-site field revision from Earl Govern, for which Elm Haven agreed to compensate Neri. Vincent Neri testified that Ivan Carlsen, John Ford, and Mark Budnick from LEA were on site that day and were aware that this extra work was performed due to the revisions from Blades & Govern. Elm Haven argues that this

153

work was covered by Change Order No. 207-24, dated April 20, 2000, which covered

"the replacement of HC ramps at . . . New Street 2/Canal Street in accordance with

Blades & Govern design revisions dated 4/19/00." (Ex. 316).   Furthermore, Elm Haven

points out that, although Vincent Neri testified that the extra claim was for four hours of

work, Neri has billed for two laborers for eight hours each.   The Court finds that Change

Order No. 207-24 did not cover these additional revisions which were made by Blades &

Govern in the field several weeks after this Change Order was issued.  However, the

Court does agree with Elm Haven that there is a mathematical error on Neri's Receiving

Ticket in the amount of $320.00, plus overhead and bond premium, for a total reduction

of $357.44.  The Court will allow this extra work claim for $703.00.

335.   NC-207-146 (Ex. 592) - The last extra work claim on Project 207 is NC-207-146 in the

amount of $2,565.00 for adjusting three manholes at Ashmun Street and New Street 1

based on the City's requirements to make them flush with the existing pavement so as not

to create a hazard for vehicular traffic.  Vincent Neri testified that Neri was directed to

make this adjustment until the permanent paving could be accomplished.  (V. Neri

Testimony 6/15/05 at 32-33).   This was at a time when Block B had been completed and

people who were moving into the Block B units were utilizing the unfinished streets.  (Id.

at 33).   Elm Haven objects to this claim on the ground that adjustments of structures,

such as manhole covers, was part of Neri's scope of work.   Moreover, the Subcontract

explicitly provided that the top course of paving would not be installed until the end of

the Project, or as determined by Elm Haven.  (Attachment "A" ¶ 6.Q.).  Thus, Neri was

on notice that these adjustments would have to be made.   Elm Haven further points out

154

that the Receiving Ticket is not signed by any representative of Elm Haven, and that the

"attached Exclusion" is missing, as well as field notes or other supporting documentation.

The Court has previously found that Neri had been directed to perform temporary paving

as part of the Block B acceleration, which apparently resulted in problems with the

elevation of the manhole covers.  The Court will allow this claim in the amount of

$2,565.00.

7.  Summary of Neri's Extra Work Claims

336.    The following is a summary of the Court's Conclusions of Law as to each of Neri's Extra

Work Claims.  The amounts are in addition to those previously conceded by Elm Haven

as due on these claims and included in the Adjusted Subcontract Price, set forth above.

Project 204 - Phase IB

|       |                        |            |
|-------|------------------------|------------|
| i.    | NC-010-204 (Ex. 593)   | $ 5,247.00 |
| ii.   | NC-013-204-1 (Ex. 594) | $     -0-  |
| iii.  | NC-015 (Ex. 595)       | $   391.00 |
| iv.   | NC-16-204-G  (Ex. 597) | $   383.00 |
| v.    | NC-017-204-1 (Ex. 598) | $21,833.00 |
| vi.   | NC-019-204-1 (Ex. 599) | $     -0-  |
| vii.  | NC-019-204-1-G (Ex. 600) | $     -0- |
| viii. | NC-019-204-2-G (Ex. 601) | $     -0- |
| ix.   | NC-023-204-1 (Ex. 602) | $   253.00 |
| x.    | NC-045-204-1 (Ex. 605) | $     -0-  |
| xi.   | NC-075-204-1 (Ex. 607) | $ 5,226.00 |

| | | |
|---|---|---|
| xii. | NC-204-56 (Ex. 608) | $      -0- |
| xiii. | NC-204-57 (Ex. 609) | $      -0- |
| xiv. | NC-204-78 (Ex. 610) | $ 5,213.00 |
| xv. | NC-204-87 (Ex. 611) | $ 2,445.00 |
| xvi. | NC-204-130 (Ex. 612) | $23,232.00 |
| xvii. | NC-204-131 (Ex. 613) | $19,156.00 |
| xviii. | NC-204-134 (Ex. 614) | $ 5,340.00 |
| xix. | NC-204-135 (Ex. 615) | $25,025.00 |
| xx. | NC-204-139 (Ex. 616) | $26,145.00 |
| xxi. | NC-028-204-1-G  (Ex. 603) | $48,835.00 |

Total Extra Work Claims on Project 204:     $188,724.00

Project 207 - Phase IC[34]

| | | |
|---|---|---|
| i. | NC-022-207-1 (Ex. 555) | $ 4,915.00 |
| ii. | NC-022-207-1-C (Ex. 556) | $ 5,791.00 |
| iii. | NC-039-207-2-B (Ex. 557) | $ 1,047.00 |
| iv. | NC-051-207 (Ex. 560) | $      -0- |
| v. | NC-052-207 (Ex. 561) | $      -0- |
| vi. | NC-056-207-1 (Ex. 563) | $15,883.00 |
| vii. | NC-056-207-4 (Ex. 564) | $ 4,955.00 |
| viii. | NC-058-207-1 (Ex. 565) | $ 4,240.00 |

[34] As noted above, neither Neri nor Elm Haven addressed eight of the extra work claims set forth on Neri's summary exhibit, Exhibit 660. The Court has assumed that these claims have been abandoned and are not addressed in this ruling. See Note 17, supra.

ix.     NC-059-207-1 (Ex. 566)                     $ 5,590.00

x.      NC-060-207-1 (Ex. 567)                     $ 2,670.00

xi.     NC-061-207-1 (Ex. 568)                     $ 4,235.00

xii.    NC-062-207-1 (Ex. 569)                     $60,166.00

xiii.   NC-063-207 (Ex. 570)                       $   755.00

xiv.    NC-064-207 (Ex. 572)                       $ 1,569.00

xv.     NC-065-207-2 (Ex. 574)                     $ 7,230.00

xvi.    NC-065-207-4 (Ex. 575)                     $      -0-

xvii.   NC-067-207-1 (Ex. 576)                     $ 5,014.00

xviii.  NC-067-207-2 (Ex. 577)                     $      -0-

xiv.    NC-068-207-1 (Ex. 578)                     $ 9,379.00

xv.     NC-069-207-1 (Ex. 580)                     $11,200.00

xvi.    NC-070-207 (Ex. 581)                       $23,619.00

xvii.   NC-070-207-1 (Ex. 582)                     $ 2,311.00

xviii.  NC-074-207-2-B (Ex. 583)                   $ 1,837.00

xix.    NC-076-207-3-C (Ex. 584)                   $ 1,825.00

xx.     NC-076-207-6-B (Ex. 585)                   $      -0-

xxi.    NC-207-115 (Ex. 586)                       $ 1,684.00

xxii.   NC-207-126 (Ex. 587)                       $      -0-

xxiii.  NC-207-129 (Ex. 588)                       $      -0-

xxiv.   NC-207-138 (Ex. 590)                       $   703.00

xxv.    NC-207-146 (Ex. 592)                       $ 2,565.00

|  | Total Extra Work Claims on Project 207: | $179,183.00 |

Neri's Total Extra Work Claims

| | Project 204 | $188,724.00 |
| | Project 207 | $179,183.00 |
| | | $367,907.00 |

337.    Thus, the Court finds that Neri is entitled to recover $367,907.00 on its Extra Work

Claims against Elm Haven.   Adding that to the total due Neri under the Subcontract,

$404,892.00, results in a total amount due to Neri of $772,799.00.

**H.    Prejudgment Interest**

338.    Additionally, the parties have both sought prejudgment interest in the amount of ten

percent (10%) per annum.  Neri seeks prejudgment interest from July 11, 2001, whereas

Elm Haven seeks prejudgment interest from January 1, 2002.

339.    Connecticut General Statutes § 37-3a provides that prejudgment interest at the rate of ten

percent (10%) may be awarded in civil actions as an element of damages for the wrongful

detention of money after it becomes payable.

340.    The allowance of prejudgment interest is a matter committed to the sound discretion of

the trial court.  See Metcalfe v. Talarski, 213 Conn. 145, 160 (1989); Patron v. Konover,

35 Conn. App. 504, 517 (1994); see also Atlas v. Miller, 20 Conn. App. 680, 684-85

(1990) (holding that the allowance of prejudgment interest is primarily an equitable

determination within the discretion of the trial court).    "Where the claim rests on a

breach of contract, statutory interest accrues from the date the contract was breached."

Patron, 35 Conn. App. at 517; West Haven Sound Development Corp. v West Haven,

207 Conn. 308, 322-23 (1988).

341.    "If opposing parties both seek interest under General Statutes § 37-3a on related

contractual claims, those claims and interest cannot be set off against each other before

interest is calculated unless the court finds that interest should be awarded at the same

rate and commencing from the same date for both claims." Ceci Brothers, Inc. v. Five

Twenty-One Corp., 81 Conn. App. 419, 429 n.8 (2004).

342.    In this case, the parties' claims against each other clearly arise out of the same facts and

circumstances.  The breaches of contract occurred over a period of close to two years.

Neither party, however, has asked the Court to break down prejudgment interest on a per

claim basis, and the Court declines to do so.  Neri seeks prejudgment interest from July

11, 2001, the date this lawsuit was filed.  Elm Haven seeks prejudgment interest from

January 1, 2002, a date by which, according to Elm Haven, all costs would have been

incurred.  (Elm Haven's Proposed Concl. of Law at 236).   The last day that Neri had

manpower on the Project was May 9, 2001.   The last payment requisition approved by

Elm Haven dated back to October 2000.   Under the Subcontract, Article 4, once a

progress payment requisition was approved, Elm Haven was obligated to pay ninety

percent (90%) of the amount of the requisition, subject to certain exceptions.  Once the

Architect accepted the entire Work which constituted the Project, final payment was due

within sixty-five (65) days.  Thus, full payment was not due upon performance of the

work.

343.    Neither side has briefed the issue of when prejudgment interest should commence to run.

The Court has found that both sides breached the Subcontract at various times throughout

the course of Neri's work on the Project.  Elm Haven breached it by, inter alia, failing to

make payments to Neri when due.  As discussed above, Neri breached the Subcontract on numerous occasions by, inter alia, failing to complete certain work that was within the scope of its Subcontract.  There is no evidence of record as to when the Architect finally accepted the work on the entire Project, such that final payment would have been due Neri, had Neri completed its work under the Subcontract.

344.    The Court, in the exercise of its equitable discretion, finds that prejudgment interest should commence to run on both parties' claims on the same day, January 1, 2002, and that both parties are entitled to recover prejudgment interest at the rate of ten percent (10%) per annum.  Thus, the Court will offset the prejudgment interest Elm Haven was entitled to receive on the claims on which it prevailed against the prejudgment interest that Neri is entitled to receive on its successful claims.

345.    Based upon Neri's net recovery of $772,799.00, it is entitled to receive prejudgment interest at the rate of 10% per annum, which amounts to $211.7258 per day.  The interest from January 1, 2002, to November 16, 2007, which is 2,145 days, is $454,152.00.  Of course, Neri is entitled to prejudgment interest at this rate until the date judgment is entered.

**I.    Conclusion**

346.    Accordingly, for the reasons set forth above, the Court finds that Neri is entitled to recover from Elm Haven the amount of $772,799.00, plus prejudgment interest at the rate of ten percent (10%) per annum, or $211.7258 per day, from January 1, 2002 to the date Judgment is entered.

347.    Though not briefed by the parties, it appears that Third-Party Defendant, American

Casualty Company of Reading, Pennsylvania, the payment surety for Elm Haven on this Project, is liable to Neri for this same amount.

348.    Accordingly, Judgment should enter against Elm Haven on Neri's Counterclaim in the amount of $772,799.00, plus prejudgment interest. Likewise, Judgment should enter against American Casualty Company of Reading, Pennsylvania, in the amount of $772,799.00, plus prejudgment interest. Of course, Neri is not entitled to a double recovery.

349.    In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties in this case consented to have the Undersigned conduct any and all proceedings in this case, including the entry of a final Judgment. Therefore, this is not a recommended ruling.

350.    The Clerk is directed to enter Judgment accordingly.

SO ORDERED, this ___16th__ day of November, 2007, at Bridgeport, Connecticut.


  _/s/ *William I. Garfinkel*_____
  WILLIAM I. GARFINKEL
  United States Magistrate Judge

161



ELM HAVEN UNIT ADDRESS PLAN

ELM HAVEN HOPE VI URBAN REVITILIZATION HOUSING

FLETCHER THOMPSON
ARCHITECTURE / ENGINEERING / INTERIOR DESIGN

ADDENDUM "A"